ROBERT J. MAYNES, ISB No. 6905
*Attorney at Law*
P. O. Box 3005
Idaho Falls, ID 83405
Telephone: (208) 552-6442
Facsimile: (208) 522-1334
Email: mayneslaw@hotmail.com

*Debtor's counsel*

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF IDAHO

| | |
|---|---|
| In Re: | Case No. 10-40743 JDP |
| LEED CORPORATION (THE), | Chapter 11 |
| Debtor. | |

---

### FIRST AMENDED DISCLOSURE STATEMENT

---

COMES NOW The Leed Corporation, the Debtor and Debtor-in-possession herein, and hereby submits its First Amended Disclosure Statement ("Disclosure Statement") pursuant to 11 USC §1125.

### *INTRODUCTION*

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN OF REORGANIZATION.**

**PLEASE READ THIS DOCUMENT WITH CARE!**

This Disclosure Statement is provided by The Leed Corporation, the Debtor in the above entitled case, to creditors and all parties in interest in order to inform them of the terms of the proposed plan of reorganization (the "Plan"), filed by the proponent in this case under Chapter 11 of Title 11 of the United States Code, in the United States Bankruptcy Court for the District of

Idaho.  The purpose of this Disclosure Statement is to enable holders of claims as defined in the plan, to make an informed judgment about the Plan of Reorganization, and to permit such creditors and interest holders to make an informed judgment in exercising their right to vote on the Plan of Reorganization.  Section 1125 of the Bankruptcy Code requires that this Disclosure Statement be submitted to holders of claims against the Debtor.  This Disclosure Statement is to contain sufficient information about the Debtor to enable creditors and other interested parties to make an informed decision regarding the Plan of Reorganization.  Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement was presented to the Bankruptcy Court for approval.

> THE APPROVAL BY THE COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED THEREIN.

This Disclosure Statement is being furnished to all known creditors and claimants to inform them about the plan and their rights with respect thereto.  The only representations that are authorized by the Debtor concerning its finances and business operations, the value of the Debtor's assets (as provided by the estate's professionals consisting of a certified appraiser, licensed realtor and marketing expert), its reorganization prospects, or other matters are the representations contained in this Disclosure Statement.  Certain of the financial information contained in this Disclosure Statement has not been subjected to an audit by an independent Certified Public Accountant.  For that reason, the Debtor is not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy; however, great effort has been made to ensure that all such information is fairly represented.

In determining the acceptance of the Plan, votes will only be counted if submitted by the claimant whose claim is duly scheduled by the proponent as undisputed, non-contingent, and

liquidated, or who, prior to the hearing on confirmation has filed with the court a proof of claim which has not been disallowed or suspended prior to the computation of the vote on the plan. A class that is unimpaired is deemed to have accepted the plan if solicitation of acceptance is not required under 11 USC § 1126(f). The ballot received from you does not constitute a Proof of Claim. If you are in any way uncertain whether or not your claim has been correctly scheduled, you should check the debtor's schedules which are on file in the office of the Clerk of the United States Bankruptcy Court, U.S. Courthouse, Pocatello, Idaho. Due to the business of the Clerk of the Bankruptcy Court, it is believed that this information will not be given by telephone.

Pursuant to Bankruptcy Code 11 USC §1129(b), the plan may be confirmed even it is not accepted by one or all of the impaired classes, provided the Bankruptcy Court does not discriminate unfairly and the plan is *fair and equitable* to such class or classes.

Accompanying this Disclosure Statement are copies of the following documents:

APPENDIX A:        The Court's *Order Approving Disclosure Statement* pursuant to 11 USC §1125, and affixing the time for the filing of acceptances or rejections of the Plan of Reorganization and for a hearing on confirmation of the Plan of Reorganization;

APPENDIX B:        The First Amended Plan of Reorganization (the "Plan");

APPENDIX C:        The ballot form for acceptance or rejection of the Plan of Reorganization;

APPENDIX D:        Debtor's list of secured and unsecured claims, including any disputed claims;

APPENDIX E:        Stipulation and Order Establishing Restitution Schedule (Case No. CR 96-02184);

APPENDIX F:        February 28, 2008 Letter from Lee Grigg re: Restitution Payment and Plan Completion;

APPENDIX G:        2006, 2007, 2008 and 2009 Income Statements;

APPENDIX H:        Landaker Marketing Economic Summary Report (May 2011);

APPENDIX I:        Dodge/Farah Criminal Indictment (CL&M) (Case No. 10-CR-01/02);

APPENDIX J:        April 2011 Lincoln County Work Force Trends (Idaho Department of Labor);

APPENDIX K:        Alternative Airport Replacement Sites map and Frequently Asked Questions (http://www.flysvra.com/archives.html);

APPENDIX L;        Debtor's Post-petition Profit and Loss Statement through April 30, 2011;

APPENDIX M;        Debtor's Landscaping and Home Sales Net Profit Projections;

APPENDIX N:        Debtor's Net Rents Projections;

APPENDIX O:        Possible Contested Claims;

APPENDIX P:        Debtor's Real Property Liquidation Analysis;

APPENDIX Q:        Debtor's Notes Receivable and Age A/R Liquidation Analysis; and

APPENDIX R:        Debtor's Machinery and Equipment Liquidation Analysis.

*DEFINITIONS*

Unless the context otherwise requires, the following terms, when used in this First Amended Plan of Reorganization and the First Amended Disclosure Statement shall have the following meanings:

1.    ADMINISTRATIVE CLAIM:  A cost or expense of administration of this Chapter 11 case, including any actual and necessary expense of preserving or liquidating the estate, any actual and necessary expense of operating the business of the Debtor, and all allowances approved by the Court in accordance with the Bankruptcy Code.

2    ALLOWED CLAIM:  "Allowed Claim" shall mean a Claim:

(i)    in which a proof of Claim has been filed with the Court on or prior to the Bar Date, which claim has been determined by the Bankruptcy Court to be allowed by law; or

(ii)    which is scheduled in the Debtor's schedules of assets and liabilities and statement of financial affairs filed with the Court pursuant to §521 of the Bankruptcy Code and which has not been listed (or is no longer listed on the Confirmation Date, if previously so listed) as disputed, contingent or unliquidated; or

(iii)    in respect of which a proof of Claim has been filed with the Court pursuant to §502(h) or §502(i) of the Bankruptcy Code; and in any case as to which no objection to the allowance thereof has been interposed within any applicable period of limitation fixed by Bankruptcy Rule or an order of the Court, or as to which, if objections have been interposed, the Claim has been allowed by order of the Court.

3.    <u>ALLOWED INTEREST:</u>  "Allowed Interest" shall mean an interest in respect of which a proof of Interest has been filed with the Court on or prior to the Bar Date.

4.    <u>BANKRUPTCY CODE:</u>  "Bankruptcy Code" or "Code" shall mean the United States Bankruptcy Code, 11 U. S. C. §101 et seq. , and any amendments thereof.

5.    <u>CLAIM:</u>  "Claim" shall mean any right to payment or right to an equitable remedy against Debtor for breach of performance if such breach gives rise to a right to payment, whether or not such right to payment or right to an equitable remedy is reduced to judgment, or whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured.

6.    <u>CLASS:</u>  "Class" shall mean any class into which Claims or Interests are classified pursuant to the terms of the Plan.

7.    <u>CONFIRMATION DATE:</u>  The first business day occurring on or after the (14th) day after the Order of Confirmation is entered by the Court provided, however, that if a stay of the order confirming the Plan is in effect on such first business day, then the Confirmation Date shall be the first business day thereafter on which (i) no stay of the order confirming the Plan is in effect and (ii) the order confirming the Plan has not been vacated.

8.    <u>CONTESTED CLAIM:</u>  "Contested Claim" shall mean any Claim which is listed on the schedules filed by the Debtor as contingent, unliquidated or disputed or is, or becomes, the subject of an objection filed with the Court in accordance with the provisions of the Bankruptcy Code and which remains unresolved.

9.    <u>COURT:</u>  "Court" shall mean the United States Bankruptcy Court for the District of Idaho, presiding over the cases or, if necessary the United States District Court for said district having original jurisdiction over bankruptcy cases and the judges thereof.

10.    <u>EFFECTIVE DATE:</u>  The effective date of the Plan shall be the Confirmation Date as that term is defined above.

11.    <u>IN FULL:</u>  "In full" shall mean the amount owing as of the date of the filing of petition, the amount provided in a proof of claim owing as of the date of the filing of the petition, or the amount listed in the bankruptcy schedules filed with the Bankruptcy Court, whichever is less.  "In full" shall further mean a payment without post-petition interest, unless specifically provided for hereinafter.

12.     NET LITIGATION RECOVERY:  "Net Litigation Recovery" means any and all funds recovered for the benefit of this estate, exclusive of the payment of attorney's fees and costs.  It also includes the Net Sale Proceeds on real property in which liens are successfully avoided.

13.     NET PROFIT:  "Net Profit" shall mean the operating funds remaining to the Debtor after payment of all operating costs, taxes, capital improvements, plan payments to members of the secured and priority unsecured creditors classes as set forth herein, etc., during each Plan Year, as defined herein below, calculated annually.

14.     NET SALE PROCEEDS:  "Net Sale Proceeds" shall mean that portion of the proceeds remaining to the Debtor, i.e. the Debtor's interest, from the sale of any of the real property, exclusive of realtor's commission, title fees, and ordinary and customary closing costs and fees.

15.     NET RENTS:  "Net Rents" shall mean the rental proceeds remaining after payment of accruing post-petition real property taxes, associated insurance premiums, management fees, maintenance and repairs, advertising, etc.

16.     PLAN TERM: "Plan Term" shall mean the eight (8) years immediately following the Effective Date, without any prepayment penalty.

17.     PLAN YEAR:  "Plan Year" shall mean the year(s) immediately following the Effective Date.  For example, Plan Year One shall be the 12 months immediately following the Effective Date, Plan Year Two shall be months 13 to 24 immediately following the Effective Date, and so on.

18.     PERSON:  "Person" shall mean an individual, corporation, partnership, joint venture, trust, estate, unincorporated organizations, or a government or any agency or political subdivision thereof.

19.     REVENUE CODE:  "Revenue Code" shall mean the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 1 et seq.

## PLAN SUMMARY

The Plan consists of four components of the Debtor's operation, namely (1) the landscaping operations, (2) the rental operations and real property sales, (3) the winding down of construction operations, and (4) the pending litigation.  It is the Debtor's stated purpose under this Plan to first, return the Debtor's primary business operations back to its landscaping business which has proven to be profitable over the years.  Second, to retain those rental properties that

have a positive cash flow of the existing indebtedness as determined under 11 U.S.C. 506 or as stipulated to by the relevant secured creditors (including the real property in which interest has been waived for a limited time period), during the term of the Plan until such time as the Debtor determines the properties should be sold (or refinancing is obtained on more favorable terms)—with the Net Sale Proceeds being distributed to the unsecured creditors upon closing of the sale on each property.  Third, constructions operations shall be restricted to the completion of the Old School Project, which homes can be completed, in light of the settlement agreements proposed herein and related financing, and sold for a profit—which Net Sale Proceeds shall be distributed to the unsecured creditors upon close of the sale of each home.  Last, this Plan provides that the Net Litigation Recovery, if any, shall be distributed to unsecured creditors, as more fully described herein below.  The Plan further provides that with respect to all operations, except the landscaping operations, that the Debtor shall continue to manage its affairs under the Plan subject to the oversight and input of the Official Committee of Unsecured Creditors for the duration of the Plan.

### GENERAL HISTORY OF THE DEBTOR

The Leed Corporation is an Idaho corporation in good standing.  Incorporated in 1992, the corporation has been a real estate developer, including new construction and land development, as well as landscaping and related care and maintenance of existing real estate in southern Idaho, primarily based out of Shoshone, Idaho.  During the winter months, the Debtor has also done landscaping in New Mexico.  The Debtor has been involved in construction since 1991.  The Debtor has built over fifty-five new residential homes and remodeled numerous homes in the Magic Valley and Shoshone areas.  The Debtor participated in development of the following subdivisions:  Desert Rose Estates which consisted of 75 platted lots and 41 pre-

platted lots that were in subdivision application process, Riverview Estates which consisted of 41 platted lots and 160 pre-platted lots that were in the preliminary annexation process and Old Shoshone Ranch Estates which consisted of 18 platted lots..  The Debtor also developed the Fir St and 6th St. Townhouse lots, and 12 of the Old School Lots.  The Debtor formerly had limited farming operations; however, current farming operations consist of irrigation for pasture and current subdivision development.   The Debtor currently has in excess of 400 landscaping customers throughout southern Idaho.

*The 1996 Chapter 11 Case*

The Debtor has filed a previous chapter 11 case.  Approximately fifteen years ago, in 1996 the Debtor filed a previous Chapter 11 petition; a Confirmed Plan of Reorganization was approved by the Court in 1997.  As noted in the Court-approved disclosure statement in that case (Case No. 96-00847 JDP, Docket No. 102) the following is a brief explanation of the events leading up to the previous bankruptcy case:

> The company was formed in early 1992 as a family corporation among many members of the Montgomery family.  Its core business has always been in landscaping and sprinkler installation and repair.  Gene Montgomery, Sr., Eugene Montgomery Jr. and Lon Montgomery were the founders of the corporation but later several other members of the family including Laytn, Eugene Montgomery Jr, Kaylynn Butterfield and Chad Montgomery became shareholders with the corporation and were also paid salaries.  Leed Corporation asserts that these individuals were not only employees but also stockholders, directors and officers of the corporation.  Through a series of unsophisticated borrowing the company began to receive monies from various third parties.  The company incurred over $900,000.00 in debt in this fashion by either obtaining loans or giving investors preferred shares in the company.  The corporation also formed other related companies including Montgomery Family Corporation which was to develop a piece of real property in Mellon Valley Idaho.  Its purpose was also to serve as a holding company for all the businesses.  The other companies, however, were never merged into Montgomery Family Corporation.  A Country Side Corporation was also formed which acquired a restaurant in Buhl Idaho and made substantial alterations and improvements to that facility. . . .

Also the corporation, since it did not have an operating loan or much liquidity was unable to acquire assets and loans.  For several years, therefore, many of the members of the Montgomery Family borrowed monies from lenders in their own individual names and this money was invested in the corporation.  Montgomery family members would also acquire various assets in their personal names and place these assets in the corporation.  With certain exceptions these loans were paid by the corporation until the summer of 1995.  A Limited Liability Company named Green Cut was also formed which paid officers their salaries.  Despite numerous names used and various unsophisticated transactions perpetuated by this family the assets and liabilities were, with certain exceptions, held by or on behalf of Leed Corporation.  Many of the secured debts were guaranteed by the individuals of the corporation.

Prior to July of 1995 the history of the company can essentially be explained as a start up business which in certain instances should have utilized the services of attorneys or more sophisticated business people related to the formation of companies and the borrowing of money.  The loans and or investments received by Leed from non Montgomery family members are currently under investigation by the Idaho Department of Finance as the potential sale of unregistered securities.

In the spring of 1995 problems began to ensue for the corporation and the Montgomery Family.  Once the debts began to mount for the corporation the Montgomery Family began to disagree as to how to save the company.  Laytn, Chad and Eugene Montgomery Jr. walked out of the company and resigned as directors and officers in July 1995.  They then formed their own company which began to directly compete with the Debtor.  The remaining Directors Lon Montgomery and Kaylynn Butterfield sought the assistance of an expert to advise the corporation on how to solve its financial problems and whether it should file bankruptcy.  That assistance was rendered by Galen Guthrie who collected a fee from the corporation and began advising it in late July and early August 1995.  Unfortunately rather than assisting the struggling Company, the course of action recommended by Mr. Guthrie would result in more turmoil for the corporation.

In late July and early August 1995 Mr. Guthrie recommended that the company should avoid filing a bankruptcy proceeding at all costs.  He recommended that the corporation and Lon Montgomery transfer assets to various corporations or entities controlled by Mr. Guthrie.  Mr Guthrie advised the corporation that in this manner the creditors could be paid by buying more time to orderly liquidate the assets and would further provide protection to the numerous third parties who invested in the corporation.  Over five corporations were formed into which various assets were transferred.  An outline describing these assets is contained on Appendix "D" attached to this disclosure statement. [not attached to this Disclosure Statement]  Initially the purchase price for the assets by the new corporations was set at a value equal to the liquidation value of the various assets.  Lon Montgomery was to be a consultant for Mr. Guthrie to ensure that the

customers were maintained and that a smooth transition would occur.  Many debts were assumed and paid by the new entities and new common stock was issues to the old Leed Corporation investors.  Soon, however, Mr. Montgomery believed that the prior representations of Mr. Guthrie were being ignored or circumvented by him and it appeared to Mr. Montgomery that the assets were being dissipated and many were being set up for the eventual sale or transfer to Mr. Guthrie for his personal gain, which should have been to the detriment of the creditors and investors.  Once this became apparent to Mr. Lon Montgomery he advised the various stockholders of the Guthrie Corporations who then confronted Mr. Guthrie.  Mr. Guthrie surrendered all his stock in the various corporations and also resigned from those companies.  After this resignation, however, Mr. Guthrie was retained by at least one of the remaining shareholders in the  Guthrie corporations to act as a professional consultant and was paid a substantial consultant fee.  In Leed's opinion his new tenure resulted in further depletions of corporate assets and reputation.  After this experience Leed Corporation hired a Salt Lake City law firm to unwind all the Guthrie corporations and return all the assets to Leed Corporation.  This was primarily accomplished prior to April 9, 1996 and the real property and personal property transferred out to the Guthrie corporations have been returned to Leed Corporation.  . . .

The foregoing circumstances which have occurred over the last year have made it extremely difficult for the corporation to maintain itself.  With good reason many of the creditors are confused and angry.  The legal relationship between the individual Montgomery and the corporation were often blurred in that the individuals borrowed in their names and placed assets in their names, but the debtor in many instances paid the debt service and therefore maintained a large equitable interest in various real and personal property.  Now, with certain exceptions, the title to the majority of real and personal property assets appears to be in Leed Corporation.

The foregoing excerpt is from the Debtor's 1996 bankruptcy case.  The previous disclosure statement, from which the above excerpt is derived, consists of 132 pages; an electronic copy is available from Debtor's counsel upon request.  A copy is also available from the Court's docket, Case No. 96-00847, Docket No. 102, filed 9/30/96, entered 10/7/96.  Additionally, the previous chapter 11 plan consisting of 54 pages can also be obtained from the Court's docket, Case No. 96-00847, Docket No. 170; an electronic copy is also available from Debtor's counsel upon request.

As a result of the investigation by the Idaho Department of Finance referenced above, Mr. Lon Montgomery was prosecuted in 1997 by the Idaho Department of Finance for sale of unlicensed securities. While initially charge with thirty-five separate counts, consisting of an amalgamation of securities fraud, selling securities without a license, selling unregistered securities and offering to sell unregistered securities, in October 1997 Montgomery entered a plea agreement with the State of Idaho for one count of Racketeering for Securities Violations and received a reduced sentence. Specifically, after presentation of the State's evidence, the trial court indicated that the State had proven nor established fraudulent intent; however, certain aspects of the charges were under a strict liability standard. The strict liability made the fact Mr. Montgomery was relying on the advice of an attorney prior to obtaining such investments irrelevant to a portion of the charges. Pursuant to the trial court's instruction and prior to the presentation of the Defendant's case, the State and Mr. Montgomery's Counsel, Mr. Keith Roark, met in a court conference room and agreed to the plea agreement and related restitution of approximately $850,000.00. Subsequently, the trial court expressly provided in that certain *Stipulation and Order Establishing Restitution Schedule* that the required restitution "shall be made through the Defendant's Chapter 11 bankruptcy plan as confirmed by the U.S. Bankruptcy Court in case In re Leed Corporation, No. 96-00847 (Bankruptcy Plan)" and that Mr. Grigg would act as the receiver for the restitution payments. Attached hereto as Appendix E is a true and correct copy of the *Stipulation and Order Establishing Restitution Schedule.* In February 2008, the Debtor was short of the funds necessary to complete its prior chapter 11 plan and associated restitution payments. The Debtor borrowed the necessary funds to complete the prior chapter 11 plan and pay the associated restitution from Mr. Nathan Bachman. Mr. Bachman is a creditor in this case based, in part, on this 2008 loan. On February 28, 2008, using, in part, the

funds borrowed from Mr. Bachman, the receiver Mr. Grigg paid the necessary funds to complete the plan and related restitution. Attached hereto as Appendix F is a true and correct copy of a Letter from Mr. Grigg, filed with the State Court on February 29, 2008 indicating that $573,697.60 had been paid pursuant to the *Stipulation and Order Establishing Restitution Schedule* and previous bankruptcy plan.

*The 2010 Bankruptcy Case*

Historically, for the four years immediate preceding the petition (2006 to 2009), the Debtor's Income Statements are summarized as follows:

| Income Statements Summary (2006-2009) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Date** | **Gross Revenue** | **Landscaping** | **Rental** | **Farm** | **Construction** | **Other** | **Net Income** |
| December 31, 2006 | 1,694,826.19 | 636,230.44 | 47,567.38 | 15,499.00 | 992,309.80 | 3,219.57 | 220,151.78 |
| *Percentage Break Down* | *100%* | *37.5%* | *2.8%* | *0.9%%* | *58.5%* | *0.2%* | *13.0%* |
| | | | | | | | |
| December 31, 2007 | 1,807,324.98 | 690,327.47 | 63,625.78 | 17,018.85 | 958,400.00 | 77,952.88 | 17,240.22 |
| *Percentage Break Down* | *100%* | *38.3%* | *3.5%* | *0.9%* | *53.0%* | *4.3%* | *1.0%* |
| | | | | | | | |
| December 31, 2008 | 4,014,254.81 | 405,886.56 | 81,659.06 | 180.00 | 3,518,189.99 | 8,339.20 | 1,365.74 |
| *Percentage Break Down* | *100%* | *10.2%* | *2.0%* | *0.0%* | *87.6%* | *0.2%* | *0.0%* |
| | | | | | | | |
| December 31, 2009 | 1,775,836.82 | 320,360.32 | 219,859.84 | 10,000.00 | 914,480.02 | 311,136.64 | (385,897.82) |
| *Percentage Break Down* | *100%* | *18.0%* | *12.4%* | *0.6%* | *51.5%* | *17.5%* | *(21.7%)* |

True and correct copies of the Debtor's 2006, 2007, 2008 and 2009 Income Statements are attached hereto as Appendix G. In reviewing the Income Statements Summary and Appendix G, it is the Debtor's considered opinion that the landscaping operations has historically been the Debtor's financial base and that construction, while lucrative for a short period of time, has detracted from the Debtor's current landscaping operations. In short, the Debtor believes that a returning focus on the landscaping operations and limiting construction to the completion of the Old School Project's fifteen (15) homes is in the best interest of this estate. As noted in the Economic Market Study prepared by Landaker Marketing Group, LLC at the Debtor's request,

attached hereto as Appendix H,[1] the national and Idaho real estate markets in 2008 were experiencing a significant recession that negatively impacted the Debtor's construction business in 2009. The Economic Market Study supports the Debtor's conservative approach contained in the Plan where the non-performing real property is surrendered, which properties that have a positive cash flow are retained to maximize market appreciation. *Id.*

Additionally, it is the Debtor's considered opinion that in 2009 it was the victim of what the Debtor believes to be predatory lending. For instance, in 2009 the Debtor was unable to complete fifteen residential properties (the Old School Project) due to the conduct of CL&M and related entities and individuals. CL&M arranged and funded approximately 15 loans to Leed Corporation (the "Leed Loans"). CLM set up the following as the lenders on the Leed Loans: BFH 2009 Realty Trust, BZ 2009 Realty Trust, D&M 2009 Realty Trust, Greatland Project Development, Inc., JP 2009 Realty Trust, MGZ 2009 Realty Trust, MSCRN 2009 Realty Trust, RMBZ 2009 Realty Trust, SBSB 2009 Realty Trust, WHRS 2009 Realty Trust, Richard M. Frucci, Louis Gargasz, Richard N. Krauth, Equity Trust Co., Custodian FBO Bruce A. Quimby IRA, Spruce Mountain Associates, LLC, Equity Trust Co., Custodian FBO Raymond P. Kleopper II IRA, Pensco Trust Co., Custodian FBO David L. DeVeber IRA, NTC and Company, FBO Robert T. Keating IRA, Equity Trust Co., Custodian FBO Andrea S. Quimby, and Equity Trust Co., Custodian FBO Bruce A. Quimby IRA (collectively, the "Purported Leed Lenders"). The Leed Loans were approximately 15 construction loans for the construction of houses on approximately 15 lots in a subdivision in Shoshone, Idaho.

---

[1] The Economic Market Study attached hereto as Appendix H, incorporates a number of Appendices consisting of a total of 171 pages, which have not been included in this Disclosure Statement, but have been filed with the Court as a related Supplement. Copies of these Appendices are available either from the Court's Docket or a copy can also be requested in writing from Debtor's counsel.

Based upon review of the New Hampshire Bankruptcy Court Docket and the Criminal Indictment (a copy of the Criminal Indictment is attached hereto as Appendix I), it is the Debtor's considered opinion that CL&M established a contract with each of the Purported Leed Lenders providing that CL&M was the mortgage servicer with the power to represent each Purported Leed Lender with respect to each Leed Loan. The Debtor further believes that although CL&M represented that it was only the mortgage servicer on the Leed Loans, CL&M was in reality the lender on the Leed Loans. The Purported Leed Lenders paid their funds to CL&M in advance of any of the Leed Loans being closed or funded. CL&M commingled all investor funds into one operating account (the "Commingled Account"). The limited funds in the Commingled Account were $10 million to $20 million less than would have been necessary to pay all of CL&M's obligations related to all of its loans. When the Leed Loans closed, CL&M funded only closing costs and purported reserved interest. Then CL&M funded a portion of the Leed Loans over a period of months. As a result of the shortage of funds in the Commingled Account, the Leed Loans were actually funded with the funds of later investors in CL&M. CL&M used the funds of the Purported Leed Lenders to fund loans for earlier CL&M investors. In short, it appears that CL&M and related persons were operating a *Ponzi* scheme of which Leed was one of hundreds, if not thousands, of victims. The principals of CL&M have been prosecuted for their participation in this scheme (see Appendix I); however, recovery of the 1.2 million owed to Leed is unlikely except as it relates to the liens related to the Old School Project as discussed further herein below.

Each of the Leed Loans was in the face amount of $180,000; there are 15 separate construction loan agreements, notes and mortgages. CL&M extended between approximately $800,000 and $1.3 million in credit to the Leed Corporation, but did not extend the full amount

called for under any of the 15 construction loan agreements.  As a result of the failure of the Purported Leed Lenders to extend all of the funds required under the 15 construction loan agreements, the Debtor was not able to complete the homes in the Shoshone, Idaho subdivision. Construction draws were in the submission process to CL&M in the approximate amount of $480,000.00 and when the requested funds were not received the immediate and devastating effect on the Debtor's ongoing operations ultimately led to the bankruptcy petition, notwithstanding the Debtor's efforts to obtain replacement financing.

In an effort to complete the Old School Project, Leed approached a number of hard money lenders, some of whom charged significant loan fees, but failed or refused to provide any financing despite representations to the contrary.  Leed has investigated whether legal action against these lenders would benefit this estate; however it appears that some of these persons can no longer be located.  These potential refunds/collection matters are noted, in part, in Schedule B of the Debtor's schedules.  Leed expressly reserves all claims against lenders and creditors and corresponding the jurisdiction of the United States Bankruptcy Court for the District of Idaho, including, but not limited to the above referenced lenders associated with CL&M.

*Current Stock Ownership/Personal Bankruptcy Filings*

The corporate stock is owned by two shareholders namely Lon E. Montgomery and Joshua A. McCuistion, both of whom have filed personal bankruptcy petitions and their respective share hold interest being subject to their respective bankruptcy cases.  Mr. Montgomery filed a joint, personal chapter 11 petition; Mr. McCuistion filed a joint, personal chapter 7 petition.  Mr. Montgomery's personal chapter 11 case has not adversely impacted this estate and to the extent the personal chapter 11 case by Mr. Montgomery were to be unsuccessful, it is the Debtor's opinion that a chapter 7 trustee would have no interest in shutting

the corporation down as that would simply increase the liability due and owing by the chapter 7 estate due to the related personal guaranties of the corporate debt by Mr. Montgomery.  Mr. McCuistion's personal chapter 7 case has not had a significant impact on this chapter 11 reorganization, presumably to his minority interest, i.e. 10%.  To date, Mr. McCuistion's chapter 7 trustee has expressed no interest or intent to participate in this chapter 11 reorganization.

### MARKET FACTORS SUPPORTING THE DEBTOR'S PLAN

The following are factors that in the Debtor's opinion support the viability of the Debtor's Plan:

#### Bedroom Community

As noted in the attached Lincoln County, Work Force Trends, April 2011, the city of Shoshone, "the gateway to Sun Valley" is a "bedroom community to both the Wood River Valley and Twin Falls . . . ."  The Idaho Department of Labor further notes that "[a]ffordable housing continues to be an issue in the Wood River Valley so subdivisions and residential construction will continue in Shoshone, where sustainable growth is expected over the long term."  See Appendix J attached hereto.  The Debtor believes the historical housing values will return in time as the economy for the Wood River Valley and surrounding area improves. However, the Debtor's Plan provides that only the Old School Project will be completed and sold.  It is the Debtor's considered opinion that the Old School Project homes have a lower price point and can be completed and sold under the Plan for a profit, in light of the proposed settlement with the CL&M bankruptcy trustee and David and Jody Orr.

#### Wood River Regional Airport

The following is the Debtor's opinion with respect to the proposed relocation of the Friedman Memorial Airport.  The Debtor's opinion regarding the airport relocation and related

economic impacts is based in large part on communications with Mr. Rick Baird, head of the Airport Authority, and the Debtor's review of www.flysvra.com, the website for the Sun Valley Replacement Airport (SVRA).  Due to the amount of information available to the public from this website, it has not been reproduced as a part of this Disclosure Statement; however, the Debtor urges creditors to review this website in conjunction with this Disclosure Statement.  In addition, attached as Appendix K are the *Alternative Airport Replacement Sites* map and *Frequently Asked Questions* section retrieved from http://www.flysvra.com/archives.html. Portions addressing the selection of site 10A (the site nearest to Lincoln County) have been marked and supports the Debtor's stated opinion.

In the Debtor's considered opinion, the construction and operation of a new regional airport will have a major impact on the region including Blaine and Lincoln Counties and surrounding areas.  With the FAA's mandate that a replacement airport is required in the coming years to continue to provide air service in and out of the Wood River Valley, the impending selection of a new site and construction is a major topic of discussion in the area.  Although a formal announcement of the site has not been made, indications are it will most likely be Site 10A, which is located just off of SH 75 close to the southern border of Blaine County that abuts to Lincoln County.  This location would place the airport approximately 24 miles from the center of Shoshone with an easy commute via SH75 corridor for construction workers and eventually airport employees.

A recent article in the Idaho Mountain Express reported that construction of the airport is estimated to generate more than $108 million in payroll for the 3,450 jobs that will be created by

the project[2]. The article went on to state an additional $185 million in indirect economic activity will create 1,900 indirect jobs, translating into another $50 million in local payroll. It was noted that these estimates are based on the widely used and respected Regional Input-Output Modeling system developed by the U.S. Department of Commerce's Bureau of Economic Analysis. This system is designed to help create reliable economic estimates that are specific to particular locations, such as Blaine County and the surrounding areas. Once operational, a replacement airport in the region will have a $30 million annual economic impact and create 500 permanent jobs. The indirect impact will amount to an additional $19 million and 280 additional jobs. In total, the new airport will generate an annual economic impact of more than $49 million and 780 permanent jobs in the area[3].

A preliminary engineering report was released in January 2011[4] that included an estimate of probable construction costs for a replacement airport at alternative sites, Site 10a and Site 12. In addition land appraisals for the land acquisition at each site were provided. It was noted that these cost estimates would continue to be updated and should be considered a work in progress. The estimates were based on current data and were subject to change and escalation. It was further noted that these costs did not include providing utilities to each site (including gas, power, communications, and water), mitigation costs, and costs for the construction and installation of an FAA Airport Traffic Control Tower and navigational aids.

The next step in the process will be the release of the Draft Economic Impact Study (EIS), which was scheduled for late May, but was recently postponed until late summer/early fall

---

[2] Replacement Airport Would Boost Economy, Idaho Mountain Express, May 11 2011. The article was co-written by Tom Bowman, a Blaine County commissioner and chairman of the Friedman Memorial Airport Authority board and Martha Burke, a member of the Hailey City Council and vice chair of the Friedman board.
[3] The permanent economic impact numbers are based upon estimates of new visitor spending, increased economic activity associated with improved air traffic, and new employment. These numbers were compiled by Transystems Corporation, as part of the replacement airport environmental impact statement compiled in 2008.
[4]

2011.  It was noted that the delay is due to further refinements in the environmental and financial impact analysis being completed as part of the Draft EIS. Once the Draft EIS is published a 90 day public comment period will begin. A public hearing will be held during the comment period. Based on the current FAA schedule, a final EIS – and a formal Record of Decision – can be expected early in 2012

The question of how soon construction would begin once the site has been selected still remains.  Once the final EIS has been submitted there is a time limit for land acquisition and the beginning of construction, otherwise a new EIS will be required.

Potential Economic Impact of New Airport on Shoshone and Lincoln County:  Assuming Site 10A is selected the economic impact on the city of Shoshone and Lincoln County can be expected to be dramatic.  Conveniently located on the SH 75 corridor, workers will find the commute from Shoshone and housing developments north of Shoshone to be desirable.  Housing costs are significantly less than those found in Blaine County to the north in Bellevue or Hailey. It is reasonable to expect new home construction to pick up again with the increased demand caused by the construction workforce and later the new airport and supporting businesses employees.\

### *MEANS OF PLAN IMPLEMENTATION*

**Landscaping Operations:**  Attached hereto as Appendix G are the Income Statements setting forth the Debtor's operations for the years of 2006, 2007, 2008 and 2009.   Also attached hereto as Appendix L is the Debtor's Profit and Loss Statement from April 29, 2010 (the petition date) to January 31, 2011.  Also attached hereto as Appendix M are the Debtor's Projections (prepare with the assistance of Mr. Landaker) for business operations for the duration of the Plan.  Naturally, projections are not guaranteed and it is problematic to predict future events.

However, it is the Debtor's considered opinion that these Appendices support the Debtor's assertion that landscaping operations can continue to be operated at a profit for the benefit and support of Plan implementation, and that the propose rental property operation and real estate sales are in the best interest of creditors.

**Rental/Sale of Real Property:**  Attached hereto as Appendix N is the Debtor's Rental Properties Summary, setting forth the Debtor's cash flow analysis for the properties being retained in the Plan, which demonstrates that these properties have a positive cash flow—with the exception of three properties that have a negative cash flow collectively of $117.62 (68.20; 7.75; and 41.67).  With regards to these three properties, the Debtor believes that retention of these properties, with landscaping revenue supporting these monthly payments, is in the best interest of creditors and will allow the estate to benefit from market appreciation.  Creditors should also note that in the event the real estate market further depreciates, these properties may ultimately be in a negative cash flow situation resulting in potential, additional deficiency claims against the Debtor.  This is, in the Debtor's opinion, an inherent risk in the real estate market.  Assuming that the housing market remains relatively flat, the Debtor's Plan only retains those properties that cash flow, with those properties unable to cash flow being surrendered to the associated secured creditors.  By retaining the properties that currently cash flow, the Debtor hopes to capture any market appreciation for the benefit of the unsecured creditors upon the sale of the property during the term of the Plan.  The timing of such sales shall be made by the Debtor, with the oversight and input from the Official Committee of Unsecured Creditors.

**Net Litigation Recovery:**  Further, the primary litigation relates to the Meyers/Campbell parties.  A brief summary is provided herein below.  Any Net Litigation Recovery shall be used to fund the Plan.  Please see the summary herein for further details.  A copy of the Complaint

and related pleadings is available from the Court's Adversary Docket or a copy can be requested from Debtor's counsel.

## BANKRUPTCY STATUS

The proponent filed its Voluntary Petition for relief under the Bankruptcy Code on April 29, 2010.  A Meeting of Creditors pursuant to 11 U.S.C. § 341(a) was held on June 18, 2010.  A Notice of Appointment of Unsecured Creditors' Committee was filed on July 7, 2010.

Since the date of the filing of the petition, the proponent has operated as Debtor-in-possession.  When the Plan is confirmed, the proponent will continue to administer the estate in compliance therewith, and the proponent will be re-vested with the remaining property subject to the conditions and requirements of the Plan.

In the fall of 2010, the Debtor had obtained preliminary loan approval to complete the Old School Lots from a prospective lender, Granite Funding, LLC.  After a number of court hearings and amendments to the proposed lending the Debtor obtained Court approval of a reduced loan to complete two of the homes, with the proviso stated by the Court that no further changes would be allowed.  Notwithstanding this instruction from the Court, Granite Funding subsequently requested additional changes to the lending agreement, such that the Debtor was no longer willing to consider Granite Funding as a prospective lender.

The Debtor has obtained preliminary loan approval from Equity Trust Company custodian FBO Neal C. Hocklander IRA for two loans set forth as Exhibits to the Plan.  In brief, there are two loans being provided pursuant to Exhibit A to the Plan.  Loan #1 is to fund the payments to Classes SC2 and SC3 (the NH Trustee and the Orrs, respectively, creditors with asserted liens in the Old School Project).  Loan #2, a revolving line of credit, is to fund

construction as of the partially completed homes with homes being completed and sold as the market permits under the Plan.

Additionally, the Plan considers one additional post-petition refinance loan.  As noted in Class SC28 of the Plan (Plan at p. 31): With regards to the Riverview Subdivision, members of this class agree to provide the Debtor an additional twelve (12) months, interest free, to refinance the loans on the property associated with this class, with an extension for an additional twelve (12) months at the then current WSJ prime rate plus 2.0 percent for such extension time period, at the Debtor's sole discretion.  If the Debtor is unable to obtain a refinance loan on the Riverview Subdivision during this time period, the Riverview Subdivision shall be surrendered to the members of this class in full satisfaction of the indebtedness.  In furtherance of such refinancing, members of this class agree to provide post-petition financing up to $15,900.00 for the due diligence fee referenced in the attached Letter of Intent from Accelerated Lending Group, Inc., attached to the Plan as Exhibit "D."  This post-petition loan such constitute part and parcel of the claim held by members of Class SC28 as a future advance under the existing loan.

### MAJOR ASSET DISPOSITIONS

No major assets have been voluntarily disposed of by Debtor, except in the ordinary course of the Debtor's business or as authorized by the Court.

### LEASEHOLD INTERESTS/EXECUTORY CONTRACTS

To the extent not assumed as noted herein below the Debtor rejects all prepetition leases and executory contracts:

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| Edward E. Montgomery<br>701 Pine<br>Buhl, ID 83316 | 4235 N. 1360 E., Buhl, ID | Assume.  Debtor is current with no default. |
| Harley Sanders<br>P.O. Box 37 | Phase 5, Riverview, 7th St., Shoshone, ID—lease with | Assume as modified herein.  Specifically, the parties shall agree that this property shall be converted to |

| Oakley, ID 83346 | option to purchase—entire phase valued at $1,488,000.00 per May 2011 Broker's Price Opinion. | jointly owned property with net profits associated with the property shared 70% to Mr. Sanders and 30% for the benefit of the bankruptcy estate. Costs and expenses associated with the property shall be split on the same percentage basis. In exchange for the above modification, Mr. Sanders will receive the 1st 725,000.00 of Net Sale Proceeds and the remaining profit shall be divided under the aforementioned percentages, with the Debtor's percentage share being used for the benefit of the Plan. |
| --- | --- | --- |
| Lon & Rebecca Montgomery 726 N. 1360 E. Shoshone, ID 83352 | 104 Sunset Dr., Shoshone, ID | Assume as modified herein. Specifically, the parties shall agree that this property shall be jointly owned with net profits associated with the property shared 60% to Mr. and Mrs. Montgomery and 40% for the benefit of the bankruptcy estate. Costs and expenses associated with the property shall be split on the same percentage basis. |
| Mitch Campbell P.O. Box 1785 Twin Falls, ID 83303 | 141 Syringa Loop, Shoshone, ID | This alleged lease is the subject of Adversary Proceeding 10-08086 JDP wherein the Debtor has asserted that this is in fact a disguised financing agreement that has not been properly perfected. To the extent the Court determines this to be a valid lease, the same is hereby rejected; to the extent the Debtor prevails in the adversary proceeding, the net litigation recovery would be available to prepay unsecured creditors under the Plan. |
| Robert & Kathi Meyers c/o David A. Coleman, Esq. P.O. Box 525 Twin Falls, ID 83303-0525 | 525 N., 527 N., 531 N. Fir Street, Shoshone, ID  152 E., 182 E., 191 E. Syringa Loop, Shoshone, ID South Park Development Beverly Street, Shoshone, ID 201 E., 203 E., 205 E., 207 E., 301 E., 303 E. 6th Street, Shoshone, ID Lot 10/12, Block 2 Riverview Subdivision, Shoshone, ID 318 N. Date St., Shoshone, ID | This alleged lease is the subject of Adversary Proceeding 10-08086 JDP wherein the Debtor has asserted that this is in fact a disguised financing agreement that has not been properly perfected. To the extent the Court determines this to be a valid lease, the same is hereby rejected; to the extent the Debtor prevails in the adversary proceeding, the net litigation recovery would be available to prepay unsecured creditors under the Plan. |
| Thomas Cooper Sandra Crenshaw 4235 N. 1360 E. Buhl, ID 83316 | 4235 N. 1360 E., Buhl, ID | Assume. Debtor is current with no default. |
| Avauntae Property Management | Property management agreement. | Terminated post-petition. REJECT to the extent not otherwise terminated. Please note that this agreement is the subject of Adversary Proceeding |

| | | 10-08086 JDP. The validity and impact of this purported agreement remains to be determined in that adversary proceeding and the ultimate disposition of said adversary proceeding shall be, to the extent necessary, a modification of this portion of the Plan. |
|---|---|---|
| Robert & Kathi Meyers | Assignment of Rents, Profits and Lease or Purchase and Sale Agreements dated 11/24/2009 | Please note that this agreement is the subject of Adversary Proceeding 10-08086 JDP. The validity and impact of this purported assignment remains to be determined in that adversary proceeding and the ultimate disposition of said adversary proceeding shall be, to the extent necessary, a modification of this portion of the Plan. |
| Robert & Kathi Meyers/Mitch Campbell | Employment Agreement | Please note that this agreement is the subject of Adversary Proceeding 10-08086 JDP. The validity and impact of this purported agreement remains to be determined in that adversary proceeding and the ultimate disposition of said adversary proceeding shall be, to the extent necessary, a modification of this portion of the Plan. |
| Sandra J. Huntley | 107 and 110 Riverview Dr. Shoshone, Idaho | Assume as modified herein. Specifically, the parties shall agree that these properties shall be jointly owned with net profits associated with the property be shared 50% to Mrs. Huntley and 50% for the benefit of the bankruptcy estate. Costs and expenses associated with the property shall be split on the same percentage basis. These properties are subject to first liens for the benefit of GMAC, which are being crammed down in the Plan under the auspices of *Johnson v. Home State Bank*, 501 U.S. 78 (1991) and progeny, which allow the Debtor to restructure such claims despite the lack of liability of the estate for the notes. |
| Nathan D. Bachman | Old Shoshone Ranch agreements and related loan documents | REJECT, subject to the modifications and releases stated herein. Leed releases any and all claims or interest it might assert as a member of the Old Shoshone Ranch, LLC through its principal Lon Montgomery, in exchange Mr. Bachman and Old Shoshone Ranch, LLC shall release Leed and Mr. Montgomery from any and all liability arising from any and all claims of any nature whatsoever, that have or might have been asserted against Leed or Mr. Montgomery. |
| Lincoln County, Idaho | Development Agreement | Assume as modified herein. Notwithstanding the County's apparent violations of section 362(a), Leed agrees to waive such violations in exchange for the |

| | | County's agreement to honor the existing Development Agreement for the term of the Plan and to honor related building permits for an additional 12 months subsequent to the Effective Date. |
|---|---|---|
| City of Shoshone | Development agreement, with associated permits. | Assume as modified herein. City hereby agrees to honor the existing Development Agreement and to honor related building permits for an additional 12 months subsequent to the Effective Date. |

To the extent that there are any prepetition leases/executory contracts that have not been accepted or rejected previously, such leases/executory contracts are hereby rejected.

The Debtor, through its property manager, has entered into various leases post-petition in the ordinary course of business. While the Debtor believes it is not necessary to assume or reject these agreements, to the extent necessary the Debtor expressly assumes all such <u>post-petition</u> leases.

*PENDING LEGAL PROCEEDINGS*

<u>State Court and Federal Court Actions (Including Bankruptcy Proceedings)</u>:

a.     *Unlawful Detainer Actions*: Prepetition the Debtor, in the ordinary course of business, was the Plaintiff in a number of unlawful detainer actions (eviction matters) against miscellaneous tenants in various district courts of the state of Idaho. There are not any unlawful detainer actions currently being pursued by the Debtor.

b.     *CL&M Involuntary Bankruptcy*: On November 20, 2009 involuntary petitions for relief, pursuant to Chapter 7 of the Bankruptcy Code, were filed against C L & M, Inc. and Financial Resources Mortgage, Inc. ("FRM") by three unsecured creditors with the assistance of the New Hampshire Attorney General's Office. The Bankruptcy Trustee, Steven M. Notinger, was appointed as chapter 7 trustee for the CL&M and FRM bankruptcy estates, and ultimately for approximately <u>100</u> related corporate and trust entities. FRM and CL&M operated a large

fraudulent scheme that used a mortgage brokerage business to steal millions of dollars from investors. These bankruptcy cases are pending in the state of New Hampshire. The Plan includes a proposed settlement on the 15 homes as follows: Pursuant to a two post-petition loans from Equity Trust Company custodian FBO Neal C. Hocklander IRA, the Debtor will purchase the lien positions of the New Hampshire Trustee for 100,000.00 as full and complete settlement of all claims between the two bankruptcy estates. Additionally, the Debtor will purchase the lien position of David and Martha Orr for $120,000.00. This $220,000.00 would constitute the first loan from Equity Trust Company custodian FBO Neal C. Hocklander IRA, which would receive a first position, super priority lien in the Old School Project properties. The second loan would work as a line of credit in the amount of 100,000.00, which would be for the completion of the homes on a revolving basis. The completion of the homes will be determined upon pre-sold contracts, as much as possible and it is anticipated that the completion time frame will span a 2-year period. The Debtor currently has two of the homes under contract and a Motion to approve the same is anticipated in the immediate future (as of the time of filing this Disclosure Statement).

c.       *Leed v. Meyers et al.*: On September 29, 2010 the Debtor filed an Adversary Complaint against Robert & Kathi Meyers, Mitchell R. & Laura Campbell, and affiliated entities on behalf of this bankruptcy estate asserting a number of lender liability, avoidance, consumer protection and various tort and statutory claims against these Defendants. The Debtor further asserts that these Defendants' overreaching and predatory lending practices were a contributing factor to the bankruptcy filing. This adversary proceeding is pending before the United States Bankruptcy Court for the District of Idaho.

In short, the Debtor believes this estate is a victim of the Defendants' wide scale "loan to own" scheme, wherein they entice unwitting borrowers to participate in loans secured by real property with improperly calculated interest, deceptive and illegal terms which are ultimately designed to force the borrowers into default so that after the Defendants have usurped every available resource from the borrower, they then foreclose and take ownership of the secured property.  To disguise their activities, the Defendants function under many different *personas* and entities ripe with undisclosed conflicts of interest, including phony "escrow" companies to make their transactions appear legitimate and neutral.  They skirt the statutory requirements of the law to avoid scrutiny, and have in fact misrepresented their operation to the state regulatory agencies.  In some cases, the Defendants have unilaterally changed the terms of the lending agreements, compelling the borrowers to accept these terms or face legal or foreclosure action. Any challenges to the legality of these lending arrangements are met with threats of "criminal prosecution" and impugning of character in the community.

This adversary proceeding seeks to recover damages incurred by the Debtor as a result of the Defendants' wrongful acts and illegal scheme arising out of the myriad of loan transactions dating back to 2005.  Without limiting the scope and breadth of the adversary proceeding, the Debtor is informed and believes that Defendants used American Escrow Service, LLC (and all of its various iterations) as its escrow agent, notwithstanding the fact that this company is not licensed as an escrow agent in the state of Idaho.  Acting as an escrow agent under the Idaho Escrow Act (I.C. § 30-901 et seq.) is an unlawful act, making collection of the associated loans, collection of an unlawful debt under R.I.C.O.  Further, it appears from evidence and deposition testimony that these Defendants did not maintain separate, fully funded escrow accounts at the time each loan was allegedly funded.  Notwithstanding the fact the loans appear to have not been

fully funded at loan closing, interest was charged on the entire loan balance from the date of loan closing. Accordingly, pursuant to I.C. § 48-608, the Debtor may be entitled to recovery all of the interest that was overcharged. In addition, Defendants' conduct may be an "unfair or deceptive practice" under I.C. §§ 30-919(8) and 48-603(17), such that pursuant to I.C. § 48-608 and 11 U.S.C. § 544, each and every loan transaction is "voidable" rendering Defendants wholly unsecured. Now that Debtor has brought this adversary proceeding, the Defendants have made several calculated attacks against the Debtor in the community, spreading rumors that the Debtor is dishonest, and interfering with the contractual business relationship between the Debtor and creditors. This interference also occurred prepetition with Defendants spreading rumors among Debtor's tenants and subcontractors. Damages have been requested, including punitive and treble damages—and such other equitable relief the Court determines necessary under the facts of the adversary proceeding.

As a precursor to the adversary proceeding the Debtor filed a Motion for Contempt against these Defendants for violations of the automatic stay, arising out of Defendants' continuing collection of the rents in which they assert an interest subsequent to the petition. Shortly prior to the hearing on the Motion the parties settled the Motion for Contempt and these Defendants consented to the Debtor's use of cash collateral through the end of February 11, 2011.

Naturally, given the fact that the loans involved in the adversary proceeding approach $8,000,000.00 and treble damages are available under R.I.C.O., Defendants have, and continue, vehemently to oppose the allegations and claims contained in the Complaint. It is the Debtor's considered belief that Mr. Campbell's Motion to Dismiss asserting various acts of bankruptcy fraud, mortgage fraud, consumer fraud, etc. against the Debtor, the Debtor's principal, Debtor's

counsel, and a myriad of other parties, including the Unsecured Creditors' Committee, is an attempt to (1) redirect attention away from the adversary proceeding; and (2) in furtherance of Mr. Campbell's threat to pursue criminal sanctions in order to obtain an advantage in this civil matter.  At his deposition regarding his Motion to Dismiss, Mr. Campbell indicated that he has contacted a number of governmental agencies, including the FBI, the Idaho Attorney General's Office, the Idaho Department of Finance, and the Idaho Real Estate Commission.  The Debtor has filed a Rule 9011 Motion seeking sanctions for what the Debtor considers to be inappropriate litigation conduct by Mr. Campbell.  The outcome of that Rule 9011 Motion remains to be determined by the Court.

Defendants have also expressed concern over the administrative attorney's fees incurred with respect to this adversary proceeding.  The Plan proposes that attorney's fees related to this litigation will be converted to a contingency fee arrangement, with counsel being paid 1/3 (33.33%) of the gross litigation recovery, plus expenses, should the matter settle in advance of 60 days prior to the first scheduled trial date, and 40% of the gross litigation recovery, plus expenses, should the matter settle within 60 days of trial, proceed to trial or upon appeal.

Pending resolution of this adversary proceeding, the Net Rents from the real properties in which the Defendants assert an interest will be held in a Litigation Reserve Account, pending further Court order or resolution of the adversary proceeding.

d.      *Deere v. Leed et al.*:  On or about October 13, 2010, Deere Credit filed an Adversary Complaint against Leed asserting that certain equipment was not property of this bankruptcy estate.  Leed filed a counterclaim against Deere, as well as a third-party complaint against Gary L. Rainsdon, Trustee and Joshua A. McCuistion, asserting that Leed holds paramount title to the equipment.  Leed has requested entry of default against Mr. Rainsdon and

entered into a Stipulation with Deere, which stipulation was approved by the Court after notice

and a hearing on the proposed compromise on February 23, 2011.  The stipulation between

Deere and the Debtor provided for a partial surrender of the equipment that the Debtor did not

deem necessary for its current and future operations and corresponding plan treatment for the

equipment Leed retained for the benefit of this estate, i.e. equipment necessary or useful for

landscaping operations.

As set forth in Appendix O, the Debtor believes claim objections may be necessary.

Additionally, litigation may be undertaken to recover property of the Debtor or to adjudicate

claims of this Debtor.  Specifically, there are a significant number of receivables or notes listed

in the Debtor's schedules.   The Debtor, in consultation with The Official Committee of

Unsecured Creditors, shall pursue such receivables and notes as the Debtor and the Committee,

in the exercise of their business judgment deem advisable.  To the extent the Debtor and the

Committee disagree, the Debtor's shall determine whether to pursue collection.  The Debtor's

Plan expressly reserves the right to pursue collection of these assets in the event that in the

Debtor's business judgment such legal action will result in a benefit to the unsecured creditors

and not simply a Pyrrhic victory.  In such collection efforts the Debtor shall attempt to retain

counsel as needed, preferably on a contingency fee basis when possible.  The Net Litigation

Recovery shall be paid to the unsecured creditors under the Plan.

Claims that may  be Contested:  Some claims may later be contested which may increase

the pro rata distribution to unsecured creditors.  Many of these potential claim objections are

addressed under the terms of the Plan and need only be addressed should creditors disagree with

the Plan.  For example, the § 506 valuation of collateral objections can be determined as a part of

the confirmation process without the necessity of incurring exorbitant legal fees and costs, and

otherwise stipulated to in the existing plan treatment stipulations, as noted in the Plan.  The Plan does not prevent other interested parties from asserting claim objections on their own behalf. The Debtor reserves all rights to contest any additional claims not listed in Appendix O and to amend its schedules as the Debtor deems advisable.

        <u>Preferences, Fraudulent Conveyances, and Lien Avoidance</u>:  Adversary complaints may be filed by the Debtor-in-possession to avoid certain preferential and/or fraudulent transfers, as the Debtor-in-possession deems advisable.  Potential causes of action are noted in the Debtor's *Statement of Financial Affairs*, filed with the Court on May 28, 2010 as Docket No. 35, see specifically ¶¶ 3.b, 3.c, 5, and 13.  The Debtor reserves all rights of this estate under the Bankruptcy Code to contest the validity of liens, any and all pre-petition transfers, as well as post-petition transfers to the extent that such transfers were payments on an avoidable security interest under Article 9 of the Idaho Uniform Commercial Code or State law and such payments or transfers are avoidable under 11 U.S.C. chapter 5.  The Debtor further reserves its rights under State law to contest pre- and post-petition actions.  Recovery, if any, of such transfers shall be administered pursuant to the terms of the Plan upon confirmation.

        **THE DEBTOR IS AWARE THAT A NUMBER OF LIEN HOLDERS LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT OR UNLIQUIDATED FAILED TO FILE PROOFS OF CLAIM PRIOR TO THE BAR DATE.  THE DEBTOR'S PLAN RESERVES ALL RIGHTS TO AVOID SUCH LIENS OR TO DETERMINE THAT SUCH LIENS ARE EFFECTIVELY VALUELESS UNDER SECTION 506, AS NEEDED TO ESTABLISH CLEAR TITLE TO ASSETS OF THIS BANKRUPTCY ESTATE.  THE PLAN RESERVES JURISDICTION TO THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRIT OF IDAHO TO ADDRESS THESE MATTERS.**

*CORPORATE ORGANIZATION*

The Debtor is an Idaho Corporation in good standing.  At the present time, the Debtor has only one class of Stock, common stock.  It is a voting class.  All shares of stock are owned by two (2) shareholders, namely Lon E. Montgomery and Joshua A. McCuistion.  The shares of stock are recorded on the books of the company in the following amounts:

| NAME OF SHAREHOLDER | PERCENTAGE |
|---|---|
| Lon E. Montgomery | 90% |
| Joshua A. McCuistion | 10% |

The Plan contemplates restructuring of the corporate organization and the capital structure of the Debtor in compliance with 11 U.S.C. § 1129(b)(2)(B)(ii).  **An effect of confirmation shall be to extinguish the equity interest of the prepetition shareholders and vest ownership of the Debtor in the post-petition/post-confirmation equity interest holders of class EI2:**

| **Name of Post-petition Stockholder** | **Percentage** |
|---|---|
| Lon E. Montgomery | 100% |

*See Article Four, Paragraph 4 of the Plan.*

The proposed corporate organization post-confirmation, identifying officers and directors, is set out below:

| *Name* | *Office Held* |
|---|---|
| Lon E. Montgomery | President |
| Sandra J. Huntley | Secretary |
| Lon E. Montgomery | Director |
| Debra J. Denny | Director |
| Sandra J. Huntley | Director |

In exchange for the above described equity interests, said interest holders under the Plan have provided post-petition ongoing support and assistance to the Debtor to ensure successful ongoing business operations.  It is the Debtor's considered opinion that absent the assistance, expertise, and support of these individuals the Debtor's reorganization effort would be severely hampered, with liquidation the probable result without such support.

### BASIS OF VALUATION

The basis of the evaluation of property contained in the liquidation analysis, or best interest of creditors, test, was obtained from various sources, primarily the opinions the estate's certified appraiser and licensed realtor, whose employment applications have been filed with approval pending.  While certain creditors have expressed concern over the difference between the scheduled values, it should be noted that the previous values established in the schedules were obtained from appraisals pursuant to a former lender's request which obtained instructions to the appraiser for the determination of values pursuant to the lender's requirements and were the most recent appraisals at the time of the filing of the petition—obtained in 2009. The values in the current BPOs and appraisals are relative to the market conditions today, as summarized in the attached Appendix P.  Copies of the underlying documentation upon which the attached summaries are based can be obtained upon written request to Debtor's counsel.

IT SHOULD BE BORNE IN MIND THAT THE VALUES ESTABLISHED IN THIS ANALYSIS ARE ONLY THE BEST ESTIMATES OF THE DEBTOR.  These values were arrived at by assuming that the entirety of the Debtor's assets would be liquidated and it is assumed that different values might be obtained in limited or spot sales of similar property over an extended period of time.  It must be kept in mind that secured creditors will exert a major effort to reclaim their property at the earliest possible time to avoid their collateral being involved in the liquidation process.  This sort of activity will reduce the liquidation value of the Debtor's estate.

### LIQUIDATION ANALYSIS
#### "Best Interests of Creditors Test"

Notwithstanding acceptance of the Plan by creditors, in order to confirm the Plan the Court must independently determine that the Plan is in the best interests of all classes of creditors and stockholders.  The "best interest" test requires that the Court find that the Plan provides to each member of each impaired class of claims and interest a recovery which has a present value at least equal to the present value of a distribution which each such person would receive from the Debtors if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code instead of being reorganized under Chapter 11 of the Bankruptcy Code.

To calculate what members of each impaired class of unsecured claims or interest would receive if the Debtors were liquidated, the Court must first determine the dollar amount that

would be generated from the disposition or liquidation of the assets of the Debtors in excess of the amount necessary to pay allowed secured claims, plus the cash held by the Debtors, and plus recoveries on actions against third parties.  The proceeds of this liquidation will then be reduced by the costs of the liquidation.  Such a liquidation would probably take place in a Chapter 7 proceeding and such a proceeding would likely include the fees of a trustee as well as those of counsel and other professionals that might be retained by such trustee, selling expenses (including costs of advertising and auctioneer's fees or brokerage commissions), unpaid expenses incurred by the Debtor during its reorganization proceedings under Chapter 11, and claims arising by rejection by the trustee of obligations incurred by the Debtor during the pendency of the Chapter 11 case.

The value of the distributions after liquidation, deduction of costs of liquidation, and in keeping with the analysis described above would then be compared by the Court with the present value being offered to each of the classes of unsecured claims and interests under the Plan.  The Debtor also believes that secured and unsecured claims in a liquidation would be significantly greater than under the contemplated plan.

The proponent also believes that liquidation of the Debtor's estate would be a time consuming matter and might involve litigation between a Chapter 7 trustee and the various claimants to assets of the estate.  It would not be unusual that no distribution to unsecured creditors in a Chapter 7 liquidation proceeding would be forthcoming for one or more years.

THE DEBTOR FIRMLY BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF EACH CLASS OF CREDITORS AND THAT THE CREDITORS WILL RECEIVE A LARGER AND QUICKER DISTRIBUTION UNDER THIS PLAN OF REORGANIZATION THAN THEY WOULD IF THE DEBTOR'S ESTATE WERE LIQUIDATED.

The following pages set forth assets, liabilities and estimated expenses Debtor is using to

calculate its liquidation analysis.

## LIQUIDATION ANALYSIS SUMMARY

| TYPE OF ASSET | ESTIMATED VALUE |
|---|---|
| Real Property Assets (See Appendix P for itemization and details) | 392,138.02[6] |
| Cash on hand | 3.96[7] |
| Cash on account | 14,287.72[8] |

---

[6] For the Debtor's opinion of the current fair market value of the estate's interest in real property, please see Appendix P, which is based on recent appraisals and broker's price opinions obtained by the Debtor.

[7] This number represents the cash on hand as of April 30, 2011.

[8] This amount represents all of the Debtor's accounts as of April 30, 2011, and consists of the following:

| | |
|---|---|
| Current Accounts Receivable | 5,332.15[9] |
| Notes Receivable/Aged A/R (*See Appendix Q for itemization and detail*) | 93,661.90[10] |
| L&S Development, Inc. | 0.00[11] |
| Old Shoshone Ranch, LLC | 0.00[12] |
| Machinery & Equipment (*See Appendix R for itemization and detail*) | $37,381.51[13] |
| Preferences, Fraudulent Conveyances, and Lien Avoidance, etc. (Litigation | TBD--0.00[14] |

---

| | |
|---|---|
| Magic Valley Bank (Operating Account): | $6,484.73 |
| Magic Valley Bank (Rental Account): | 869.28 |
| Property Management Trust: | 6,933.71 |

The amount of the Magic Valley Bank (Litigation Reserve) Account in the amount of 10,767.70 is not included in the above noted amount due to the related litigation.

[9] This amount represents all of the Debtor's current accounts receivable as of April 30, 2011 No discount factor has been attributed as the Debtor believes these accounts will be paid without the necessity of any discount or associated collection cost outside the ordinary course of business.

[10] This amount includes notes that were previously secured by second lien hold positions in real property that has been foreclosed upon  in violation of 11 USC § 362.  It also include notes listed in Schedule B, Attachment B.21. Collectability of the notes as unsecured obligations would, in the Debtor's opinion, be extremely difficult and uncertain.  While these notes have a face value of $936,619.00 in the aggregate, the Debtor believes 10% of face value is a reasonable estimate of the liquidation value after discounting for the factors set forth above and in light of anticipated collectability issues and costs of collection.  Notwithstanding this substantial discount, the Plan provides that the Net Litigation Recovery on these receivables shall be paid to the unsecured creditors.

[11]  L&S Development, Inc. is a corporation in which 49% of the stock is held by Mr. Montgomery for and in behalf of The Leed Corporation.  This corporation consists of a real estate development known as Phase 5 of Green Cut Subdivision, also known as Desert Rose Estates, which was listed on Schedule A at line A.1.74.  This property is valued at $225,500.00 and has a loan against it in the amount of $100,000.00, leaving an estimated $125,500.00 in equity of which the Debtor's interest is $61,495.00.  However, there are additional liabilities of L&S Development, Inc. that must be satisfied before any shareholder distribution can be made.  The Debtor understands that Mr. Slusher and Slusher Construction loaned an additional $200,000.00 to L&S Development, Inc. and this loan leaves no available equity for the benefit of this estate.

[12]  Old Shoshone Ranch, LLC is a limited liability company in which the 25% membership interest is held by Mr. Montgomery for and in behalf of the Debtor.  This company's operations consist of the development of the Parker Ranch Subdivision, which was listed on Schedule A at lines A.1.41 to A.1.45, and other acreages that have been rezoned.  This property is fully encumbered by a loan for the benefit of Nathan D. Bachman.  Where Debtor's interest is limited to an equitable interest in the 25% membership interest, and the company is a single asset real estate entity, it is the Debtor's opinion that there is currently no available equity for the benefit of this estate.

[13] The Debtor believes that the majority of the machinery and equipment are subject to valid liens, which have been addressed in adequate protection stipulations.  The Debtor further believes that in a liquidation, there would be no equity above the amount stated and the amount owed to the secured creditors resulting from the liquidation of this machinery and equipment.  The $56,000.00 noted here is due to the post-petition recordation of the Miner lien on certain equipment and is the Debtor's estimate as to the value of the equipment that would be unencumbered.

[14] As set forth *supra*, the Debtor believes it may have claims under the Bankruptcy Code and Idaho Law; however such claims are as of yet undetermined, subject to litigation and such the amount listed here is zero.  *Again, the Debtor's Plan provides that the Net Litigation Recovery shall be paid to unsecured creditors.*

Recovery)

Executory Contracts/Leases                                                    0.00[15]

                                                    **TOTAL:    $542,805.26**

*LIABILITIES*

*INDEBTEDNESS*                                    *AMOUNT OF DEBT*

**ASSERTED SECURED CLAIMS:[16]**

| | | |
|---|---|---:|
| 3 | IDAHO TAX | 1,180.41 |
| 9 | VARGAS ROOFING | 4,564.65 |
| 11 | AGUNDEZ CONCRETE | 15,065.17 |
| 12 | FRANKLIN BUILDING | 178,746.17 |
| 13 | FARM BUREAU | 20,177.93 |
| 14 | FARM BUREAU | 42,700.38 |
| 15 | FARM BUREAU | 14,600.82 |
| 16 | DEERE CREDIT | 28,752.66 |
| 19 | 21ST MORTGAGE | 117,027.56 |
| 20 | 21ST MORTGAGE | 124,145.24 |
| 22 | SPRUCE MOUNTAIN | 180,000.00 |
| 23 | WFDS | 32,487.39 |
| 24 | WFDS | 36,598.65 |
| 26 | WFDS | 32,755.46 |
| 32 | INTERNAL REVENUE SERVICE | 28,805.28 |
| 33 | IDAHO MUTUAL TRUST | 204,594.65 |
| 37 | TIMBERLINE EXT. | 8,762.90 |
| 38 | MITCH CAMPBELL | 336,400.00 |
| 39 | SHAUN MINER | 16,000.00 |
| 41 | JOHN DEERE LAND. | 54,852.14 |
| 42 | GMAC | 123,980.67 |
| 43 | WOODMASTER | 20,000.00 |
| 44 | GMAC | 118,710.75 |
| 45 | GMAC | 128,252.00 |
| 46 | TWIN FALLS CO. | 9,153.46 |
| 48 | QUALITY TRUSS | 36,731.00 |
| 49 | SECURITY FINANCIAL | 173,304.25 |
| 52 | GMAC | 173,687.48 |
| 56 | MONTROSE INVEST. | 522,635.84 |
| 61 | RUSTY/ANN PARKER | 122,000.00 |
| 62 | GMAC | 155,920.43 |
| 63 | GMAC | 283,412.95 |
| 64 | GMAC | 211,448.11 |
| 65 | ALT. FUNDING | 130,000.00 |
| 66 | ROBERT/KATHI MEYERS | 114,330.00 |
| 67 | MEYERS | 305,102.87 |
| 68 | RUSTY/ANN PARKER | 106,000.00 |
| 69 | ROBERT/KATHI MEYERS | 260,000.00 |

---

[15] The Debtor believes that the executory contracts and leases set forth supra retain value in a reorganization; however, the Debtor believes that such agreements retain no value in the event of a liquidation.
[16] These amounts do not included stipulated reductions; the Debtor believes that such stipulations may retain no force in the event of a liquidation.

| 70 | ROBERT/KATHI MEYERS | | 197,000.00 |
| 84 | ROBERT/KATHI MEYERS | | 130,000.00 |
| 86 | KENNY CARDONA | | 5,619.27 |
| 87 | DAVID/MARTHA ORR | | 391,991.95 |
| 88 | LINCOLN COUNTY | | 47,537.27 |
| D | 127 MILL GREEN | | 44,741.88 |
| D | BANK OF AM. | | 10,000.00 |
| D | BANK OF AM. | | 87,903.53 |
| D | BANK OF AM. | | 196,000.00 |
| D | BANK OF AM. | | 66,309.24 |
| D | ORRS | | 390,000.00 |
| D | EMC | | 46,227.74 |
| D | MARTENS | | 310,000.00 |
| D | NEAL HOCKLANDER | | 56,000.00 |
| D | VANDERBILT MORTGAGE | | 49,368.83 |
| | | **TOTAL SECURED CLAIMS:** | **$6,501,586.98** |
| | | | |
| **UNSECURED PRIORITY CLAIM** | | | |
| 3 | IDAHO TAX | | 8,305.77 |
| 32 | INTERNAL REVENUE SERVICE | | 36,858.73 |
| 47 | IDAHO LABOR | | 1,495.05 |
| Schedule E | STATE OF NEW MEXICO | | 105.00 |
| Unpaid Estimated Administrative Claims (Professionals) | | | $150,000.00[17] |
| Contingent Attorney's Fees | 33.33 to 40% of Net Litigation Recovery plus costs | | TBD/Unknown |
| | | **TOTAL PRIORITY CLAIMS:** | **$196,764.55** |
| **GENERAL UNSECURED CREDITORS** | | **TOTAL GUS CLAIMS:** | **$1,515,618.34[18]** |
| | | **TOTAL CLAIMS:** | **$8,213,969.87** |
| | | **NET DIFFERENCE:** | **(7,671,164.61)** |

This Disclosure Statement shows that General Unsecured Creditors would not be paid in full, in the event of a Chapter 7 liquidation. The "Net Difference" represents the estimated value available to other claims of that Chapter 7 estate and to the Debtors-in-possession. The total amount of unsecured claims listed in Appendix "D" is **$1,515,618.34**. Additionally, please note

---

[17] To the extent creditors object to confirmation of the proposed plan and/or additional litigation is required in order to liquidate assets of this estate, administrative expenses may exceed this estimate; to the extent a consensual Plan may be confirmed, this amount may be less than the stated estimate. Further, this estimate is extremely conservative given the amount of potential litigation arising out of the claims and lien avoidance issues, etc. associated with this case. The Plan provides that the Net Litigation Recovery will be paid to unsecured creditors. Any such professional fees are subject to Court approval prior to payment pursuant to 11 U.S.C. § 330 and § 503.

[18] This amount is the total amount of general unsecured claims without taking into account the anticipated claim objections, or unsecured portions allowed pursuant to 11 U.S.C. § 506.

that *the "Net Difference" does not quantify the costs of liquidation of the estate by a Chapter 7 Trustee.*'

The books and records of the proponent are largely in the possession of proponent. Attached hereto as Appendix G is a true and correct copy of the Debtor's Income Statements for 2006, 2007, 2008 and 2009 (i.e. the four years preceding the petition date of April 29, 2010). Attached hereto as Appendix "L" is a true and correct copy of the Debtor's Profit and Loss Statement from the date of filing, April 29, 2010 through April 30, 2011.

## CONFIRMATION OF THE PLAN

<u>Voting Procedure</u>:  All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the "Ballot for Accepting or Rejecting Plan of Reorganization" attached to this Disclosure Statement as Appendix C. The Ballot must be filed with the Bankruptcy Court and may be submitted personally or by mailing such Ballot to the U.S. Bankruptcy Court, 801 E. Sherman Street, Pocatello, ID 83201.  In order to be counted all ballots must be filed or received by the Bankruptcy Court prior to 5:00 o'clock p.m. on the date specified in the order approving the Debtor's Disclosure Statement.

<u>Persons Entitled to Vote on Plan</u>:  Only the votes of classes of creditors whose claims or interests are impaired by the Plan of Reorganization will be counted in connection with confirmation of the Plan of Reorganization.  Generally, and subject to the specific provisions of §1124 of the Bankruptcy Code, this includes any creditor who, under the Plan, will receive less than payment in full in cash of the allowed amount of their respective claims on the <u>effective</u> date of the Plan.  It appears to Debtor that, excepting classes PC1, PC3, PC5 and SC22, all claims/classes are impaired.  *See Article Two* and *Article Three* of the Plan.  In determining acceptance of the Plan, votes will be counted only if submitted by a creditor whose claim is scheduled by the Debtor as undisputed, non-contingent and liquidated, or who, prior to the hearing on confirmation, has filed with the Bankruptcy Court a Proof of Claim which has not

been disallowed, disqualified, suspended or otherwise objected to prior to computation of the vote on the Plan. The ballot which accompanies this Disclosure Statement does not constitute a Proof of Claim. If you are uncertain whether your claim has been correctly scheduled, you should check the Debtor's schedules which are on file with, and may be inspected at, the U.S. Bankruptcy Court, 801 E. Sherman Street, Pocatello, ID 83201.

The Plan sets forth membership of the respective classes at Article One. Treatment of the respective classes is set forth in Article Four. **Please review the Plan carefully to determine how your claim is treated under the Plan.**

Acceptances May Not be Necessary to Confirm Plan: Under §1126 of the Bankruptcy Code an impaired class is deemed to have accepted the Plan if (1) at least 2/3 in amount and (2) more than 1/2 in number of the allowed claims or interests of class members who have voted on the Plan have voted to accept it. Further, unless there is unanimous acceptance of the Plan by an impaired class, the Bankruptcy Court must also determine that under the Plan such class members will receive property of value, as of the effective date of the Plan, that is not less than the amount that such class member would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the effective date of the Plan. Even if all classes of claims or interests accept the Plan, the Court may refuse to confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and there are other provisions therein which may affect confirmation exclusive of the votes of creditors.

Confirmation of Plan Without Acceptances: The Court may confirm a Plan even though less than all of the classes of claims or interests accepts the Plan. The circumstances under which the Court may confirm a Plan over the objection of a class of claims or interests are set forth in §1129(b) of the Bankruptcy Code. This section provides that the Court may confirm a

Plan notwithstanding its rejection by one or more impaired classes if the Court finds that the Plan does not discriminate unfairly and is *fair and equitable* with respect to each impaired class which does not accept the Plan. With respect to classes of secured creditors, the *fair and equitable* test requires that a secured creditor (1) retain its lien and receive cash payments having a present value equal to its allowed secured claim, and (2) receive the proceeds of the sale of its collateral, or (3) realize the indubitable equivalent of its claim to the extent validly secured.

With respect to a class of unsecured claims, the *fair and equitable* test requires that if each creditor in such class does not receive property having a present value equal to the amount of such creditors allowed claim, no junior class can receive or retain any property. The proponent of the Plan will rely on the features of §1129(b) in the event there is a rejection of the Plan by a class of claims or interests. The invocation of the provision of §1129(b) is a legal matter required to be heard by the Court at the confirmation hearing or at a hearing set by the Court.

Consequences of Confirming the Plan: Confirmation of the Plan will not discharge the Debtor from the debts provided in the plan; confirmation makes the Plan binding upon the Debtor, creditors and other parties in interest regardless of whether they have accepted or rejected the Plan. Confirmation of the Plan will, generally, provide for the distribution of value to the creditors as set forth in the Plan.

Risks Associated with Confirming the Plan: The Debtor has endeavored to accurately state the projected Net Profit based on the projections contained in Appendices "M" and "N." Given the relatively recent upheaval in the national and local economy, projections are inherently difficult—particularly if based upon historical data. The projections contained in Appendices "M" and "N" are based primarily upon the Debtor's historic performance as well as the Debtor's

performance projected for the term of the Plan, anticipating a 2% increase in operating expenses and a 4% increase in landscaping revenue. These projections are naturally conservative and assume that the Debtor's performance will remain fairly constant with no significant decrease or increase. The real estate sales projections are based on the assumptions discussed supra. Even assuming the airport relocation takes longer than and the real estate market remains stagnant, the plan allows for the recapture of any appreciation in the market for the benefit of the unsecured creditors, while using the Net Rents for the benefit of the creditors. This recapture is accomplished through the use of rents fund payments to secured creditors whose liens have been "crammed down" to the current fair market value. Fifty percent of the landscaping Net Profit is also dedicated to implement the Plan. To the extent that negative, unforeseen circumstances may occur, the Debtor's performance may be negatively impacted to the detriment of this estate and creditors thereof.

Current Real Estate Market Conditions: Appendix H contains historical data with regards to the Idaho real estate market; such data indicates that the Idaho real estate market has been in a significant decline and further decline is forecast for the next year. However, the historical data does suggest that the market will rebound, although when such a rebound occurs and how swiftly are unknown. When considering the Debtor's Plan, creditors should consider the current state of the market.

Hearing on Confirmation of the Plan: The Bankruptcy court has set a hearing date to determine whether the Plan has or will be accepted and whether the other requirements for confirmation of the Plan have been satisfied. A time for hearing for confirmation of the Plan has been established in Appendix "A" hereto and each creditor and shareholder should make note of that Notice of Hearing and determine whether or not they want to attend. Attendance is not

mandatory to establish a claim.  Also, as also set forth in Appendix "A", all ballots must be timely filed with the Bankruptcy Court as outlined in Appendix "A."

Retention of Jurisdiction:  If the Plan is confirmed the Bankruptcy Court, it will retain jurisdiction, as more specifically set out in the Plan, to adjudicate the allowance of claims, the value of secured interests, the disposition of executory contracts or unexpired leases, the avoidance of liens or transfers, litigation concerning claims and property of the estate (including actions regarding title to property of the estate), rule on modifications of the Plan if any, and to issue such orders and judgments as may be necessary to implement the Plan and resolve disputes concerning the Plan.

## *TAX IMPLICATIONS*

Debtor does not currently believe there will be any adverse tax consequences connected to confirmation of the Plan. Debtor is not familiar with any tax attributes held by its creditors and is advising creditors to consult with their own experts as to the tax implications, if any, of the Plan on those creditors.

## *BANKRUPTCY SCHEDULES*

This Disclosure Statement is meant to disclose all of the assets and liabilities of the Debtor in summary fashion.  To the extent it contradicts the bankruptcy schedules on file with the Bankruptcy Court the disclosures contained in this Disclosure Statement and Appendices control.

DATED:      May 27, 2011

THE LEED CORPORATION

By: _/s/ Lon E. Montgomery_
    LON E. MONTGOMERY
    President

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br>LEED CORPORATION (THE),<br><br><br>Debtor. | Case No. 10-40743 JDP<br><br>Chapter 11 |

*[PROPOSED]* ORDER APPROVING DISCLOSURE STATEMENT AND FIXING TIME FOR: (1) FILING ACCEPTANCES OR REJECTIONS OF PLAN, AND (2) HEARING ON CONFIRMATION OF THE PLAN

A Disclosure Statement under Chapter 11 of the Bankruptcy Code having been filed by the Debtor on February 24, 2011, referring to a proposed Chapter 11 Plan of Reorganization (the "Plan") filed by the Debtor on the same date; and

The Court finding, pursuant to 11 U.S.C. § 1125(b), that approval of the Disclosure Statement is appropriate, and finding that the Disclosure Statement contains adequate information, and other good cause appearing

IT IS ORDERED AND NOTICE IS HEREBY GIVEN THAT:

A.  The Disclosure Statement filed by the Debtor dated February 24, 2011 is approved pursuant to 11 U.S.C. § 1125(b);

B.  _____ is fixed as the last day for filing written acceptances or rejections of the Plan referred to above;

C. The hearing on confirmation of the Plan has been set before this Court, at the U.S. Courtroom, Federal Building, 801 E. Sherman Avenue, Pocatello, Idaho on _____, or as soon thereafter as counsel can be heard;

D. Within seven (7) days after entry of this Order, the Plan, a copy of this Order, the Disclosure Statement, and a Ballot conforming to Official Form 14 shall be mailed to creditors,

## APPENDIX "A"

*([Proposed] Order Approving Disclosure Statement)*

equity security holders, and other parties in interest, and shall be transmitted to the United States Trustee, as provided in Federal Rules of Bankruptcy Procedure 3017(d).

E. _____ is fixed as the last day for filing and serving written objections to confirmation of the Plan pursuant to Federal Rule of Bankruptcy Procedure 3020(b)(1).

F. Any objections must be filed with the United States Bankruptcy Court at 801 E. Sherman Avenue, Pocatello, Idaho and served on Debtor's counsel, Robert J. Maynes, Esq., P.O. Box 3005, Idaho Falls, Idaho 83403 and on the United States Trustee, 720 Park Boulevard, Suite 220, Boise, Idaho 83712.

//end of text//
Submitted by:
Robert J. Maynes
Debtor's Counsel

APPENDIX "A"

*([Proposed] Order Approving Disclosure Statement)*

# APPENDIX "B"

*(The Plan of Reorganization)*

ROBERT J. MAYNES, ISB No. 6905
*Attorney at Law*
P. O. Box 3005
Idaho Falls, ID 83403
Telephone: (208) 552-6442
Facsimile: (208) 522-1334
Email: mayneslaw@hotmail.com

*Debtor's counsel*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br>LEED CORPORATION (THE),<br><br><br>Debtor. | Case No. 10-40743 JDP<br><br>Chapter 11<br><br>**BALLOT FOR ACCEPTING OR REJECTING PLAN**<br><br>[  ] **Secured**<br>[  ] **Unsecured**<br>[  ] **Priority** |

TO: _____
                (Name of Creditor)

The plan referred to in this ballot can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class and the holders of two-thirds in amount of equity security interest in each class voting on the plan. In the event the requisite acceptance are not obtained, the Court may nevertheless confirm the plan if the Court finds that the plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of Section 1129(b) of the Code.

**<u>To have your vote count you must complete and return this ballot</u>**.

DISCLOSURE STATEMENT—THE LEED CORPORATION
MAY 27, 2011
PAGE 46

# APPENDIX "C"

*(Ballot for Accepting or Rejecting Plan)*

[*If holder of a secured claim*] The undersigned, a creditor of the above named Debtor in the unpaid principal amount of $ _____, with a secured interest in _____ [*property of the Debtor in which security interest is claimed*],

[*If holder of a priority unsecured claim*] The undersigned, a creditor of the above named Debtor in the unpaid principal amount of $ _____, entitled to priority status pursuant to 11 U.S.C. _____ [*Bankruptcy Code section under which priority status is claimed*], or

[*If holder of general unsecured claim*] The undersigned, a creditor of the above named Debtor in the unpaid principal amount of $ _____,

**Check one box:**      [    ] **Accepts**           [    ] **Rejects**

the plan for the reorganization of the above named Debtor.

Print or type name of business: _____

Signed: _____

(If appropriate)     By: _____

As: _____

Address: _____

_____

**THIS BALLOT MUST BE RETURNED TO THE BELOW ADDRESS, SO THAT IT IS RECEIVED ON OR BEFORE <u>JUNE 11, 2010</u>.**

Case Administrator
U.S. Federal Bldg.
801 E. Sherman
Pocatello, ID  83201

# APPENDIX "C"

*(Ballot for Accepting or Rejecting Plan)*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br>LEED CORPORATION (THE),<br><br>Debtor. | Case No. 10-40743 JDP<br><br>Chapter 11 |

**DEBTOR'S LIST OF CLAIMS[19]**

| CLAIM NO. | CLAIMANT | SECURED | PRIORITY | UNSECURED |
|---|---|---|---|---|
| 1 | DEERE | 11,086.01 | | |
| 2 | COSHO HUMPHREY | | | 51.10 |
| 3 | IDAHO TAX | 1,180.41 | 8,305.77 | 2,144.41 |
| 4 | NAPA AUTO PARTS | | | 989.65 |
| 5 | ASH INTERNATIONAL | | | 30,800.49 |
| 6 | HARPER LEAVITT | | | 14,633.21 |
| 7 | JOHN LOTHSPEICH | | | 36,949.09 |
| 8 | BRENNEN CARPET | | | 3,400.00 |
| 9 | VARGAS ROOFING | 4,564.65 | | |
| 10 | WELLS FARGO BANK | | | 10,936.97 |
| 11 | AGUNDEZ CONCRETE | 15,065.17 | | |
| 12 | FRANKLIN BUILDING | 178,746.17 | | |
| 13 | FARM BUREAU | 20,177.93 | | |
| 14 | FARM BUREAU | 42,700.38 | | |
| 15 | FARM BUREAU | 14,600.82 | | |
| 16 | DEERE | 28,752.66 | | |
| 17 | AAA RENTAL | | | 4,739.63 |
| 18 | FIA CARD SERVICES | | | 18,574.83 |
| 19 | 21ST MORTGAGE | 117,027.56 | | |
| 20 | 21ST MORTGAGE | 124,145.24 | | |
| 21 | NAMES & NUMBERS | | | 445.11 |
| 22 | SPRUCE MOUNTAIN | 180,000.00 | | |
| 23 | WFDS | 32,487.39 | | |
| 24 | WFDS | 36,598.65 | | |
| 25 | CITY OF SHOSHONE | | | 2,907.36 |

---

[19] This list does not include those parties listed on Schedule G or the Equity Interest Holders of the Debtor.  It also does not account for any anticipated objections to claims.  It also does not account for stipulated reductions in secured claims.

APPENDIX "D"

*(Debtor's List of Claimants)*

| 26 | WFDS | 32,755.46 | | |
| 27 | MILLER CONCRETE | | | 720.00 |
| 28 | IDAHO MOUNTAIN EXPRESS | | | 506.40 |
| 29 | FRUIT TRACT WATER | | | 678.91 |
| 30 | IDAHO POWER | | | 1,654.66 |
| 31 | CAPITAL LAW GROUP | | | 1,166.41 |
| 32 | INTERNAL REVENUE SERVICE | 28,805.28 | 36,858.73 | 7,804.45 |
| 33 | IDAHO MUTUAL TRUST | 204,594.65 | | |
| 34 | GLENDALE CONSTR. | | | 35,005.67 |
| 35 | SPRINKLER SHOP | | | 107.83 |
| 36 | SPRINT/NEXTEL | | | 1,710.71 |
| 37 | TIMBERLINE EXT. | 8,762.90 | | |
| 38 | MITCH CAMPBELL | 336,400.00 | | |
| 39 | SHAUN MINER | 16,000.00 | | 2,300.00 |
| 40 | MERCHANTS CREDIT | | | 1,677.22 |
| 41 | JOHN DEERE LAND. | | | 54,852.14 |
| 42 | GMAC | 123,980.67 | | |
| 43 | WOODMASTER | 20,000.00 | | 22,309.10 |
| 44 | GMAC | 118,710.75 | | |
| 45 | GMAC | 128,252.00 | | |
| 46 | TWIN FALLS CO. | 9,153.46 | | |
| 47 | IDAHO LABOR | | 1,495.05 | 234.12 |
| 48 | QUALITY TRUSS | 36,731.00 | | 10,466.73 |
| 49 | SECURITY FINANCIAL | 173,304.25 | | |
| 50 | CITIBANK | | | 40,702.91 |
| 51 | CBP AFFILIATED | | | 1,115.14 |
| 52 | GMAC | 173,687.48 | | |
| 53 | CJ HEATING/AC | | | 31,184.50 |
| 54 | GE MONEY | | | 1,279.99 |
| 55 | ZION'S | | | 4,780.80 |
| 56 | MONTROSE INVEST. | 522,635.84 | | |
| 57 | ACTION PLUMBING | | | 22,400.00 |
| 58 | OLD HOME PLACE | | | 7,356.18 |
| 59 | PHILS ELECTRIC | | | 43,959.27 |
| 60 | HOTSHOT ELECTRIC | | | 6,988.50 |
| 61 | RUSTY/ANN PARKER | 122,000.00 | | 806.01 |
| 62 | GMAC | 155,920.43 | | |
| 63 | GMAC | 283,412.95 | | |
| 64 | GMAC | 211,448.11 | | |
| 65 | ALT. FUNDING | 130,000.00 | | 108,161.14 |

# APPENDIX "D"

*(Debtor's List of Claimants)*

| | | | |
|---|---|---|---|
| 66 | ROBERT/KATHI MEYERS | 114,330.00 | 98,116.20 |
| 67 | ROBERT/KATHI MEYERS | 305,102.87 | 58,957.13 |
| 68 | RUSTY/ANN PARKER | 106,000.00 | 5,280.93 |
| 69 | ROBERT/KATHI MEYERS | 260,000.00 | 88,754.00 |
| 70 | ROBERT/KATHI MEYERS | 197,000.00 | 65,834.35 |
| 71 | ROBERT/KATHI MEYERS | | 15,759.00 |
| 72 | ROBERT/KATHI MEYERS | | 15,759.00 |
| 73 | ROBERT/KATHI MEYERS | | 14,805.00 |
| 74 | ROBERT/KATHI MEYERS | | 12,920.00 |
| 75 | ROBERT/KATHI MEYERS | | 6,519.00 |
| 76 | ROBERT/KATHI MEYERS | | 9,918.00 |
| 77 | ROBERT/KATHI MEYERS | | 13,230.00 |
| 78 | ROBERT/KATHI MEYERS | | 13,230.00 |
| 79 | ROBERT/KATHI MEYERS | | 13,230.00 |
| 80 | ROBERT/KATHI MEYERS | | 4,095.00 |
| 81 | ROBERT/KATHI MEYERS | | 8,118.00 |
| 82 | ROBERT/KATHI MEYERS | | 9,918.00 |
| 83 | ROBERT/KATHI MEYERS | | 9,918.00 |
| 84 | ROBERT/KATHI MEYERS | 130,000.00 | 106,741.33 |
| 85 | ROBERT/KATHI MEYERS | | 4,086.00 |
| 86 | KENNY CARDONA | 5,619.27 | |
| 87 | DAVID/MARTHA ORR | 391,991.95 | |
| 88 | LINCOLN COUNTY | 47,537.27 | |
| 89 | IDAHO PIPE AND STEEL | | 1,123.19 |
| D | 127 MILL GREEN | 44,741.88 | |
| D | BANK OF AM. | 10,000.00 | |
| D | BANK OF AM. | 87,903.53 | |
| D | BANK OF AM. | 196,000.00 | |
| D | BANK OF AM. | 66,309.24 | |
| D | ORRS | 390,000.00 | |
| D | EMC | 46,227.74 | |
| D | MARTENS | 310,000.00 | |
| D | NEAL HOCKLANDER | 56,000.00 | |
| D | VANDERBILT MORT. | 49,368.83 | |
| E | STATE OF NEW MEXICO | 105.00 | |
| F | A-CORE | | 325.00 |
| F | ACTION PLUMBING | | 15,400.00 |
| F | APPLIANCES ETC. | | 169.73 |
| F | BIG WOOD CANAL | | 203.00 |
| F | KJ SUPERSTORE | | 83.31 |

APPENDIX "D"

*(Debtor's List of Claimants)*

| | | |
|---|---|---:|
| F | BOZZUTO'S FURNITURE | 1,985.73 |
| F | C&D HEATING | 2,000.00 |
| F | CABLE ONE | 173.48 |
| F | CENTRAL IDAHO C. | 100,000.00 |
| F | CESCO | 888.06 |
| F | CITY OF DIETRICH | 32.18 |
| F | CH'S HEATING | 17,179.00 |
| F | CLEAR CREEK DISP. | 183.57 |
| F | CONSTR. SEMINARS | 106.06 |
| F | CRAMER PUMP | 300.00 |
| F | DAVE SLUSHER | 100,000.00 |
| F | DEX | 2,752.65 |
| F | DISH NETWORK | 68.70 |
| F | FAST GLASS | 243.60 |
| F | FRUIT TRACT | 678.91 |
| F | GLENDALE CONST. | 35,005.67 |
| F | GRATZER H/C | 165.00 |
| F | HAILEY WHOLESALE | 588.53 |
| F | HARLEY SANDERS | 25,000.00 |
| F | HIATT TRUCKING | 4,888.29 |
| F | IDAHO MT. EXPRESS | 506.40 |
| F | IRWIN REALTY | 12,000.00 |
| F | KELLEY SOD | 252.73 |
| F | LTE | 61.00 |
| F | LAVA ROCK RENTALS | 716.80 |
| F | LEE'S AUTOMOTIVE | 1,109.12 |
| F | LOWE/GE MONEY BANK | 11,684.60 |
| F | MCI | 161.74 |
| F | MICROBE GUARD | 3,271.20 |
| F | MILLER CONCRETE | 1,303.00 |
| F | MR. STEAMS VALLEY | 583.00 |
| F | NAMES & NUMBERS | 445.11 |
| F | NAPA AUTO PARTS | 989.65 |
| F | NORTHVIEW SUBDIV. | 813.00 |
| F | OUTDOOR POWER | 49.45 |
| F | PARKER RANCH SUB | 510.00 |
| F | PETERSON BROS. | 650.00 |
| F | QWEST | 1,389.86 |
| F | RENTER CENTER | 232.92 |
| F | SPRINT | 2,152.84 |

APPENDIX "D"
*(Debtor's List of Claimants)*

| | | |
|---|---|---:|
| F | SUN VALLEY PROPERTIES | 25,000.00 |
| F | TAX MANAGEMENT | 2,000.00 |
| F | TAYLOR SEPTIC | 550.00 |
| F | SPRINKLER SHOP | 107.83 |
| F | TIMBERLINE TRASH | 148.76 |
| F | TIMES NEWS | 58.94 |
| F | TWIN FALLS CANAL | 142.08 |
| F | WEBB NURSERY | 3,822.40 |
| F | WESTERN COMMUNITY | 8,996.22 |
| F | WESTERN WASTE | 275.29 |
| F | WEX | 12,492.28 |
| F | WILSON BATES | 1,247.84 |
| F | WINDOR'S GREENHOUSE | 661.04 |

| **SECURED** | **PRIORITY** | **UNSECURED** |
|---|---|---|
| **6,457,820.85** | **46,764.55** | **1,515,618.34** |

# APPENDIX "D"

*(Debtor's List of Claimants)*