ROBERT J. MAYNES, ISB No. 6905
*Attorney at Law*
P. O. Box 3005
Idaho Falls, ID 83405
Telephone: (208) 552-6442
Facsimile: (208) 522-1334
Email: mayneslaw@hotmail.com

*Debtor's counsel*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In Re: | Case No. 10-40743 JDP |
| LEED CORPORATION (THE), | Chapter 11 |
| Debtor. | |

## FIRST AMENDED DISCLOSURE STATEMENT

COMES NOW The Leed Corporation, the Debtor and Debtor-in-possession herein, and hereby submits its First Amended Disclosure Statement ("Disclosure Statement") pursuant to 11 USC §1125.

### *INTRODUCTION*

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN OF REORGANIZATION.

### PLEASE READ THIS DOCUMENT WITH CARE!

This Disclosure Statement is provided by The Leed Corporation, the Debtor in the above entitled case, to creditors and all parties in interest in order to inform them of the terms of the proposed plan of reorganization (the "Plan"), filed by the proponent in this case under Chapter 11 of Title 11 of the United States Code, in the United States Bankruptcy Court for the District of

Idaho. The purpose of this Disclosure Statement is to enable holders of claims as defined in the

plan, to make an informed judgment about the Plan of Reorganization, and to permit such

creditors and interest holders to make an informed judgment in exercising their right to vote on

the Plan of Reorganization. Section 1125 of the Bankruptcy Code requires that this Disclosure

Statement be submitted to holders of claims against the Debtor. This Disclosure Statement is to

contain sufficient information about the Debtor to enable creditors and other interested parties to

make an informed decision regarding the Plan of Reorganization. Pursuant to the terms of the

United States Bankruptcy Code, this Disclosure Statement was presented to the Bankruptcy

Court for approval.

> THE APPROVAL BY THE COURT OF THE DISCLOSURE STATEMENT
> DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE
> PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF
> THE INFORMATION CONTAINED THEREIN.

This Disclosure Statement is being furnished to all known creditors and claimants to

inform them about the plan and their rights with respect thereto. The only representations that

are authorized by the Debtor concerning its finances and business operations, the value of the

Debtor's assets (as provided by the estate's professionals consisting of a certified appraiser,

licensed realtor and marketing expert), its reorganization prospects, or other matters are the

representations contained in this Disclosure Statement. Certain of the financial information

contained in this Disclosure Statement has not been subjected to an audit by an independent

Certified Public Accountant. For that reason, the Debtor is not able to warrant or represent that

the information contained in this Disclosure Statement is without any inaccuracy; however, great

effort has been made to ensure that all such information is fairly represented.

In determining the acceptance of the Plan, votes will only be counted if submitted by the

claimant whose claim is duly scheduled by the proponent as undisputed, non-contingent, and

liquidated, or who, prior to the hearing on confirmation has filed with the court a proof of claim which has not been disallowed or suspended prior to the computation of the vote on the plan. A class that is unimpaired is deemed to have accepted the plan if solicitation of acceptance is not required under 11 USC § 1126(f). The ballot received from you does not constitute a Proof of Claim. If you are in any way uncertain whether or not your claim has been correctly scheduled, you should check the debtor's schedules which are on file in the office of the Clerk of the United States Bankruptcy Court, U.S. Courthouse, Pocatello, Idaho. Due to the business of the Clerk of the Bankruptcy Court, it is believed that this information will not be given by telephone.

Pursuant to Bankruptcy Code 11 USC §1129(b), the plan may be confirmed even it is not accepted by one or all of the impaired classes, provided the Bankruptcy Court does not discriminate unfairly and the plan is *fair and equitable* to such class or classes.

Accompanying this Disclosure Statement are copies of the following documents:

APPENDIX A:  The Court's *Order Approving Disclosure Statement* pursuant to 11 USC §1125, and affixing the time for the filing of acceptances or rejections of the Plan of Reorganization and for a hearing on confirmation of the Plan of Reorganization;

APPENDIX B:  The First Amended Plan of Reorganization (the "Plan");

APPENDIX C:  The ballot form for acceptance or rejection of the Plan of Reorganization;

APPENDIX D:  Debtor's list of secured and unsecured claims, including any disputed claims;

APPENDIX E:  Stipulation and Order Establishing Restitution Schedule (Case No. CR 96-02184);

APPENDIX F:  February 28, 2008 Letter from Lee Grigg re: Restitution Payment and Plan Completion;

APPENDIX G:  2006, 2007, 2008 and 2009 Income Statements;

APPENDIX H:  Landaker Marketing Economic Summary Report (May 2011);

APPENDIX I:        Dodge/Farah Criminal Indictment (CL&M) (Case No. 10-CR-01/02);

APPENDIX J:        April 2011 Lincoln County Work Force Trends (Idaho Department of Labor);

APPENDIX K:        Alternative Airport Replacement Sites map and Frequently Asked Questions (http://www.flysvra.com/archives.html);

APPENDIX L;        Debtor's Post-petition Profit and Loss Statement through April 30, 2011;

APPENDIX M;        Debtor's Landscaping and Home Sales Net Profit Projections;

APPENDIX N:        Debtor's Net Rents Projections;

APPENDIX O:        Possible Contested Claims;

APPENDIX P:        Debtor's Real Property Liquidation Analysis;

APPENDIX Q:        Debtor's Notes Receivable and Age A/R Liquidation Analysis; and

APPENDIX R:        Debtor's Machinery and Equipment Liquidation Analysis.

## *DEFINITIONS*

Unless the context otherwise requires, the following terms, when used in this First Amended Plan of Reorganization and the First Amended Disclosure Statement shall have the following meanings:

1.    ADMINISTRATIVE CLAIM:    A cost or expense of administration of this Chapter 11 case, including any actual and necessary expense of preserving or liquidating the estate, any actual and necessary expense of operating the business of the Debtor, and all allowances approved by the Court in accordance with the Bankruptcy Code.

2    ALLOWED CLAIM:    "Allowed Claim" shall mean a Claim:

(i)    in which a proof of Claim has been filed with the Court on or prior to the Bar Date, which claim has been determined by the Bankruptcy Court to be allowed by law; or

(ii)    which is scheduled in the Debtor's schedules of assets and liabilities and statement of financial affairs filed with the Court pursuant to §521 of the Bankruptcy Code and which has not been listed (or is no longer listed on the Confirmation Date, if previously so listed) as disputed, contingent or unliquidated; or

(iii)   in respect of which a proof of Claim has been filed with the Court pursuant to §502(h) or §502(i) of the Bankruptcy Code; and in any case as to which no objection to the allowance thereof has been interposed within any applicable period of limitation fixed by Bankruptcy Rule or an order of the Court, or as to which, if objections have been interposed, the Claim has been allowed by order of the Court.

3.   <u>ALLOWED INTEREST:</u>  "Allowed Interest" shall mean an interest in respect of which a proof of Interest has been filed with the Court on or prior to the Bar Date.

4.   <u>BANKRUPTCY CODE:</u>  "Bankruptcy Code" or "Code" shall mean the United States Bankruptcy Code, 11 U. S. C. §101 et seq. , and any amendments thereof.

5.   <u>CLAIM:</u>  "Claim" shall mean any right to payment or right to an equitable remedy against Debtor for breach of performance if such breach gives rise to a right to payment, whether or not such right to payment or right to an equitable remedy is reduced to judgment, or whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured.

6.   <u>CLASS:</u>  "Class" shall mean any class into which Claims or Interests are classified pursuant to the terms of the Plan.

7.   <u>CONFIRMATION DATE:</u>  The first business day occurring on or after the (14th) day after the Order of Confirmation is entered by the Court provided, however, that if a stay of the order confirming the Plan is in effect on such first business day, then the Confirmation Date shall be the first business day thereafter on which (i) no stay of the order confirming the Plan is in effect and (ii) the order confirming the Plan has not been vacated.

8.   <u>CONTESTED CLAIM:</u>  "Contested Claim" shall mean any Claim which is listed on the schedules filed by the Debtor as contingent, unliquidated or disputed or is, or becomes, the subject of an objection filed with the Court in accordance with the provisions of the Bankruptcy Code and which remains unresolved.

9.   <u>COURT:</u>  "Court" shall mean the United States Bankruptcy Court for the District of Idaho, presiding over the cases or, if necessary the United States District Court for said district having original jurisdiction over bankruptcy cases and the judges thereof.

10.   <u>EFFECTIVE DATE:</u>  The effective date of the Plan shall be the Confirmation Date as that term is defined above.

11.   <u>IN FULL:</u>  "In full" shall mean the amount owing as of the date of the filing of petition, the amount provided in a proof of claim owing as of the date of the filing of the petition, or the amount listed in the bankruptcy schedules filed with the Bankruptcy Court, whichever is less.  "In full" shall further mean a payment without post-petition interest, unless specifically provided for hereinafter.

12. NET LITIGATION RECOVERY: "Net Litigation Recovery" means any and all funds recovered for the benefit of this estate, exclusive of the payment of attorney's fees and costs. It also includes the Net Sale Proceeds on real property in which liens are successfully avoided.

13. __NET PROFIT__: "Net Profit" shall mean the operating funds remaining to the Debtor after payment of all operating costs, taxes, capital improvements, plan payments to members of the secured and priority unsecured creditors classes as set forth herein, etc., during each Plan Year, as defined herein below, calculated annually.

14. NET SALE PROCEEDS: "Net Sale Proceeds" shall mean that portion of the proceeds remaining to the Debtor, i.e. the Debtor's interest, from the sale of any of the real property, exclusive of realtor's commission, title fees, and ordinary and customary closing costs and fees.

15. NET RENTS: "Net Rents" shall mean the rental proceeds remaining after payment of accruing post-petition real property taxes, associated insurance premiums, management fees, maintenance and repairs, advertising, etc.

16. PLAN TERM: "Plan Term" shall mean the eight (8) years immediately following the Effective Date, without any prepayment penalty.

17. __PLAN YEAR__: "Plan Year" shall mean the year(s) immediately following the Effective Date. For example, Plan Year One shall be the 12 months immediately following the Effective Date, Plan Year Two shall be months 13 to 24 immediately following the Effective Date, and so on.

18. __PERSON__: "Person" shall mean an individual, corporation, partnership, joint venture, trust, estate, unincorporated organizations, or a government or any agency or political subdivision thereof.

19. __REVENUE CODE__: "Revenue Code" shall mean the Internal Revenue Code of 1954, as amended, 26 U.S.C. § 1 et seq.

*PLAN SUMMARY*

The Plan consists of four components of the Debtor's operation, namely (1) the landscaping operations, (2) the rental operations and real property sales, (3) the winding down of construction operations, and (4) the pending litigation. It is the Debtor's stated purpose under this Plan to first, return the Debtor's primary business operations back to its landscaping business which has proven to be profitable over the years. Second, to retain those rental properties that

have a positive cash flow of the existing indebtedness as determined under 11 U.S.C. 506 or as stipulated to by the relevant secured creditors (including the real property in which interest has been waived for a limited time period), during the term of the Plan until such time as the Debtor determines the properties should be sold (or refinancing is obtained on more favorable terms)—with the Net Sale Proceeds being distributed to the unsecured creditors upon closing of the sale on each property.  Third, constructions operations shall be restricted to the completion of the Old School Project, which homes can be completed, in light of the settlement agreements proposed herein and related financing, and sold for a profit—which Net Sale Proceeds shall be distributed to the unsecured creditors upon close of the sale of each home.  Last, this Plan provides that the Net Litigation Recovery, if any, shall be distributed to unsecured creditors, as more fully described herein below.  The Plan further provides that with respect to all operations, except the landscaping operations, that the Debtor shall continue to manage its affairs under the Plan subject to the oversight and input of the Official Committee of Unsecured Creditors for the duration of the Plan.

### *GENERAL HISTORY OF THE DEBTOR*

The Leed Corporation is an Idaho corporation in good standing.  Incorporated in 1992, the corporation has been a real estate developer, including new construction and land development, as well as landscaping and related care and maintenance of existing real estate in southern Idaho, primarily based out of Shoshone, Idaho.  During the winter months, the Debtor has also done landscaping in New Mexico.  The Debtor has been involved in construction since 1991.  The Debtor has built over fifty-five new residential homes and remodeled numerous homes in the Magic Valley and Shoshone areas.  The Debtor participated in development of the following subdivisions:  Desert Rose Estates which consisted of 75 platted lots and 41 pre-

platted lots that were in subdivision application process, Riverview Estates which consisted of 41

platted lots and 160 pre-platted lots that were in the preliminary annexation process and Old

Shoshone Ranch Estates which consisted of 18 platted lots.  The Debtor also developed the Fir St

and 6th St. Townhouse lots, and 12 of the Old School Lots.  The Debtor formerly had limited

farming operations; however, current farming operations consist of irrigation for pasture and

current subdivision development.   The Debtor currently has in excess of 400 landscaping

customers throughout southern Idaho.

*The 1996 Chapter 11 Case*

The Debtor has filed a previous chapter 11 case.  Approximately fifteen years ago, in

1996 the Debtor filed a previous Chapter 11 petition; a Confirmed Plan of Reorganization was

approved by the Court in 1997.  As noted in the Court-approved disclosure statement in that case

(Case No. 96-00847 JDP, Docket No. 102) the following is a brief explanation of the events

leading up to the previous bankruptcy case:

> The company was formed in early 1992 as a family corporation among many
> members of the Montgomery family.  Its core business has always been in
> landscaping and sprinkler installation and repair.  Gene Montgomery, Sr., Eugene
> Montgomery Jr. and Lon Montgomery were the founders of the corporation but
> later several other members of the family including Laytn, Eugene Montgomery
> Jr, Kaylynn Butterfield and Chad Montgomery became shareholders with the
> corporation and were also paid salaries.  Leed Corporation asserts that these
> individuals were not only employees but also stockholders, directors and officers
> of the corporation.  Through a series of unsophisticated borrowing the company
> began to receive monies from various third parties.  The company incurred over
> $900,000.00 in debt in this fashion by either obtaining loans or giving investors
> preferred shares in the company.  The corporation also formed other related
> companies including Montgomery Family Corporation which was to develop a
> piece of real property in Mellon Valley Idaho.  Its purpose was also to serve as a
> holding company for all the businesses.  The other companies, however, were
> never merged into Montgomery Family Corporation.   A Country Side
> Corporation was also formed which acquired a restaurant in Buhl Idaho and made
> substantial alterations and improvements to that facility. . . .

Also the corporation, since it did not have an operating loan or much liquidity was unable to acquire assets and loans. For several years, therefore, many of the members of the Montgomery Family borrowed monies from lenders in their own individual names and this money was invested in the corporation. Montgomery family members would also acquire various assets in their personal names and place these assets in the corporation. With certain exceptions these loans were paid by the corporation until the summer of 1995. A Limited Liability Company named Green Cut was also formed which paid officers their salaries. Despite numerous names used and various unsophisticated transactions perpetuated by this family the assets and liabilities were, with certain exceptions, held by or on behalf of Leed Corporation. Many of the secured debts were guaranteed by the individuals of the corporation.

Prior to July of 1995 the history of the company can essentially be explained as a start up business which in certain instances should have utilized the services of attorneys or more sophisticated business people related to the formation of companies and the borrowing of money. The loans and or investments received by Leed from non Montgomery family members are currently under investigation by the Idaho Department of Finance as the potential sale of unregistered securities.

In the spring of 1995 problems began to ensue for the corporation and the Montgomery Family. Once the debts began to mount for the corporation the Montgomery Family began to disagree as to how to save the company. Laytn, Chad and Eugene Montgomery Jr. walked out of the company and resigned as directors and officers in July 1995. They then formed their own company which began to directly compete with the Debtor. The remaining Directors Lon Montgomery and Kaylynn Butterfield sought the assistance of an expert to advise the corporation on how to solve its financial problems and whether it should file bankruptcy. That assistance was rendered by Galen Guthrie who collected a fee from the corporation and began advising it in late July and early August 1995. Unfortunately rather than assisting the struggling Company, the course of action recommended by Mr. Guthrie would result in more turmoil for the corporation.

In late July and early August 1995 Mr. Guthrie recommended that the company should avoid filing a bankruptcy proceeding at all costs. He recommended that the corporation and Lon Montgomery transfer assets to various corporations or entities controlled by Mr. Guthrie. Mr. Guthrie advised the corporation that in this manner the creditors could be paid by buying more time to orderly liquidate the assets and would further provide protection to the numerous third parties who invested in the corporation. Over five corporations were formed into which various assets were transferred. An outline describing these assets is contained on Appendix "D" attached to this disclosure statement. [not attached to this Disclosure Statement] Initially the purchase price for the assets by the new corporations was set at a value equal to the liquidation value of the various assets. Lon Montgomery was to be a consultant for Mr. Guthrie to ensure that the

customers were maintained and that a smooth transition would occur. Many debts were assumed and paid by the new entities and new common stock was issues to the old Leed Corporation investors. Soon, however, Mr. Montgomery believed that the prior representations of Mr. Guthrie were being ignored or circumvented by him and it appeared to Mr. Montgomery that the assets were being dissipated and many were being set up for the eventual sale or transfer to Mr. Guthrie for his personal gain, which should have been to the detriment of the creditors and investors. Once this became apparent to Mr. Lon Montgomery he advised the various stockholders of the Guthrie Corporations who then confronted Mr. Guthrie. Mr. Guthrie surrendered all his stock in the various corporations and also resigned from those companies. After this resignation, however, Mr. Guthrie was retained by at least one of the remaining shareholders in the Guthrie corporations to act as a professional consultant and was paid a substantial consultant fee. In Leed's opinion his new tenure resulted in further depletions of corporate assets and reputation. After this experience Leed Corporation hired a Salt Lake City law firm to unwind all the Guthrie corporations and return all the assets to Leed Corporation. This was primarily accomplished prior to April 9, 1996 and the real property and personal property transferred out to the Guthrie corporations have been returned to Leed Corporation. . . .

The foregoing circumstances which have occurred over the last year have made it extremely difficult for the corporation to maintain itself. With good reason many of the creditors are confused and angry. The legal relationship between the individual Montgomery and the corporation were often blurred in that the individuals borrowed in their names and placed assets in their names, but the debtor in many instances paid the debt service and therefore maintained a large equitable interest in various real and personal property. Now, with certain exceptions, the title to the majority of real and personal property assets appears to be in Leed Corporation.

The foregoing excerpt is from the Debtor's 1996 bankruptcy case. The previous disclosure statement, from which the above excerpt is derived, consists of 132 pages; an electronic copy is available from Debtor's counsel upon request. A copy is also available from the Court's docket, Case No. 96-00847, Docket No. 102, filed 9/30/96, entered 10/7/96. Additionally, the previous chapter 11 plan consisting of 54 pages can also be obtained from the Court's docket, Case No. 96-00847, Docket No. 170; an electronic copy is also available from Debtor's counsel upon request.

As a result of the investigation by the Idaho Department of Finance referenced above, Mr. Lon Montgomery was prosecuted in 1997 by the Idaho Department of Finance for sale of unlicensed securities.  While initially charge with thirty-five separate counts, consisting of an amalgamation of securities fraud, selling securities without a license, selling unregistered securities and offering to sell unregistered securities, in October 1997 Montgomery entered a plea agreement with the State of Idaho for one count of Racketeering for Securities Violations and received a reduced sentence.  Specifically, after presentation of the State's evidence, the trial court indicated that the State had not proven nor established fraudulent intent; however, certain aspects of the charges were under a strict liability standard.  The strict liability made the fact Mr. Montgomery was relying on the advice of an attorney prior to obtaining such investments irrelevant to a portion of the charges.  Pursuant to the trial court's instruction and prior to the presentation of the Defendant's case, the State and Mr. Montgomery's Counsel, Mr. Keith Roark, met in a court conference room and agreed to the plea agreement and related restitution of approximately $850,000.00.  Subsequently, the trial court expressly provided in that certain *Stipulation and Order Establishing Restitution Schedule* that the required restitution "shall be made through the Defendant's Chapter 11 bankruptcy plan as confirmed by the U.S. Bankruptcy Court in case In re Leed Corporation, No. 96-00847 (Bankruptcy Plan)" and that Mr. Grigg would act as the receiver for the restitution payments.  Attached hereto as Appendix E is a true and correct copy of the *Stipulation and Order Establishing Restitution Schedule.*  In February 2008, the Debtor was short of the funds necessary to complete its prior chapter 11 plan and associated restitution payments.  The Debtor borrowed the necessary funds to complete the prior chapter 11 plan and pay the associated restitution from Mr. Nathan Bachman.  Mr. Bachman is a creditor in this case based, in part, on this 2008 loan.  On February 28, 2008, using, in part, the

funds borrowed from Mr. Bachman, the receiver Mr. Grigg paid the necessary funds to complete

the plan and related restitution.  Attached hereto as Appendix F is a true and correct copy of a

Letter from Mr. Grigg, filed with the State Court on February 29, 2008 indicating that

$573,697.60 had been paid pursuant to the *Stipulation and Order Establishing Restitution

Schedule* and previous bankruptcy plan.

*The 2010 Bankruptcy Case*

Historically, for the four years immediate preceding the petition (2006 to 2009), the

Debtor's Income Statements are summarized as follows:

| Income Statements Summary (2006-2009) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Date** | **Gross Revenue** | **Landscaping** | **Rental** | **Farm** | **Construction** | **Other** | **Net Income** |
| December 31, 2006 | 1,694,826.19 | 636,230.44 | 47,567.38 | 15,499.00 | 992,309.80 | 3,219.57 | 220,151.78 |
| *Percentage Break Down* | *100%* | *37.5%* | *2.8%* | *0.9%%* | *58.5%* | *0.2%* | *13.0%* |
| | | | | | | | |
| December 31, 2007 | 1,807,324.98 | 690,327.47 | 63,625.78 | 17,018.85 | 958,400.00 | 77,952.88 | 17,240.22 |
| *Percentage Break Down* | *100%* | *38.3%* | *3.5%* | *0.9%* | *53.0%* | *4.3%* | *1.0%* |
| | | | | | | | |
| December 31, 2008 | 4,014,254.81 | 405,886.56 | 81,659.06 | 180.00 | 3,518,189.99 | 8,339.20 | 1,365.74 |
| *Percentage Break Down* | *100%* | *10.2%* | *2.0%* | *0.0%* | *87.6%* | *0.2%* | *0.0%* |
| | | | | | | | |
| December 31, 2009 | 1,775,836.82 | 320,360.32 | 219,859.84 | 10,000.00 | 914,480.02 | 311,136.64 | (385,897.82) |
| *Percentage Break Down* | *100%* | *18.0%* | *12.4%* | *0.6%* | *51.5%* | *17.5%* | *(21.7%)* |

True and correct copies of the Debtor's 2006, 2007, 2008 and 2009 Income Statements are

attached hereto as Appendix G.  In reviewing the Income Statements Summary and Appendix G,

it is the Debtor's considered opinion that the landscaping operations has historically been the

Debtor's financial base and that construction, while lucrative for a short period of time, has

detracted from the Debtor's current landscaping operations.  In short, the Debtor believes that a

returning focus on the landscaping operations and limiting construction to the completion of the

Old School Project's fifteen (15) homes is in the best interest of this estate.  As noted in the

Economic Market Study prepared by Landaker Marketing Group, LLC at the Debtor's request,

attached hereto as Appendix H,[1] the national and Idaho real estate markets in 2008 were experiencing a significant recession that negatively impacted the Debtor's construction business in 2009. The Economic Market Study supports the Debtor's conservative approach contained in the Plan where the non-performing real property is surrendered, which properties that have a positive cash flow are retained to maximize market appreciation. *Id.*

Additionally, it is the Debtor's considered opinion that in 2009 it was the victim of what the Debtor believes to be predatory lending. For instance, in 2009 the Debtor was unable to complete fifteen residential properties (the Old School Project) due to the conduct of CL&M and related entities and individuals. CL&M arranged and funded approximately 15 loans to Leed Corporation (the "Leed Loans"). CLM set up the following as the lenders on the Leed Loans: BFH 2009 Realty Trust, BZ 2009 Realty Trust, D&M 2009 Realty Trust, Greatland Project Development, Inc., JP 2009 Realty Trust, MGZ 2009 Realty Trust, MSCRN 2009 Realty Trust, RMBZ 2009 Realty Trust, SBSB 2009 Realty Trust, WHRS 2009 Realty Trust, Richard M. Frucci, Louis Gargasz, Richard N. Krauth, Equity Trust Co., Custodian FBO Bruce A. Quimby IRA, Spruce Mountain Associates, LLC, Equity Trust Co., Custodian FBO Raymond P. Kleopper II IRA, Pensco Trust Co., Custodian FBO David L. DeVeber IRA, NTC and Company, FBO Robert T. Keating IRA, Equity Trust Co., Custodian FBO Andrea S. Quimby, and Equity Trust Co., Custodian FBO Bruce A. Quimby IRA (collectively, the "Purported Leed Lenders"). The Leed Loans were approximately 15 construction loans for the construction of houses on approximately 15 lots in a subdivision in Shoshone, Idaho.

---

[1] The Economic Market Study attached hereto as Appendix H, incorporates a number of Appendices consisting of a total of 171 pages, which have not been included in this Disclosure Statement, but have been filed with the Court as a related Supplement. Copies of these Appendices are available either from the Court's Docket or a copy can also be requested in writing from Debtor's counsel.

Based upon review of the New Hampshire Bankruptcy Court Docket and the Criminal Indictment (a copy of the Criminal Indictment is attached hereto as Appendix I), it is the Debtor's considered opinion that CL&M established a contract with each of the Purported Leed Lenders providing that CL&M was the mortgage servicer with the power to represent each Purported Leed Lender with respect to each Leed Loan.  The Debtor further believes that although CL&M represented that it was only the mortgage servicer on the Leed Loans, CL&M was in reality the lender on the Leed Loans.  The Purported Leed Lenders paid their funds to CL&M in advance of any of the Leed Loans being closed or funded.  CL&M commingled all investor funds into one operating account (the "Commingled Account").  The limited funds in the Commingled Account were $10 million to $20 million less than would have been necessary to pay all of CL&M's obligations related to all of its loans.  When the Leed Loans closed, CL&M funded only closing costs and purported reserved interest.  Then CL&M funded a portion of the Leed Loans over a period of months.  As a result of the shortage of funds in the Commingled Account, the Leed Loans were actually funded with the funds of later investors in CL&M.  CL&M used the funds of the Purported Leed Lenders to fund loans for earlier CL&M investors.  In short, it appears that CL&M and related persons were operating a *Ponzi* scheme of which Leed was one of hundreds, if not thousands, of victims.  The principals of CL&M have been prosecuted for their participation in this scheme (see Appendix I); however, recovery of the 1.2 million owed to Leed is unlikely except as it relates to the liens related to the Old School Project as discussed further herein below.

Each of the Leed Loans was in the face amount of $180,000; there are 15 separate construction loan agreements, notes and mortgages.  CL&M extended between approximately $800,000 and $1.3 million in credit to the Leed Corporation, but did not extend the full amount

called for under any of the 15 construction loan agreements.  As a result of the failure of the Purported Leed Lenders to extend all of the funds required under the 15 construction loan agreements, the Debtor was not able to complete the homes in the Shoshone, Idaho subdivision. Construction draws were in the submission process to CL&M in the approximate amount of $480,000.00 and when the requested funds were not received the immediate and devastating effect on the Debtor's ongoing operations ultimately led to the bankruptcy petition, notwithstanding the Debtor's efforts to obtain replacement financing.

In an effort to complete the Old School Project, Leed approached a number of hard money lenders, some of whom charged significant loan fees, but failed or refused to provide any financing despite representations to the contrary.  Leed has investigated whether legal action against these lenders would benefit this estate; however it appears that some of these persons can no longer be located.  These potential refunds/collection matters are noted, in part, in Schedule B of the Debtor's schedules.  Leed expressly reserves all claims against lenders and creditors and corresponding jurisdiction of the United States Bankruptcy Court for the District of Idaho, including, but not limited to the above referenced lenders associated with CL&M.

*Current Stock Ownership/Personal Bankruptcy Filings*

The corporate stock is owned by two shareholders namely Lon E. Montgomery and Joshua A. McCuistion, both of whom have filed personal bankruptcy petitions and their respective share hold interest being subject to their respective bankruptcy cases.  Mr. Montgomery filed a joint, personal chapter 11 petition; Mr. McCuistion filed a joint, personal chapter 7 petition.  Mr. Montgomery's personal chapter 11 case has not adversely impacted this estate and to the extent the personal chapter 11 case by Mr. Montgomery were to be unsuccessful, it is the Debtor's opinion that a chapter 7 trustee would have no interest in shutting

the corporation down as that would simply increase the liability due and owing by the chapter 7 estate due to the related personal guaranties of the corporate debt by Mr. Montgomery.  Mr. McCuistion's personal chapter 7 case has not had a significant impact on this chapter 11 reorganization, presumably to his minority interest, i.e. 10%.  To date, Mr. McCuistion's chapter 7 trustee has expressed no interest or intent to participate in this chapter 11 reorganization.

### *MARKET FACTORS SUPPORTING THE DEBTOR'S PLAN*

The following are factors that in the Debtor's opinion support the viability of the Debtor's Plan:

#### *Bedroom Community*

As noted in the attached Lincoln County, Work Force Trends, April 2011, the city of Shoshone, "the gateway to Sun Valley" is a "bedroom community to both the Wood River Valley and Twin Falls . . . ."  The Idaho Department of Labor further notes that "[a]ffordable housing continues to be an issue in the Wood River Valley so subdivisions and residential construction will continue in Shoshone, where sustainable growth is expected over the long term."  See Appendix J attached hereto.  The Debtor believes the historical housing values will return in time as the economy for the Wood River Valley and surrounding area improves.  However, the Debtor's Plan provides that only the Old School Project will be completed and sold.  It is the Debtor's considered opinion that the Old School Project homes have a lower price point and can be completed and sold under the Plan for a profit, in light of the proposed settlement with the CL&M bankruptcy trustee and David and Jody Orr.

#### **Wood River Regional Airport**

The following is the Debtor's opinion with respect to the proposed relocation of the Friedman Memorial Airport.  The Debtor's opinion regarding the airport relocation and related

economic impacts is based in large part on communications with Mr. Rick Baird, head of the Airport Authority, and the Debtor's review of www.flysvra.com, the website for the Sun Valley Replacement Airport (SVRA).  Due to the amount of information available to the public from this website, it has not been reproduced as a part of this Disclosure Statement; however, the Debtor urges creditors to review this website in conjunction with this Disclosure Statement.  In addition, attached as Appendix K are the *Alternative Airport Replacement Sites* map and *Frequently Asked Questions* section retrieved from http://www.flysvra.com/archives.html. Portions addressing the selection of site 10A (the site nearest to Lincoln County) have been marked and supports the Debtor's stated opinion.

In the Debtor's considered opinion, the construction and operation of a new regional airport will have a major impact on the region including Blaine and Lincoln Counties and surrounding areas.  With the FAA's mandate that a replacement airport is required in the coming years to continue to provide air service in and out of the Wood River Valley, the impending selection of a new site and construction is a major topic of discussion in the area.  Although a formal announcement of the site has not been made, indications are it will most likely be Site 10A, which is located just off of SH 75 close to the southern border of Blaine County that abuts to Lincoln County.  This location would place the airport approximately 24 miles from the center of Shoshone with an easy commute via SH75 corridor for construction workers and eventually airport employees.

A recent article in the Idaho Mountain Express reported that construction of the airport is estimated to generate more than $108 million in payroll for the 3,450 jobs that will be created by

the project[2]. The article went on to state an additional $185 million in indirect economic activity will create 1,900 indirect jobs, translating into another $50 million in local payroll.  It was noted that these estimates are based on the widely used and respected Regional Input-Output Modeling system developed by the U.S. Department of Commerce's Bureau of Economic Analysis. This system is designed to help create reliable economic estimates that are specific to particular locations, such as Blaine County and the surrounding areas. Once operational, a replacement airport in the region will have a $30 million annual economic impact and create 500 permanent jobs. The indirect impact will amount to an additional $19 million and 280 additional jobs. In total, the new airport will generate an annual economic impact of more than $49 million and 780 permanent jobs in the area[3].

A preliminary engineering report was released in January 2011 that included an estimate of probable construction costs for a replacement airport at alternative sites, Site 10a and Site 12. In addition land appraisals for the land acquisition at each site were provided. It was noted that these cost estimates would continue to be updated and should be considered a work in progress. The estimates were based on current data and were subject to change and escalation. It was further noted that these costs did not include providing utilities to each site (including gas, power, communications, and water), mitigation costs, and costs for the construction and installation of an FAA Airport Traffic Control Tower and navigational aids.

The next step in the process will be the release of the Draft Economic Impact Study (EIS), which was scheduled for late May, but was recently postponed until late summer/early fall 2011.  It was noted that the delay is due to further refinements in the environmental and financial

---

[2] Replacement Airport Would Boost Economy,  Idaho Mountain Express, May 11 2011.  The article was co-written by Tom Bowman, a Blaine County commissioner and chairman of the Friedman Memorial Airport Authority board and Martha Burke, a member of the Hailey City Council and vice chair of the Friedman board.
[3] The permanent economic impact numbers are based upon estimates of new visitor spending, increased economic activity associated with improved air traffic, and new employment. These numbers were compiled by Transystems Corporation, as part of the replacement airport environmental impact statement compiled in 2008.

impact analysis being completed as part of the Draft EIS. Once the Draft EIS is published a 90 day public comment period will begin. A public hearing will be held during the comment period. Based on the current FAA schedule, a final EIS – and a formal Record of Decision – can be expected early in 2012

The question of how soon construction would begin once the site has been selected still remains.  Once the final EIS has been submitted there is a time limit for land acquisition and the beginning of construction, otherwise a new EIS will be required.

Potential Economic Impact of New Airport on Shoshone and Lincoln County:  Assuming Site 10A is selected the economic impact on the city of Shoshone and Lincoln County can be expected to be dramatic.  Conveniently located on the SH 75 corridor, workers will find the commute from Shoshone and housing developments north of Shoshone to be desirable.  Housing costs are significantly less than those found in Blaine County to the north in Bellevue or Hailey. It is reasonable to expect new home construction to pick up again with the increased demand caused by the construction workforce and later the new airport and supporting businesses employees.

### MEANS OF PLAN IMPLEMENTATION

**Landscaping Operations:**  Attached hereto as Appendix G are the Income Statements setting forth the Debtor's operations for the years of 2006, 2007, 2008 and 2009.  Also attached hereto as Appendix L is the Debtor's Profit and Loss Statement from April 29, 2010 (the petition date) to April 30, 2011.  Also attached hereto as Appendix M are the Debtor's Projections (prepare with the assistance of Mr. Landaker) for business operations for the duration of the Plan.  Naturally, projections are not guaranteed and it is problematic to predict future events. However, it is the Debtor's considered opinion that these Appendices support the Debtor's

assertion that landscaping operations can continue to be operated at a profit for the benefit and support of Plan implementation, and that the proposed rental property operation and real estate sales are in the best interest of creditors.

**Rental/Sale of Real Property:**  Attached hereto as Appendix N is the Debtor's Rental Properties Summary, setting forth the Debtor's cash flow analysis for the properties being retained in the Plan, which demonstrates that these properties have a positive cash flow—with the exception of three properties that have a negative cash flow collectively of $117.62 (68.20; 7.75; and 41.67).  With regards to these three properties, the Debtor believes that retention of these properties, with landscaping revenue supporting these monthly payments, is in the best interest of creditors and will allow the estate to benefit from market appreciation.  Creditors should also note that in the event the real estate market further depreciates, these properties may ultimately be in a negative cash flow situation resulting in potential, additional deficiency claims against the Debtor.  This is, in the Debtor's opinion, an inherent risk in the real estate market.  Assuming that the housing market remains relatively flat, the Debtor's Plan only retains those properties that cash flow, with those properties unable to cash flow being surrendered to the associated secured creditors.  By retaining the properties that currently cash flow, the Debtor hopes to capture any market appreciation for the benefit of the unsecured creditors upon the sale of the property during the term of the Plan.  The timing of such sales shall be made by the Debtor, with the oversight and input from the Official Committee of Unsecured Creditors.

**Net Litigation Recovery:**  Further, the primary litigation relates to the Meyers/Campbell parties.  A brief summary is provided herein below.  Any Net Litigation Recovery shall be used to fund the Plan.  Please see the summary herein for further details.  A copy of the Complaint

and related pleadings is available from the Court's Adversary Docket or a copy can be requested from Debtor's counsel.

BANKRUPTCY STATUS

The proponent filed its Voluntary Petition for relief under the Bankruptcy Code on April 29, 2010.  A Meeting of Creditors pursuant to 11 U.S.C. § 341(a) was held on June 18, 2010.  A Notice of Appointment of Unsecured Creditors' Committee was filed on July 7, 2010.

Since the date of the filing of the petition, the proponent has operated as Debtor-in-possession.  When the Plan is confirmed, the proponent will continue to administer the estate in compliance therewith, and the proponent will be re-vested with the remaining property subject to the conditions and requirements of the Plan.

In the fall of 2010, the Debtor had obtained preliminary loan approval to complete the Old School Lots from a prospective lender, Granite Funding, LLC.  After a number of court hearings and amendments to the proposed lending the Debtor obtained Court approval of a reduced loan to complete two of the homes, with the proviso stated by the Court that no further changes would be allowed.  Notwithstanding this instruction from the Court, Granite Funding subsequently requested additional changes to the lending agreement, such that the Debtor was no longer willing to consider Granite Funding as a prospective lender.

The Debtor has obtained preliminary loan approval from Equity Trust Company custodian FBO Neal C. Hocklander IRA for two loans set forth as Exhibits to the Plan.  In brief, there are two loans being provided pursuant to Exhibit A to the Plan.  Loan #1 is to fund the payments to Classes SC2 and SC3 (the NH Trustee and the Orrs, respectively, creditors with asserted liens in the Old School Project).  Loan #2, a revolving line of credit, is to fund

construction as of the partially completed homes with homes being completed and sold as the market permits under the Plan.

Additionally, the Plan considers one additional post-petition refinance loan. As noted in Class SC28 of the Plan (Plan at p. 31): With regards to the Riverview Subdivision, members of this class agree to provide the Debtor an additional twelve (12) months, interest free, to refinance the loans on the property associated with this class, with an extension for an additional twelve (12) months at the then current WSJ prime rate plus 2.0 percent for such extension time period, at the Debtor's sole discretion. If the Debtor is unable to obtain a refinance loan on the Riverview Subdivision during this time period, the Riverview Subdivision shall be surrendered to the members of this class in full satisfaction of the indebtedness. In furtherance of such refinancing, members of this class agree to provide post-petition financing up to $15,900.00 for the due diligence fee referenced in the attached Letter of Intent from Accelerated Lending Group, Inc., attached to the Plan as Exhibit "D." This post-petition loan shall constitute a part and parcel of the claim held by members of Class SC28 as a future advance under the existing loan and the proceeds from the refinance loan shall first satisfy members of this class.

*MAJOR ASSET DISPOSITIONS*

No major assets have been voluntarily disposed of by Debtor, except in the ordinary course of the Debtor's business or as authorized by the Court.

*LEASEHOLD INTERESTS/EXECUTORY CONTRACTS*

To the extent not assumed as noted herein below the Debtor rejects all prepetition leases and executory contracts:

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| Edward E. Montgomery<br>701 Pine<br>Buhl, ID 83316 | 4235 N. 1360 E., Buhl, ID | Assume. Debtor is current with no default. |

| | | |
|---|---|---|
| Harley Sanders<br>P.O. Box 37<br>Oakley, ID 83346 | Phase 5, Riverview, 7th St., Shoshone, ID—lease with option to purchase—entire phase valued at $1,488,000.00 per May 2011 Broker's Price Opinion. | Assume as modified herein. Specifically, the parties shall agree that this property shall be converted to jointly owned property with net profits associated with the property shared 70% to Mr. Sanders and 30% for the benefit of the bankruptcy estate. Costs and expenses associated with the property shall be split on the same percentage basis. In exchange for the above modification, upon payment to Mr. Sanders of725,000.00 of Net Sale Proceeds under the above stated percentages, Mr. Sanders shall transfer and assign any remaining right, title or interest in the property to estate to be administered under the terms of the Plan and the remaining profit shall be divided under the aforementioned percentages, with the Debtor's interest being used for the benefit of the Plan. |
| Lon & Rebecca Montgomery<br>726 N. 1360 E.<br>Shoshone, ID 83352 | 104 Sunset Dr., Shoshone, ID | Assume as modified herein. Specifically, the parties shall agree that this property shall be jointly owned with net profits associated with the property shared 60% to Mr. and Mrs. Montgomery and 40% for the benefit of the bankruptcy estate. Costs and expenses associated with the property shall be split on the same percentage basis. |
| Mitch Campbell<br>P.O. Box 1785<br>Twin Falls, ID 83303 | 141 Syringa Loop, Shoshone, ID | This alleged lease is the subject of Adversary Proceeding 10-08086 JDP wherein the Debtor has asserted that this is in fact a disguised financing agreement that has not been properly perfected. To the extent the Court determines this to be a valid lease, the same is hereby rejected; to the extent the Debtor prevails in the adversary proceeding, the net litigation recovery would be available to prepay unsecured creditors under the Plan. |
| Robert & Kathi Meyers<br>c/o David A. Coleman, Esq.<br>P.O. Box 525<br>Twin Falls, ID 83303-0525 | 525 N., 527 N., 531 N. Fir Street, Shoshone, ID<br>152 E., 182 E., 191 E. Syringa Loop, Shoshone, ID<br>South Park Development Beverly Street, Shoshone, ID<br>201 E., 203 E., 205 E., 207 E., 301 E., 303 E. 6th Street, Shoshone, ID<br>Lot 10/12, Block 2 Riverview Subdivision, Shoshone, ID<br>318 N. Date St., Shoshone, ID | This alleged lease is the subject of Adversary Proceeding 10-08086 JDP wherein the Debtor has asserted that this is in fact a disguised financing agreement that has not been properly perfected. To the extent the Court determines this to be a valid lease, the same is hereby rejected; to the extent the Debtor prevails in the adversary proceeding, the net litigation recovery would be available to prepay unsecured creditors under the Plan. |
| Thomas Cooper<br>Sandra Crenshaw<br>4235 N. 1360 E. | 4235 N. 1360 E., Buhl, ID | Assume. Debtor is current with no default. |

Buhl, ID 83316

| | | |
|---|---|---|
| Avauntae Property Management | Property management agreement. | Terminated post-petition. REJECT to the extent not otherwise terminated. Please note that this agreement is the subject of Adversary Proceeding 10-08086 JDP. The validity and impact of this purported agreement remains to be determined in that adversary proceeding and the ultimate disposition of said adversary proceeding shall be, to the extent necessary, a modification of this portion of the Plan. |
| Robert & Kathi Meyers | Assignment of Rents, Profits and Lease or Purchase and Sale Agreements dated 11/24/2009 | Please note that this agreement is the subject of Adversary Proceeding 10-08086 JDP. The validity and impact of this purported assignment remains to be determined in that adversary proceeding and the ultimate disposition of said adversary proceeding shall be, to the extent necessary, a modification of this portion of the Plan. |
| Robert & Kathi Meyers/Mitch Campbell | Employment Agreement | Please note that this agreement is the subject of Adversary Proceeding 10-08086 JDP. The validity and impact of this purported agreement remains to be determined in that adversary proceeding and the ultimate disposition of said adversary proceeding shall be, to the extent necessary, a modification of this portion of the Plan. |
| Sandra J. Huntley | 107 and 110 Riverview Dr. Shoshone, Idaho | Assume as modified herein. Specifically, the parties shall agree that these properties shall be jointly owned with net profits associated with the property be shared 50% to Mrs. Huntley and 50% for the benefit of the bankruptcy estate. Costs and expenses associated with the property shall be split on the same percentage basis. These properties are subject to first liens for the benefit of GMAC, which are being crammed down in the Plan under the auspices of *Johnson v. Home State Bank*, 501 U.S. 78 (1991) and progeny, which allow the Debtor to restructure such claims despite the lack of liability of the estate for the notes. |
| Nathan D. Bachman | Old Shoshone Ranch agreements and related loan documents | REJECT, subject to the modifications and releases stated herein. Leed releases any and all claims or interest it might assert as a member of the Old Shoshone Ranch, LLC through its principal Lon Montgomery, in exchange Mr. Bachman and Old Shoshone Ranch, LLC shall release Leed and Mr. Montgomery from any and all liability arising from any and all claims of any nature whatsoever, that have or might have been asserted against Leed or |

Mr. Montgomery.

| | | |
|---|---|---|
| Lincoln County, Idaho | Development Agreement | Assume as modified herein. Notwithstanding the County's apparent violations of section 362(a), Leed agrees to waive such violations in exchange for the County's agreement to honor the existing Development Agreement for the term of the Plan and to honor related building permits for an additional 12 months subsequent to the Effective Date. |
| City of Shoshone | Development agreement, with associated permits. | Assume as modified herein. City hereby agrees to honor the existing Development Agreement and to honor related building permits for an additional 12 months subsequent to the Effective Date. |

To the extent that there are any prepetition leases/executory contracts that have not been accepted or rejected previously, such leases/executory contracts are hereby rejected.

The Debtor, through its property manager, has entered into various leases post-petition in the ordinary course of business. While the Debtor believes it is not necessary to assume or reject these agreements, to the extent necessary the Debtor expressly assumes all such <u>post-petition</u> leases.

### *PENDING LEGAL PROCEEDINGS*

<u>State Court and Federal Court Actions (Including Bankruptcy Proceedings)</u>:

a.    *Unlawful Detainer Actions*: Prepetition the Debtor, in the ordinary course of business, was the Plaintiff in a number of unlawful detainer actions (eviction matters) against miscellaneous tenants in various district courts of the state of Idaho. There are not any unlawful detainer actions currently being pursued by the Debtor.

b.    *CL&M Involuntary Bankruptcy*: On November 20, 2009 involuntary petitions for relief, pursuant to Chapter 7 of the Bankruptcy Code, were filed against C L & M, Inc. and Financial Resources Mortgage, Inc. ("FRM") by three unsecured creditors with the assistance of the New Hampshire Attorney General's Office. The Bankruptcy Trustee, Steven M. Notinger,

was appointed as chapter 7 trustee for the CL&M and FRM bankruptcy estates, and ultimately for approximately 100 related corporate and trust entities.  FRM and CL&M operated a large fraudulent scheme that used a mortgage brokerage business to steal millions of dollars from investors.  These bankruptcy cases are pending in the state of New Hampshire.  The Plan includes a proposed settlement on the 15 homes as follows:  Pursuant to a two post-petition loans from Equity Trust Company custodian FBO Neal C. Hocklander IRA, the Debtor will purchase the lien positions of the New Hampshire Trustee for 100,000.00 as full and complete settlement of all claims between the two bankruptcy estates.  Additionally, the Debtor will purchase the lien position of David and Martha Orr for $120,000.00.  This $220,000.00 would constitute the first loan from Equity Trust Company custodian FBO Neal C. Hocklander IRA, which would receive a first position, super priority lien in the Old School Project properties.  The second loan would work as a line of credit in the amount of 100,000.00, which would be for the completion of the homes on a revolving basis.  The completion of the homes will be determined upon pre-sold contracts, as much as possible and it is anticipated that the completion time frame will span a 2-year period.  The Debtor currently has two of the homes under contract and a Motion to approve the same is anticipated in the immediate future (as of the time of filing this Disclosure Statement).

c.    *Leed v. Meyers et al.*: On September 29, 2010 the Debtor filed an Adversary Complaint against Robert & Kathi Meyers, Mitchell R. & Laura Campbell, and affiliated entities on behalf of this bankruptcy estate asserting a number of lender liability, avoidance, consumer protection and various tort and statutory claims against these Defendants.  The Debtor further asserts that these Defendants' overreaching and predatory lending practices were a contributing

factor to the bankruptcy filing.  This adversary proceeding is pending before the United States Bankruptcy Court for the District of Idaho.

In short, the Debtor believes this estate is a victim of the Defendants' wide scale "loan to own" scheme, wherein they entice unwitting borrowers to participate in loans secured by real property with improperly calculated interest, deceptive and illegal terms which are ultimately designed to force the borrowers into default so that after the Defendants have usurped every available resource from the borrower, they then foreclose and take ownership of the secured property.  To disguise their activities, the Defendants function under many different *personas* and entities ripe with undisclosed conflicts of interest, including phony "escrow" companies to make their transactions appear legitimate and neutral.  They skirt the statutory requirements of the law to avoid scrutiny, and have in fact misrepresented their operation to the state regulatory agencies.  In some cases, the Defendants have unilaterally changed the terms of the lending agreements, compelling the borrowers to accept these terms or face legal or foreclosure action. Any challenges to the legality of these lending arrangements are met with threats of "criminal prosecution" and impugning of character in the community.

This adversary proceeding seeks to recover damages incurred by the Debtor as a result of the Defendants' wrongful acts and illegal scheme arising out of the myriad of loan transactions dating back to 2005.  Without limiting the scope and breadth of the adversary proceeding, the Debtor is informed and believes that Defendants used American Escrow Service, LLC (and all of its various iterations) as its escrow agent, notwithstanding the fact that this company is not licensed as an escrow agent in the state of Idaho.  Acting as an escrow agent under the Idaho Escrow Act (I.C. § 30-901 et seq.) is an unlawful act, making collection of the associated loans, collection of an unlawful debt under R.I.C.O.  Further, it appears from evidence and deposition

testimony that these Defendants did not maintain separate, fully funded escrow accounts at the time each loan was allegedly funded.  Notwithstanding the fact the loans appear to have not been fully funded at loan closing, interest was charged on the entire loan balance from the date of loan closing.  Accordingly, pursuant to I.C. § 48-608, the Debtor may be entitled to recovery all of the interest that was overcharged.  In addition, Defendants' conduct may be an "unfair or deceptive practice" under I.C. §§ 30-919(8) and 48-603(17), such that pursuant to I.C. § 48-608 and 11 U.S.C. § 544, each and every loan transaction is "voidable" rendering Defendants wholly unsecured.  Now that Debtor has brought this adversary proceeding, the Defendants have made several calculated attacks against the Debtor in the community, spreading rumors that the Debtor is dishonest, and interfering with the contractual business relationship between the Debtor and creditors.  This interference also occurred prepetition with Defendants spreading rumors among Debtor's tenants and subcontractors.  Damages have been requested, including punitive and treble damages—and such other equitable relief the Court determines necessary under the facts of the adversary proceeding.

As a precursor to the adversary proceeding the Debtor filed a Motion for Contempt against these Defendants for violations of the automatic stay, arising out of Defendants' continuing collection of the rents in which they assert an interest subsequent to the petition. Shortly prior to the hearing on the Motion the parties settled the Motion for Contempt and these Defendants consented to the Debtor's use of cash collateral through the end of February 11, 2011.

Naturally, given the fact that the loans involved in the adversary proceeding approach $8,000,000.00 and treble damages are available under R.I.C.O., Defendants have, and continue, vehemently to oppose the allegations and claims contained in the Complaint.  It is the Debtor's

considered belief that Mr. Campbell's Motion to Dismiss asserting various acts of bankruptcy fraud, mortgage fraud, consumer fraud, etc. against the Debtor, the Debtor's principal, Debtor's counsel, and a myriad of other parties, including the Unsecured Creditors' Committee, is an attempt to (1) redirect attention away from the adversary proceeding; and (2) in furtherance of Mr. Campbell's threat to pursue criminal sanctions in order to obtain an advantage in this civil matter.  At his deposition regarding his Motion to Dismiss, Mr. Campbell indicated that he has contacted a number of governmental agencies, including the FBI, the Idaho Attorney General's Office, the Idaho Department of Finance, and the Idaho Real Estate Commission.  The Debtor has filed a Rule 9011 Motion seeking sanctions for what the Debtor considers to be inappropriate litigation conduct by Mr. Campbell.  The outcome of that Rule 9011 Motion remains to be determined by the Court.

Defendants have also expressed concern over the administrative attorney's fees incurred with respect to this adversary proceeding.  The Plan proposes that attorney's fees related to this litigation will be converted to a contingency fee arrangement, with counsel being paid 1/3 (33.33%) of the gross litigation recovery, plus expenses, should the matter settle in advance of 60 days prior to the first scheduled trial date, and 40% of the gross litigation recovery, plus expenses, should the matter settle within 60 days of trial, proceed to trial or upon appeal.

Pending resolution of this adversary proceeding, the Net Rents from the real properties in which the Defendants assert an interest will be held in a Litigation Reserve Account, pending further Court order or resolution of the adversary proceeding.

d.    *Deere v. Leed et al.*:  On or about October 13, 2010, Deere Credit filed an Adversary Complaint against Leed asserting that certain equipment was not property of this bankruptcy estate.  Leed filed a counterclaim against Deere, as well as a third-party complaint

against Gary L. Rainsdon, Trustee and Joshua A. McCuistion, asserting that Leed holds paramount title to the equipment.  Leed has requested entry of default against Mr. Rainsdon and entered into a Stipulation with Deere, which stipulation was approved by the Court after notice and a hearing on the proposed compromise on February 23, 2011.  The stipulation between Deere and the Debtor provided for a partial surrender of the equipment that the Debtor did not deem necessary for its current and future operations and corresponding plan treatment for the equipment Leed retained for the benefit of this estate, i.e. equipment necessary or useful for landscaping operations.

As set forth in Appendix O, the Debtor believes claim objections may be necessary.  Additionally, litigation may be undertaken to recover property of the Debtor or to adjudicate claims of this Debtor.  Specifically, there are a significant number of receivables or notes listed in the Debtor's schedules.   The Debtor, in consultation with The Official Committee of Unsecured Creditors, shall pursue such receivables and notes as the Debtor and the Committee, in the exercise of their business judgment deem advisable.  To the extent the Debtor and the Committee disagree, the Debtor's shall determine whether to pursue collection.  The Debtor's Plan expressly reserves the right to pursue collection of these assets in the event that in the Debtor's business judgment such legal action will result in a benefit to the unsecured creditors and not simply a Pyrrhic victory.  In such collection efforts the Debtor shall attempt to retain counsel as needed, preferably on a contingency fee basis when possible.  The Net Litigation Recovery shall be paid to the unsecured creditors under the Plan.

Claims that may be Contested:  Some claims may later be contested which may increase the pro rata distribution to unsecured creditors.  Many of these potential claim objections are addressed under the terms of the Plan and need only be addressed should creditors disagree with

the Plan.  For example, the § 506 valuation of collateral objections can be determined as a part of the confirmation process without the necessity of incurring exorbitant legal fees and costs, and otherwise stipulated to in the existing plan treatment stipulations, as noted in the Plan.  The Plan does not prevent other interested parties from asserting claim objections on their own behalf. The Debtor reserves all rights to contest any additional claims not listed in Appendix O and to amend its schedules as the Debtor deems advisable.

Preferences, Fraudulent Conveyances, and Lien Avoidance:  Adversary complaints may be filed by the Debtor-in-possession to avoid certain preferential and/or fraudulent transfers, as the Debtor-in-possession deems advisable.  Potential causes of action are noted in the Debtor's *Statement of Financial Affairs*, filed with the Court on May 28, 2010 as Docket No. 35, see specifically ¶¶ 3.b, 3.c, 5, and 13.  The Debtor reserves all rights of this estate under the Bankruptcy Code to contest the validity of liens, any and all pre-petition transfers, as well as post-petition transfers to the extent that such transfers were payments on an avoidable security interest under Article 9 of the Idaho Uniform Commercial Code or State law and such payments or transfers are avoidable under 11 U.S.C. chapter 5.  The Debtor further reserves its rights under State law to contest pre- and post-petition actions.  Recovery, if any, of such transfers shall be administered pursuant to the terms of the Plan upon confirmation.

**THE DEBTOR IS AWARE THAT A NUMBER OF LIEN HOLDERS LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT OR UNLIQUIDATED FAILED TO FILE PROOFS OF CLAIM PRIOR TO THE BAR DATE.  THE DEBTOR'S PLAN RESERVES ALL RIGHTS TO AVOID SUCH LIENS OR TO DETERMINE THAT SUCH LIENS ARE EFFECTIVELY VALUELESS UNDER SECTION 506, AS NEEDED TO ESTABLISH CLEAR TITLE TO ASSETS OF THIS BANKRUPTCY ESTATE.  THE**

**PLAN RESERVES JURISDICTION TO THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRIT OF IDAHO TO ADDRESS THESE MATTERS.**

*CORPORATE ORGANIZATION*

The Debtor is an Idaho Corporation in good standing. At the present time, the Debtor has only one class of Stock, common stock. It is a voting class. All shares of stock are owned by two (2) shareholders, namely Lon E. Montgomery and Joshua A. McCuistion. The shares of stock are recorded on the books of the company in the following amounts:

| NAME OF SHAREHOLDER | PERCENTAGE |
|---|---|
| Lon E. Montgomery | 90% |
| Joshua A. McCuistion | 10% |

The Plan contemplates restructuring of the corporate organization and the capital structure of the Debtor in compliance with 11 U.S.C. § 1129(b)(2)(B)(ii). **An effect of confirmation shall be to extinguish the equity interest of the prepetition shareholders and vest ownership of the Debtor in the post-petition/post-confirmation equity interest holders of class EI2:**

| **Name of Post-petition Stockholder** | **Percentage** |
|---|---|
| Lon E. Montgomery | 100% |

*See Article Four, Paragraph 4 of the Plan.*

The proposed corporate organization post-confirmation, identifying officers and directors, is set out below:

| *Name* | *Office Held* |
|---|---|
| Lon E. Montgomery | President |
| Sandra J. Huntley | Secretary |
| Lon E. Montgomery | Director |
| Debra J. Denny | Director |

Sandra J. Huntley                                    Director

In exchange for the above described equity interests, said interest holders under the Plan have provided post-petition ongoing support and assistance to the Debtor to ensure successful ongoing business operations.  It is the Debtor's considered opinion that absent the assistance, expertise, and support of these individuals the Debtor's reorganization effort would be severely hampered, with liquidation the probable result without such support.

### BASIS OF VALUATION

The basis of the evaluation of property contained in the liquidation analysis, or best interest of creditors, test, was obtained from various sources, primarily the opinions the estate's certified appraiser and licensed realtor, whose employment applications have been filed with approval pending.  While certain creditors have expressed concern over the difference between the scheduled values, it should be noted that the previous values established in the schedules were obtained from appraisals pursuant to a former lender's request which obtained instructions to the appraiser for the determination of values pursuant to the lender's requirements, which included projected and completed/developed values, and were the most recent appraisals at the time of the filing of the petition—obtained in 2009 and the Debtor was not in a financial position to obtain new appraisals at the time of filing of the petition. The values in the current BPOs and appraisals are relative to the market conditions today, as summarized in the attached Appendix P. Copies of the underlying documentation upon which the attached summaries are based can be obtained upon written request to Debtor's counsel.

IT SHOULD BE BORNE IN MIND THAT THE VALUES ESTABLISHED IN THIS ANALYSIS ARE ONLY THE BEST ESTIMATES OF THE DEBTOR.  These values were arrived at by assuming that the entirety of the Debtor's assets would be liquidated and it is assumed that different values might be obtained in limited or spot sales of similar property over an extended period of time.  It must be kept in mind that secured creditors will exert a major effort to reclaim their property at the earliest possible time to avoid their collateral being involved in the liquidation process.  This sort of activity will reduce the liquidation value of the Debtor's estate.

### LIQUIDATION ANALYSIS
#### "Best Interests of Creditors Test"

Notwithstanding acceptance of the Plan by creditors, in order to confirm the Plan the Court must independently determine that the Plan is in the best interests of all classes of creditors and stockholders.  The "best interest" test requires that the Court find that the Plan provides to each member of each impaired class of claims and interest a recovery which has a present value at least equal to the present value of a distribution which each such person would receive from

the Debtors if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code instead of being reorganized under Chapter 11 of the Bankruptcy Code.

To calculate what members of each impaired class of unsecured claims or interest would receive if the Debtors were liquidated, the Court must first determine the dollar amount that would be generated from the disposition or liquidation of the assets of the Debtors in excess of the amount necessary to pay allowed secured claims, plus the cash held by the Debtors, and plus recoveries on actions against third parties. The proceeds of this liquidation will then be reduced by the costs of the liquidation. Such a liquidation would probably take place in a Chapter 7 proceeding and such a proceeding would likely include the fees of a trustee as well as those of counsel and other professionals that might be retained by such trustee, selling expenses (including costs of advertising and auctioneer's fees or brokerage commissions), unpaid expenses incurred by the Debtor during its reorganization proceedings under Chapter 11, and claims arising by rejection by the trustee of obligations incurred by the Debtor during the pendency of the Chapter 11 case.

The value of the distributions after liquidation, deduction of costs of liquidation, and in keeping with the analysis described above would then be compared by the Court with the present value being offered to each of the classes of unsecured claims and interests under the Plan. The Debtor also believes that secured and unsecured claims in a liquidation would be significantly greater than under the contemplated plan.

The proponent also believes that liquidation of the Debtor's estate would be a time consuming matter and might involve litigation between a Chapter 7 trustee and the various claimants to assets of the estate. It would not be unusual that no distribution to unsecured creditors in a Chapter 7 liquidation proceeding would be forthcoming for one or more years.

THE DEBTOR FIRMLY BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF EACH CLASS OF CREDITORS AND THAT THE CREDITORS WILL RECEIVE A LARGER AND QUICKER DISTRIBUTION UNDER THIS PLAN OF REORGANIZATION THAN THEY WOULD IF THE DEBTOR'S ESTATE WERE LIQUIDATED.

The following pages set forth assets, liabilities and estimated expenses Debtor is using to

calculate its liquidation analysis.

## LIQUIDATION ANALYSIS SUMMARY

| TYPE OF ASSET | ESTIMATED VALUE |
|---|---|
| Real Property Assets *(See Appendix P for itemization and details)* | 425,716.89[5] |

---

[5] For the Debtor's opinion of the current fair market value of the estate's interest in real property, please see Appendix P, which is based on recent appraisals and broker's price opinions obtained by the Debtor.

| | |
|---|---|
| Cash on hand | 3.96[6] |
| Cash on account | 14,287.72[7] |
| Current Accounts Receivable | 5,332.15[8] |
| Notes Receivable/Aged A/R (*See Appendix Q for itemization and detail*) | 93,661.90[9] |
| L&S Development, Inc. | 0.00[10] |
| Old Shoshone Ranch, LLC | 0.00[11] |
| Machinery & Equipment (*See Appendix R for itemization and detail*) | $79,950.31[12] |
| Preferences, Fraudulent Conveyances, | TBD--0.00[13] |

---

[6] This number represents the cash on hand as of April 30, 2011.

[7] This amount represents all of the Debtor's accounts as of April 30, 2011, and consists of the following:

| | |
|---|---|
| Magic Valley Bank (Operating Account): | $6,484.73 |
| Magic Valley Bank (Rental Account): | 869.28 |
| Property Management Trust: | 6,933.71 |

The amount of the Magic Valley Bank (Litigation Reserve) Account in the amount of 10,767.70 is <u>not</u> included in the above noted amount due to the related litigation.

[8] This amount represents all of the Debtor's current accounts receivable as of April 30, 2011. No discount factor has been attributed as the Debtor believes these accounts will be paid without the necessity of any discount or associated collection cost outside the ordinary course of business.

[9] This amount includes notes that were previously secured by second lien hold positions in real property that has been foreclosed upon in violation of 11 USC § 362. It also includes notes listed in Schedule B, Attachment B.21. Collectability of the notes as unsecured obligations would, in the Debtor's opinion, be extremely difficult and uncertain. While these notes have a face value of $936,619.00 in the aggregate, the Debtor believes 10% of face value is a reasonable estimate of the liquidation value after discounting for the factors set forth above and in light of anticipated collectability issues and costs of collection. Notwithstanding this substantial discount, the Plan provides that the Net Litigation Recovery on these receivables shall be paid to the unsecured creditors.

[10] L&S Development, Inc. is a corporation in which 49% of the stock is held by Mr. Montgomery for and in behalf of The Leed Corporation. This corporation consists of a real estate development known as Phase 5 of Green Cut Subdivision, also known as Desert Rose Estates, which was listed on Schedule A at line A.1.74. This property is valued at $225,500.00 and has a loan against it in the amount of $100,000.00, leaving an estimated $125,500.00 in equity of which the Debtor's interest is $61,495.00. However, there are additional liabilities of L&S Development, Inc. that must be satisfied before any shareholder distribution can be made. The Debtor understands that Mr. Slusher and Slusher Construction loaned an additional $200,000.00 to L&S Development, Inc. and this loan leaves no available equity for the benefit of this estate. Debtor may be responsible for 49% of all costs associated with the real property.

[11] Old Shoshone Ranch, LLC is a limited liability company in which the 25% membership interest is held by Mr. Montgomery for and in behalf of the Debtor. This company's operations consist of the development of the Parker Ranch Subdivision, which was listed on Schedule A at lines A.1.41 to A.1.45, and other acreages that have been rezoned. This property is fully encumbered by a loan for the benefit of Nathan D. Bachman. Where Debtor's interest is limited to an equitable interest in the 25% membership interest, and the company is a single asset real estate entity, it is the Debtor's opinion that there is currently no available equity for the benefit of this estate.

[12] Please see Appendix R for itemization and detail.

and Lien Avoidance, etc. (Litigation Recovery)

Executory Contracts/Leases                                          0.00[14]

                                             **TOTAL:    $625,886.64**

*LIABILITIES*

*INDEBTEDNESS*                                   *AMOUNT OF DEBT*

**ASSERTED SECURED CLAIMS:**[15]

| | | |
|---|---|---:|
| 3 | IDAHO TAX | 1,180.41 |
| 9 | VARGAS ROOFING | 4,564.65 |
| 11 | AGUNDEZ CONCRETE | 15,065.17 |
| 12 | FRANKLIN BUILDING | 178,746.17 |
| 13 | FARM BUREAU | 20,177.93 |
| 14 | FARM BUREAU | 42,700.38 |
| 15 | FARM BUREAU | 14,600.82 |
| 16 | DEERE CREDIT | 28,752.66 |
| 19 | 21ST MORTGAGE | 117,027.56 |
| 20 | 21ST MORTGAGE | 124,145.24 |
| 22 | SPRUCE MOUNTAIN | 180,000.00 |
| 23 | WFDS | 32,487.39 |
| 24 | WFDS | 36,598.65 |
| 26 | WFDS | 32,755.46 |
| 32 | INTERNAL REVENUE SERVICE | 28,805.28 |
| 33 | IDAHO MUTUAL TRUST | 204,594.65 |
| 37 | TIMBERLINE EXT. | 8,762.90 |
| 38 | MITCH CAMPBELL | 336,400.00 |
| 39 | SHAUN MINER | 16,000.00 |
| 41 | JOHN DEERE LAND. | 54,852.14 |
| 42 | GMAC | 123,980.67 |
| 43 | WOODMASTER | 20,000.00 |
| 44 | GMAC | 118,710.75 |
| 45 | GMAC | 128,252.00 |
| 46 | TWIN FALLS CO. | 9,153.46 |
| 48 | QUALITY TRUSS | 36,731.00 |
| 49 | SECURITY FINANCIAL | 173,304.25 |
| 52 | GMAC | 173,687.48 |
| 56 | MONTROSE INVEST. | 522,635.84 |
| 61 | RUSTY/ANN PARKER | 122,000.00 |
| 62 | GMAC | 155,920.43 |
| 63 | GMAC | 283,412.95 |
| 64 | GMAC | 211,448.11 |
| 65 | ALT. FUNDING | 130,000.00 |

---

[13] As set forth *supra*, the Debtor believes it may have claims under the Bankruptcy Code and Idaho Law; however such claims are as of yet undetermined, subject to litigation and such the amount listed here is zero. *Again, the Debtor's Plan provides that the Net Litigation Recovery shall be paid to unsecured creditors.*

[14] The Debtor believes that the executory contracts and leases set forth supra retain value in a reorganization; however, the Debtor believes that such agreements retain no value in the event of liquidation.

[15] These amounts do not included stipulated reductions; the Debtor believes that such stipulations may retain no force in the event of a liquidation.

| 66 | ROBERT/KATHI MEYERS | 114,330.00 |
|----|---------------------|------------|
| 67 | MEYERS | 305,102.87 |
| 68 | RUSTY/ANN PARKER | 106,000.00 |
| 69 | ROBERT/KATHI MEYERS | 260,000.00 |
| 70 | ROBERT/KATHI MEYERS | 197,000.00 |
| 84 | ROBERT/KATHI MEYERS | 130,000.00 |
| 86 | KENNY CARDONA | 5,619.27 |
| 87 | DAVID/MARTHA ORR | 391,991.95 |
| 88 | LINCOLN COUNTY | 47,537.27 |
| D | 127 MILL GREEN | 44,741.88 |
| D | BANK OF AM. | 10,000.00 |
| D | BANK OF AM. | 87,903.53 |
| D | BANK OF AM. | 196,000.00 |
| D | BANK OF AM. | 66,309.24 |
| D | ORRS | 390,000.00 |
| D | EMC | 46,227.74 |
| D | MARTENS | 310,000.00 |
| D | NEAL HOCKLANDER | 56,000.00 |
| D | VANDERBILT MORTGAGE | 49,368.83 |

**TOTAL SECURED CLAIMS:**  **$6,501,586.98**

**UNSECURED PRIORITY CLAIM**

| 3 | IDAHO TAX | 8,305.77 |
|----|-----------|----------|
| 32 | INTERNAL REVENUE SERVICE | 36,858.73 |
| 47 | IDAHO LABOR | 1,495.05 |
| Schedule E | STATE OF NEW MEXICO | 105.00 |
| Unpaid Estimated Administrative Claims (Professionals) | | $150,000.00[16] |
| Contingent Attorney's Fees | 33.33 to 40% of Net Litigation Recovery plus costs | TBD/Unknown |

**TOTAL PRIORITY CLAIMS:**  **$196,764.55**

**GENERAL UNSECURED CREDITORS**  **TOTAL GUS CLAIMS:**  **$1,515,618.34[17]**

**TOTAL CLAIMS:**  **$8,213,969.87**

**NET DIFFERENCE:**  **(7,588,083.23)**

This Disclosure Statement shows that General Unsecured Creditors would not be paid in full, in the event of a Chapter 7 liquidation. The "Net Difference" represents the estimated value

---

[16] To the extent creditors object to confirmation of the proposed plan and/or additional litigation is required in order to liquidate assets of this estate, administrative expenses may exceed this estimate; to the extent a consensual Plan may be confirmed, this amount may be less than the stated estimate. Further, this estimate is extremely conservative given the amount of potential litigation arising out of the claims and lien avoidance issues, etc. associated with this case. The Plan provides that the Net Litigation Recovery will be paid to unsecured creditors. Any such professional fees are subject to Court approval prior to payment pursuant to 11 U.S.C. § 330 and § 503.

[17] This amount is the total amount of general unsecured claims without taking into account the anticipated claim objections, or unsecured portions allowed pursuant to 11 U.S.C. § 506.

available to other claims of that Chapter 7 estate and to the Debtors-in-possession.  The total amount of unsecured claims listed in Appendix "D" is **1,515,618.34**.

The books and records of the proponent are largely in the possession of proponent. Attached hereto as Appendix G is a true and correct copy of the Debtor's Income Statements for 2006, 2007, 2008 and 2009 (i.e. the four years preceding the petition date of April 29, 2010). Attached hereto as Appendix "L" is a true and correct copy of the Debtor's Profit and Loss Statement from the date of filing, April 29, 2010 through April 30, 2011.

## PLAN PROJECTION SUMMARY

The Debtor projects the following disbursements would be available under the Second Amended Plan for unsecured creditors:

### PROJECTED DISBURSEMENTS TO GENERAL UNSECURED CREDITORS
*(Class UC2)*

| Category | Projected Amount Under the Plan |
|---|---|
| *Landscaping Operations:*[18] | $268,112.90 |
| *Real Estate Operations:* | |
| Rental Operations (Net Rents):[19] | $58,317.12 |
| Real Property Sales (Net Sale Proceeds excluding Old School):[20] | $600,809.00 |
| The Old School Project Sales (Net Sale Proceeds):[21] | $285,200.00 |
| *Litigation:* | TBD |
| **Total Projected Disbursements:** | **$1,212,439.02** |

| Category | Plan Provides | Estimated Amounts |
|---|---|---|
| Landscaping Operations | 50% of the Net Profit, calculated annually, payable | Plan Year 1:[22] $31,237.78  Plan Year 2:   $31,862.54 |

---

[18] Please see Appendix M.

[19] As noted in Appendix N, Monthly Net Rents is projected to be $1,619.92. Rental properties are slated to be sold beginning in 2014.  The amount stated above assumes Net Rents of $1,619.92 for 36 months.  While the Debtor believes there will be additional Net Rents available for distribution during the sale down of the rental properties, none of the Net Rents post-36 months after confirmation have been included in these projections.  Actual Net Rents will be disbursed as set forth in the Plan, i.e. 100% of Net Rents disbursed to Class UC2.

[20] The projected net proceeds from the sale of real property, excluding the Old School Project is $1,193,339.00 (as noted in the Attached Sales Projections Summary), of which $592,530.00 is the projected payments to priority creditors and for marketing costs, leaving $600,809.00 as the projected disbursement to unsecured creditors under this category.

[21] Designated as "House Under Construction on the Attached Sales Projections Summary." See Appendix M.

[22] Plan Year 1 consists of the first 12 months following the Effective Date, Plan Year 2 consists of months 13 to 24 following the Effective Date, and so on.

| | | | |
|---|---|---|---|
| | no later then the final day of the 12th month following the Effective Date. | Plan Year 3: | $32,499.79 |
| | | Plan Year 4: | $33,149.78 |
| | | Plan Year 5: | $33,812.78 |
| | | Plan Year 6: | $34,389.03 |
| | | Plan Year 7: | $35,178.81 |
| | | Plan Year 8: | $35,882.39 |
| | | *Subtotal:* | *$268,112.90* |
| Net Rents | 100% of the Net Rents, payable annually no later than the final day of the 12th month after the Effective Date. | Plan Year 1: | $19,439.04 |
| | | Plan Year 2: | $19,439.04 |
| | | Plan Year 3: | $19,439.04 |
| | | *Subtotal:* | *$58,317.12* |
| | | Plan Years 4-8: TBD[23] | |
| Net Sale Proceeds (including Old School Project) | 100% of the Net Sale Proceeds, after satisfaction of the priority claimants, distributed upon closing of each sale. | 2011: | $32,450.00 |
| | | 2012: | $ 6,882.00 |
| | | 2013: | $36,966.00 |
| | | 2014: | $94,767.00 |
| | | 2015: | $77,396.00 |
| | | 2016: | $61,741.00 |
| | | 2017: | $80,624.00 |
| | | 2018: | $34,080.00 |
| | | 2019: | $461,103.00 |
| | | *Subtotal:* | *$886,009.00* |
| Net Litigation Recovery | 100% of the Net Litigation Recovery upon collection, if any. To the extent that liens are avoided and property liquidated, the disbursements would be made upon closing of the sale, as the case may be. | To Be Determined | |

Before accounting for any Net Litigation Recovery, the Debtor projects that the Plan will provide a pro rata distribution of approximately 79% towards members of Class UC2 as currently constituted. To the extent that projections, opinions or assumptions stated in the First Amended Disclosure Statement (including this Supplement), or the First Amended Plan may

---

[23] These projections anticipate that the rental properties will be sold down beginning in Plan Year 4 and as such, no Net Rents have been included in this chart for Plan Years 4-8. Net Rents during Plan Years 4-8 will be disbursed to members of UC2 on an annual basis, no later than the last day of the 12th month of each Plan Year.

prove to be incorrect, deficiency claims are filed, and/or objections to claims are filed, such distribution percentage would be adjusted accordingly.

## CONFIRMATION OF THE PLAN

Voting Procedure:  All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the "Ballot for Accepting or Rejecting Plan of Reorganization" attached to this Disclosure Statement as Appendix C. The Ballot must be filed with the Bankruptcy Court and may be submitted personally or by mailing such Ballot to the U.S. Bankruptcy Court, 801 E. Sherman Street, Pocatello, ID 83201.  In order to be counted all ballots must be filed or received by the Bankruptcy Court prior to 5:00 o'clock p.m. on the date specified in the order approving the Debtor's Disclosure Statement.

Persons Entitled to Vote on Plan:  Only the votes of classes of creditors whose claims or interests are impaired by the Plan of Reorganization will be counted in connection with confirmation of the Plan of Reorganization.  Generally, and subject to the specific provisions of §1124 of the Bankruptcy Code, this includes any creditor who, under the Plan, will receive less than payment in full in cash of the allowed amount of their respective claims on the effective date of the Plan.  It appears to Debtor that, excepting classes PC1, PC3, PC5 and SC22, all claims/classes are impaired.  *See Article Two* and *Article Three* of the Plan.  In determining acceptance of the Plan, votes will be counted only if submitted by a creditor whose claim is scheduled by the Debtor as undisputed, non-contingent and liquidated, or who, prior to the hearing on confirmation, has filed with the Bankruptcy Court a Proof of Claim which has not been disallowed, disqualified, suspended or otherwise objected to prior to computation of the vote on the Plan.  The ballot which accompanies this Disclosure Statement does not constitute a Proof of Claim.  If you are uncertain whether your claim has been correctly scheduled, you

should check the Debtor's schedules which are on file with, and may be inspected at, the U.S. Bankruptcy Court, 801 E. Sherman Street, Pocatello, ID 83201.

The Plan sets forth membership of the respective classes at Article One.  Treatment of the respective classes is set forth in Article Four.  **Please review the Plan carefully to determine how your claim is treated under the Plan.**

Acceptances May Not be Necessary to Confirm Plan:  Under §1126 of the Bankruptcy Code an impaired class is deemed to have accepted the Plan if (1) at least 2/3 in amount and (2) more than 1/2 in number of the allowed claims or interests of class members who have voted on the Plan have voted to accept it.  Further, unless there is unanimous acceptance of the Plan by an impaired class, the Bankruptcy Court must also determine that under the Plan such class members will receive property of value, as of the effective date of the Plan, that is not less than the amount that such class member would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the effective date of the Plan. Even if all classes of claims or interests accept the Plan, the Court may refuse to confirm the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and there are other provisions therein which may affect confirmation exclusive of the votes of creditors.

Confirmation of Plan Without Acceptances:  The Court may confirm a Plan even though less than all of the classes of claims or interests accepts the Plan.  The circumstances under which the Court may confirm a Plan over the objection of a class of claims or interests are set forth in §1129(b) of the Bankruptcy Code.  This section provides that the Court may confirm a Plan notwithstanding its rejection by one or more impaired classes if the Court finds that the Plan does not discriminate unfairly and is *fair and equitable* with respect to each impaired class which does not accept the Plan.  With respect to classes of secured creditors, the *fair and equitable* test

requires that a secured creditor (1) retain its lien and receive cash payments having a present value equal to its allowed secured claim, and (2) receive the proceeds of the sale of its collateral, or (3) realize the indubitable equivalent of its claim to the extent validly secured.

With respect to a class of unsecured claims, the *fair and equitable* test requires that if each creditor in such class does not receive property having a present value equal to the amount of such creditors allowed claim, no junior class can receive or retain any property.   The proponent of the Plan will rely on the features of §1129(b) in the event there is a rejection of the Plan by a class of claims or interests.   The invocation of the provision of §1129(b) is a legal matter required to be heard by the Court at the confirmation hearing or at a hearing set by the Court.

Consequences of Confirming the Plan:  Confirmation of the Plan will not discharge the Debtor from the debts provided in the plan; confirmation makes the Plan binding upon the Debtor, creditors and other parties in interest regardless of whether they have accepted or rejected the Plan.  Confirmation of the Plan will, generally, provide for the distribution of value to the creditors as set forth in the Plan.

Risks Associated with Confirming the Plan:  The Debtor has endeavored to accurately state the projected Net Profit based on the projections contained in Appendices "M" and "N." Given the relatively recent upheaval in the national and local economy, projections are inherently difficult—particularly if based upon historical data.  The projections contained in Appendices "M" and "N" are based primarily upon the Debtor's historic performance as well as the Debtor's performance projected for the term of the Plan, anticipating a 2% increase in operating expenses and a 4% increase in landscaping revenue.  These projections are naturally conservative and assume that the Debtor's performance will remain fairly constant with no significant decrease or

increase.  The real estate sales projections are based on the assumptions discussed supra.  Even assuming the airport relocation takes longer than and the real estate market remains stagnant, the plan allows for the recapture of any appreciation in the market for the benefit of the unsecured creditors, while using the Net Rents for the benefit of the creditors.  This recapture is accomplished through the use of rents fund payments to secured creditors whose liens have been "crammed down" to the current fair market value.  Fifty percent of the landscaping Net Profit is also dedicated to implement the Plan.  To the extent that negative, unforeseen circumstances may occur, the Debtor's performance may be negatively impacted to the detriment of this estate and creditors thereof.

Current Real Estate Market Conditions:  Appendix H contains historical data with regards to the Idaho real estate market; such data indicates that the Idaho real estate market has been in a significant decline and further decline is forecast for the next year.  However, the historical data does suggest that the market will rebound, although when such a rebound occurs and how swiftly are unknown.  When considering the Debtor's Plan, creditors should consider the current state of the market.

Hearing on Confirmation of the Plan:  The Bankruptcy court has set a hearing date to determine whether the Plan has or will be accepted and whether the other requirements for confirmation of the Plan have been satisfied.  A time for hearing for confirmation of the Plan has been established in Appendix "A" hereto and each creditor and shareholder should make note of that Notice of Hearing and determine whether or not they want to attend.  Attendance is not mandatory to establish a claim.  Also, as also set forth in Appendix "A", all ballots must be timely filed with the Bankruptcy Court as outlined in Appendix "A."

Retention of Jurisdiction:  If the Plan is confirmed the Bankruptcy Court, it will retain jurisdiction, as more specifically set out in the Plan, to adjudicate the allowance of claims, the value of secured interests, the disposition of executory contracts or unexpired leases, the avoidance of liens or transfers, litigation concerning claims and property of the estate (including actions regarding title to property of the estate), rule on modifications of the Plan if any, and to issue such orders and judgments as may be necessary to implement the Plan and resolve disputes concerning the Plan.

## TAX IMPLICATIONS

Debtor does not currently believe there will be any adverse tax consequences connected to confirmation of the Plan. Debtor is not familiar with any tax attributes held by its creditors and is advising creditors to consult with their own experts as to the tax implications, if any, of the Plan on those creditors.

## BANKRUPTCY SCHEDULES

This Disclosure Statement is meant to disclose all of the assets and liabilities of the Debtor in summary fashion.  To the extent it contradicts the bankruptcy schedules on file with the Bankruptcy Court the disclosures contained in this Disclosure Statement and Appendices control.

DATED:        June 23, 2011

THE LEED CORPORATION


By: /s/ Lon E. Montgomery
_____
LON E. MONTGOMERY
President

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br>LEED CORPORATION (THE),<br><br><br>Debtor. | Case No. 10-40743 JDP<br><br>Chapter 11 |

---

**_[PROPOSED]_ ORDER APPROVING SECOND AMENDED DISCLOSURE STATEMENT AND FIXING TIME FOR: (1) FILING ACCEPTANCES OR REJECTIONS OF PLAN, AND (2) HEARING ON CONFIRMATION OF THE PLAN**

---

A Second Amended Disclosure Statement (the "Disclosure Statement") under Chapter 11 of the Bankruptcy Code having been filed by the Debtor on June 23, 2011, referring to the proposed Second Amended Chapter 11 Plan of Reorganization (the "Plan") filed by the Debtor on the same date; and

The Court finding, pursuant to 11 U.S.C. § 1125(b), that approval of the Disclosure Statement is appropriate, and finding that the Disclosure Statement contains adequate information, and other good cause appearing

IT IS ORDERED AND NOTICE IS HEREBY GIVEN THAT:

A.   The Disclosure Statement filed by the Debtor dated June 23, 2011 is approved pursuant to 11 U.S.C. § 1125(b);

B.   September 16, 2011 is fixed as the last day for filing written acceptances or rejections of the Plan referred to above;

C. The hearing on confirmation of the Plan has been set before this Court, at the U.S. Courtroom, Federal Building, 801 E. Sherman Avenue, Pocatello, Idaho on September 28, 2011, at 1:30 p.m., or as soon thereafter as counsel can be heard;

**APPENDIX "A"**

*([Proposed] Order Approving Disclosure Statement)*

D. Within fifteen (15) days after entry of this Order, the Plan, a copy of this Order, the Disclosure Statement, and a Ballot conforming to Official Form 14 shall be mailed to creditors, equity security holders, and other parties in interest, and shall be transmitted to the United States Trustee, as provided in Federal Rules of Bankruptcy Procedure 3017(d).

E.  August 26, 2011 is fixed as the last day for filing and serving written objections to confirmation of the Plan pursuant to Federal Rule of Bankruptcy Procedure 3020(b)(1).

F. Any objections must be filed with the United States Bankruptcy Court at 801 E. Sherman Avenue, Pocatello, Idaho and served on Debtor's counsel, Robert J. Maynes, Esq., P.O. Box 3005, Idaho Falls, Idaho 83403 and on the United States Trustee, 720 Park Boulevard, Suite 220, Boise, Idaho 83712.

//end of text//
Submitted by:
Robert J. Maynes
Debtor's Counsel

APPENDIX "A"

*([Proposed] Order Approving Disclosure Statement)*

# APPENDIX "B"

*(The Plan of Reorganization)*

ROBERT J. MAYNES, ISB No. 6905
*Attorney at Law*
P. O. Box 3005
Idaho Falls, ID 83403
Telephone: (208) 552-6442
Facsimile: (208) 522-1334
Email: mayneslaw@hotmail.com

*Debtor's counsel*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br>LEED CORPORATION (THE),<br><br><br>Debtor. | Case No. 10-40743 JDP<br><br>Chapter 11<br><br>**BALLOT FOR ACCEPTING OR REJECTING PLAN**<br><br>[  ] **Secured**<br>[  ] **Unsecured**<br>[  ] **Priority** |

TO: _____
         (Name of Creditor)

The plan referred to in this ballot can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class and the holders of two-thirds in amount of equity security interest in each class voting on the plan.  In the event the requisite acceptance are not obtained, the Court may nevertheless confirm the plan if the Court finds that the plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of Section 1129(b) of the Code.

**<u>To have your vote count you must complete and return this ballot</u>**.

# APPENDIX "C"

*(Ballot for Accepting or Rejecting Plan)*

[*If holder of a secured claim*] The undersigned, a creditor of the above named Debtor in the unpaid principal amount of $ _____, with a secured interest in _____ [*property of the Debtor in which security interest is claimed*],

[*If holder of a priority unsecured claim*] The undersigned, a creditor of the above named Debtor in the unpaid principal amount of $ _____, entitled to priority status pursuant to 11 U.S.C. _____ [*Bankruptcy Code section under which priority status is claimed*], or

[*If holder of general unsecured claim*] The undersigned, a creditor of the above named Debtor in the unpaid principal amount of $ _____,

**Check one box:**        **[    ] Accepts**            **[    ] Rejects**

the plan for the reorganization of the above named Debtor.

Print or type name of business:        _____

Signed:        _____

(If appropriate)      By:        _____

As:        _____

Address:        _____

_____

**THIS BALLOT MUST BE RETURNED TO THE BELOW ADDRESS, SO THAT IT IS RECEIVED ON OR BEFORE SEPTEMBER 16, 2011.**

Case Administrator
U.S. Federal Bldg.
801 E. Sherman
Pocatello, ID  83201

SECOND AMENDED DISCLOSURE STATEMENT—THE LEED
CORPORATION
JUNE 23, 2011
PAGE 49

# APPENDIX "C"

*(Ballot for Accepting or Rejecting Plan)*

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF IDAHO

In re:
LEED CORPORATION (THE),


Debtor.

Case No. 10-40743 JDP

Chapter 11

### DEBTOR'S LIST OF CLAIMS[24]

| CLAIM NO. | CLAIMANT | SECURED | PRIORITY | UNSECURED |
|---|---|---|---|---|
| 1 | DEERE | 11,086.01 | | |
| 2 | COSHO HUMPHREY | | | 51.10 |
| 3 | IDAHO TAX | 1,180.41 | 8,305.77 | 2,144.41 |
| 4 | NAPA AUTO PARTS | | | 989.65 |
| 5 | ASH INTERNATIONAL | | | 30,800.49 |
| 6 | HARPER LEAVITT | | | 14,633.21 |
| 7 | JOHN LOTHSPEICH | | | 36,949.09 |
| 8 | BRENNEN CARPET | | | 3,400.00 |
| 9 | VARGAS ROOFING | 4,564.65 | | |
| 10 | WELLS FARGO BANK | | | 10,936.97 |
| 11 | AGUNDEZ CONCRETE | 15,065.17 | | |
| 12 | FRANKLIN BUILDING | 178,746.17 | | |
| 13 | FARM BUREAU | 20,177.93 | | |
| 14 | FARM BUREAU | 42,700.38 | | |
| 15 | FARM BUREAU | 14,600.82 | | |
| 16 | DEERE | 28,752.66 | | |
| 17 | AAA RENTAL | | | 4,739.63 |
| 18 | FIA CARD SERVICES | | | 18,574.83 |
| 19 | 21ST MORTGAGE | 117,027.56 | | |
| 20 | 21ST MORTGAGE | 124,145.24 | | |
| 21 | NAMES & NUMBERS | | | 445.11 |
| 22 | SPRUCE MOUNTAIN | 180,000.00 | | |
| 23 | WFDS | 32,487.39 | | |
| 24 | WFDS | 36,598.65 | | |
| 25 | CITY OF SHOSHONE | | | 2,907.36 |

---

[24] This list does not include those parties listed on Schedule G or the Equity Interest Holders of the Debtor.  It also does not account for any anticipated objections to claims.  It also does not account for stipulated reductions in secured claims.

APPENDIX "D"

*(Debtor's List of Claimants)*

| 26 | WFDS | 32,755.46 | | |
| 27 | MILLER CONCRETE | | | 720.00 |
| 28 | IDAHO MOUNTAIN EXPRESS | | | 506.40 |
| 29 | FRUIT TRACT WATER | | | 678.91 |
| 30 | IDAHO POWER | | | 1,654.66 |
| 31 | CAPITAL LAW GROUP | | | 1,166.41 |
| 32 | INTERNAL REVENUE SERVICE | 28,805.28 | 36,858.73 | 7,804.45 |
| 33 | IDAHO MUTUAL TRUST | 204,594.65 | | |
| 34 | GLENDALE CONSTR. | | | 35,005.67 |
| 35 | SPRINKLER SHOP | | | 107.83 |
| 36 | SPRINT/NEXTEL | | | 1,710.71 |
| 37 | TIMBERLINE EXT. | 8,762.90 | | |
| 38 | MITCH CAMPBELL | 336,400.00 | | |
| 39 | SHAUN MINER | 16,000.00 | | 2,300.00 |
| 40 | MERCHANTS CREDIT | | | 1,677.22 |
| 41 | JOHN DEERE LAND. | | | 54,852.14 |
| 42 | GMAC | 123,980.67 | | |
| 43 | WOODMASTER | 20,000.00 | | 22,309.10 |
| 44 | GMAC | 118,710.75 | | |
| 45 | GMAC | 128,252.00 | | |
| 46 | TWIN FALLS CO. | 9,153.46 | | |
| 47 | IDAHO LABOR | | 1,495.05 | 234.12 |
| 48 | QUALITY TRUSS | 36,731.00 | | 10,466.73 |
| 49 | SECURITY FINANCIAL | 173,304.25 | | |
| 50 | CITIBANK | | | 40,702.91 |
| 51 | CBP AFFILIATED | | | 1,115.14 |
| 52 | GMAC | 173,687.48 | | |
| 53 | CJ HEATING/AC | | | 31,184.50 |
| 54 | GE MONEY | | | 1,279.99 |
| 55 | ZION'S | | | 4,780.80 |
| 56 | MONTROSE INVEST. | 522,635.84 | | |
| 57 | ACTION PLUMBING | | | 22,400.00 |
| 58 | OLD HOME PLACE | | | 7,356.18 |
| 59 | PHILS ELECTRIC | | | 43,959.27 |
| 60 | HOTSHOT ELECTRIC | | | 6,988.50 |
| 61 | RUSTY/ANN PARKER | 122,000.00 | | 806.01 |
| 62 | GMAC | 155,920.43 | | |
| 63 | GMAC | 283,412.95 | | |
| 64 | GMAC | 211,448.11 | | |
| 65 | ALT. FUNDING | 130,000.00 | | 108,161.14 |

# APPENDIX "D"

*(Debtor's List of Claimants)*

| | | | |
|---|---|---:|---:|
| 66 | ROBERT/KATHI MEYERS | 114,330.00 | 98,116.20 |
| 67 | ROBERT/KATHI MEYERS | 305,102.87 | 58,957.13 |
| 68 | RUSTY/ANN PARKER | 106,000.00 | 5,280.93 |
| 69 | ROBERT/KATHI MEYERS | 260,000.00 | 88,754.00 |
| 70 | ROBERT/KATHI MEYERS | 197,000.00 | 65,834.35 |
| 71 | ROBERT/KATHI MEYERS | | 15,759.00 |
| 72 | ROBERT/KATHI MEYERS | | 15,759.00 |
| 73 | ROBERT/KATHI MEYERS | | 14,805.00 |
| 74 | ROBERT/KATHI MEYERS | | 12,920.00 |
| 75 | ROBERT/KATHI MEYERS | | 6,519.00 |
| 76 | ROBERT/KATHI MEYERS | | 9,918.00 |
| 77 | ROBERT/KATHI MEYERS | | 13,230.00 |
| 78 | ROBERT/KATHI MEYERS | | 13,230.00 |
| 79 | ROBERT/KATHI MEYERS | | 13,230.00 |
| 80 | ROBERT/KATHI MEYERS | | 4,095.00 |
| 81 | ROBERT/KATHI MEYERS | | 8,118.00 |
| 82 | ROBERT/KATHI MEYERS | | 9,918.00 |
| 83 | ROBERT/KATHI MEYERS | | 9,918.00 |
| 84 | ROBERT/KATHI MEYERS | 130,000.00 | 106,741.33 |
| 85 | ROBERT/KATHI MEYERS | | 4,086.00 |
| 86 | KENNY CARDONA | 5,619.27 | |
| 87 | DAVID/MARTHA ORR | 391,991.95 | |
| 88 | LINCOLN COUNTY | 47,537.27 | |
| 89 | IDAHO PIPE AND STEEL | | 1,123.19 |
| D | 127 MILL GREEN | 44,741.88 | |
| D | BANK OF AM. | 10,000.00 | |
| D | BANK OF AM. | 87,903.53 | |
| D | BANK OF AM. | 196,000.00 | |
| D | BANK OF AM. | 66,309.24 | |
| D | ORRS | 390,000.00 | |
| D | EMC | 46,227.74 | |
| D | MARTENS | 310,000.00 | |
| D | NEAL HOCKLANDER | 56,000.00 | |
| D | VANDERBILT MORT. | 49,368.83 | |
| E | STATE OF NEW MEXICO | 105.00 | |
| F | A-CORE | | 325.00 |
| F | ACTION PLUMBING | | 15,400.00 |
| F | APPLIANCES ETC. | | 169.73 |
| F | BIG WOOD CANAL | | 203.00 |
| F | KJ SUPERSTORE | | 83.31 |

APPENDIX "D"

*(Debtor's List of Claimants)*

| | | |
|---|---|---:|
| F | BOZZUTO'S FURNITURE | 1,985.73 |
| F | C&D HEATING | 2,000.00 |
| F | CABLE ONE | 173.48 |
| F | CENTRAL IDAHO C. | 100,000.00 |
| F | CESCO | 888.06 |
| F | CITY OF DIETRICH | 32.18 |
| F | CH'S HEATING | 17,179.00 |
| F | CLEAR CREEK DISP. | 183.57 |
| F | CONSTR. SEMINARS | 106.06 |
| F | CRAMER PUMP | 300.00 |
| F | DAVE SLUSHER | 100,000.00 |
| F | DEX | 2,752.65 |
| F | DISH NETWORK | 68.70 |
| F | FAST GLASS | 243.60 |
| F | FRUIT TRACT | 678.91 |
| F | GLENDALE CONST. | 35,005.67 |
| F | GRATZER H/C | 165.00 |
| F | HAILEY WHOLESALE | 588.53 |
| F | HARLEY SANDERS | 25,000.00 |
| F | HIATT TRUCKING | 4,888.29 |
| F | IDAHO MT. EXPRESS | 506.40 |
| F | IRWIN REALTY | 12,000.00 |
| F | KELLEY SOD | 252.73 |
| F | LTE | 61.00 |
| F | LAVA ROCK RENTALS | 716.80 |
| F | LEE'S AUTOMOTIVE | 1,109.12 |
| F | LOWE/GE MONEY BANK | 11,684.60 |
| F | MCI | 161.74 |
| F | MICROBE GUARD | 3,271.20 |
| F | MILLER CONCRETE | 1,303.00 |
| F | MR. STEAMS VALLEY | 583.00 |
| F | NAMES & NUMBERS | 445.11 |
| F | NAPA AUTO PARTS | 989.65 |
| F | NORTHVIEW SUBDIV. | 813.00 |
| F | OUTDOOR POWER | 49.45 |
| F | PARKER RANCH SUB | 510.00 |
| F | PETERSON BROS. | 650.00 |
| F | QWEST | 1,389.86 |
| F | RENTER CENTER | 232.92 |
| F | SPRINT | 2,152.84 |

APPENDIX "D"

*(Debtor's List of Claimants)*

| | | |
|---|---|---:|
| F | SUN VALLEY PROPERTIES | 25,000.00 |
| F | TAX MANAGEMENT | 2,000.00 |
| F | TAYLOR SEPTIC | 550.00 |
| F | SPRINKLER SHOP | 107.83 |
| F | TIMBERLINE TRASH | 148.76 |
| F | TIMES NEWS | 58.94 |
| F | TWIN FALLS CANAL | 142.08 |
| F | WEBB NURSERY | 3,822.40 |
| F | WESTERN COMMUNITY | 8,996.22 |
| F | WESTERN WASTE | 275.29 |
| F | WEX | 12,492.28 |
| F | WILSON BATES | 1,247.84 |
| F | WINDOR'S GREENHOUSE | 661.04 |

| **SECURED** | **PRIORITY** | **UNSECURED** |
|---|---|---|
| 6,457,820.85 | 46,764.55 | 1,515,618.34 |

# APPENDIX "D"

*(Debtor's List of Claimants)*

# APPENDIX "E"

*(Stipulation and Order Establishing
Restitution Schedule)*

STATE OF IDAHO )
County of Bonner )ss
FILED _8-25-98_ a
AT _11:46_ O'clock _A_ M
CLERK   DISTRICT COURT
_TD_
Deputy

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF BONNER

STATE OF IDAHO,

        Plaintiff,

    vs.

LON MONTGOMERY,

        Defendant.

Case No. CR 96-02184

STIPULATION AND
ORDER ESTABLISHING
RESTITUTION SCHEDULE

This matter having come before the Court and the Court accepting the conditional plea of the Defendant, and restitution having been ordered and the parties having reached an agreement regarding the appropriate schedule of restitution in this matter, and good cause appearing,

THEREFORE, THE COURT ORDERS:

The Defendant shall pay restitution to the individuals listed in Attachment A; and

The payments to the individuals shall be made through the Defendant's Chapter 11 bankruptcy plan as confirmed by the U.S. Bankruptcy Court in case *In re Leed Corporation*, No. 96-00847 (Bankruptcy Plan); and

Mr. Lee Grigg, LPA, shall act as a receiver for the payments of the restitution and make monthly reports to the Court, the state's attorney and the Defendant's attorney regarding the Defendant's compliance with the Bankruptcy Plan and Mr. Montgomery's monthly profits; and

The Defendant shall be responsible for any costs associated with the services of Mr. Grigg in preparing the monthly receivership report in accordance with generally accepted accounting procedures; and

STIPULATION AND ORDER ESTABLISHING RESTITUTION SCHEDULE- 1

Mr. Montgomery waives any accountant-client privilege with respect to any communications between Mr. Montgomery and Mr. Grigg which may be applicable to Mr. Grigg's services as a receiver.

DATED this ___ day of _____ 1998.

_____
James Michaud
District Judge

State's Consent:

_____
Dennis M. Charney
Deputy Attorney General

Defendant's Consent:

_____
A. Keith Roark
Teresa A. Hampton
Attorneys for Defendant

_____
Lon E. Montgomery
Defendant

STIPULATION AND ORDER ESTABLISHING RESTITUTION SCHEDULE - 2

# APPENDIX "F"
*(February 28, 2008 Letter re: Restitution
Payment and Plan Completion)*

**LON MONTGOMERY TRUST**
W. L. Grigg, Trustee
228 Pleasanton Dr. S.
Nampa, ID 83686-8308
(208) 466-1093

February 28, 2008

To Those Concerned:

The attached and enclosed check register will verify that for the year ending December 31, 2007, restitution payments totaling $573,697.60 were mailed to all recipients pursuant to Case CR 96-02184 "Stipulation and Order Establishing Restitution Schedule" and 96-00847-JDP, "A Chapter 11 Bankruptcy Reorganization".

This mailing concludes the orders stipulated by the above listed Cases. Full payment has been completed with this mailing to each named recipient.

Thank you for your patience in allowing us to complete this major project in a timely manner.

W. L. Grigg, Trustee

APPENDIX "G"

*(2006, 2007, 2008 and 2009*
*Income Statements)*

Leed Corporation
STATEMENT OF INCOME
For The Twelve Months Ended December 31, 2006

| | CURRENT PERIOD | | YEAR TO DATE | |
| | Amount | Percent | Amount | Percent |
|---|---|---|---|---|
| **Revenue** | | | | |
| Revenues-Idaho Sales | $ 356,032.30 | 21.0 | $ 356,032.30 | 21.0 |
| Revenue-N/Mex Sales | 229,360.44 | 13.5 | 229,360.44 | 13.5 |
| Revenues-Idaho Service | 50,837.70 | 3.0 | 50,837.70 | 3.0 |
| Revenues-Farm Livestock | 15,499.00 | 0.9 | 15,499.00 | 0.9 |
| Revenues-Rentals | 47,567.38 | 2.8 | 47,567.38 | 2.8 |
| Revenues-Other | 2,933.98 | 0.2 | 2,933.98 | 0.2 |
| Revenue:Land/homes | 988,309.80 | 58.3 | 988,309.80 | 58.3 |
| Revenue-Const labor-ID | 4,000.00 | 0.2 | 4,000.00 | 0.2 |
| Interest income | 61.23 | 0.0 | 61.23 | 0.0 |
| Check returns/refunds | 44.27 | 0.0 | 44.27 | 0.0 |
| Reimbursed expenses | 180.09 | 0.0 | 180.09 | 0.0 |
| Total Revenue | 1,694,826.19 | 100.0 | 1,694,826.19 | 100.0 |
| **Expenses** | | | | |
| Purchases-Idaho Materials | 247,265.29 | 14.6 | 247,265.29 | 14.6 |
| Purchases-N/Mex Materials | 62,095.57 | 3.7 | 62,095.57 | 3.7 |
| Purchases-Labor ID | 119,524.41 | 7.1 | 119,524.41 | 7.1 |
| Purchases-Labor N/Mex | 42,131.75 | 2.5 | 42,131.75 | 2.5 |
| Purchases-contract labor | 86.14 | 0.0 | 86.14 | 0.0 |
| Purchases-New Constr | 304,678.55 | 18.0 | 304,678.55 | 18.0 |
| Purchases-Closing cost | 6,087.44 | 0.4 | 6,087.44 | 0.4 |
| Purchases-Engr/drafting | 314.00 | 0.0 | 314.00 | 0.0 |
| Purchases-Other | 5,000.00 | 0.3 | 5,000.00 | 0.3 |
| Advertising-Idaho Jobs | 5,697.11 | 0.3 | 5,697.11 | 0.3 |
| Advertising-N/Mex | 19.99 | 0.0 | 19.99 | 0.0 |
| Advertising-Farm | 424.75 | 0.0 | 424.75 | 0.0 |
| Auto exp-ID | 24,560.94 | 1.4 | 24,560.94 | 1.4 |
| Auto-N/Mex | 3,813.99 | 0.2 | 3,813.99 | 0.2 |
| Bank charges | 1,023.02 | 0.1 | 1,023.02 | 0.1 |
| Corporate income tax | 60.17 | 0.0 | 60.17 | 0.0 |
| Depreciation | 20,237.00 | 1.2 | 20,237.00 | 1.2 |
| Deprec-Rentals | 4,991.00 | 0.3 | 4,991.00 | 0.3 |
| Depreciation-Farm equip | 9,261.00 | 0.5 | 9,261.00 | 0.5 |
| Dues & subscriptions | 1,175.50 | 0.1 | 1,175.50 | 0.1 |
| Farm expense-Fuel | 7,940.91 | 0.5 | 7,940.91 | 0.5 |
| Farm expense-Frt/Del | 54.63 | 0.0 | 54.63 | 0.0 |
| Farm expense-Rep/maint | 3,968.79 | 0.2 | 3,968.79 | 0.2 |
| Farm expense-Supplies | 2,637.07 | 0.2 | 2,637.07 | 0.2 |
| Farm expense-taxes | 3,842.81 | 0.2 | 3,842.81 | 0.2 |
| Farm expense-Utilities | 110.43 | 0.0 | 110.43 | 0.0 |
| Fuel-ID | 41,452.13 | 2.4 | 41,452.13 | 2.4 |
| Fuel-NM | 9,327.90 | 0.6 | 9,327.90 | 0.6 |
| Insurance-Gen'l liab ID | 21,153.35 | 1.2 | 21,153.35 | 1.2 |
| Insurance-W/comp ID | 5,066.00 | 0.3 | 5,066.00 | 0.3 |
| Insurance-W/comp N/Mex | 3,612.00 | 0.2 | 3,612.00 | 0.2 |
| Freight/delivery | 58.36 | 0.0 | 58.36 | 0.0 |
| Insurance-Health | 10,182.50 | 0.6 | 10,182.50 | 0.6 |
| Insurance-NM | 3,618.95 | 0.2 | 3,618.95 | 0.2 |

Leed Corporation
STATEMENT OF INCOME
For The Twelve Months Ended December 31, 2006

| | CURRENT PERIOD | | YEAR TO DATE | |
|---|---|---|---|---|
| | Amount | Percent | Amount | Percent |
| Insurance-Title fees | 5,396.55 | 0.3 | 5,396.55 | 0.3 |
| Interest-Loan | 5,630.59 | 0.3 | 5,630.59 | 0.3 |
| Interest-Fin Charge | 3,896.72 | 0.2 | 3,896.72 | 0.2 |
| Interest-Mortgages | 115,576.38 | 6.8 | 115,576.38 | 6.8 |
| Interest-Other | 1,590.32 | 0.1 | 1,590.32 | 0.1 |
| Janitorial | 297.19 | 0.0 | 297.19 | 0.0 |
| Leases-Farm Property | 1.00 | 0.0 | 1.00 | 0.0 |
| Leases-Property | 21,944.42 | 1.3 | 21,944.42 | 1.3 |
| Miscellaneous expnese | 69.00 | 0.0 | 69.00 | 0.0 |
| Office supplies-ID | 1,634.26 | 0.1 | 1,634.26 | 0.1 |
| Office supplies-N/Mex | 265.07 | 0.0 | 265.07 | 0.0 |
| Payroll taxes | 58,546.35 | 3.5 | 58,546.35 | 3.5 |
| Payroll taxes-NMex | 13,251.76 | 0.8 | 13,251.76 | 0.8 |
| Postage & freight | 563.64 | 0.0 | 563.64 | 0.0 |
| Professional fees | 62,255.00 | 3.7 | 62,255.00 | 3.7 |
| Public relations | 301.52 | 0.0 | 301.52 | 0.0 |
| Rent-Building N/Mex | 1,373.37 | 0.1 | 1,373.37 | 0.1 |
| Rent-Building ID | 2,795.00 | 0.2 | 2,795.00 | 0.2 |
| Equip Rents-ID | 2,750.31 | 0.2 | 2,750.31 | 0.2 |
| Equip Rents-N/Mex | 1,558.33 | 0.1 | 1,558.33 | 0.1 |
| Repairs & maintenance-ID | 45,979.54 | 2.7 | 45,979.54 | 2.7 |
| Repairs/maint-NM | 1,655.04 | 0.1 | 1,655.04 | 0.1 |
| Salaries - officers | 105,526.92 | 6.2 | 105,526.92 | 6.2 |
| Taxes-Lic/permits N/Mex | 151.06 | 0.0 | 151.06 | 0.0 |
| Taxes-Lic/permits ID | 6,930.68 | 0.4 | 6,930.68 | 0.4 |
| Taxes - Property | 5,553.50 | 0.3 | 5,553.50 | 0.3 |
| Tax-property-NMex | 12,418.20 | 0.7 | 12,418.20 | 0.7 |
| Telephone-ID | 13,823.44 | 0.8 | 13,823.44 | 0.8 |
| Telephone-NM | 368.91 | 0.0 | 368.91 | 0.0 |
| Travel-Meals ID | 3,711.33 | 0.2 | 3,711.33 | 0.2 |
| Travel-Meals N/Mex | 780.56 | 0.0 | 780.56 | 0.0 |
| Travel-Motels ID | 213.34 | 0.0 | 213.34 | 0.0 |
| Travel-Motels N/Mex | 225.16 | 0.0 | 225.16 | 0.0 |
| Utilities | 6,002.08 | 0.4 | 6,002.08 | 0.4 |
| Utilities-NM | 164.42 | 0.0 | 164.42 | 0.0 |
| Total Expenses | 1,474,674.41 | 87.0 | 1,474,674.41 | 87.0 |
| Net Income | $ 220,151.78 | 13.0 | $ 220,151.78 | 13.0 |

Leed Corporation
STATEMENT OF INCOME
For The Twelve Months Ended December 31, 2007

|  | CURRENT PERIOD | | YEAR TO DATE | |
|---|---:|---:|---:|---:|
|  | Amount | Percent | Amount | Percent |
| **Revenue** |  |  |  |  |
| Revenues-Idaho Sales | $ 640,701.70 | 35.5 | $ 640,701.70 | 35.5 |
| Revenue-N/Mex Sales | 8,304.09 | 0.5 | 8,304.09 | 0.5 |
| Revenues-Idaho Service | 41,321.68 | 2.3 | 41,321.68 | 2.3 |
| Revenues-Farm Commodities | 215.00 | 0.0 | 215.00 | 0.0 |
| Revenues-Farm Livestock | 16,803.85 | 0.9 | 16,803.85 | 0.9 |
| Revenues-Rentals | 63,625.78 | 3.5 | 63,625.78 | 3.5 |
| Revenues-Other | 31,575.00 | 1.7 | 31,575.00 | 1.7 |
| Revenue:Land/homes | 958,400.00 | 53.0 | 958,400.00 | 53.0 |
| Interest income | 16.88 | 0.0 | 16.88 | 0.0 |
| Reimbursed expenses | 46,361.00 | 2.6 | 46,361.00 | 2.6 |
| Total Revenue | 1,807,324.98 | 100.0 | 1,807,324.98 | 100.0 |
| **Expenses** |  |  |  |  |
| Purchases-Idaho Materials | 80,177.93 | 4.4 | 80,177.93 | 4.4 |
| Purchases-Labor ID | 556,815.02 | 30.8 | 556,815.02 | 30.8 |
| Purchases-contract labor | 5,500.00 | 0.3 | 5,500.00 | 0.3 |
| Purchases-New Constr | 101,196.01 | 5.6 | 101,196.01 | 5.6 |
| Purchases-Closing cost | 14,165.46 | 0.8 | 14,165.46 | 0.8 |
| Purchases-Engr/drafting | 11,259.22 | 0.6 | 11,259.22 | 0.6 |
| Purchases-Loan/doc Fees | 10,380.00 | 0.6 | 10,380.00 | 0.6 |
| Purchases-Marketing | 14,800.00 | 0.8 | 14,800.00 | 0.8 |
| Purchases-R/E Consulting | 11,095.00 | 0.6 | 11,095.00 | 0.6 |
| Purchases-Cleaning | 61.90 | 0.0 | 61.90 | 0.0 |
| Advertising-Idaho Jobs | 4,134.08 | 0.2 | 4,134.08 | 0.2 |
| Advertising-N/Mex | 74.89 | 0.0 | 74.89 | 0.0 |
| Advertising-Farm | 28.00 | 0.0 | 28.00 | 0.0 |
| Auto exp-ID | 14,346.49 | 0.8 | 14,346.49 | 0.8 |
| Auto-N/Mex | 73.19 | 0.0 | 73.19 | 0.0 |
| Bank charges | 998.12 | 0.1 | 998.12 | 0.1 |
| Corporate income tax | 640.44 | 0.0 | 640.44 | 0.0 |
| Depreciation | 33,001.00 | 1.8 | 33,001.00 | 1.8 |
| Deprec-Rentals | 17,790.52 | 1.0 | 17,790.52 | 1.0 |
| Depreciation-Farm equip | 9,261.00 | 0.5 | 9,261.00 | 0.5 |
| Dues & subscriptions | 2,030.39 | 0.1 | 2,030.39 | 0.1 |
| Farm expense-Rep/maint | 5,338.94 | 0.3 | 5,338.94 | 0.3 |
| Farm expense-Supplies | 7,738.94 | 0.4 | 7,738.94 | 0.4 |
| Farm expense-Livestock purchase | 12,705.00 | 0.7 | 12,705.00 | 0.7 |
| Fuel-ID | 64,797.03 | 3.6 | 64,797.03 | 3.6 |
| Fuel-NM | 774.11 | 0.0 | 774.11 | 0.0 |
| Insurance-Gen'l liab ID | 8,079.80 | 0.4 | 8,079.80 | 0.4 |
| Insurance-W/comp ID | 35,403.00 | 2.0 | 35,403.00 | 2.0 |
| Insurance-W/comp N/Mex | 1,449.90 | 0.1 | 1,449.90 | 0.1 |
| Freight/delivery | 7.93 | 0.0 | 7.93 | 0.0 |
| Insurance-Health | 36,332.50 | 2.0 | 36,332.50 | 2.0 |
| Insurance-NM | 1,783.01 | 0.1 | 1,783.01 | 0.1 |
| Insurance-Title fees | 3,753.70 | 0.2 | 3,753.70 | 0.2 |
| Insurance-Liability | 12,925.54 | 0.7 | 12,925.54 | 0.7 |

Leed Corporation
STATEMENT OF INCOME
For The Twelve Months Ended December 31, 2007

| | CURRENT PERIOD | | YEAR TO DATE | |
| --- | --- | --- | --- | --- |
| | Amount | Percent | Amount | Percent |
| Interest-Loan | 11,780.84 | 0.7 | 11,780.84 | 0.7 |
| Interest-Fin Charge | 200.06 | 0.0 | 200.06 | 0.0 |
| Interest-Mortgages | 243,351.47 | 13.5 | 243,351.47 | 13.5 |
| Leases-Property | 41,711.93 | 2.3 | 41,711.93 | 2.3 |
| Miscellaneous expnse | 1,503.90 | 0.1 | 1,503.90 | 0.1 |
| Office supplies-ID | 2,283.26 | 0.1 | 2,283.26 | 0.1 |
| Office supplies-N/Mex | 1.07 | 0.0 | 1.07 | 0.0 |
| Payroll taxes | 70,511.77 | 3.9 | 70,511.77 | 3.9 |
| Payroll taxes-NMex | 1,693.58 | 0.1 | 1,693.58 | 0.1 |
| Postage & freight | 598.97 | 0.0 | 598.97 | 0.0 |
| Professional fees | 13,856.19 | 0.8 | 13,856.19 | 0.8 |
| Public relations | 142.00 | 0.0 | 142.00 | 0.0 |
| Reconveyance Fees | 439.00 | 0.0 | 439.00 | 0.0 |
| Rent-Building ID | 3,207.91 | 0.2 | 3,207.91 | 0.2 |
| Equip Rents-ID | 150.00 | 0.0 | 150.00 | 0.0 |
| Repairs & maintenance-ID | 14,290.03 | 0.8 | 14,290.03 | 0.8 |
| Salaries - officers | 112,732.87 | 6.2 | 112,732.87 | 6.2 |
| Taxes-Lic/permits N/Mex | 106.06 | 0.0 | 106.06 | 0.0 |
| Taxes-Lic/permits ID | 1,904.06 | 0.1 | 1,904.06 | 0.1 |
| Taxes - Property | 14,462.90 | 0.8 | 14,462.90 | 0.8 |
| Trustee payments | 125,000.00 | 6.9 | 125,000.00 | 6.9 |
| Telephone-ID | 15,676.00 | 0.9 | 15,676.00 | 0.9 |
| Telephone-NM | 235.16 | 0.0 | 235.16 | 0.0 |
| Travel-Meals ID | 19,680.79 | 1.1 | 19,680.79 | 1.1 |
| Travel-Meals N/Mex | 508.36 | 0.0 | 508.36 | 0.0 |
| Travel-Motels ID | 652.97 | 0.0 | 652.97 | 0.0 |
| Travel-Motels N/Mex | 1,263.81 | 0.1 | 1,263.81 | 0.1 |
| Utilities | 13,221.74 | 0.7 | 13,221.74 | 0.7 |
| Total Expenses | 1,790,084.76 | 99.0 | 1,790,084.76 | 99.0 |
| Net Income | $ 17,240.22 | 1.0 | $ 17,240.22 | 1.0 |

Leed Corporation
STATEMENT OF INCOME
For The Twelve Months Ended December 31, 2008

|  | CURRENT PERIOD | | YEAR TO DATE | |
|  | Amount | Percent | Amount | Percent |
|---|---|---|---|---|
| **Revenue** | | | | |
| Revenues-IdSprinkler Sales | $    67,511.07 | 1.7 | $    67,511.07 | 1.7 |
| Revenue-N/M Sprinkler Sales | 3,142.08 | 0.1 | 3,142.08 | 0.1 |
| Revenues-Idaho Service | 335,233.41 | 8.4 | 335,233.41 | 8.4 |
| Revenues-Farm Commodities | 180.00 | 0.0 | 180.00 | 0.0 |
| Revenues-Rentals | 81,659.06 | 2.0 | 81,659.06 | 2.0 |
| Revenues-Other | 700.00 | 0.0 | 700.00 | 0.0 |
| Revenue:Land/homes | 3,476,941.09 | 86.6 | 3,476,941.09 | 86.6 |
| Revenue-Const labor-ID | 41,248.90 | 1.0 | 41,248.90 | 1.0 |
| Interest income | 6.49 | 0.0 | 6.49 | 0.0 |
| Reimbursed expenses | 7,632.71 | 0.2 | 7,632.71 | 0.2 |
| Total Revenue | 4,014,254.81 | 100.0 | 4,014,254.81 | 100.0 |
| **Expenses** | | | | |
| Purchases-Idaho Materials | 106,075.34 | 2.6 | 106,075.34 | 2.6 |
| Purchases-Labor ID | 282,326.04 | 7.0 | 282,326.04 | 7.0 |
| Purchases-contract labor | 14,295.85 | 0.4 | 14,295.85 | 0.4 |
| Purchases-New Constr | 2,276,130.13 | 56.7 | 2,276,130.13 | 56.7 |
| Purchases-Closing cost | 186,687.68 | 4.7 | 186,687.68 | 4.7 |
| Purchases-Engr/drafting | 5,367.20 | 0.1 | 5,367.20 | 0.1 |
| Purchases-Prop Appraisals | 900.00 | 0.0 | 900.00 | 0.0 |
| Purchases-Cleaning | 11.73 | 0.0 | 11.73 | 0.0 |
| Advertising-Idaho Jobs | 12,363.80 | 0.3 | 12,363.80 | 0.3 |
| Advertising-N/Mex | 96.47 | 0.0 | 96.47 | 0.0 |
| Auto exp-ID | 19,799.48 | 0.5 | 19,799.48 | 0.5 |
| Bank charges | 1,170.91 | 0.0 | 1,170.91 | 0.0 |
| Corporate income tax | 109.00 | 0.0 | 109.00 | 0.0 |
| Depreciation | 41,219.00 | 1.0 | 41,219.00 | 1.0 |
| Deprec-Rentals | 17,358.00 | 0.4 | 17,358.00 | 0.4 |
| Depreciation-Farm equip | 13,904.00 | 0.3 | 13,904.00 | 0.3 |
| Donations | 4,234.20 | 0.1 | 4,234.20 | 0.1 |
| Dues & subscriptions | 368.76 | 0.0 | 368.76 | 0.0 |
| Farm expense-Rep/maint | 1,208.41 | 0.0 | 1,208.41 | 0.0 |
| Farm expense-Supplies | 4,761.32 | 0.1 | 4,761.32 | 0.1 |
| Farm expense-Utilities | 2,404.16 | 0.1 | 2,404.16 | 0.1 |
| Fuel-ID | 66,954.98 | 1.7 | 66,954.98 | 1.7 |
| Fuel-NM | 217.67 | 0.0 | 217.67 | 0.0 |
| Insurance-Prop liab-ID | 8,013.86 | 0.2 | 8,013.86 | 0.2 |
| Insurance-W/comp ID | 16,011.51 | 0.4 | 16,011.51 | 0.4 |
| Insurance-Health | 11,735.00 | 0.3 | 11,735.00 | 0.3 |
| Insurance-Title fees | 199.50 | 0.0 | 199.50 | 0.0 |
| Insurance-Liability | 19,445.91 | 0.5 | 19,445.91 | 0.5 |
| Interest-Loan | 125,144.09 | 3.1 | 125,144.09 | 3.1 |
| Interest-Fin Charge | 6,132.92 | 0.2 | 6,132.92 | 0.2 |
| Interest-Mortgages | 409,054.01 | 10.2 | 409,054.01 | 10.2 |
| Janitorial | 77.45 | 0.0 | 77.45 | 0.0 |
| Leases-Farm Property | 57,309.00 | 1.4 | 57,309.00 | 1.4 |
| Leases-Other | 1,219.58 | 0.0 | 1,219.58 | 0.0 |
| Miscellaneous expnese | 340.00 | 0.0 | 340.00 | 0.0 |

Leed Corporation
STATEMENT OF INCOME
For The Twelve Months Ended December 31, 2008

| | CURRENT PERIOD | | YEAR TO DATE | |
| --- | ---: | ---: | ---: | ---: |
| | Amount | Percent | Amount | Percent |
| Office supplies-ID | 2,303.26 | 0.1 | 2,303.26 | 0.1 |
| Office supplies-N/Mex | 368.25 | 0.0 | 368.25 | 0.0 |
| Payroll taxes | 39,903.83 | 1.0 | 39,903.83 | 1.0 |
| Payroll taxes-NMex | 85.00 | 0.0 | 85.00 | 0.0 |
| Postage & freight | 396.02 | 0.0 | 396.02 | 0.0 |
| Professional fees | 21,829.32 | 0.5 | 21,829.32 | 0.5 |
| Equip Rents-ID | 1,473.06 | 0.0 | 1,473.06 | 0.0 |
| Repairs & maintenance-ID | 14,198.11 | 0.4 | 14,198.11 | 0.4 |
| Repairs/maint-NM | 171.10 | 0.0 | 171.10 | 0.0 |
| Salaries - officers | 140,436.84 | 3.5 | 140,436.84 | 3.5 |
| Taxes-Lic/permits N/Mex | 151.60 | 0.0 | 151.60 | 0.0 |
| Taxes-Lic/permits ID | 13,247.19 | 0.3 | 13,247.19 | 0.3 |
| Taxes - Property | 27,800.06 | 0.7 | 27,800.06 | 0.7 |
| Telephone-ID | 15,191.08 | 0.4 | 15,191.08 | 0.4 |
| Telephone-NM | 248.00 | 0.0 | 248.00 | 0.0 |
| Travel-Meals ID | 4,589.34 | 0.1 | 4,589.34 | 0.1 |
| Travel-Meals N/Mex | 49.77 | 0.0 | 49.77 | 0.0 |
| Travel-Motels ID | 794.00 | 0.0 | 794.00 | 0.0 |
| Travel-Motels N/Mex | 72.96 | 0.0 | 72.96 | 0.0 |
| Utilities | 16,918.32 | 0.4 | 16,918.32 | 0.4 |
| Utilities-NM | 15.00 | 0.0 | 15.00 | 0.0 |
| Total Expenses | 4,012,889.07 | 100.0 | 4,012,889.07 | 100.0 |
| Net Income | $ 1,365.74 | 0.0 | $ 1,365.74 | 0.0 |

Leed Corporation
STATEMENT OF INCOME
For The Twelve Months Ended December 31, 2009

| | CURRENT PERIOD | | YEAR TO DATE | |
|---|---:|---:|---:|---:|
| | Amount | Percent | Amount | Percent |
| **Revenue** | | | | |
| Revenues-IdSprinkler Sales $ | 259,990.68 | 14.6 $ | 259,990.68 | 14.6 |
| Revenues-Idaho Service | 60,369.64 | 3.4 | 60,369.64 | 3.4 |
| Revenues-Farm Commodities | 10,000.00 | 0.6 | 10,000.00 | 0.6 |
| Revenues-Rentals | 219,859.84 | 12.4 | 219,859.84 | 12.4 |
| Revenues-Other | 4,292.00 | 0.2 | 4,292.00 | 0.2 |
| Revenue:Land/homes | 61,525.91 | 3.5 | 61,525.91 | 3.5 |
| Revenue-Const labor-ID | 852,954.11 | 48.0 | 852,954.11 | 48.0 |
| Interest income | 1.57 | 0.0 | 1.57 | 0.0 |
| Reimbursed expenses | 306,843.07 | 17.3 | 306,843.07 | 17.3 |
| Total Revenue | 1,775,836.82 | 100.0 | 1,775,836.82 | 100.0 |
| **Expenses** | | | | |
| Purchases-Idaho Materials | 113,167.54 | 6.4 | 113,167.54 | 6.4 |
| Purchases-Labor ID | 453,798.41 | 25.6 | 453,798.41 | 25.6 |
| Purchases-New Constr | 533,438.76 | 30.0 | 533,438.76 | 30.0 |
| Purchases-Closing cost | 41,582.26 | 2.3 | 41,582.26 | 2.3 |
| Purchases-Engr/drafting | 2,715.80 | 0.2 | 2,715.80 | 0.2 |
| Purchases-Prop Appraisals | 10,450.00 | 0.6 | 10,450.00 | 0.6 |
| Purchases-Marketing | 11,725.00 | 0.7 | 11,725.00 | 0.7 |
| Purchases-Cleaning | 2,159.55 | 0.1 | 2,159.55 | 0.1 |
| Purchases:R/E Fees | 6,180.00 | 0.3 | 6,180.00 | 0.3 |
| Advertising-Idaho Jobs | 2,443.03 | 0.1 | 2,443.03 | 0.1 |
| Advertising-New Construction | 41,131.28 | 2.3 | 41,131.28 | 2.3 |
| Auto exp-ID | 19,601.52 | 1.1 | 19,601.52 | 1.1 |
| Auto-N/Mex | 400.00 | 0.0 | 400.00 | 0.0 |
| Bank charges | 3,229.42 | 0.2 | 3,229.42 | 0.2 |
| Depreciation | 42,661.00 | 2.4 | 42,661.00 | 2.4 |
| Deprec-Rentals | 130,889.00 | 7.4 | 130,889.00 | 7.4 |
| Depreciation-Farm equip | 15,335.00 | 0.9 | 15,335.00 | 0.9 |
| Dues & subscriptions | 1,324.89 | 0.1 | 1,324.89 | 0.1 |
| Farm expense-Rep/maint | 100.00 | 0.0 | 100.00 | 0.0 |
| Farm expense-Utilities | 12,265.63 | 0.7 | 12,265.63 | 0.7 |
| Fuel-ID | 58,386.67 | 3.3 | 58,386.67 | 3.3 |
| Fuel-NM | 185.67 | 0.0 | 185.67 | 0.0 |
| Insurance-W/comp ID | 11,925.00 | 0.7 | 11,925.00 | 0.7 |
| Insurance-Health | 12,155.00 | 0.7 | 12,155.00 | 0.7 |
| Insurance-Liability | 33,787.60 | 1.9 | 33,787.60 | 1.9 |
| Gifts | 9,200.00 | 0.5 | 9,200.00 | 0.5 |
| Interest-Loan | 71,624.46 | 4.0 | 71,624.46 | 4.0 |
| Interest-Fin Charge | 8,648.58 | 0.5 | 8,648.58 | 0.5 |
| Interest-Mortgages | 211,759.48 | 11.9 | 211,759.48 | 11.9 |
| Leases-Property | 84,829.02 | 4.8 | 84,829.02 | 4.8 |
| Leases-Other | 2,800.00 | 0.2 | 2,800.00 | 0.2 |
| Miscellaneous expnese | 764.03 | 0.0 | 764.03 | 0.0 |
| Office supplies-ID | 1,601.09 | 0.1 | 1,601.09 | 0.1 |
| Office supplies-N/Mex | 2.65 | 0.0 | 2.65 | 0.0 |
| Payroll taxes | 67,343.98 | 3.8 | 67,343.98 | 3.8 |
| Postage & freight | 1,266.35 | 0.1 | 1,266.35 | 0.1 |

Leed Corporation
STATEMENT OF INCOME
For The Twelve Months Ended December 31, 2009

| | CURRENT PERIOD | | YEAR TO DATE | |
| | Amount | Percent | Amount | Percent |
|---|---|---|---|---|
| Professional fees | 25,140.14 | 1.4 | 25,140.14 | 1.4 |
| Property Management Fees | 7,920.29 | 0.4 | 7,920.29 | 0.4 |
| Rent-Building ID | 1,500.00 | 0.1 | 1,500.00 | 0.1 |
| Equip Rents-ID | 25,833.87 | 1.5 | 25,833.87 | 1.5 |
| Repairs & maintenance-ID | 17,638.57 | 1.0 | 17,638.57 | 1.0 |
| Sanitation | 558.54 | 0.0 | 558.54 | 0.0 |
| Taxes-Lic/permits N/Mex | 300.00 | 0.0 | 300.00 | 0.0 |
| Taxes-Lic/permits ID | 6,591.65 | 0.4 | 6,591.65 | 0.4 |
| Taxes - Property | 14,274.84 | 0.8 | 14,274.84 | 0.8 |
| Telephone-ID | 17,386.29 | 1.0 | 17,386.29 | 1.0 |
| Telephone-NM | 65.02 | 0.0 | 65.02 | 0.0 |
| Travel-Meals N/Mex | 171.39 | 0.0 | 171.39 | 0.0 |
| Travel-Motels ID | 9,332.80 | 0.5 | 9,332.80 | 0.5 |
| Travel-Motels N/Mex | 95.48 | 0.0 | 95.48 | 0.0 |
| Utilities | 14,048.09 | 0.8 | 14,048.09 | 0.8 |
| Total Expenses | 2,161,734.64 | 121.7 | 2,161,734.64 | 121.7 |
| Net Income | $ (385,897.82) | (21.7) | $ (385,897.82) | (21.7) |

# Economic Market Study

## of Lincoln County, Idaho and Surrounding Area

Prepared for

## Leed Corp

May 26, 2011

Compiled by

**Paul Landaker**
**Landaker Marketing Group, LLC**
**Portland, Oregon**

APPENDIX "H"
*(Landaker Marketing's Economic*
*Summary Report—May 2011)*

# Economic Market Study of Lincoln County, Idaho and Surrounding Area

## Contents

| | |
|---|---|
| *Introduction* | *3* |
| *Objective of the Study* | *3* |
| *Scope and Limitations* | *3* |
| *Methods and Procedures* | *3* |
| *Data Analysis* | *3* |
| *Profile of Lincoln County and the City of Shoshone* | *4* |
|     *Population* | *4* |
|     *Labor Force & Employment* | *4* |
|     *Wages & Income* | *4* |
|     *A Comparison with Neighboring Counties* | *5* |
| *The Economy and Signs of Improvement* | *6* |
| *The Impact of a New Regional Airport* | *9* |
| *Conclusions and Summary* | *10* |

### Appendixes

| | |
|---|---|
| 1. | *Lincoln County Work Force Trends, April 2011 (Idaho Dept. of Labor)* |
| 2. | *Blaine County Work Force Trends, April 2011 (Idaho Dept. of Labor)* |
| 3. | *Jerome County Work Force Trends, April 2011 (Idaho Dept. of Labor)* |
| 4. | *Twin Falls County Work Force Trends, April 2011 (Idaho Dept. of Labor)* |
| 5. | *State of Idaho Work Force Trends, April 2011 (Idaho Dept. of Labor)* |
| 6. | *Central Idaho County Population Characteristics Comparison, 2005-2009 Survey (U.S. Census)* |
| 7. | *Lincoln County, Idaho - Fact Sheet - American Fact Finder, 2005-2009 Survey (U.S. Census)* |
| 8. | *Blaine County, Idaho - Fact Sheet - American Fact Finder, 2005-2009 Survey (U.S. Census)* |
| 9. | *Jerome County, Idaho - Fact Sheet - American Fact Finder, 2005-2009 Survey (U.S. Census)* |
| 10. | *Twin Falls County, Idaho - Fact Sheet - American Fact Finder, 2005-2009 Survey (U.S. Census)* |
| 11. | *State of Idaho - Fact Sheet - American Fact Finder, 2005-2009 Survey (U.S. Census)* |
| 12. | *Labor Characteristics comparison 4 counties, Idaho & US 2005-2009 Survey (U.S. Census)* |
| 13. | *Zions Bank Insight Economic Outlook, Winter 2011* |
| 14. | *Zions Bank index indicates continued growth, May 12, 2011 (Times-News)* |
| 15. | *Economic Forecast Exec Sum, Apr 2011 (Idaho Div. of Financial Mgmt.)* |
| 16. | *Economist John Church forecast Idaho tops for job growth in next 5 years Nov 2010* |
| 17. | *Idaho Outlook General Fund Revenue Report, May 2011 (Idaho Div. of Financial Mgmt.)* |
| 18. | *Idaho Economic Indicators, May 24, 2011 (Idaho Dept. of Labor)* |
| 19. | *Moody's Analytics Idaho Economic Outlook* |
| 20. | *Chase Bank State of Idaho's Economy, Mar 15, 2011* |
| 21. | *Fed Raises Its Forecast for Growth, Feb 16, 2011 (New York Times)* |
| 22. | *Economic Trends & Conditions, May 2011 (Federal Reserve Bank of San Francisco, Economic* |
| 23. | *Existing Home Sales Rise in Most States in 1st Qtr, May 10, 2011 (National Assoc. of Realtors)* |
| 24. | *Idaho Real Estate Forecast, March 16, 2011 (forecastchart.com)* |
| 25. | *Housing and Interest Rate Forecast, May23, 2011 (National Assoc. of Home Builders)* |
| 26. | *Quarterly Housing Affordability Index, 1st Qtr. 2011 (National Assoc. of Realtors)* |
| 27. | *Replacement airport would boost economy, May 11, 2011 (Idaho Mountain Express)* |
| 28. | *Airport Economic Analysis Report, Sept 2008* |
| 29. | *Replacement Airport Site10A Engineers Report 1-13-2011* |

**APPENDIX "H"**

*(Landaker Marketing's Economic
Summary Report—May 2011)*

### Introduction

This document has been prepared to provide insight and perspective into the current and future economic conditions impacting Lincoln County, Idaho and the community of Shoshone as it relates to the potential for future home building and sales of properties currently owned by Leed Corp. As you will see, this study references a cross section of sources to provide a national, state and local perspective on the economy, population, jobs and other factors impacting the current and future economic prospects and viability of the area. The purpose of the study was to research and explore economic and other factors impacting the mid to long term market demand and potential values of residential real estate developments in and around Shoshone, Idaho. The study was conducted by the Landaker Marketing Group, LLC (Landaker Marketing) using secondary research methods accessing reports, forecasts and news articles, available via the internet, from various state and federal, public and private based sources. Based on this data a home and lots sales prospectus forecast gathered about the Lincoln and Blaine County areas of Central Idaho.

### Objective of the Study

**The aim of the study will be to draw a conclusion about the mid to long term economic vitality of the area in the foreseeable future and how that vitality will impact demand for housing and related development and how that demand may impact future housing and real estate values.**

### Scope and Limitations

This study will be descriptive and exploratory in approach. Landaker Marketing has compiled a comprehensive study of the recent past, current and future market conditions impacting the Lincoln and Blaine Counties. Based on currently available information, a forecasting model has been developed with a timeline going out into the next nine years. As such, unforeseen changes in the economy or timeline to construct a new airport may impact demand and changes in real estate values.

### Methods and Procedures

Secondary research has been conducted for this study. Sources in secondary research include studies and forecasts produced by various divisions of the State of Idaho using data produced by U.S. Bureau of Labor Statistics, the U.S. Census Bureau, U.S. Department of Commerce, Bureau of Labor Statistics, newspaper, magazine and journal content, organization statistics, etc. As noted earlier, a similar study was compiled by Landaker Marketing for Leed Corp in 2007 that included data gathered from various State, Federal and County sources as well as various government agencies, MLS and other business related sources. In addition to obtaining current, updated data from these same sources, the study draws from available reports and studies conducted pertaining to the new airport and related data compiled for and by the FAA in evaluating and selecting a new airport location. Elements that have been considered include:

1. Economic growth

2. Population forecasts based on US Census data

3. Geographic proximity between Twin Falls and the Wood River Valley / Sun Valley/ Ketchum areas.

4. Area transportation and traffic patterns on Highway 75.

5. New housing construction and real estate activity.

6. Updated reports and studies being made available for the Friedman Memorial Airport Authority and the FAA pertaining to the inevitable construction of a new regional airport that will dramatically impact the area starting with increased employment opportunities during construction and then afterwards.

### Data Analysis

Data analysis includes both the qualitative and the quantitative. Available quantitative data includes graphs, tables and figures to support the analysis. Once this information has been gathered, interpretation has been conducted which can be accounted as qualitative in nature. The forecast model is based on these interpretations of available data.

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

## APPENDIX "H"
*(Landaker Marketing's Economic
Summary Report—May 2011)*

## Profile of Lincoln County and the City of Shoshone

Located at the intersection marking the beginning of the Sawtooth Scenic Byway (state highway 75) that leads north to Sun Valley, and U.S. highway 93 that leads south to Twin Falls, the city of Shoshone has long been considered a bedroom community[25] to both areas.  Workers have an easy commute in both directions. With affordable housing continuing to be an issue in the Wood River Valley, subdivisions and residential construction is expected to continue in and around Shoshone, where sustainable growth is expected over the long term. These assumptions are confirmed by a higher "Mean travel time to work (minutes)" by the Labor force located in Lincoln County compared to surrounding counties, and the lower Median value (dollars) of houses in Lincoln County compared to Blaine County, as reported in the U.S. Census Bureau American FactFinder 2005-2009 American Survey 5-Year Estimates[26].

### Population

Lincoln County's population has risen 16 percent in the last 10 years, keeping pace with other growing counties in the region. The city of Shoshone, long considered the gateway to Sun Valley, is the county seat with a population of 1,461. Lincoln County's economy continues to rely on agriculture with several large scale dairies contributing to the industry's regional growth. Manufacturing was nearly non-existent prior to Glanbia Food's whey processing plant in Richfield, 14 miles east of Shoshone, and Rocky Mountain Hardware, which machines brass fixtures in Shoshone.

### Labor Force & Employment

Since the economic downturn, unemployment in Shoshone County has reached unprecedented levels with a major loss of construction jobs pushing it to 13.4 percent in March 2011 — well above surrounding counties, the state and national rates. Over the years unemployment has been a roller coaster in Lincoln County. The seasonally adjusted rate originally peaked at 5.6 percent in 2008 from a record low of 3.2 percent in 2007. During six of the last 10 years, the unemployment rate has exceeded 5 percent. Economic diversification has created new jobs but mostly in the service sector. Dairies have brought stability to traditional seasonal jobs in tourism, landscaping and agriculture. More retail is beginning to emerge to serve highway traffic between Twin Falls and the Wood River Valley. Whey processing jobs in Richfield are stable, and manufacturing is gaining ground and raising area wages. Hay, grains, corn and other crops that can be green chopped for dairy silage are the primary commodities. The U.S. Bureau of Land Management's regional headquarters and the National Interagency Fire Center dispatch operation are seasonal employers. It has been noted that the surrounding small communities all saw interest in new housing prior to the downturn. According to the April 2011 edition of the Lincoln County Work Force Trends publication, the county is expected to resume a steady growth when the economy rebounds and higher-paying jobs return to Blaine County[27].

### Wages & Income

Per capita income in Lincoln County while growing steadily, rising 38 percent from 2000 to 2009, remains 10.7 percent below the state per capita income and 28 percent below the national figure. The county ranks 29th among the 44 counties and is below surrounding counties, especially Blaine county. Many of the jobs are in services and agriculture, which tend to pay lower wages. Both, however, have experienced a jump with the minimum wage increases in 2007, 2008 and 2009. The whey manufacturing plant offers higher-paying jobs and the possibility of expansion. As the economy improves, it is expected that retail and office developers will continue to make concerted efforts at capturing the commuter traffic market so they can lease existing space[28].

---

[25] The city of Shoshone and surrounding area has long been referenced as a "bedroom community" to both the Wood River Valley and Twin Falls areas in the monthly Lincoln County edition of the **Work Force Trends** publication produced by the Idaho Department of Labor (www.labor.idaho.gov). Copies of the Work Forces Trends reports for Lincoln and surrounding counties can be found in their entirety in the Appendixes of this report.

[26] U.S. Census Bureau American FactFinder 2005-2009 American Survey 5-Year Estimates data comparison of Lincoln, Blaine, Jerome and Twin Falls Counties in Idaho (www.factfinder.census.gov). Copies of the Fact Sheets for Lincoln and surrounding counties can be found in their entirety in the Appendixes of this report.

[27] The Lincoln County April 2011 edition of the "Work Force Trends" publication produced by the Idaho Department of Labor (www.labor.idaho.gov).

[28] The Lincoln County April 2011 edition of the "Work Force Trends" publication produced by the Idaho Department of Labor (www.labor.idaho.gov).

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

APPENDIX "H"
*(Landaker Marketing's Economic
Summary Report—May 2011)*

**A Comparison with Neighboring Counties**

The economic downturn that hit the U.S. and Idaho was even more dramatic in Lincoln County where unemployment jumped from a historic low of 3.2% in 2007 to over 13% in 2010. This compares to similar increases in unemployment in neighboring counties[29], although not to the extent experienced in Lincoln County.  Average annual wages in Lincoln County are also lower than the state average and lower than neighboring counties.  Education levels in Lincoln County are lower than Blaine and Twin Falls Counties and state averages, but slightly higher than Jerome County.

| County: | Lincoln | | Blaine | | Jerome | | Twin Falls | | Idaho | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Labor Force** | Mar-10 | Mar-11 | Mar-10 | Mar-11 | Mar-10 | Mar-11 | Mar-10 | Mar-11 | Dec-09 | Dec-10 | |
| | | | | | | | | | | | |
| Civilian Labor Force | 2,649 | 2,610 | 12,619 | 12,805 | 10,327 | 10,547 | 38,519 | 39,289 | 750,851 | 756,521 | |
| Total Employment | 2,329 | 2,260 | 11,542 | 11,599 | 9,495 | 9,622 | 35,369 | 35,844 | 683,375 | 685,765 | |
| Unemployed | 320 | 350 | 1,077 | 1,206 | 833 | 925 | 3,150 | 3,445 | 67,476 | 70,756 | |
| % of Labor Force Unemployed | 12.1 | 13.4 | 8.5 | 9.4 | 8.1 | 8.8 | 8.2 | 8.8 | 9.0 | 9.4 | |
| State of Idaho | 9.0 | 9.7 | 9.0 | 9.7 | 9.0 | 9.7 | 9.0 | 9.7 | X | X | |
| U.S. % Unempoyed | 9.7 | 8.8 | 9.7 | 8.8 | 9.7 | 8.8 | 9.7 | 8.8 | 10.0 | 9.8 | |
| | | | | | | | | | | | |
| **% of Labor Force Unemployed** | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| | | | | | | | | | | | |
| Lincoln County | 4.3 | 3.9 | 5.1 | 5.5 | 5.3 | 4.3 | 4.1 | 3.2 | 5.5 | 11.0 | 13.1 |
| Blaine County | 3.5 | 3.3 | 3.9 | 4.1 | 3.5 | 2.7 | 2.4 | 2.1 | 3.8 | 7.7 | 9.2 |
| Jerome County | 4.2 | 4 | 4.2 | 4.4 | 4.3 | 3.6 | 3.0 | 2.5 | 4.1 | 6.6 | 8.5 |
| Twin Falls County | 4.1 | 4.1 | 4.2 | 4.3 | 4.2 | 3.5 | 3.1 | 2.4 | 3.9 | 6.4 | 8.2 |
| | | | | | | | | | | | |
| State of Idaho | 4.6 | 4.9 | 5.4 | 5.3 | 4.7 | 3.9 | 3.2 | 3 | 4.9 | 8 | 9.2 |
| | | | | | | | | | | | |
| **Average Annual Wages** | 2000 | 2009 | 2010 | | | | | | | | |
| | | | | | | | | | | | |
| Lincoln County | 20,280 | 29,228 | 28,840 | | | | | | | | |
| Blaine County | 31,635 | 35,576 | 35,886 | | | | | | | | |
| Jerome County | 21,837 | 29,712 | 30,196 | | | | | | | | |
| Twin Falls County | 22,343 | 28,517 | 28,921 | | | | | | | | |
| | | | | | | | | | | | |
| State of Idaho | 26,049 | 33,886 | 34,081 | | | | | | | | |

With a Mean travel time to work (minutes) higher than surrounding counties, it can be assumed many workers commute outside of the county to their jobs.  Median household income, while less than Blaine County and the state is higher than residents in Jerome and Twin Falls Counties.  That may be impacted by a slightly lower average household and average family size than Jerome and Twin Falls Counties.  A disparity does exist with the percentage of families below the poverty level at 11.6%, highest of the neighboring counties and the state.  The Median value (dollars) of houses in Lincoln averaged only $116,300, compared to over $500,000 in Blaine County.  It is the lowest of other neighboring counties as well.  The median age of the Lincoln County population was 33.8 compared to 38.8 in Blaine County, second lowest to only Jerome at 33.1 of other neighboring Counties.

[29] U.S. Census Bureau American FactFinder 2005-2009 American Survey 5-Year Estimates data comparison of Lincoln, Blaine, Jerome and Twin Falls Counties in Idaho (www.factfinder.census.gov).

*APPENDIX "H"*

*(Landaker Marketing's Economic
Summary Report—May 2011)*

| Central Idaho County Population Characteristics Comparison | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| U.S. Census Burear American FactFinder | | | | | | | | | | | |
| 2005-2009 American Survey 5-Year Estimates | | | | | | | | | | | |
| Data Profile Highlights | | | | | | | | | | | |
| County: | Lincoln | | Blaine | | Jerome | | Twin Falls | | Idaho | | U.S. |
| | Estimate | Perc. | Estimate | Perc. | Estimate | Perc. | Estimate | Perc. | Estimate | Perc. | |
| **Social Characteristics** | | | | | | | | | | | |
| Avr Household size | 2.49 | (X) | 2.44 | (X) | 3.01 | (X) | 2.63 | (X) | 2.64 | (X) | 2.60 |
| Avr Family size | 2.94 | (X) | 3.04 | (X) | 3.54 | (X) | 3.15 | (X) | 3.12 | (X) | 3.19 |
| Population 25 years and over | 2,702 | | 14,900 | | 11,726 | | 45,937 | | 926,767 | | |
| High School Grad | (X) | 78.7 | (X) | 92.0 | (X) | 74.0 | (X) | 83.6 | (X) | 87.7 | 84.6 |
| Bachelor's degree or higher | (X) | 12.3 | (X) | 40.7 | (X) | 11.9 | (X) | 16.7 | (X) | 23.7 | 27.5 |
| Household population | 4,364 | | 21,535 | | 20,142 | | 71,101 | | 1,458,278 | | |
| | | | | | | | | | | | |
| **Economic Characteristics** | | | | | | | | | | | |
| Labor force (16 years and older) | 2,205 | 65.4 | 12,575 | 72.9 | 9,458 | 65.9 | 35,733 | 64.7 | 745,000 | 65.9 | 65.0 |
| Mean travel time to work (min.) | 31.3 | | 18.3 | | 17.2 | | 15.8 | | 20.0 | | 25.2 |
| Median household income | $ 45,903 | | $ 56,601 | | $ 40,322 | | $ 41,577 | | $ 46,183 | | $ 51,425 |
| Median family income | $ 48,528 | | $ 72,833 | | $ 46,283 | | $ 47,804 | | $ 54,057 | | $ 62,363 |
| Families below poverty level | (X) | 11.6 | (X) | 5.8 | (X) | 8.9 | (X) | 11.4 | (X) | 9.5 | 9.9 |
| | | | | | | | | | | | |
| **Housing Characteristics** | | | | | | | | | | | |
| Total housing units | 2,046 | | 14,298 | | 7,354 | | 29,529 | | 626,901 | | |
| Occupied housing units | 1,752 | 85.6 | 8,833 | 61.8 | 6,691 | 91.0 | 27,024 | 91.5 | 552,726 | 88.2 | 88.2 |
| Owner-occupied | 1,243 | 70.9 | 6,007 | 68.8 | 4,471 | 66.8 | 18,463 | 68.3 | 393,813 | 71.2 | 66.9 |
| Renter-occupied | 509 | 29.1 | 2,826 | 32.0 | 2,220 | 33.2 | 8,561 | 31.7 | 158,913 | 28.8 | 33.1 |
| Vacant housing units | 294 | 14.4 | 5,465 | 38.2 | 663 | 9.0 | 2,505 | 8.5 | 74,175 | 11.8 | 11.8 |
| Owner-occupied | 1,243 | | 6,007 | | 4,471 | | 18,463 | | 393,813 | | |
| Median value (dollars) | $ 116,300 | (X) | $ 501,300 | (X) | $ 130,600 | (X) | $ 139,400 | (X) | $ 166,700 | (X) | $185,400 |
| Median of selected mthly. Owner costs | | | | | | | | | | | |
| With a mortgage (dollars) | $ 1,056 | (X) | $ 1,820 | (X) | $ 1,014 | (X) | $ 1,051 | (X) | $ 1,177 | (X) | 1,486 |
| Not mortgaged (dollars) | $ 307 | (X) | $ 498 | (X) | $ 289 | (X) | $ 296 | (X) | $ 319 | (X) | 419 |
| | | | | | | | | | | | |
| **ACS Demographic Estimates** | | | | | | | | | | | |
| Total population | 4,533 | | 21,775 | | 20,142 | | 72,578 | | 1,492,573 | | |
| Male | 2,292 | 50.6 | 11,399 | 52.3 | 10,244 | 50.9 | 35,621 | 49.1 | 749,117 | 50.2 | 49.3 |
| Female | 2,241 | 49.4 | 10,376 | 47.7 | 9,898 | 49.1 | 36,957 | 50.9 | 743,456 | 49.8 | 50.7 |
| Median age (years) | 33.8 | (X) | 38.8 | (X) | 33.1 | | 34.5 | (X) | 34.0 | (X) | 36.5 |
| Under 5 years | 446 | 9.8 | 1,507 | 6.9 | 2,009 | 10.0 | 5,728 | 7.9 | 118,779 | 8.0 | 6.9 |
| 18 years and over | 3,328 | 71.2 | 16,685 | 76.6 | 13,782 | 68.4 | 53,030 | 73.1 | 1,086,071 | 72.8 | 75.4 |
| 65 years and over | 546 | 12.0 | 2,175 | 10.0 | 2,261 | 11.2 | 10,410 | 14.3 | 175,348 | 11.7 | 12.6 |
| One race | 4,467 | 98.5 | 21,437 | 98.4 | 19,943 | 99.0 | 70,983 | 97.8 | 1,456,119 | 97.6 | 97.8 |
| White | 4,251 | 93.8 | 19,970 | 91.7 | 18,786 | 93.3 | 67,731 | 93.3 | 1,374,465 | 92.1 | 74.5 |
| Black or African American | 3 | 0.1 | 6 | - | 57 | 0.3 | 241 | 0.3 | 9,030 | 0.6 | 12.4 |
| American Indian & Alaska Native | 21 | 0.5 | 288 | 1.3 | 282 | 1.4 | 523 | 0.7 | 18,352 | 1.2 | 0.8 |
| Asian | 18 | 0.4 | 164 | 0.8 | - | - | 528 | 0.7 | 16,739 | 1.1 | 4.4 |
| Hispanic or Latino | 1,112 | 24.5 | 3,772 | 17.3 | 5,244 | 15.1 | 8,908 | 12.3 | 149,979 | 10.0 | 15.1 |
| | | | | | | | | | | | |
| Source: 2005-2009 American Community Survey | | | | | | | | | | | |
| www.factfinder.census.gov | | | | | | | | | | | |

## The Economy and Signs of Improvement

The dramatic economic downturn felt across the U.S. had an even more dramatic impact on Lincoln County where unemployment spiked to over 13% in 2010.  Considered a bedroom community to both Sun Valley and Twin Falls, the economic downturn and loss of jobs in those communities caused almost a virtual standstill to the new home construction and home sales that Leed Corp had been actively developing in and around the community of Shoshone.

Positive economic indicators are being reported from many sources.  An economic consultant for the Zions Bank, Jeff Thredgold, President, Thredgold Economic Associates wrote in the Zions Bank Idaho Economic Outlook Winter 2011[30], that

---

[30] Zions Bank Idaho **Economic Outlook Winter 2011** (Appendix item #13) can be found online at
http://www.zionsbancorporation.com/zionsbank/ins/insID2011winter.html

APPENDIX "H"
*(Landaker Marketing's Economic
Summary Report—May 2011)*

"The transition of the Idaho economy from painful recession to modest growth appears to be on track, with overall performance expected to improve during 2011" The report went on to state "A more traditional solid economic growth is expected during 2012. This most welcome return to growth follows one of the deepest and most widespread Idaho recessions since the Great Depression."  The report ended on a positive note: "The state's recovery from one of its most painful downturns since the Great Depression continues to unfold, with modest employment gains expected in 2011. Stronger employment gains are anticipated during 2012. Increasing recognition of the Gem state as a great place to invest, to work, and to play will pay major dividends for years to come. The Idaho economy is on the mend!"

An article posted on the Magicvalley.com Times-News website dated May 12 titled "Zions Bank index indicates continued growth[31]" reported on a press release by the bank regarding their Small Business Index for Idaho.  Although strengthening economic growth is forecasted for the rest of the year, which will benefit Gem State small business, factors tied to the state's unemployment rate pushed April's index slightly lower compared to March.  The article noted that the bank is expecting continued economic growth in Idaho and the United States.  Making forecasting difficult on a national level, the report notes, are "major unknowns" surrounding oil price volatility, European sovereign debt anxieties and U.S. government spending the countries debt ceiling. Nonetheless, most forecasters see first quarter economic weakness as an aberration, tied to higher energy prices and poor weather.  Growth is expected to return to a 3 percent to 3.5 percent annual rate in coming quarters, with some forecasts suggesting even stronger gains.

The latest economic forecast for Idaho released in April by the state **Division of Financial Management** paints an improving picture of the state's future, with higher employment and personal income growth expected to continue.  The **April 2011 Idaho Economic Forecast[32]** prepared by state **Economist Derek Santos** and his staff has improved slightly since their winter 2010 forecast.  The forecast is based on national economic estimates provided by IHS Global Insight.  After three straight years of declining employment, Santos expects the state to add about 8,000 jobs this year, or a 1.3 percent increase. That should jump to about 17,000 new jobs each year for the next three years, he said. Personal income is expected to rise 3.6 percent this year, adding about $2 billion to Idaho's economy. Santos estimates that will gradually improve through 2014, when the annual increase is expected to be about 6 percent (without adjusting for inflation). If those projections are correct, personal income would surpass $60 billion in 2014.

Encouraging words about the economy were also voiced by Idaho economist John Church who kicked off the **Annual Economic Outlook Forum[33]** held in Boise last November with positive projections for 2011 and beyond. While he didn't mince words about how dismal the past few years have been, he said there is light at the end of the tunnel. Church said a national economic forecast firm **ranks Idaho the number one state in the nation for employment growth over the next five years**. That same firm also predicts the Gem State will have the **fifth highest population growth**.

Yet another positive economic indicator can be found in the May edition of the **Idaho General Fund Revenue** Report[34], also produced by the state **Division of Financial Management.**  The report noted that April Idaho state tax revenues were almost $14 million above expectations, giving the state close to a $74.2 million surplus for the current budget year, which ends June 30th.

The Idaho Department of Labor's May edition of their monthly report titled the **Idaho Economic Indicators[35]** also offers positive indications noting that "After losing over 58,000 jobs in a recession that cut more deeply into Idaho than any other since World War II, the state economy appeared to stabilize in early 2011 and begin to slowly recover. Seasonally adjusted unemployment, which stood at a record 9.7 percent from December through March, fell in April for the first time in over four years."  The report went on to note "Nonfarm jobs continued to run ahead of the year-earlier total for the fourth straight month in April, topping 600,000 to exceed April 2010 by 3,600. While the gap has only run around 0.6 percent over the four months, it is another sign that the economy may be inching its way into recovery. Total employment in April was up for the

---

[31] **Zions Bank index indicates continued growth** article posted on the Times-News website can be found in its entirety (Appendix #14) or by going to http://www.magicvalley.com/business/local/article_b97cb512-7c44-11e0-a864-001cc4c002e0.html.

[32] April 2011 **Idaho Economic Forecast** is produced by the Idaho Division of Financial Management quarterly (Refer to Appendix #15) to review the Executive Summary of the report.  The entire forecast can be found at www.dfm.idaho.gov/Publications/EAB/Forecast/2011/April/iefapr2011.html

[33] Economist John Church's comments at the **Annual Economic Outlook Forum** held in Boise were reported in an article posted on KTVB.com. The article in its entirety can be found in this report (Appendix #16)

[34] May edition of the **Idaho General Fund Revenue** Report in its entirety is included in this report (Appendix # 17).

[35] The May 24th edition of the **Idaho Economic Indicators** report produced by the Idaho Department of Labor is also included in this report (Appendix #18).

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

APPENDIX "H"
*(Landaker Marketing's Economic
Summary Report—May 2011)*

fourth straight month, rising nearly 3,300 to 692,200, the highest level since June 2009. The increase exceeded the increase in the labor force of 2,500 for the second month in a row, dropping the unemployment rate for the first time in 52 months."

The **Moody's Analytics Idaho Economic Outlook**[36] ranks Idaho 10th in the nation for employment growth from 2009 to 2011 with strengths being cited as strong growth in high-tech and business services, potential for strong population growth and in-migration from working professionals and retirees and anticipated better performance of the local leisure/hospitality industry than the U.S.

A Chase Bank report of **The State of Idaho's Economy**[37] produced in March also noted several positive indicators for the state's economy. A rebound is anticipated for 2011 and 2012 with the states' Real GDP forecasted to increase by 4.9% in 2011 and 5.4% in 2012.  This compares to Q4 to Q4 drops in 2008 and 2009.  Nonfarm employment is also projected to increase by 2.5% in 2011 and 3.1% in 2012.  In general the Chase report indicated Idaho's 2011 outlook as promising noting that Idaho is expected to continue to fare better than the national economy. With regard to relative house prices, the report noted declines in real estate values in Idaho compared with the national trend in house prices and is expected to continue to be in line with national trends as the recovery begins to gain momentum.  The report noted that new home building activity is likely to remain depressed in 2011.  We will comment further regarding real estate and home building later in this narrative.

Realizing the fortunes of Idaho's economic recovery are tied to the national economy's continued recovery statements by the Federal Reserve were taken into consideration in this evaluation.  An article in the New York Times, dated February 16, 2011 was headlined **"Fed Forecasts Faster Growth as Economy Improves"**[38] and reported that the Federal Reserve had upgraded their forecasts for how much the economy will grow this year.  The article reported that top Fed officials expect output of goods and services to grow by 3.4 to 3.9%.  But their grim outlook for the job market was largely unchanged: 8.8 to 9% unemployment this year, only one-tenth of a percentage point lower than its November forecast.

A more recent report posted by the Federal Reserve Bank of San Francisco's Economic Research Department is the **ETC Economic Trends and Conditions** report, May 2011 Edition[39].  The repost noted that "Although recent economic news has been disappointing, much of the first-quarter weakness appears to reflect transitory factors, including harsh winter weather at the start of the year. The underlying pace of economic recovery appears intact and (they) expect real GDP to increase 3½ to 4% over the next year."  The report went on to state "A revival of the labor market is a crucial underpinning of a strengthening, self-sustaining economic recovery. The pace of private-sector hiring has picked up recently. During the past two months, private employment has risen by almost a half million jobs."  The report noted "Economic activity in the Twelfth District expanded moderately during the reporting period of late February into the beginning of April. Retail sales continued to improve overall, and demand for business and consumer services rose further".

Although the Fed report noted, "the sales pace for new and existing homes was mixed across the District but remained very weak overall,"  forecasts by housing and real estate industry leaders see signs of improvement in the coming years.  A recent press release by the National Association of Realtors® dated May 10 reported signs of improvement in existing-home sales.  The release, titled "**Existing Home Sales Rise in Most States in First Quarter**[40]" reported "Existing-home sales continued to recover in the first quarter with gains recorded in 49 states and the District of Columbia, while 22 percent of the available metropolitan areas saw prices rise from a year ago, according to the latest survey by the National Association of Realtors®."  The release noted that Lawrence Yun, NAR chief economist, "The national median existing single-family home price was $158,700 in the first quarter, down 4.6 percent from $166,400 in the first quarter of 2010. The median is where half sold for more and half sold for less. Distressed homes,[3] typically sold at a discount of about 20 percent, accounted for 39 percent of first quarter sales, up from 36 percent a year earlier."  Of particular interest to our evaluation of the Leed Corp house inventory situation was Yuns' statement that lower priced homes have seen the best sales performance. "The biggest sales increase has been in the lower price ranges, which are popular with investors and cash buyers," he said. "The preponderance of sales activity at the lower end is bringing down the median price, so what we're seeing is the result of a change in the composition of home sales."  Although sales are slightly below a year ago, the volume of homes sold for $100,000 or less in the first quarter

[36] **Moody's Analytics Idaho Economic Outlook** is also included in this report (Appendix # 19).

[37] The entire Chase Bank report of The **State of Idaho's Economy** produced in March is included in this report (Appendix # 20).

[38] New York Times article, dated February 16, 2011 **Fed Forecasts Faster Growth as Economy Improves**  can be found in its entirety (Appendix # 21)

[39] Federal Reserve Bank of San Francisco's Economic Research Department **ETC Economic Trends and Conditions report**, May 2011 Edition can be found in its entirety (Appendix # 22)

[40] **Existing Home Sales Rise in Most States in First Quarter** press release dated May 10, 2011 by the National Association of Realtors® can be found in its entirety (Appendix # 23) or online by going to: http://www.realtor.org/press_room/news_releases/2011/05/state_firstquarter

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

*APPENDIX "H"*

*(Landaker Marketing's Economic
Summary Report—May 2011)*

was 8.9 percent higher than the first quarter of 2010, creating a downward skew on the overall median price. The share of all-cash home purchases rose to 33 percent in the first quarter from 27 percent in the first quarter of 2010.  The press release also reported that Existing-home sales in the West jumped 13.5 percent in the first quarter to a level of 1.29 million and are 2.1 percent above a year ago. The median existing single-family home price in the West fell 4.7 percent to $197,400 in the first quarter from the first quarter of 2010.

Views on how the real estate market and new home construction will fare in Idaho vary, depending on the sources accessed. The **Idaho Real Estate Forecast**[41] found on the forecastchart.com website forecasts an additional 8.1% reduction in the average sales price by March 2012.  This compares to a 7.7% price drop last year and a 5% drop over the last 5 years.  It was also noted that house prices increased by 40% over the last 10 years and 124% over the last 20 years. On a positive note, the National Association of Home Builders (NAHB) recent **Housing and Interest Rate Forecast**[42] dated May 20th, 2011 is projecting a 41% increase in single family housing starts in 2012 and a 39% increase in single family home sales.  One variable supporting this projection is the improving **Quarterly Housing Affordability Index**[43] compiled by the National Association of Realtors®.  As the median price of existing Single Family Homes has dropped, along with relatively low Mortgage rates and an improving Median Family Income, the Composite Affordability Index has climbed to 191.3.  This compares to an affordability index in 2008 of only 137.8.

## *The Impact of a New Regional Airport*

There is no question that construction and operation of a new regional airport will have a major impact on the region including Blaine and Lincoln Counties and surrounding areas.  With the FAA's mandate that a replacement airport is required in the coming years to continue to provide air service in and out of the Wood River Valley, the impending selection of a new site and construction is a major topic of discussion in the area.  Although a formal announcement of the site has not been made, indications are it will most likely be Site 10, which is located just off of SH 75 close to the southern border of Blaine County that abuts to Lincoln County.  This location would place the airport approximately 24 miles from the center of Shoshone with an easy commute via SH75 corridor for construction workers and eventually airport employees.  A recent article in the Idaho Mountain Express reported that construction of the airport is estimated to generate more than $108 million in payroll for the 3,450 jobs that will be created by the project[44]. The article went on to state an additional $185 million in indirect economic activity will create 1,900 indirect jobs, translating into another $50 million in local payroll.  It was noted that these estimates are based on the widely used and respected Regional Input-Output Modeling system developed by the U.S. Department of Commerce's Bureau of Economic Analysis. This system is designed to help create reliable economic estimates that are specific to particular locations, such as Blaine County and the surrounding areas. Once operational, a replacement airport in the region will have a $30 million annual economic impact and create 500 permanent jobs. The indirect impact will amount to an additional $19 million and 280 additional jobs. In total, the new airport will generate an annual economic impact of more than $49 million and 780 permanent jobs in the area[45].

A **Preliminary Engineering Report** was released in January 2011[46] that included an estimate of probable construction costs for a replacement airport at alternative sites, Site 10a and Site 12. In addition land appraisals for the land acquisition at each site were provided. It was noted that these cost estimates would continue to be updated and should be considered a work in progress. The estimates were based on current data and were subject to change and escalation. It was further noted that these costs did not include providing utilities to each site (including gas, power, communications, and water), mitigation costs, and costs for the construction and installation of an FAA Airport Traffic Control Tower and navigational aids.  Of particular interest was the significant cost difference between site 10a and Site 12 at over $50 additional to build at Site 12 before considering additional costs for utilities and other costs.

---

[41] **Idaho Real Estate Forecast** produced by forecastchart.com can be found in its entirety (Appendix # 24)
[42] National Association of Home Builders (NAHB) **Housing and Interest Rate Forecast** dated May 20th, 2011 can be found in its entirety (Appendix # 25)
[43] **Quarterly Housing Affordability Index** compiled by the National Association of Realtors® can be found in its entirety (Appendix # 26 )
[44] **Replacement Airport Would Boost Economy**, Idaho Mountain Express, May 11 2011. The article was co-written by Tom Bowman, a Blaine County commissioner and chairman of the Friedman Memorial Airport Authority board and Martha Burke, a member of the Hailey City Council and vice chair of the Friedman board.
[45] The permanent economic impact numbers are based upon estimates of new visitor spending, increased economic activity associated with improved air traffic, and new employment. These numbers were compiled by Transystems Corporation, as part of the **Replacement Airport Environmental Impact Statement** compiled in 2008.  The report can be found in its entirety in the Appendix # 28
[46] Replacement Airport **Preliminary Engineering Report Engineers Report** can be found in its entirety in Appendix #29

**APPENDIX "H"**
*(Landaker Marketing's Economic
Summary Report—May 2011)*

The next step in the process will be the release of the Draft Economic Impact Study (EIS), which was scheduled for late May, but was recently postponed until late summer/early fall 2011. It was noted that the delay is due to further refinements in the environmental and financial impact analysis being completed as part of the Draft EIS. Once the Draft EIS is published a 90 day public comment period will begin. A public hearing will be held during the comment period. Based on the current FAA schedule, a final EIS – and a formal Record of Decision – can be expected early in 2012

The question of how soon construction would begin once the site has been selected still remains.  Once the final EIS has been submitted there is a three time limit for land acquisition and the beginning of construction, otherwise a new EIS will be required.

**Potential Economic Impact of New Airport on Shoshone and Lincoln County**

Assuming Site 10a is selected the economic impact on the city of Shoshone and Lincoln County can be expected to be dramatic. Conveniently located on the SH 75 corridor, workers will find the commute from Shoshone and housing developments north of Shoshone to be desirable. Housing costs are significantly less than those found in Blaine County to the north in Bellevue or Hailey.  It is reasonable to expect new home construction to pick up again with the increased demand caused by the construction workforce and later the new airport and supporting businesses employees.

## Conclusions and Summary

As we all know, the economic downturn felt across the U.S. had a profound impact across all sectors of the economy here in Idaho.  As a bedroom community to Sun Valley and to Twin Falls, the downturn was even more drastic here in Lincoln County and the community of Shoshone as jobs to the north and south went away and unemployment skyrocketed.

As the economy begins to improve and with it the return of jobs in the Wood River Valley and Twin Falls, the fortunes of Lincoln County and the community of Shoshone will also improve.  As will the opportunity for Leed Corp to reorganize it's business of building and selling affordable homes to workers from Sun Valley to Twin Falls.  As noted above in this report, homes priced at $100,000 provide the brightest opportunity for sales as the economy resurrects itself across Idaho and corridor between Sun Valley and Twins.  Add the dramatic impact of the construction and operation of a new regional airport just north of Shoshone and the prospects for the county, the community of Shoshone and Leed Corp must be considered very bright within the next nine years and beyond.  The need for affordable housing, such as what Leed Corp places and emphasis, in the surrounding area must be expected to expand dramatically in the future..

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

APPENDIX "H"
*(Landaker Marketing's Economic
Summary Report—May 2011)*

# APPENDIX "I"

*(Dodge/Farah Criminal Indictment)*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  1:10-CR-  -01/02- |
| | ) | |
| SCOTT FARAH | ) | |
| DONALD DODGE | ) | |

### INDICTMENT

The Grand Jury Charges:

### Introduction

1.      In or about 1989, defendant Scott Farah formed Financial Resources and Assistance of the Lakes Region, Inc. with minority investors including Robert Farah and defendant Donald Dodge.  At some point in the 1990s, defendant Scott Farah bought out the minority investors and renamed the business as Financial Resources National and then Financial Resources Mortgage.  Each of these entities, which hereinafter are referred to collectively as "FRM," were engaged in mortgage brokering, including so called private lending between private lenders and residential and commercial borrowers.  During the period from June 2005, through November 2009, FRM operated out of offices located at 15 Northview Drive,  Meredith, New Hampshire.

2.      During the period from June 2005, through November 2009, Donald Dodge owned and operated CL and M, Inc., (hereinafter referred to as "CL and M"), an entity that provided mortgage servicing services to the private lending customers of FRM.  During the period from June 2005, through November 2009, CL and M operated out of offices located at 15 Northview Drive,  Meredith, New Hampshire.

-1-

3.      Scott Farah  marketed FRM's services to private lenders through the Internet, through the United States mail, and through personal representations. Through its marketing, FRM alerted potential lenders to projects that the lenders could provide financing for with the promise of earning earn substantial returns on the money loaned for the project.

4.      Donald Dodge and CL and M were responsible for, among other things, maintaining funds provided by private lenders to finance specific projects, disbursing funds to borrowers as progress payments when phases of the projects were completed, and making interest payments to private lenders.

## COUNT ONE

### [Mail Fraud – 18 U.S.C. §§ 1341]

5.      The allegations set forth in paragraphs one through four of this Indictment are re-alleged and incorporated as if fully set forth herein.

6.      From some date in or around 1989 through on or about November 6, 2009, in the District of New Hampshire and elsewhere, the defendant,

### SCOTT FARAH,

knowingly and willfully devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, caused investment solicitations and related materials to be placed in an authorized depository for mail to be delivered by the United States Postal Service to prospective private lenders from whom he solicited investments of money that he falsely represented would be used for the exclusive purpose of funding specific private mortgages.

-2-

7.      It was part of the scheme to defraud that in furtherance thereof, on or about October 9, 2009, and on several other dates during the course of conducting the scheme, the defendant, **SCOTT FARAH**, caused an employee of FRM to deposit in the mail at Meredith, New Hampshire, for delivery by the United States Postal Service to prospective private lenders, envelopes containing solicitations and other materials related to private mortgage investment opportunities.

8.      It was part of the scheme to defraud that the defendant, **SCOTT FARAH**, through the solicitations and other communications with prospective and actual private lenders, falsely represented that a lender's money would be, or had been, used exclusively to fund one or more specific private mortgage loans.

9.      It was part of the scheme to defraud that the defendant, **SCOTT FARAH**, did not disclose to prospective private lenders his intention to use all or part of their money to fund mortgages in which they had not agreed to invest, to make interest payments to other lenders and sometimes themselves, to defray FRM's operating expenses, and to fund his personal expenditures, and he did not disclose to actual private lenders that he did in fact use their money for those purposes without their knowledge or authorization.

10.     It was part of the scheme to defraud that the defendant, **SCOTT FARAH**, deposited money obtained from private lenders into one or more general use bank accounts maintained on behalf of FRM or CL and M.

11.     Through this scheme, the defendant, **SCOTT FARAH**, defrauded private lenders of approximately $33,567,110.43.

All in violation of Title 18, Unites States Code, Sections 1341and 2.

-3-

## COUNT TWO
### [Wire Fraud - 18 U.S.C. § 1343]

12.    The allegations set forth in paragraphs one through four of this indictment are re-alleged and incorporated as if fully set forth herein.

13.    Beginning not later than June 1, 2005, and continuing through at least November 5, 2009, in the District of New Hampshire, and elsewhere, the defendants,

### SCOTT FARAH
and
### DONALD DODGE,

knowingly and willfully devised and intended to devise a scheme and artifice to obtain money by false and fraudulent pretenses, representations and promises and, for the purpose of executing such scheme and artifice and attempting to do so, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, including wire transfers of money from accounts in the name of CL and M maintained at Citizens Bank to accounts in the name of FRM and accounts in the name of SMM 2007 Realty Trust maintained by Citizens Bank and at Lowell Cooperative Bank.

14.    It was a part of the scheme to defraud that defendant, Scott Farah, represented to potential private lenders that their funds would be used to fund specific projects and that any funds provided by the private lenders would be held by CL and M until all funds necessary for the project were collected.

15.    It was further a part of the scheme to defraud that Scott Farah and Donald Dodge directed private lenders agreeing to provide funds for the projects offered by Scott Farah and FRM to make the funds payable to CL and M and that the funds were deposited in accounts

-4-

maintained on behalf of CL and M.

16.     It was further a part of the scheme to defraud that neither Scott Farah nor Donald

Dodge disclosed to any private lender that CL and M had entered into a $10 million dollar

Discretionary Line of Credit Agreement and Promissory Note (hereinafter referred to as the

"Line of Credit") with Scott D. Farah on June 1, 2005, or that CL and M had transferred

$1,050,000 to Scott Farah under the terms of the Line of Credit by July 31, 2005.

17.     It was further a part of the scheme to defraud that Scott Farah and Donald Dodge

executed revisions, sometimes referred to as Note in Series documents, to the Line of Credit in

order to facilitate transfers of funds from CL and M to Scott Farah that exceeded the $10 million

dollar limitation of the original Line of Credit.  At some point on or after June 1, 2005, and

before November 5, 2009, Scott Farah executed a  blank Note in Series document.  On or about

November 5, 2009, Donald Dodge completed a blank Note in Series previously executed by

Scott Farah to reflect  that the sum of $20,348,321.43 had been transferred from CL and M to the

benefit of Scott Farah and FRM during the period from June 1, 2005, through November 2,

2009.

18.     For the purpose of executing the scheme and artifice to defraud described above,

the defendants Scott Farah and Donald Dodge did knowingly cause to be transmitted by means

of wire communications in interstate and foreign commerce, certain writings, signs, signals,

pictures and sounds transferring funds from CL and M to the benefit of Scott Farah, including

but not limited to, the wire transfers described below:

| Date | Amount |
|---|---|
| June  30, 2005 | $  200,000.00 |
| July    5, 2005 | $  200,000.00 |
| July    8, 2005 | $  330,000.00 |
| July   15, 2005 | $  100,000.00 |
| July   22, 2005 | $  150,000.00 |
| Aug.    4, 2005 | $   50,000.00 |
| Aug.  15, 2005 | $   50,000.00 |
| Aug.  25, 2005 | $  100,000.00 |
| Sept.   6, 2005 | $  160,000.00 |
| Sept.  13, 2005 | $  150,000.00 |
| Sept.  16, 2005 | $   50,000.00 |
| Sept.  22, 2005 | $   50,000.00 |
| Sept.  28, 2005 | $  100,000.00 |
| Sept.  30, 2005 | $  100,000.00 |
| Oct.    3, 2005 | $  200,000.00 |
| Oct.    6, 2005 | $  100,000.00 |
| Oct.   11, 2005 | $   50,000.00 |
| Oct.   12, 2005 | $  100,000.00 |
| Oct.   17, 2005 | $  125,000.00 |
| Oct.   25, 2005 | $   60,000.00 |
| Nov.    2, 2005 | $  100,000.00 |
| Nov.    4, 2005 | $  125,000.00 |
| Nov.  14, 2005 | $   40,000.00 |
| Nov.  27, 2005 | $   40,000.00 |
| Nov.  29, 2005 | $   30,000.00 |

| Date | Amount |
|------|--------|
| Dec.   3, 2005 | $ 100,000.00 |
| Dec. 14, 2005 | $ 100,000.00 |
| Dec. 22, 2005 | $  50,000.00 |
| Apr.   7, 2006 | $ 100,000.00 |
| Apr.  13, 2006 | $  50,000.00 |
| Apr.  18, 2006 | $ 100,000.00 |
| Apr.  25, 2006 | $ 155,000.00 |
| May    3, 2006 | $ 100,000.00 |
| May    5, 2006 | $ 250,000.00 |
| May   10, 2006 | $ 100,000.00 |
| May   11, 2006 | $ 300,000.00 |
| May   22, 2006 | $ 150,000.00 |
| June   1, 2006 | $ 200,000.00 |
| June   9, 2006 | $ 100,000.00 |
| June  16, 2006 | $ 100,000.00 |
| June  28, 2006 | $ 250,000.00 |
| Dec.  27, 2007 | $  50,000.00 |
| Dec.  31, 2007 | $ 240,000.00 |
| Mar.  24, 2008 | $  50,000.00 |
| Apr.   9, 2008 | $  50,000.00 |
| Apr.  24, 2008 | $  60,000.00 |
| Apr.  29, 2008 | $  55,000.00 |
| May    6, 2008 | $  45,000.00 |
| June   4, 2008 | $ 180,000.00 |
| June  12, 2008 | $ 120,000.00 |

| Date | Amount |
|---|---|
| July     1, 2008 | $    50,000.00 |
| July     8, 2008 | $    50,000.00 |
| July    17, 2008 | $    50,000.00 |
| July    22, 2008 | $    50,000.00 |
| July    25, 2008 | $    40,000.00 |
| July    29, 2008 | $    48,000.00 |
| Aug.     1, 2008 | $    30,000.00 |
| Aug.     8, 2008 | $    60,000.00 |
| Aug.    13, 2008 | $    25,000.00 |
| Aug.    20, 2008 | $    60,000.00 |
| Aug.    27, 2008 | $    70,000.00 |
| Sept.   11, 2008 | $    50,000.00 |
| Sept.   12, 2008 | $    35,000.00 |
| Sept.   15, 2008 | $    30,000.00 |
| Sept.   24, 2008 | $    50,000.00 |
| Sept.   29, 2008 | $    30,000.00 |
| Oct.    27, 2008 | $    30,000.00 |
| Nov.    17, 2008 | $  100.000.00 |
| Nov.    18, 2008 | $    45,000.00 |
| Nov.    19, 2008 | $    95,000.00 |
| Dec.     5, 2008 | $    50,000.00 |
| Dec.    17, 2008 | $    40,000.00 |
| Dec.    18, 2008 | $    75,000.00 |
| Dec.    19, 2008 | $    20,000.00 |
| Dec.    24, 2008 | $    72,000.00 |

| Date | Amount |
|---|---|
| Jan.    7, 2009 | $    50,000.00 |
| Jan.   13, 2009 | $    45,000.00 |
| Jan.   16, 2009 | $    20,000.00 |
| Jan.   20, 2009 | $    30,000.00 |
| Feb.    3, 2009 | $    62,000.00 |
| Feb.    6, 2009 | $    25,000.00 |
| Apr.    6, 2009 | $    40,000.00 |
| Apr.  10, 2009 | $    40,000.00 |
| Apr.  15, 2009 | $    25,000.00 |
| Apr.  20, 2009 | $    40,000.00 |
| Apr.  21, 2009 | $    30,000.00 |
| Apr.  23, 2009 | $    60,000.00 |
| Apr.  24, 2009 | $    81,200.00 |
| May    4, 2009 | $    68,500.00 |
| May   11, 2009 | $    25,000.00 |
| May   19, 2009 | $    20,000.00 |
| May   21, 2009 | $    50,000.00 |
| May   27, 2009 | $    70,000.00 |
| June   5,  2009 | $    65,000.00 |
| June 15,  2009 | $    30,000.00 |
| June 17,  2009 | $    40,000.00 |
| June 19,  2009 | $    95,000.00 |
| June 26,  2009 | $    40,000.00 |
| July    2, 2009 | $    40,000.00 |
| July    7, 2009 | $    35,000.00 |

| Date | Amount |
|---|---|
| July   9,  2009 | $   20,000.00 |
| July  10,  2009 | $   30,000.00 |
| July  15,  2009 | $   50,000.00 |
| July  17,  2009 | $   70,000.00 |
| July  23,  2009 | $   55,000.00 |
| July  24,  2009 | $   30,000.00 |
| July  28,  2009 | $   45,000.00 |
| July  31,  2009 | $   25,000.00 |
| Aug.   5,  2009 | $   30,000.00 |
| Aug.  10,  2009 | $   25,000.00 |
| Aug.  12,  2009 | $   25,000.00 |
| Aug.  14,  2009 | $   50,000.00 |
| Aug.  19,  2009 | $   30,000.00 |
| Aug.  25,  2009 | $   70,000.00 |
| Aug.  27,  2009 | $   20,000.00 |
| Aug.  31,  2009 | $   35,000.00 |
| Sept.   2,  2009 | $   63,000.00 |
| Sept.   4,  2009 | $   30,000.00 |
| Sept.  10,  2009 | $   20,000.00 |
| Sept.  10,  2009 | $   15,000.00 |
| Sept.  16,  2009 | $   25,000.00 |
| Sept.  18,  2009 | $   25,000.00 |
| Sept.  22,  2009 | $   50,000.00 |
| Sept.  24,  2009 | $   25,000.00 |
| Sept.  28,  2009 | $   45,000.00 |

| Date | Amount |
|------|--------|
| Oct.   1,  2009 | $   60,000.00 |
| Oct.   2,  2009 | $   25,000.00 |
| Oct. 16,  2009 | $   60,000.00 |
| Oct. 19,  2009 | $   20,000.00 |
| Oct. 23,  2009 | $   50,000.00 |
| Oct. 28,  2009 | $   25,000.00 |
| Oct. 29,  2009 | $   40,000.00 |
| Nov.  2,  2009 | $   25,000.00 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL

/s/ Grand Jury Foreperson
Grand Jury Foreperson

GRETCHEN LEAH WITT
Attorney for the United States,
Acting Under Authority Conferred by 28
U.S.C. § 515


By: /s/ Mark S. Zuckerman
Mark S. Zuckerman
Assistant United States Attorney


/s/ Donald Feith
Donald Feith
Assistant United States Attorney


April 7, 2010

-11-

# APPENDIX "J"
*(April 2011 Lincoln Co. Work
Force Trends)*



# Lincoln County

*April 2011*

## Work Force Trends

## Population

Lincoln County's population has risen 16 percent in the last 10 years, keeping pace with other growing counties in the region. The city of Shoshone, considered the gateway to Sun Valley, is the county seat with a population of 1,461. Lincoln County continues to rely on agriculture with several large scale dairies contributing to the industry's regional growth. Manufacturing was nearly non-existent prior to Glanbia Food's whey processing plant in Richfield, 14 miles east of Shoshone, and Rocky Mountain Hardware, which machines brass fixtures in Shoshone. As a bedroom community to both the Wood River Valley and Twin Falls, workers have an easy commute. Affordable housing continues to be an issue in the Wood River Valley so subdivisions and residential construction will continue in Shoshone, where sustainable growth is expected over the long term. Currently there is an inventory of building lots.



## Labor Force & Employment

Unemployment has been a roller coaster in Lincoln County. The seasonally adjusted rate originally peaked at 5.6 percent in 2008 from a record low of 3.2 percent in 2007. During six of the last 10 years, the unemployment rate has exceeded 5 percent. Since the economic downturn, unemployment has reached unprecedented levels with a major loss of construction jobs pushing it to 13.4 percent in March 2011 — well above the state and national rates. Economic diversification has created new jobs but mostly in the service sector. Dairies have brought stability to traditional seasonal jobs in tourism, landscaping and agriculture. More retail is popping up to serve the highway traffic between Twin Falls and the Wood River Valley. Whey processing jobs in Richfield are stable, and manufacturing is gaining ground and raising area wages. Hay, grains, corn and other crops that can be green



chopped for dairy silage are the primary commodities. The U.S. Bureau of Land Management's regional headquarters and the National Interagency Fire Center dispatch operation are seasonal employers. The surrounding small communities all saw interest in new housing prior to the downturn. The county is expected to continue steady growth when the economy rebounds and those higher-paying jobs return to Blaine County.

| Labor Force | Mar 10 | Mar 11 |
|---|---|---|
| Civilian Labor Force | 2,649 | 2,610 |
| Total Employment | 2,329 | 2,260 |
| Unemployed | 320 | 350 |
| % of Labor Force Unemployed | 12.1 | 13.4 |
| State of Idaho % Unemployed | 9.0 | 9.7 |
| U.S. % Unemployed | 9.7 | 8.8 |

| Labor Force | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Civilian Labor Force | 2,198 | 2,231 | 2,288 | 2,266 | 2,322 | 2,400 | 2,551 | 2,517 | 2,577 | 2,536 | 2,639 |
| Unemployment | 94 | 88 | 116 | 124 | 123 | 103 | 104 | 79 | 143 | 280 | 345 |
| % of Labor Force Unemployed | 4.3 | 3.9 | 5.1 | 5.5 | 5.3 | 4.3 | 4.1 | 3.2 | 5.5 | 11.0 | 13.1 |
| Employment | 2,104 | 2,143 | 2,172 | 2,142 | 2,198 | 2,297 | 2,447 | 2,438 | 2,434 | 2,256 | 2,294 |

*Prepared by Jan Roeser, Regional Economist, Idaho Department of Labor • 420 Falls Ave, Twin Falls, Idaho 83301*
*Phone: (208) 735-2500, ext. 3639 • email: jan.roeser@labor.idaho.gov • Labor Market Information website: lmi.idaho.gov*

### Nonfarm Payroll Jobs for 2010



| Major Employers |
|---|
| 4 Brothers Dairy |
| AHS of Idaho |
| Bootjack Dairy |
| BRP Health Management |
| Donley Farms |
| Glanbia, Inc |
| Idaho Dept of Transportation |
| Rocky Mountain Hardware |
| Sweet's Septic & Backhoe Service |
| U.S. Bureau of Land Management |

## Wages & Income

Per capita income in Lincoln County has grown steadily, rising 38 percent from 2000 to 2009. But it still remains 10.7 percent below the state per capita income and 28 percent below the national figure. The county ranks 29th among the 44 counties. Many of the jobs are in services and agriculture, which tend to pay lower wages. Both, however, have experienced a jump with the minimum wage increases in 2007, 2008 and 2009. The whey manufacturing plant offers higher-paying jobs and the possibility of expansion. Meanwhile, retail and office developers will continue to make concerted efforts at capturing the commuter traffic market so they can lease their existing space.

| Occupational Wages* | Starting Wage |
|---|---|
| Teachers | $30,000.00 |
| Bookkeepers | $9.00 |
| Cashiers | $7.25 |
| School Custodians | $10.50 |
| Cheese Processors | $9.00 |
| Receptionists | $9.00 |
| Fire Fighters | $13.00 |
| Milkers | $11.00 |
| General Farm Labor | $9.90 |
| Construction Labor | $10.00 |

* Additional occupational wage data can be found on the Idaho Department of Labor website at *lmi.idaho.gov*.

| Covered Employment & Average Annual Wages Per Job for 2000, 2009 & 2010 | 2000 | | 2009 | | 2010 | |
|---|---|---|---|---|---|---|
| | Average Employment | Average Wages | Average Employment | Average Wages | Average Employment | Average Wages |
| Total Covered Wages | 1,130 | $20,280 | 1,410 | $29,228 | 1,345 | $28,840 |
| Agriculture | 147 | $19,118 | 240 | $26,949 | 253 | $26,900 |
| Mining | 0 | $0 | 0 | $0 | 0 | $0 |
| Construction | 91 | $21,079 | 130 | $28,984 | 80 | $27,752 |
| Manufacturing | * | * | 127 | $50,306 | 130 | $45,215 |
| Trade, Utilities & Transportation | 166 | $13,182 | 143 | $18,921 | 131 | $20,153 |
| Information | | | * | $0 | * | * |
| Financial Activities | 15 | $13,888 | 20 | $15,487 | 13 | $15,078 |
| Professional and Business Services | 19 | $19,374 | 48 | $29,175 | 52 | $28,650 |
| Educational and Health Services | 112 | $21,181 | 123 | $26,216 | 140 | $23,836 |
| Leisure and Hospitality | 60 | $9,210 | 47 | $9,249 | 40 | $9,694 |
| Other Services | 0 | $0 | 7 | $24,279 | 5 | $25,930 |
| Government | 462 | $22,513 | 524 | $31,198 | 501 | $31,365 |

| Per Capita Income | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Lincoln County | $20,663 | $22,213 | $22,003 | $21,382 | $24,069 | $24,124 | $25,736 | $30,493 | $31,950 | $28,455 |
| State of Idaho | $24,683 | $25,642 | $26,007 | $26,438 | $28,414 | $29,594 | $31,585 | $32,734 | $33,062 | $31,857 |
| United States | $30,318 | $31,145 | $31,461 | $32,271 | $33,881 | $35,424 | $37,698 | $39,461 | $40,674 | $39,635 |


DEPARTMENT OF LABOR

This county is served by the office listed below:
Idaho Department of Labor
420 Falls Avenue
Twin Falls, ID 83301  Ph: (208) 735-2500

**labor.idaho.gov**

This publication is produced by the Idaho Department of Labor and is funded at least in part by federal grants from the U.S. Department of Labor. Costs associated with this specific publication are available by contacting the Idaho Department of Labor. The Idaho Department of Labor is an equal opportunity employer and service provider. Auxiliary aids and services are available upon request to individuals with disabilities. Dial 711 for TTY Idaho Relay Service.

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

# APPENDIX "K"

*(Alternative Airport Replacement Sites and
FAQ—http://www.flysvra.com/archives.html)*



Close Window



# Frequently Asked Questions

*Blaine County and the City of Hailey have undertaken a critical infrastructure replacement airport project to ensure that our community will have an all-weather, safe, reliable, and Federal Aviation Administration (FAA) design-approved airport to serve our present and future aviation needs.  This is a complex and time-intensive process involving a number of government agencies and the entire Blaine County community.*

*We understand that many residents don't have time to attend every public meeting on the airport replacement process so we have provided the following format to help everyone better understand how our community is planning for its economic future as a premiere resort and as a viable business-friendly opportunity for our residents. The following questions have been asked, over the past decade, by interested residents and visitors. If you have a question that hasn't been covered below, please contact us at 208-788-9003.*

**Q.  How will the greater Blaine County Community benefit from an airport that replaces the current Friedman Memorial Airport (FMA)?**

A.  That is an important infrastructure question and the answer is relatively simple. The community will benefit by having a modern, all-weather airport that is fully compliant with Federal Aviation Administration (FAA) safety and reliability standards and the airline traveler's need for reliability,  and one that will be attractive to additional airlines; Friedman Memorial Airport cannot meet these requirements.  The benefits cannot be achieved at the present physically-constrained airport site in Hailey:

According to initial studies by several highly-respected and renowned airport consulting firms, a replacement airport will be a major economic development, projected to create almost 2,000 construction jobs and almost 200 permanent jobs throughout the county, while substantially enhancing travel options for visitors to the Valley, for second-homeowners and residents and for local businesses that need to travel by air.  For resort communities like Blaine County, safe, accessible, and reliable commercial air service is considered essential to attract visitors, second-home owners, entrepreneurs, and for the sustainability of local businesses.

Frequently Asked Questions – A Replacement Airport in Blaine County

A state-of-the-art airport will help entice major air carriers and positively impact ticket prices. Frequent winter season diversions will become a thing of the past.  People who set out to travel to and from the Valley will enjoy a very high probability of reaching their destination and they will want to return here often rather than crossing us off their vacation list because of frustrating cancellations and time-consuming bussing.

A modern, reliable airport will serve the community's air service needs for 50 or more years and the community economic benefits will be substantial and long-lasting.

As part of the FAA's Environmental Impact Statement (EIS), the agency's contractor - Landrum & Brown – completed an Aviation Forecast.  Ten air carriers were contacted for confidential interviews. Out of seven responses to inquires about the likelihood of serving the new airport, five indicated interest from a low to high probability:

> "…the new airport would clearly increase the ability to serve the market by airlines with compatible aircraft of distant hubs as indicated by a willingness to provide charter services that have a low market risk.  The commitment of fleet and investment dollars to scheduled service is more likely on a seasonal basis, again probably based on an increased ability to match with specific airlines' fleets and route networks.  Two of the airlines indicated no likelihood of any scheduled service while two airlines cited a relatively high probability."
>
> *Friedman Memorial Replacement Airport – Aviation Activity Forecast, September 2008, p. 64.*

Frequent winter season diversions are a serious public relations and customer frustration problem today at Friedman, but will be minimized at the new site with a combination of a state of the art instrument landing system and gentle approach and departure terrain.  People who set out to travel to the Valley through the replacement airport will enjoy a very high probability of reaching their destination in a timely manner.

The new airport will be planned and designed to serve the community's air service needs for generations and the public benefits will be substantial and long lasting.

2

Frequently Asked Questions – A Replacement Airport in Blaine County

## Friedman Memorial Airport History:

**Q.  When did Friedman Memorial Airport (FMA) open?**

A.  In 1931 the Friedman Family grant-deeded land to the City of Hailey for a small grass-strip airfield south of the then-lightly-populated town.  At that time, there were neither commercial flights nor, until some years later, a resort economy in Blaine County. And of course there were no jet aircraft.

**Q.  How has FMA changed since 1931?**

A.  Since the 1930's, FMA has seen continual improvement.  Additional land was purchased by the City of Hailey and Blaine County to meet the business challenges created by the development of the air service industry.  In particular, the evolution of private and commercial aircraft, which have generally become larger and faster, necessitated changes to meet Federal Aviation Administration (FAA) design standards.  Changes in the local economy, mostly attributable to a favorable resort environment and the growth of the travel and tourism industry, also drove the need for upgrades and expansion.

**Q.  When did it become evident that FMA had reached the limit of its capability as a commercial airport?**

A.  By the last decade of the 20th century FMA had reached the limits of its commercial air service capability, and the Friedman Airport Authority determined that the solution did not lie in more expansion of the existing site.  Constraints in terms of surrounding mountainous terrain, and seasonal winter reliability, cannot be overcome with technology, as determined by the Federal Aviation Administration (FAA).  In addition, land and space limitations that preclude reasonable expansion, incompatible airline equipment, future air service potential, and customer dissatisfaction with diversions, cancellations, high fares, and limited airline access led to the decision to seek a new airport location.  Many local residents had begun using Twin Falls and Boise for air service and this trend has increased through 2010.

For example, it has become all too common for winter season flights – both commercial and private – to be diverted from Friedman.  Reliability of service is a critical factor that impacts the quality of a visitor's experience flying into and out of Sun Valley.

3

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q. When was the Friedman Memorial Airport Authority (FMAA) formed?**

A. FMAA was formed in 1994. The Authority is comprised of five members representing the two owners of the airport – the City of Hailey and Blaine County – and the public.  The county appoints two members to the board; the city appoints two members and they, in turn, must unanimously approve the fifth independent member.  All the representatives supported and encouraged commercial air service to the community at FMA and each member has consistently supported the development of a replacement airport once it became factually evident that FMA could no longer meet the present and future commercial air service needs of the community.

**Q. What are FMAA's responsibilities?**

A. To manage a safe, economically viable airport and to provide the community with modern infrastructure for existing and future commercial air service and general aviation use.

**Q. Does the FMAA only represent the City of Hailey, as some claim?**

A. The FMAA represents the entire community.  The County Commissioners have two seats on the 5-member FMAA and must concur on the selection of the fifth member.  The County Commissioners are elected by a county-wide vote and are responsible to all sectors of the community, from Carey to Sun Valley.  The County understands and supports commercial air service for the north county resort businesses and the County is also acutely sensitive to the needs of all the community's businesses and the visitors who support the local economy.

**Q. Who owns FMA?**

A. FMA is jointly owned by the City of Hailey and Blaine County. The replacement airport will be owned entirely by Blaine County.

4

Frequently Asked Questions – A Replacement Airport in Blaine County

## **Replacement Airport Process:**

**Q. What did FMAA do when the airport reached the limits of its capacity?**

A.  FMAA created an Airport Master Plan (1994) in conjunction with the FAA; authorized a Site Feasibility Study (2005) by Mead and Hunt, and requested that the FAA prepare an Environmental Impact Study (EIS) (2007) under the National Environmental Policy Act (NEPA).

**Q. What did those studies show?**

A.  Various studies completed over the last 15 years demonstrated that Friedman Memorial Airport: 1) is not FAA-compliant for its present use; 2) could not meet the needs of current and future commercial aviation service to the Wood River region; 3) that operation limitations related to the mountainous terrain that surrounds the airport on three sides could not be overcome with technology; and 4) that significant weather related diversions and cancellations would remain no matter what changes were made on the ground.

FAA contractor Landrum & Brown noted in the Purpose and Need Statement related to the EIS:

> "…it can be seen that (Friedman) is no longer 'located at an optimum site' and cannot be 'maintained to appropriate standards' nor is the airport 'efficient' given head-to-head operations, the extent of diversions, and the airfield operational restriction that has been established."

**Q. Can approach height minimums be lowered at FMA with technology?**

A.  No.  Approach height minimums, the altitude at which pilots must be able to see the runway, are associated with weather-related diversions and the FAA has stated in writing that these minimums cannot be lowered safely at FMA because of the surrounding mountains. This determination also applies to approaches to the airfield from the north.  No FAA-sanctioned solution to this technology problem has been identified.  The FAA's definitive written report on this issue is available at the FMA manager's office at the Airport.

**Q. Isn't it true that the FAA will grant waivers even if FMA is not in compliance with its operational requirements?**

A.  No.  The FAA has stated publicly that it no longer approves modifications to standards at airports that involve safety issues, including Friedman.  FMA is required to become compliant with the FAA's C-III design standards; it is not discretionary.  FMAA has committed to the FAA that it will continue efforts toward compliance by pursuing development of a replacement airport.  The first step is for the FMAA to participate in the current Environmental Impact Statement (EIS) for a replacement airport for Friedman.  Neither the FAA nor the community is willing to compromise the safety of our residents and visitors.

5

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q. What is the current aircraft design classification of FMA?**

A. FMA is a B-III design classification airport and is listed as such by the FAA in its regulations. Larger aircraft (classified as C-III) are currently landing at FMA, including Horizon Airline's Q-400 and corporate jets. The fact that the airport has one design classification (that cannot be reasonably improved) and is being utilized by aircraft of a larger classification in terms of speed and wingspan, makes the airport out of compliance with FAA design standards; an out-of-compliance condition FAA will not allow on a permanent basis.

**Q. What would be required to bring FMA into FAA Compliance?**

A. The airport may need to purchase land east, south, and/or west of the existing FMA. Such an acquisition would include approximately 80 homes in Woodside, relocating Highway 75 to the east, closing the airport for several years in order to relocate the existing runway further to the east and acquisition of land to the north and south of the airport for runway protection zones. These and other alterations represent a financial cost at least equivalent to the cost of a new airport, not to mention the enormous dislocation and impact on existing land uses.

**Q. Would land acquisitions, even considering the cost and land use impacts, solve the future aviation needs of our community?**

A. No. Even if Friedman could come into compliance with FAA safety standards on the ground, Friedman would still have the uncorrectable problems of surrounding mountain terrain, lack of reliability of service in winter, and inability to meet the present and future aviation needs of a resort economy.

**Q. Is the mountainous terrain around the airfield really that big of a problem?**

A. Yes. Terrain surrounding the airport is a very significant problem. In the event of a mis-calculated airplane approach, a commercial aircraft must be able to climb out of the valley fully loaded on one engine. Commercial airlines make their landing decisions based on these missed approach standards and divert flights accordingly.

**Q. Just how big of a problem are flight diversions caused by weather conditions, especially in the winter?**

A. Diversions and cancellations are a significant problem for our visitors as well as our local businesses. It is not unusual during the peak winter season to see 20 to 30% of flights cancelled and/or diverted. Over the President's Day weekend in 2010, which should be one of the busiest travel periods during the winter season, every commercial flight and many private flights were unable to use Friedman because of weather conditions.

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q. Will reliability at a new site really be that much better than exists at Friedman today?**

A.  Absolutely.  Substantially improved reliability is a major factor driving the need for a replacement airport.  At the preferred site for example, Site 10A, Landrum and Brown, the FAA's EIS consultant, has said that diversions will be comparable to diversions at the Boise airport.  Diversions or cancellations due to weather at Boise during the winter of 2009-2010 totaled fewer than a dozen flights according to Boise Airport officials.  By contrast, during the period from January 1st to April 30, 2010 90 flights were diverted and 28 cancelled from Friedman.

Site 10A will be able to accommodate aircraft approaches where the pilot has until 200 feet above pavement before he must make a decision on landing.  FMA currently has approaches greater than 1500' above the airfield.  Those improved minimums will provide the replacement airport with reliability similar to the Boise airport.

**Q. Won't fog be a problem at the proposed relocation site?**

A.  There is fog from time to time at all the proposed locations and at almost every airport in the U.S.  However, initial weather and wind data at Site 10A indicate that aircraft equipped with instrument landing systems will enable commercial and corporate aircraft to complete flights comparable to or better than other resort airports.

**Q. If above-design aircraft size requires significant changes to the FMA, why doesn't the airport just restrict the size of aircraft and avoid the need to relocate?**

A.  In exchange for federal funds granted to Friedman and other airports for operations and improvements, the FAA limits airports' authority to deny landing rights to aircraft that don't conform to an airport's design.  Additionally, the Airport Authority is also obligated by federal law to bring the airport into compliance with FAA design standards in conformity with aircraft that actually want to serve the community. Since there is a demonstrated need for C-III aircraft (the Horizon Q-400), FMA is legally obligated to bring the airport into compliance with C-III standards.  As explained above, it is not practical to do so at the present site.

**Q. Why not make the improvements at FMA anyway so it will comply with C-III requirements?**

A.  Compliance with C-III dimensional requirements cannot be achieved within the existing airport footprint.  Expanding the footprint, as unrealistic and costly as it may be, still would not address the reliability and operational issues that result directly from the constraints created by the surrounding terrain.

7

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q. Is it true that smaller commercial Regional Jets [RJs] can land at FMA?**

A. Possibly. Many air carriers do operate regional jets and have been encouraged to serve Friedman, but none, to date, who fly RJs, has opted to serve FMA because of economic issues and the aircraft and airport operational limitations. RJs would be welcomed if they came, and FMAA has contracted with consultants from time to time to help bring in other air carriers, but so far without success. Based on Friedman's "head-on" operations model, it is highly likely that current RJ's would operate at a weight penalty based on similar mountain airports. This deters air carriers from wanting to service our community

**Q. What happens to the existing airport property if the airport ceases operation?**

A. The total acreage of FMA is 211 acres. The original grant land reverts back to the Friedman Family Trust. The rest of the airport property purchased in the past two decades with FAA and airport operational funds will be sold and the money used for the cost of the replacement airport.

**Q. Could FMA be used for general aviation after the FAA land is sold?**

A. No. Once the airport land, other than the Friedman parcel, is sold, the remaining Friedman parcel would not be large enough for anything other than very small aircraft. Also, the City of Hailey is on record through their comprehensive plan and public resolution that once FMA is relocated, no airport of any size will be an appropriate use of the Hailey property.

**Q. What actions are being employed to provide a viable airport to replace FMA?**

A. The FAA is currently conducting the second phase of an Environmental Impact Statement (EIS) to determine the environmental impacts of the preferred site and two potential alternative relocation sites. Federal law also requires the FAA to examine the impacts of the "no action" alternative of leaving the airport at its current location.

The potential sites were identified by the FAA in Phase I of the EIS based upon criteria that the FAA articulated as its Purpose and Need for undertaking the EIS.

In part, they said:

> "Over the years, the (Friedman Memorial Airport Authority) has undertaken significant steps to maintain a safe and efficient aviation facility. However, the significant limitations at the current airport site are clear, and their impact has been fully studied and documented in numerous analyses conducted over a period of years…it can be seen that (the airport) is no longer 'located at an optimum site' and cannot be 'maintained to appropriate standards' nor is the Airport 'efficient'

8

Frequently Asked Questions – A Replacement Airport in Blaine County

> given head-to-head operations, the extent of diversions, and the airfield
> operational restriction that has been established."
> *Purpose and Needs Working Paper, July 2008, p29.*

The significant study work done by FMA, some of which dates back to the 1970's, has consistently indicated the need to relocate to a site south of the present FMA location that addresses the current problems regarding weather, mountainous terrain, aircraft design and space constraints.  That analysis, codified in 1994 by FMAA, has laid the foundation for the current EIS and plans to create a replacement airport.

**Q.  What is the status of the EIS being conducted by the Federal Aviation Administration?**

A.  Work on the EIS is continuing and the draft report is now scheduled to be released for public comment later this year.  Members of the Friedman Authority and airport staff are in regular communication with the FAA about the draft study. Once it is released in draft form there will be ample opportunity for public comment.  More information on the EIS is available at: www.flysvra.com

Based on the current FAA schedule, a final EIS – and a formal Record of Decision – can be expected early in 2012.

**Q.  Why has FMAA selected a site before the EIS is completed?**

A.  Federal law requires the airport governing body – FMAA – to have a specific proposal before the FAA can begin its formal EIS process.  The EIS process formally went on record supporting a replacement airport at the site normally referred to as Site 10A in southern Blaine County, about 24 minutes south of the existing airport.  The site was selected after a comprehensive review of all potentially viable sites.  This review, including many public meetings and outreach in the community, received support – including funding – from the FAA and was designed to select a "preferred site."  At a publicly-noticed special meeting of the FMAA Board on October 26, 2005, Site 10A was chosen as the preferred site.

The current EIS is also evaluating two other potential sites as well as the "no action" alternative. This approach is required by federal law, which requires the FAA to examine all reasonable alternatives to the FMAA's proposed site.  It is important to note that a "no action" alternative does not allow FMA to continue operating an out-of-design compliance airport and therefore future operations at FMA would be limited if FMA doesn't relocate.

FMAA believes Site 10A is the only viable site and the Board of Commissioners has stated it is only interested in pursuing construction of a replacement airport at that site.

9

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q. What influenced the Airport Authority's decision on a preferred replacement airport site?**

A. Before deciding on a preferred replacement airport site, the Airport Authority carefully weighed the technical analysis, the recommendations of the Study Advisory Committee, comprised of 25 key stakeholders in the region, and public input. The process identified the three factors that are most important for a successful Blaine County replacement airport project. Those factors are: geographic proximity to the Sun Valley Resort, location along State Highway 75, and a location in Blaine County.

**Q. Who will own the replacement airport?**

A. The Board of Blaine County Commissioners will own, operate and be recognized as financial sponsors of the replacement airport and the actual management of the replacement airport is likely to be similar in authority and responsibility to the governing authority of Friedman Memorial Airport. In fact, discussions are underway to determine how to transition FMAA to the new governing body.

**Q. Is there any chance that the replacement airport would be located at one of the other sites under EIS study?**

A. The County, as the future airport sponsor has indicated that the preferred site is 10A. Barring some new issue that is revealed in the EIS or that otherwise precludes the use of Site 10A; the Commissioners are committed to Site 10A.

**Q. Is it true that FMA and FAA have conspired with the City of Hailey to close Friedman when it isn't really necessary?**

A. No. The need for a replacement airport is driven by the physical limitation facts regarding Friedman and the reality that the airport cannot now or in the future meet the aviation needs of the area and our community. The reality that the existing use of Friedman is not compatible with a growing city is secondary to the other more critical facts of FMA being unable to meet the present and future aviation needs of our community.

**Q. Is it correct that that there are no environmental problems or air space constraints in the Bellevue Triangle and that the relocated airport could go there?**

A. The Blaine County Comprehensive Plan in many ways excludes the use of the Triangle for such purposes. And although the EIS is evaluating a possible site on the headwaters of Silver Creek, a general review of the site indicates that the environmental impacts of this site will most likely result in this site not being recommended by the FAA.

10

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q. How far away can the Airport be moved, and still be successful?**

A. Resort industry standards show that locating an airport up to one hour travel time from the main users is reasonable. Site 10A would be 36 miles from the intersection of Highway 75 and Sun Valley Road with an approximate 50 minute travel time.

While it is true the travel time will increase somewhat from the replacement airport, that small increase in time is more than offset by two other factors – reliability and the likelihood of more service to the Wood River region by more air carriers; both of which will reduce the overall door-to-door travel time for visitors to get to Sun Valley. The replacement airport will be able to accommodate all commercial aircraft that might want to serve the community, including all regional jets, the Boeing 737 and the Airbus 320 series aircraft.

## Replacement Airport Planning and Operations:

**Q. Is the FMA doing its own financial planning concerning the replacement airport?**

A. Yes. In addition to the work of the FAA and the EIS consultant, the FMAA and Blaine County have engaged, well in advance of the EIS Record of Decision (ROD), a prominent airport financial consulting firm and an expert construction program manager to prepare the detailed plans and financial information for the replacement airport.

Initial finance and planning efforts will be completed with the goal of beginning construction of the relocated airport immediately upon the FAA issuance of its Record of Decision (ROD). The goal is to create for the community a financially viable, properly designed airport as soon as physically possible.

**Q. Since Site 10A is public land owned and managed by the Bureau of Land Management (BLM) how will that site be made available for use as an airport?**

A. It could be made available in a variety of ways: purchase, exchange or conveyance. FMAA has been pursuing two paths simultaneously. First, FMAA has been working with the BLM on an administrative land purchase through BLM's transfer process. At the same time, with the cooperation of the BLM, FMAA has been working with the Idaho Congressional delegation on a legal process to convey the land to Blaine County by congressional action. Such conveyances have been often used to facilitate airport expansions or constructions in the past and FMAA thinks such an approach would be the simplest way to acquire the property for the replacement airport. The Congressional delegation has been supportive of these efforts.

Any conveyance would be contingent upon the outcome of the final EIS and Record of Decision and would not take place if, for some reason, a decision is made not to re-locate to Site 10A.

11

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q. Has FMAA done any analysis of how airport improvements have impacted other resort communities?**

A.  Yes.  In 2009, FMAA conducted a study of airport improvements related to airports that serve the Vail/Aspen and Steamboat Springs areas of Colorado.  That report – A Tale of Two Airports – is available at: www.flysvra.com

Bottom line:  airport improvements at the Eagle and Hayden, Colorado airports (serving Vail and Steamboat Springs, respectively) have exceeded the expectations of resort operators and airport managers.  In the Colorado experience, improved, all-weather airports increased the numbers of direct flights and the number of visitors to the Colorado resorts.  It is also important to note that travel time from the Colorado airports to the resort communities they serve is not seen as an issue by travelers.  Simply put, ground travel time as part of the whole travel day is not an issue for travelers, but the quality of the travel experience is vitally important.  As a point of reference, Vail is 36 miles, Aspen 78 miles and Breckenridge 107 miles from the Eagle airport.  In addition, many of the Colorado resort visitors drive from the Denver Airport.

Concerns about the location of a replacement airport in Blaine County having a detrimental impact on visitors who come to Sun Valley to ski is not supported by the experience of other successful resort communities in the U.S.

**Q. How much will the relocated airport cost and who will pay for it?**

A.  The publicly-financed portions of a relocated airport to serve the Wood River Region are estimated to cost approximately $120 million in current dollars.  A key mission of the FAA is to improve existing airports and, when necessary, to help finance new or replacement facilities.  The FAA utilizes its Airport Improvement Program (AIP), financed by taxes on airline tickets and aviation fuel, to improve safety and efficiency of the nation's airports.  FAA staff in the agency's Seattle office have made the replacement airport a high priority and have indicated they will provide grant funding – perhaps as much as half the cost.  FMAA continues to work closely with FAA officials in Seattle and Washington, D.C. and with the Congressional delegation to make sure that the project remains a high priority for grant funding.

Funding sources for the Friedman replacement airport include FAA grants, the sale of existing airport land, passenger facility charges (PFCs) and airport-generated monies.  A financial consultant has been engaged to provide FMAA and the community with detailed financial information on the costs of building and operating a relocated airport.

As a point of comparison, a new airport is nearing completion in St. George, Utah and will open early in 2011.  The FAA has contributed $120 million to that project while the community has financed additional costs by the sale of the existing airport property.  The same model is proposed for the replacement airport in Blaine County.

12

Frequently Asked Questions – A Replacement Airport in Blaine County

No local property tax support, which would require a supermajority vote if tax money is needed, is indicated at this point.

**Q. Will the existing Friedman Airport land be sold to help finance the replacement airport?**

A.  Yes; most of it.  The current airport occupies about 211 acres and somewhat less than half of that land is the original Friedman Family Trust grant.  Title work and a parcel by parcel review is underway now to define exactly what portions of the property are involved in the Friedman grant.  When the airport closes, the Friedman Family Trust land will revert to the Trust to use as they see fit and as complies with Hailey zoning ordinances.

The remainder of the property is publicly owned and much was acquired with airport and FAA funds.  The FAA requires that the property be sold when the airport closes and proceeds derived from the sale be used to help pay for the cost of the replacement airport.

**Q. What happens if FAA funds and proceeds from the sale of the public portions of the Friedman site are not adequate to support the construction of the replacement airport? Will the public have to pay?**

A.  The purpose of the economic and business planning work now underway is to refine all the projections and develop the detailed financing plan.  But, much like the new St. George, Utah airport, FMAA fully expects it will be able to construct the replacement airport with a combination of FAA financing, fees and charges paid by users of the airport, and funds derived from the sale of the existing airport.

The construction plan and airport financing plan will be modeled to assume no local property tax funds are used.

**Q. Why aren't these business plans and actual costs available right now?**

A.  Actually some preliminary work had already been done, in a conceptual way, in previous studies for a general airport site.  However, the FMAA wants a detailed review of the previous work and preparation of more focused specific financial programs related to the specific sites identified by the FAA, and which also take into consideration any changes which have taken place since earlier studies.  The replacement airport is a large infrastructure project and needs comprehensive analysis.  This financial work is currently being planned and the results will be available in adequate time for the FMAA, the County, and the community to evaluate the cost and operating viability of a replacement airport.

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q.  What will happen to the remainder of the Friedman property, the portion granted for use as an airport?**

A.  The answer to that is the subject of on-going discussion with the Friedman Family Trust. Legally, the property would automatically revert to the Friedman family when the airport closes.  A master planning process for the area is underway.

**Q.  What are the expected economic impacts from the construction and operation of a replacement airport?**

A.  Initial studies indicate a replacement airport will have enormous economic benefits to the entire Wood River Valley region of Idaho by creating construction jobs, long-term employment and enhanced economic development.

The preliminary studies assume the cost of the project is approximately $120 million, and the development is projected to:

- Produce a direct payroll of $40.1 million and a secondary affect payroll of $18.5 million for a total payroll $58.6 million
- Create 1,274 direct jobs and 716 secondary jobs for a total of 1,990 new construction jobs

Additionally, the replacement airport is projected to have continuing economic value to the region.

- The larger, design compliant airfield will be capable of handling larger aircraft capable of providing service from many hub airports throughout the country that cannot now serve Friedman.  The studies indicate that potential increased direct airline service resulting from increased reliability will:
  - increase competition
  - lower average air fares
  - increase tourism
  - encourage local business development

**Q.  What do airlines think about a replacement airport at Site 10A?**

A.  Landrum and Brown's Aviation Activity Forecast, completed in September 2008, identified 10 airlines as potentially serving the Wood River region in the future.  The airlines were Alaska/Horizon, Delta/SkyWest, Allegiant, Big Sky, Frontier, Northwest, United, US Airways, American and Continental.  Three of the airlines declined to be interviewed.  Two others indicated no likelihood of any scheduled service in the future.  Of the five other airlines, two cited a relatively high probability of service at a replacement airport and three others indicated some interest.

*(Source: Aviation Activity Forecast, p. 58-66).*

Although the economic climate has changed since the study was completed, it does not change the fact that airlines will serve markets that are most productive.

14

Frequently Asked Questions – A Replacement Airport in Blaine County

A major question for the community is whether demand for new levels of service can be created.  It is clear that airlines do not create demand, but they will respond when there is a need for additional service.

Past experience at other resort airports shows that passenger numbers increased when a larger, more efficient facility is made available and airlines have more flexibility in choosing the type of aircraft they will use.  This has been true for Steamboat Springs and Vail and is predicted at Panama City, Florida, where a new airport is expected to open soon.

**Q:  Why has Blaine County appointed an advisory committee and what will the committee be doing?**

A.  Five distinguished Blaine County residents have agreed to serve on the newly created Blaine County Airport Advisory Committee (BCAAC).  Blaine County Commissioners appointed the group to offer advice on the financing, design and construction of a replacement airport.  The group, for example, helped interview and evaluate program management consultants and will be extensively involved going forward on many of the key decisions regarding the replacement airport.

The members are:
- **Adrienne Robideaux**, a former tax attorney from a large Los Angeles firm who now makes her home in Bellevue and operated a retail store in Hailey.  Robideaux brings analytical and finance skills to the *Committee.*

- **Vanessa Fry** recently earned an MBA in sustainable management and is the former executive director of the local Citizens for Smart Growth advocacy group.  She is a teaching assistant at Presidio School of Management.  Fry is a resident of Hailey.

- **Carl Harris** is the founding owner and Chairman of the Board of Harris & Associates, a 35 year-old civil engineering and consulting firm with 450 employees and 15 offices across the west.  Harris is semi-retired and lives full-time north of Ketchum.

- **Chris Stephens**, an architect by training, is principal of 5B Investments with holdings across the country in storage units and restaurants.  Stephens is an instrument jet pilot and aircraft owner for 30 years, an active paramedic with the Ketchum Fire Department and serves as a commissioner on the Ketchum Rural Fire District.  He lives north of Ketchum

- **Len Harlig** has served as a Blaine County Commissioner for 8 years and has been a member of the Friedman Memorial Airport Authority Board for 17 years.  Harlig, who lives north of Ketchum, has been involved in a variety of community activities and is a former owner of a large and popular restaurant and hotel in California.

15

Frequently Asked Questions – A Replacement Airport in Blaine County

**Q. What are Minimum Revenue Guarantees (MRGs)?**

A. A guarantee provided by a community, or by business interests, that an airline will receive a minimum level of revenue for providing air service to/from a destination. If their airplanes carry enough passengers to be profitable, the revenue guarantees are not needed.

**Q. Why do airlines require MRGs?**

A. Obviously, airlines attempt to operate profitably. If an air carrier doesn't think enough passengers will fly to a specific designation they can, and often do, discontinue or reduce service or they demand MRGs to continue providing service on routes that would otherwise be uneconomical.

As Landrum & Brown has noted:

> "Minimum revenue guarantees essentially establish a minimum load factor and fare level for a limited period for start-up and phasing in of a service (typically one to two years or "seasons"). This is intended to offset low load factors or low introductory fares which are typically offered by an airline with no local experience or name recognition. In principle, the airline is offering a best effort to establish a viable service within the period of the guarantee while the airport and local community accept the risk of low economic returns during that period. However, ultimate viability can also be affected by other incentives or support."

Following its interviews of airlines that could potentially serve the Wood River region, Landrum & Brown said:

> "…revenue guarantees are not universally required or even accepted, and would be considered as part of a larger incentive package required to reduce risk and increase viability."
> **(Source: Aviation Activity Forecast, p. 64-66)**

**Q. What are some of the cost-factors airlines use in establishing MRGs?**

A. First, MRG levels are set in negotiations between the airlines and the community or business interest providing the guarantee. There is no formula and there are a variety of considerations. Some considerations include, which airports will be served; how many flights per day or per week will be provided; what types of aircraft will an airline own or lease; what kinds of aircraft they intend to operate in the future; personnel costs; how any one airport fits into the airlines overall route and flight schedules; fares that can charge customers; fuel costs; local and regional market demand; accessibility during bad weather; take-off and landing reliability;

16

Frequently Asked Questions – A Replacement Airport in Blaine County

passenger and crew safety; competition with other carriers; Passenger Facility Charges; TSA surcharges; airport fees for landing and terminal space;  relationships with car rental companies and hotel/motel chains; and dozens of other ordinary business factors that are not unique to the airline business.

**Q.  Is the Sun Valley Company and the community currently involved in MRGs?**

A.  Yes.  Seasonal flights from Los Angeles and Seattle are currently subject to MRGs.  In addition to the federal prohibition on airports funding MRGs, the state of Idaho does not allow government entities, like FMAA, to provide funds to private companies for MRGs.

**Q.  Will MRGs be necessary at the relocated airport?**

A.  It is possible they will be needed. MRGs are already being paid at FMA. However, the two airlines that serve FMA fly to limited locations and have limited competition. Airports with multiple airlines and destinations have lower airfares, more route choices, and less often require MRGs.

The FAA does not get involved with MRGs, which are considered a local marketing cost, and the EIS consultant has considered the FAA's position in this area.  However, the FMAA and the County are aware that some resort airports do pay MRGs and has directed its financial planners to take MRGs into consideration in their financial analysis.

**Q.  Why can't a high-speed rail system from Twin Falls Airport be built instead of a Blaine County replacement airport?**

A.  Only the location and the cost of construction and operation of the rail system would prevent such a solution. In theory it is a creative solution; in practice it is financially unobtainable. However, the County is very interested in transportation issues and will be working closely with the airport consultants, project manager and Mountain Rides on creative system modes for moving airline passengers between Site 10A and the cities of Blaine County.

Frequently Asked Questions – A Replacement Airport in Blaine County

## Airline Service Issues:

**Q. What has caused reductions in commercial flights to FMA?**

A. This is partially related to a recent reduction in passenger demand. Additionally, airline business models have changed over the past few years. If passenger service level demands aren't high enough, airlines either cut flights or drop service altogether. Nearly 100 airports in the United States have lost all commercial service in recent years. The preferred airline equipment is now a regional jet, which, as noted above, airlines do not yet fly into FMA, making an adequate replacement airport all the more imperative.

**Q. How effective are airlines in assessing future business factors?**

A. Check airline schedules and news reports on a daily basis to see how many changes in airfare prices and times of flights, or cancellations of flights take place to understand the uncertainty of airline flight planning. One need only review news reports to see how airline mergers, bankruptcies, actual or potential strikes, pilot wage givebacks, operating losses and airline stock prices, FAA requirements, and air traffic controller and equipment concerns to appreciate the complexities and uncertainties of the airline business.

**Q. What is the future of aircraft used by Horizon and SkyWest at FMA?**

A. Horizon is using the Q-400, an aircraft that is larger and not in conformity with Friedman airport design classification. FAA requires that FMA limit the operations of other aircraft when the Q-400 is landing and taking off. This temporary permission by FAA is just that – temporary – and can be revoked at any time. SkyWest flies the Brasilia. The Brasilia is an aging aircraft and may be scheduled for replacement by regional jets (RJs) in the next several years.

18

Frequently Asked Questions – A Replacement Airport in Blaine County

## General Questions:

**Q. There seems to be many questions in the community about the replacement airport project.  Where can people go to get good information?**

A. http://www.flysvra.com has information on the EIS project and factual information about economic and other information.  The site also contains an extensive file of past coverage of the replacement airport issue by the *Mountain Express.*

Questions can always been addressed to the Airport Manager (788-9003).  The monthly meetings of the FMAA Board are public meetings and a portion of every meeting is set aside to hear from and respond to information or questions from the public.  Meetings are normally held the first Tuesday of each month, at 5:30 pm in the old Blaine County Courthouse.

**Q. How does the general aviation community fit into the replacement airport project?**

A. The general aviation community at Friedman is an essential part of the success of the existing airport as well as the future success of the replacement airport.  Every effort will be made in the financing, planning and design process to accommodate the needs of private aircraft users and owners.

**Q. Are some people trying to prevent the relocation of the airport?**

A. Sometimes, those who have legitimate questions are erroneously characterized as opponents.  However, at this point there is no indication that a serious attempt will be made to prevent the relocation of the airport.  The FMAA continues diligently to provide detailed, factual information and respond to questions.  The desire to answer questions, for example, about financial issues led the Friedman Authority to retain a financial consultant early in the process.

The FMAA believes that anyone who is concerned about the long-term availability of commercial air service for Blaine County, and who studies the voluminous information available in professional, objective studies, will conclude that a replacement airport is the only possible option to ensure long-term commercial air service, improve reliability and contribute to the region's economic growth and stability.

19

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

# APPENDIX "L"
*(Debtor's Profit and Loss Statement
April 29, 2010 through April 30, 2011)*

7:53 PM

05/27/11

Cash Basis

# The LEED Corporation Debtor In Possession
# Profit & Loss
### April 29, 2010 through April 30, 2011

|  | Apr 29, '10 - Apr 30, 11 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Refunds | 2,216.00 |
| Rental Income | 149,348.21 |
| **Sales** | |
| Sales-Sprinkler Jobs | 99,725.50 |
| Sales-Sprinkler Service | 133,193.29 |
| **Total Sales** | 232,918.79 |
| Sales-Jobs New Mexico | 5,765.98 |
| **Total Income** | 390,248.98 |
| **Cost of Goods Sold** | |
| Construction Materials Costs | 975.37 |
| Equipment Rental for Jobs | 54.24 |
| Job Materials-New Mexico | 839.57 |
| Job Materials-Sprinklers | 51,448.36 |
| Other Construction Costs | -13,145.50 |
| Subcontractors Expense | 40.00 |
| Tools and Small Equipment | -3,271.14 |
| **Total COGS** | 36,940.90 |
| **Gross Profit** | 353,308.08 |
| **Expense** | |
| Advertising and Promotion | 2,615.18 |
| Auto and Truck Expenses | 4,604.31 |
| Bank Service Charges | 225.90 |
| Business Licenses and Permits | 915.00 |
| Computer and Internet Expenses | 881.35 |
| Dues and Subscriptions | 360.00 |
| **Farm Expense** | |
| Farm fuel | 1,779.36 |
| Grazing Fee & maintainance | 529.62 |
| **Total Farm Expense** | 2,308.98 |
| Farm Repairs | 1,229.00 |
| Financing fees | 2,500.00 |
| **Fuel Expense** | |
| Fuel-Idaho | 30,116.64 |
| Fuel Expense-New Mexico | 655.30 |
| **Total Fuel Expense** | 30,771.94 |
| **Insurance Expense** | |
| General Liability Insurance | 31,316.22 |
| **Total Insurance Expense** | 31,316.22 |
| Janitorial Expense | 108.14 |
| Leases-Property | 9,911.45 |
| Miscellaneous Expense | 49.90 |
| New Mexico Business Fees | 478.00 |
| Office Supplies | 1,002.21 |
| Payroll Expenses | 2,445.00 |
| Postage and Delivery | 731.97 |
| **Professional Fees** | |
| Accounting Fees | 712.50 |
| Legal Expense | 24,539.99 |
| Property Management | 7,749.64 |
| Trustee fees | 2,600.00 |
| **Total Professional Fees** | 35,602.13 |
| **Rent Expense** | |
| Rent Expense-Equipment | 492.75 |
| Storage fees | 543.00 |
| **Total Rent Expense** | 1,035.75 |

7:53 PM

05/27/11
Cash Basis

# The LEED Corporation Debtor In Possession
## Profit & Loss
### April 29, 2010 through April 30, 2011

|  | Apr 29, '10 - Apr 30, 11 |
|---|---|
| Repairs and Maintenance | 22,475.15 |
| Salaries & Wages | 112,239.15 |
| Taxes-New Mexico | 232.98 |
| Taxes - Property | 8,319.71 |
| Taxes Payroll | 114.04 |
| Telephone Expense | 8,339.28 |
| Telephone Expense-New Mexico | 78.50 |
| Travel Expense | 378.00 |
| Travel Expense-New Mexico | 78.71 |
| Utilities | 553.60 |
| **Total Expense** | 281,901.55 |
| **Net Ordinary Income** | 71,406.53 |
| **Net Income** | 71,406.53 |

| Plan Year.Month | PY1.1 | PY1.2 | PY1.3 | PY1.4 | PY1.5 |
|---|---|---|---|---|---|
| **Beginning Cash Balance** | 6,500.00 | 4,428.38 | 11,556.76 | 18,685.14 | 25,813.52 |
| **CASH RECEIPTS** | | | | | |
| Gross Landscaping Income | 60,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 60,000.00 |
| **TOTAL CASH RECEIPTS** | 60,000.00 | 70,000.00 | 70,000.00 | 70,000.00 | 60,000.00 |
| **CASH DISBURSEMENTS** | | | | | |
| Auto/Truck/Fuel Expenses | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 |
| Insurance | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| Payroll Expenses | | | **Included in Salaries/Wages** | | |
| Salaries/Wages | 24,000.00 | 28,000.00 | 28,000.00 | 28,000.00 | 24,000.00 |
| Payroll Taxes | | | **Included in Salaries/Wages** | | |
| Rent and Lease Payments (equipment) | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| Repairs and Maintenance | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 |
| Supplies | 19,800.00 | 23,100.00 | 23,100.00 | 23,100.00 | 19,800.00 |
| Utilities | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 |
| Other: Misc. | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| License renewals and fees | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| **PLAN PAYMENTS** | | | | | |
| SC5 | 208.34 | 208.34 | 208.34 | 208.34 | 208.34 |
| SC6,7,8 | 1,667.00 | 1,667.00 | 1,667.00 | 1,667.00 | 1,667.00 |
| SC9 | 204.87 | 204.87 | 204.87 | 204.87 | 204.87 |
| SC15 | 273.78 | 273.78 | 273.78 | 273.78 | 273.78 |
| SC16 | 317.63 | 317.63 | 317.63 | 317.63 | 317.63 |
| **TOTAL PAYMENTS/DISBURS.** | 55,571.62 | 62,871.62 | 62,871.62 | 62,871.62 | 55,571.62 |
| **NET CASH FLOW** | 4,428.38 | 7,128.38 | 7,128.38 | 7,128.38 | 4,428.38 |
| **Ending Cash Balance** | 4,428.38 | 11,556.76 | 18,685.14 | 25,813.52 | 30,241.90 |

SECONDED AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

# APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

| PY1.6 | PY1.7 | PY1.8 | PY1.9 | PY1.10 | PY1.11 | PY1.12 | Total |
|---|---|---|---|---|---|---|---|
| 30,241.90 | 34,670.28 | 38,065.66 | 42,461.04 | 45,856.42 | 51,951.80 | 58,047.18 | |
| | | | | | | | |
| 60,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 720,000.00 |
| 60,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 720,000.00 |
| | | | | | | | |
| 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 3,400.00 | 40,800.00 |
| 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 6,000.00 |
| | | | | | | | 0.00 |
| 24,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 288,000.00 |
| | | | | | | | 0.00 |
| 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 2,400.00 |
| 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 31,200.00 |
| 19,800.00 | 16,500.00 | 16,500.00 | 16,500.00 | 19,800.00 | 19,800.00 | 19,800.00 | 237,600.00 |
| 1,100.00 | 1,100.00 | 100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 1,100.00 | 12,200.00 |
| 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12,000.00 |
| 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 3,600.00 |
| | | | | | | | |
| 208.34 | 208.34 | 208.34 | 208.34 | 208.34 | 208.34 | 208.34 | 2,500.08 |
| 1,667.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,667.00 | 11,669.00 |
| 204.87 | 204.87 | 204.87 | 204.87 | 204.87 | 204.87 | 204.87 | 2,458.44 |
| 273.78 | 273.78 | 273.78 | 273.78 | 273.78 | 273.78 | 273.78 | 3,285.36 |
| 317.63 | 317.63 | 317.63 | 317.63 | 317.63 | 317.63 | 317.63 | 3,811.56 |
| 55,571.62 | 46,604.62 | 45,604.62 | 46,604.62 | 53,904.62 | 53,904.62 | 55,571.62 | 657,524.44 |
| | | | | | | | |
| 4,428.38 | 3,395.38 | 4,395.38 | 3,395.38 | 6,095.38 | 6,095.38 | 4,428.38 | 62,475.56 |
| | | | | | | | |
| 34,670.28 | 38,065.66 | 42,461.04 | 45,856.42 | 51,951.80 | 58,047.18 | 62,475.56 | 424,253.64 |

| | |
|---|---|
| Plan Year 2 | 63,725.07 |
| Plan Year 3 | 64,999.57 |
| Plan Year 4 | 66,299.56 |
| Plan Year 5 | 67,625.56 |
| Plan Year 6 | 68,978.07 |
| Plan Year 7 | 70,357.63 |
| Plan Year 8 | 71,764.78 |
| Total: | 536,225.80 |
| **50% Net Profit:** | **268,112.90** |

SECONDED AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

# APPENDIX "M"
*(Debtor's Income Projections—Landscaping and Home Sales)*

**SALES PROJECTIONS SUMMARY**

**Leed Corp., Case No. 10-40743 JDP**

| Lot #, Address, Description | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Houses Under Construction** | | | | | | | | | | | |
| No. Units | **4** | **5** | **6** | | | | | | | | 15 |
| **Projected Revenue** | 395,000.00 | 512,500.00 | 829,500.00 | | | | | | | | 1,737,000.00 |
| **LESS Expenses** | | | | | | | | | | | 0.00 |
| Estimated Construction Costs | 90,300.00 | 207,358.00 | 378,612.00 | | | | | | | | 676,270.00 |
| Realtors Commission & Est. Closing Costs | 31,700.00 | 40,750.00 | 61,770.00 | | | | | | | | |
| Debt Payoff | 156,000.00 | 195,000.00 | 204,000.00 | | | | | | | | 555,000.00 |
| Co-owner Split | 0.00 | 0.00 | 86,310.00 | | | | | | | | 86,310.00 |
| **Sub-Total Net Revenue** | 117,000.00 | 69,392.00 | 98,808.00 | | | | | | | | 285,200.00 |
| | | | | | | | | | | | |
| **Rental Houses** | | | | | | | | | | | |
| No. Units | | | | **4** | **4** | **5** | **5** | | | | 18 |
| **Projected Revenue** | | | | 288,250.00 | 303,900.00 | 540,200.00 | 865,250.00 | | | | 1,997,600.00 |
| **LESS Expenses** | | | | | | | | | | | 0.00 |
| Estimated Construction Costs | | | | 0.00 | 0.00 | 0.00 | 0.00 | | | | 0.00 |
| Realtors Commission & Est. Closing Costs | | | | 25,295.00 | 26,234.00 | 42,411.00 | 61,914.00 | | | | |
| Debt Payoff | | | | 166,227.00 | 233,000.00 | 442,000.00 | 635,000.00 | | | | 1,476,227.00 |
| Co-owner Split | | | | 0.00 | 0.00 | 0.00 | 35,871.00 | | | | 35,871.00 |
| **Sub-Total Net Revenue** | | | | 96,728.00 | 44,666.00 | 55,789.00 | 132,465.00 | | | | 329,648.00 |
| | | | | | | | | | | | |
| **Developed Lots** | | | | | | | | | | | |
| No. Units | | **2** | **2** | **3** | | | | | | | 7 |
| **Projected Revenue** | | 71,500.00 | 61,900.00 | 68,200.00 | | | | | | | 201,600.00 |
| **LESS Expenses** | | | | | | | | | | | 0.00 |
| Estimated Construction Costs | | 0.00 | 0.00 | 0.00 | | | | | | | 0.00 |
| Realtors Commission & Est. Closing Costs | | 6,690.00 | 57,368.00 | 53,068.00 | | | | | | | |

**APPENDIX "M"**

*(Debtor's Income Projections—Landscaping and Home Sales)*

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 | C9 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Debt Payoff | | 45,000.00 | 35,000.00 | 50,000.00 | | | | | | 130,000.00 |
| Co-owner Split | | 0.00 | 0.00 | 0.00 | | | | | | 0.00 |
| **Sub-Total Net Revenue** | | 19,810.00 | 20,786.00 | 11,708.00 | | | | | | 52,304.00 |
| **Platted Lots** | | | | | | | | | | |
| No. Units | | | | **30** | **28** | **14** | **13** | | | 85 |
| **Projected Revenue** | | | | 415,500.00 | 407,400.00 | 261,800.00 | 206,700.00 | | | 1,291,400.00 |
| **LESS Expenses** | | | | | | | | | | 0.00 |
| Estimated Construction Costs | | | | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| Realtors Commission & Est. Closing Costs | | | | 50,852.00 | 73,752.00 | 26,908.00 | 10,400.00 | | | |
| Debt Payoff | | | | 300,000.00 | 280,000.00 | 194,600.00 | 180,700.00 | | | 955,300.00 |
| Co-owner Split | | | | 0.00 | 0.00 | 0.00 | 0.00 | | | 0.00 |
| **Sub-Total Net Revenue** | | | | 66,570.00 | 80,556.00 | 40,292.00 | 3,198.00 | | | 190,616.00 |
| **Pre-Platted Lots** | | | | | | | | | | |
| No. Units | | | | | | **1** | | **80** | **121** | 202 |
| **Projected Revenue** | | | | | | 17,500.00 | | 1,024,000.00 | 1,112,900.00 | 2,154,400.00 |
| **LESS Expenses** | | | | | | | | | | 0.00 |
| Estimated Construction Costs | | | | | | 0.00 | | 0.00 | 0.00 | 0.00 |
| Realtors Commission & Est. Closing Costs | | | | | | 1,850.00 | | 125,440.00 | 131,574.00 | |
| Debt Payoff | | | | | | 0.00 | | 368,000.00 | 375,400.00 | 743,400.00 |
| Co-owner Split | | | | | | 0.00 | | 442,400.00 | 88,965.00 | 531,365.00 |
| **Sub-Total Net Revenue** | | | | | | 15,650.00 | | 88,160.00 | 516,961.00 | 620,771.00 |
| **TOTAL Net Revenue** | 117,000.00 | 89,202.00 | 119,594.00 | 175,006.00 | 125,222.00 | 111,731.00 | 135,663.00 | 88,160.00 | 516,961.00 | 1,478,539.00 |

SECONDED AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

# APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

| OPERATING EXPENSES | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | | | | | | | | |
| Professional Fees | 33,600.00 | 33,600.00 | 33,600.00 | 33,600.00 | 33,600.00 | 33,600.00 | 33,600.00 | 33,600.00 | 33,600.00 | | 302,400.00 |
| Priority Claims | 31,200.00 | 31,200.00 | 31,200.00 | 31,200.00 | | | | | | | 124,800.00 |
| Marketing * | 19,750.00 | 17,520.00 | 17,828.00 | 15,439.00 | 14,226.00 | 16,390.00 | 21,439.00 | 20,480.00 | 22,258.00 | | 165,330.00 |
| *Marketing based on % of Gross Revenues* | 0.05 | 0.03 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | | |
| Total EXPENSES | 84,550.05 | 82,320.03 | 82,628.02 | 80,239.02 | 47,826.02 | 49,990.02 | 55,039.02 | 54,080.02 | 55,858.02 | | 592,530.22 |
| | | | | | | | | | | | |
| **GAIN or (LOSS)** | **32,449.95** | **6,881.97** | **36,965.98** | **94,766.98** | **77,395.98** | **61,740.98** | **80,623.98** | **34,079.98** | **461,102.98** | | **886,008.78** |

SECONDED AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

# APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

**Leed Corp., 10-40743 JDP**

| Projected Year to Sell | | Lot #, Address, Description | No. Units | Estimated selling price per unit | Estimated Construction Costs | Realtor Commission | Estimated Closing Costs | Debt Payoff | Co-owner Split | Net | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 6% | | | | | 2.5% | 3.0% | 5.0% | 5.0% | 5.0% | 6.0% | 6.0% | 6.0% | 8.0% |
| | **Houses Under Construction** | | | | | | | | | | | | | | | | | | |
| | 2011 | 4a - 4bdr 2bth | 1 | 100,000 | 32,500 | 6,000 | 2,000 | 39,000 | | 20,500 | | | | | | | | | |
| | 2011 | 6j - 4bdr 2 bth | 1 | 100,000 | 20,650 | 6,000 | 2,000 | 39,000 | | 32,350 | | | | | | | | | |
| | 2011 | 8j - 4bdr 2 bth | 1 | 100,000 | 28,650 | 6,000 | 2,000 | 39,000 | | 24,350 | | | | | | | | | |
| | 2011 | 14j -4bdr 2bth | 1 | 95,000 | 8,500 | 5,700 | 2,000 | 39,000 | | 39,800 | | | | | | | | | |
| | | Total 2011 | 4 | 395,000 | 90,300 | 23,700 | 8,000 | 156,000 | 0 | 117,000 | | | | | | | | | |
| | 2012 | 2a - 4bdr 2 bth | 1 | 102,500 | 30,825 | 6,150 | 2,000 | 39,000 | | 24,525 | | | | | | | | | |
| | 2012 | 1j - 4bdr 2 bth | 1 | 102,500 | 39,340 | 6,150 | 2,000 | 39,000 | | 16,010 | | | | | | | | | |
| | 2012 | 5a - 4bdr 2bth | 1 | 102,500 | 45,195 | 6,150 | 2,000 | 39,000 | | 10,155 | | | | | | | | | |
| | 2012 | 7a - 4bdr 2bth | 1 | 102,500 | 52,400 | 6,150 | 2,000 | 39,000 | | 2,950 | | | | | | | | | |
| | 2012 | 16j - 4bdr 2 bth | 1 | 102,500 | 39,598 | 6,150 | 2,000 | 39,000 | | 15,752 | | | | | | | | | |
| | | Total 2012 | 5 | 512,500 | 207,358 | 30,750 | 10,000 | 195,000 | 0 | 69,392 | | | | | | | | | |
| | 2013 | 9a - 4bdr 2bth | 1 | 105,000 | 52,800 | 6,300 | 2,000 | 39,000 | | 4,900 | | | | | | | | | |
| | 2013 | 12j - 4bdr 2 bth | 1 | 105,000 | 53,900 | 6,300 | 2,000 | 39,000 | | 3,800 | | | | | | | | | |
| | 2013 | 24 - Northview subd 4bdr 2bth | 1 | 185,000 | 78,111 | 11,100 | 2,000 | 29,000 | 32,395 | 32,394 | | | | | | | | | |
| | 2013 | 13j - 4bdr 2bth | 1 | 105,000 | 53,900 | 6,300 | 2,000 | 39,000 | | 3,800 | | | | | | | | | |
| | 2013 | 15 - Sky High Subd 4bdr 2bth | 1 | 180,000 | 78,591 | 10,800 | 2,000 | 29,000 | 29,805 | 29,804 | | | | | | | | | |
| | 2013 | 19 - Carmen St 4bdr 2bth | 1 | 149,500 | 61,310 | 8,970 | 2,000 | 29,000 | 24,110 | 24,110 | | | | | | | | | |
| | | Total 2013 | 6 | 829,500 | 378,612 | 49,770 | 12,000 | 204,000 | 86,310 | 98,808 | | | | | | | | | |
| | | **Total Houses Under Construction** | **15** | **1,737,000** | **676,270** | **104,220** | **30,000** | **555,000** | **86,310** | **285,200** | | | | | | | | | |

*Appraised Value* (label on right side above 2011–2019 columns)

# APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

**Rental Houses**

| | Lot #, Address, Description | No. Units | Estimated selling price per unit | Realtor Commission | Estimated Closing Costs | Debt Payoff | Co-owner Split | Net | 2011 | 2012 2.5% | 2013 3.0% | 2014 5.0% | 2015 5.0% | 2016 5.0% | 2017 6.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | 116 E A 2 bdr 1bth | 1 | 61,000 | 3,660 | 2,000 | 40,000 | | 15,340 | 55,000 | 56,375 | 58,066 | 60,970 | | | |
| 2014 | 208 West B 2bdr 1 bth | 1 | 61,000 | 3,660 | 2,000 | 40,000 | | 15,340 | 55,000 | 56,375 | 58,066 | 60,970 | | | |
| 2014 | 4235 N 1360E Buhl 2bdr 1bth | 1 | 92,000 | 5,520 | 2,000 | 46,227 | | 38,253 | 83,000 | 85,075 | 87,627 | 92,009 | | | |
| 2014 | 319 N. Dorothy 3bdr 1bth | 1 | 74,250 | 4,455 | 2,000 | 40,000 | | 27,795 | 67,000 | 68,675 | 70,735 | 74,272 | | | |
| | Total 2014 | 4 | 288,250 | 17,295 | 8,000 | 166,227 | 0 | 96,728 | | | | | | | |
| 2015 | 516 N, Fir 2bdr 1bth | 1 | 58,200 | 3,492 | 2,000 | 50,000 | | 2,708 | 50,000 | 51,250 | 52,788 | 55,427 | 58,198 | | |
| 2015 | 516 N. Birch 2 bdr 2bth | 1 | 61,700 | 3,702 | 2,000 | 53,000 | | 2,998 | 53,000 | 54,325 | 55,955 | 58,752 | 61,690 | | |
| 2015 | 148 E. 450 N. 3bdr. 2bth 5 acres | 1 | 95,500 | 5,730 | 2,000 | 65,000 | | 22,770 | 82,000 | 84,050 | 86,572 | 90,900 | 95,445 | | |
| 2015 | 82 E. Parker Gulch Rd. 3bdr. 2bth | 1 | 88,500 | 5,310 | 2,000 | 65,000 | | 16,190 | 76,000 | 77,900 | 80,237 | 84,249 | 88,461 | | |
| | Total 2015 | 4 | 303,900 | 18,234 | 8,000 | 233,000 | 0 | 44,666 | | | | | | | |
| 2016 | 283 E. 520 N. (3bdr 2bth) | 1 | 105,100 | 6,306 | 1,999 | 86,000 | | 10,795 | 86,000 | 88,150 | 90,795 | 95,334 | 100,101 | 105,106 | |
| 2016 | 418 N Date St. 3 bdr 2bth | 1 | 97,800 | 5,868 | 2,000 | 80,000 | | 9,932 | 80,000 | 82,000 | 84,460 | 88,683 | 93,117 | 97,773 | |
| 2016 | 4233 N. 1350E Buhl 4bdr 1 bth 3 acre | 1 | 111,200 | 6,672 | 2,000 | 91,000 | | 11,528 | 91,000 | 93,275 | 96,073 | 100,877 | 105,921 | 111,217 | |
| 2016 | 524 North Fir townhouse 3bdr 2bth | 1 | 134,400 | 8,064 | 2,000 | 110,000 | | 14,336 | 110,000 | 112,750 | 116,133 | 121,939 | 128,036 | 134,438 | |
| 2016 | 422 N. Date 3 bdrm, 2 bath | 1 | 91,700 | 5,502 | 2,000 | 75,000 | | 9,198 | 75,000 | 76,875 | 79,181 | 83,140 | 87,297 | 91,662 | |
| | Total 2016 | 5 | 540,200 | 32,412 | 9,999 | 442,000 | 0 | 55,789 | | | | | | | |
| 2017 | 110 Riverview 4bdr 2bth | 1 | 163,250 | 9,795 | 1,999 | 115,000 | 18,228 | 18,228 | 126,000 | 129,150 | 133,025 | 139,676 | 146,660 | 153,992 | 163,232 |
| 2017 | 1944 E. 1300 S. Gooding 3bdr 2bth | 1 | 163,250 | 9,795 | 2,000 | 125,000 | | 26,455 | 126,000 | 129,150 | 133,025 | 139,676 | 146,660 | 153,992 | 163,232 |
| 2017 | 275 E. 506 N. 4bdr 2bth 5 acres | 1 | 189,000 | 11,340 | 2,000 | 125,000 | | 50,660 | 146,000 | 149,650 | 154,140 | 161,846 | 169,939 | 178,436 | 189,142 |
| 2017 | 107 Riverview 4bdr 2 bth | 1 | 164,500 | 9,870 | 2,000 | 127,000 | 6,760 | 18,870 | 127,000 | 130,175 | 134,080 | 140,784 | 147,823 | 155,215 | 164,528 |
| 2017 | 104 Sunset Drive 6bdr 3bth | 1 | 185,250 | 11,115 | 2,000 | 143,000 | 10,883 | 18,252 | 143,000 | 146,575 | 150,972 | 158,521 | 166,447 | 174,769 | 185,255 |
| | Total 2017 | 5 | 865,250 | 51,915 | 9,999 | 635,000 | 35,871 | 132,465 | | | | | | | |
| | **Total Rental Houses** | **18** | **1,997,600** | | | **1,476,227** | **35,871** | **329,648** | | | | | | | |

APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

| Lot #, Address, Description | No. Units | Estimated selling price per unit | Realtor Commission | Estimated Closing Costs | Debt Payoff | Net | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Appraised Value | 2.5% | 3.0% | 5.0% |
| Desert Rose Sub. 5 lots phase ll - per unit | | 21,900 | 1,314 | 800 | 10,000 | 9,786 | 21,346 | 21,880 | | |
| 2012 Desert Rose Sub. 5 lots phase ll - all units | 2 | 43,800 | 2,628 | 1,600 | 20,000 | 19,572 | | | | |
| Total 2012 | 2 | 71,500 | 4,290 | 2,400 | 45,000 | 19,810 | | | | |
| Desert Rose Sub. 5 lots phase ll - per unit | | 22,500 | 1,350 | 800 | 10,000 | 10,350 | 21,346 | 21,880 | 22,536 | |
| 2013 Desert Rose Sub. 5 lots phase ll - all units | 2 | 45,000 | 2,700 | 1,600 | 20,000 | 20,700 | | | | |
| Total 2013 | 2 | 61,900 | 30,168 | 27,200 | 35,000 | 20,786 | | | | |
| 2014 62 E. Huyser Lot 5 acres | 1 | 27,700 | 1,662 | 800 | 25,000 | 238 | 25,000 | 25,625 | 26,394 | 27,713 |
| 2014 416 N Date  St. | 1 | 16,900 | 1,014 | 800 | 15,000 | 86 | 15,000 | 15,375 | 15,836 | 16,628 |
| Desert Rose Sub. 5 lots phase ll - per unit | | 23,600 | 1,416 | 800 | 10,000 | 11,384 | | | | |
| 2014 Desert Rose Sub. 5 lots phase ll - all units | 1 | 23,600 | 1,416 | 800 | 10,000 | 11,384 | 21,346 | 21,880 | 22,536 | 23,663 |
| Total 2014 | 3 | 68,200 | 27,468 | 25,600 | 50,000 | 11,708 | | | | |
| **Total Developed Lots** | **7** | **201,600** | | | **130,000** | **52,304** | | | | |

# APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

**Platted Lots**

| | Lot #, Address, Description | No. Units | Estimated selling price per unit | Realtor Commission | Estimated Closing Costs | Debt Payoff | Net | 2011 Appraised Value | 2012 2.5% | 2013 3.0% | 2014 5.0% | 2015 5.0% | 2016 5.0% | 2017 6.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Desert Rose Sub. 58 lots phase III - per unit | | 13,850 | 831 | 800 | 10,000 | 2,219 | 12,500 | 12,813 | 13,197 | 13,857 | | | |
| 2014 | Desert Rose Sub. 58 lots phase III - all units | 30 | 415,500 | 24,930 | 24,000 | 300,000 | 66,570 | | | | | | | |
| | Total 2014 | 30 | 415,500 | 26,052 | 24,800 | 300,000 | 66,570 | | | | | | | |
| | Desert Rose Sub. 58 lots phase IV - per unit | | 14,550.00 | 873 | 800 | 10,000 | 2,877 | 12,500 | 12,813 | 13,197 | 13,857 | 14,550 | | |
| 2015 | Desert Rose Sub. 58 lots phase IV - all units | 28 | 407,400 | 24,444 | 22,400 | 280,000 | 80,556 | | | | | | | |
| | Total 2015 | 28 | 407,400 | 40,152 | 33,600 | 280,000 | 80,556 | | | | | | | |
| | Riverview Subdivision - phases III (per unit) | | 18,700 | 1,122 | 800 | 13,900 | 2,878 | 15,333 | 15,716 | 16,188 | 16,997 | 17,847 | 18,739 | |
| 2016 | Riverview Subdivision - phases III (all units) | 14 | 261,800 | 15,708 | 11,200 | 194,600 | 40,292 | | | | | | | |
| | Total 2016 | 14 | 261,800 | 15,708 | 11,200 | 194,600 | 40,292 | | | | | | | |
| | Riverview Subdivision - phases IV (per unit) | | 15,900 | 954 | 800 | 13,900 | 246 | 12,000 | 12,300 | 12,669 | 13,302 | 13,968 | 14,666 | 15,546 |
| 2017 | Riverview Subdivision - phases IV (all units) | 13 | 206,700 | 12,402 | 10,400 | 180,700 | 3,198 | | | | | | | |
| | Total 2017 | 13 | 206,700 | 12,402 | 10,400 | 180,700 | 3,198 | | | | | | | |
| | **Total Platted Lots** | **85** | **1,291,400** | **94,314** | **80,000** | **955,300** | **190,616** | | | | | | | |

APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

**Pre-Platted Lots**

| Lot #, Address, Description | No. Units | Estimated selling price per unit | Realtor Commission | Estimated Closing Costs | Debt Payoff | Co-owner Split | Net | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 283 B 520 N. (5 acres) | 1 | 17,500 | 1,050 | 800 | 0.00 | | 15,650 | Appraised Value | 2.5% | 3.0% | 5.0% | 5.0% | 5.0% | 6.0% | 6.0% | 8.0% |
| Total 2016 | 1 | 17,500 | 1,050 | 800 | 0.00 | 0.00 | 15,650 | | | | | | | | | |
| Riverview Subdivision - phase V | | 12,800 | 768 | 800 | 4,600 | 5,530 | 1,102 | 9,300 | 9,533 | 9,818 | 10,309 | 10,825 | 11,366 | 12,048 | 12,771 | |
| 2018 | 80 | 1,024,000 | 61,440 | 64,000 | 368,000 | 442,400 | 88,160 | | | | | | | | | |
| Total 2018 | 80 | 1,024,000 | 61,440 | 64,000 | 368,000 | 442,400 | 88,160 | | | | | | | | | |
| Desert Rose Subdivision - phase V | | 8,900 | 534 | 800 | 7,400 | 85 | 81 | 5,500 | 5,638 | 5,807 | 6,097 | 6,402 | 6,722 | 7,125 | 7,553 | 8,157 |
| 2019 | 41 | 364,900 | 21,894 | 32,800 | 303,400 | 3,485 | 3,321 | | | | | | | | | |
| Riverview Subdivision - phase V | | 13,800 | 828 | 800 | 4,600 | 1,111 | 6,461 | 9,300 | 9,533 | 9,818 | 10,309 | 10,825 | 11,366 | 12,048 | 12,771 | 13,793 |
| 2019 | 80 | 1,104,000 | 66,240 | 64,000 | 368,000 | 88,880 | 516,880 | | | | | | | | | |
| Total 2019 | 121 | 1,112,900 | 66,774 | 64,800 | 375,400 | 88,965 | 516,961 | | | | | | | | | |
| **Total Pre-Platted Lots** | **202** | **2,154,400** | **129,264** | **129,600** | **743,400** | **531,365** | **620,771** | | | | | | | | | |

APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

| | No. Units | Estimated selling price per unit | Estimated Construction Costs | Realtor Commission | Estimated Closing Costs | Debt Payoff | Co-owner Split | Net |
|---|---|---|---|---|---|---|---|---|
| Grand Total | 327 | 7,382,000 | 676,270 | 403,224.00 | 294,800 | 3,859,927.00 | 653,546.00 | 1,478,539.00 |

APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

**Annual Median Sold Values from years 2005 through 05/24/2011**

| Community | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| **Shoshone** | | | | | | | |
| Median Sold | 100000 | 123450 | 158000 | 138000 | 131250 | 85950 | 92400 |
| Median Active | | | 120900 | | Under Contract | | 101205 |
| **Gooding** | | | | | | | |
| Median Sold | 85950 | 90000 | 101450 | 101000 | 94500 | 98500 | 81500 |
| Median Active | | | 126950 | | Under Contract | | 94750 |
| **Jerome** | | | | | | | |
| Median Sold | 109000 | 105000 | 147200 | 140000 | 130000 | 120000 | 114000 |
| Median Active | | | 146195 | | Under Contract | | 102700 |

Source:  Intermountain MLS

This data shows the trend of median values for each community. The median active and under contract is a current value only.

The median value for active and under contract listings is higher than the median value for sold comps.

This would indicate the values are starting to trend upwards for Shoshone and Good; Jerome may still be dealing with an oversupply of homes and REO sales.

APPENDIX "M"

*(Debtor's Income Projections—Landscaping and Home Sales)*

# Properties currently subject to litigation
## Adv. No. 10-08086 JDP

**Rental Houses**

| | | | |
|---|---|---|---|
| 112 E Syringa loop 3bdr 2bth | 1 | $ | 146,000 |
| 303 E. C Shoshone 4 plex apts | 1 | $ | 105,000 |
| | **2** | **$** | **251,000** |
| | | | |
| 141 E Syringa loop 4bdr 3bth | 1 | $ | 194,000 |
| 152 E. Syringa loop 4bdr 3bth | 1 | $ | 162,000 |
| 182 E Syringa loop 4bdr 2bth | 1 | $ | 152,000 |
| 191 E Syringa loop 4bdr 2bth | 1 | $ | 148,000 |
| 205 E 6th St townhouse 3bdr 2bth | 1 | $ | 116,000 |
| 207 E 6th St townhouse 3bdr 2bth | 1 | $ | 116,000 |
| 301 E 6th St townhouse 3bdr 2bth | 1 | $ | 115,000 |
| 303 E 6th St townhouse 3bdr 2bth | 1 | $ | 115,000 |
| 305 E 6th St. townhouse 3bdr 2bth | 1 | $ | 116,000 |
| 307 E 6th St townhouse 3bdr 2bth | 1 | $ | 116,000 |
| 318 N. Date St. 3 bdr 1 bth | 1 | $ | 62,000 |
| 525 N Fir townhouse 3bdr 2bth | 1 | $ | 115,000 |
| 527 N Fir townhouse 3bdr 2bth | 1 | $ | 115,000 |
| 531 N Fir 2 bdr house 1bth, remodel | 1 | $ | 50,000 |
| | **14** | **$** | **1,692,000** |
| 605 W 14th Gooding 4bdr 3 bth | - | $ | 100,000 |

**Lots**

| | | | |
|---|---|---|---|
| 201 and 203 E 6th St. | 1 | $ | 16,000 |
| Riverview lot Lot 10 Block 2 | 1 | $ | 21,000 |
| South Park Development | 1 | $ | 25,000 |
| | **3** | **$** | **62,000** |

Should the Debtor prevail in the adversary complaint, 10-08086 JDP, properties that are the subject of that adversary complaint that may be subject to avoidance claims may provide property liquidation values of approximately $1,900,000.00 for implementation of the Plan. This calculation is based upon current appraised values and/or broker's price opinions as noted in Appendix P. Please note that the Plan provides that the Net Litigation Recovery would be paid into the Plan.

# APPENDIX "M"
*(Debtor's Income Projections—Landscaping and Home Sales)*

# RENT PROJECTIONS and NET RENT CALCULATION
## As of the Effective Date

| Property Description | Gross Rents | Monthly Taxes | Monthly Insurance | Prop. Man. Fees | Net Rents | Plan Payments | Cash Flow |
|---|---|---|---|---|---|---|---|
| 404 N. Birch | 800.00 | 222.34 | 32.34 | 72.00 | 457.57 | CLandM | Purch & Sale 95,000 |
| 422 N. Date St. | 650.00 | 132.40 | 39.67 | 58.50 | 418.83 | 402.82 | yes |
| 524 N. Fir St | 750.00 | 95.00 | 38.67 | 67.50 | 548.83 | 590.50 | (41.67) |
| 283 E. 520 N. | 650.00 | 65.90 | 20.67 | 58.50 | 504.93 | 500.00 | yes |
| 116 E. A St. | 495.00 | 108.00 | 58.33 | 40.50 | 288.17 | 295.92 | (7.75) |
| 208 W. B St. | 595.00 | 108.00 | 39.34 | 53.55 | 394.11 | 295.92 | yes |
| 319 N. Dorothy | 595.00 | 108.00 | 24.00 | 53.55 | 409.45 | 359.67 | yes |
| 275 E. 506 N | 995.00 | 103.09 | 40.00 | 89.55 | 762.36 | 500.00 | yes |
| 82 Parker Gulch | 750.00 | 80.00 | 27.00 | 67.50 | 575.50 | 410.84 | yes |
| 148 E. 450 N. | 695.00 | 80.00 | 27.00 | 62.55 | 525.45 | 410.84 | yes |
| 418 N. Date | 710.00 | 110.00 | 42.34 | 63.90 | 493.76 | 429.46 | yes |
| 516 N. Fir | 450.00 | 94.12 | 40.00 | 36.00 | 290.23 | 268.41 | yes |
| 516 N. Birch | 495.00 | 94.12 | 40.00 | 44.55 | 316.33 | 284.52 | yes |
| 104 Sunset Dr. | 1,095.00 | 222.00 | 75.00 | 98.55 | 699.45 | 767.65 | (68.20) |
| 107 Riverview | 1,600.00 | 222.00 | 40.00 | 144.00 | 1,204.00 | 692.60 | Purch & Sale |
| 110 Riverview | 995.00 | 222.00 | 40.00 | 80.55 | 652.45 | 617.34 | yes |
| 4233 N. 1360 E. Buhl | 795.00 | 113.87 | 34.00 | 71.55 | 575.58 | 545.59 | yes |
| 4235 N. 1360 E. Buhl | 798.00 | 94.26 | 31.34 | 0.00 | 672.40 | 671.00 | yes |
| 1944 E. 1300 S. Good. | 795.00 | 141.11 | 32.34 | 71.55 | 550.00 | 676.40 | Purch & Sale 125,000 retain 1 lot (2 acres) lot free and clear in sales transaction |
| Totals: | 14,708.00 | 2,415.96 | 722.04 | 1,234.35 | 10,339.40 | 8,719.48 | |

**Net Rents:**    **1,619.92**

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

# APPENDIX "N"
*(Debtor's Income Projections—Rents)*

## CLAIMS THAT MAY BE CONTESTED [47]

| No. | Claimant | Amount | Basis for Objection |
|---|---|---|---|
| 3 | IDAHO TAX | 11,630.59 | § 506 Valuation of collateral and lien perfection |
| 9 | VARGAS ROOFING | 4,564.65 | § 506 Valuation of collateral and lien perfection, § 546(b) noncompliance, etc. |
| 11 | AGUNDEZ CONCRETE | 15,065.17 | § 506 Valuation of collateral and lien perfection, § 546(b) noncompliance, etc. |
| 12 | FRANKLIN BUILDING | 178,746.17 | § 506 Valuation of collateral and lien perfection, § 546(b) noncompliance, etc. |
| 16 | DEERE | 28,752.66 | § 506 Valuation of collateral |
| 22 | SPRUCE MOUNTAIN | 180,000.00 | § 506 Valuation of collateral, lien perfection, may be subject to set off for lender liability, subordination, etc. |
| 32 | INTERNAL REVENUE SERVICE | 73,468.46 | § 506 Valuation of collateral and lien perfection |
| 37 | TIMBERLINE EXT. | 8,762.90 | § 506 Valuation of collateral and lien perfection |
| 38 | MITCH CAMPBELL | 336,400.00 | This claim is the subject of Adversary Proceeding 10-08086 JDP; a copy of the complaint is available upon request and discussed briefly herein above. |
| 39 | SHAUN MINER | 18,300.00 | § 506 Valuation of collateral and lien perfection; Claimant appears to have attempted to perfect his security interest post-petition in violation of § 362(a). |
| 41 | JOHN DEERE LAND. | 54,852.14 | § 506 Valuation of collateral and lien perfection |
| 42 | GMAC | 123,980.67 | § 506 Valuation of collateral and lien perfection |
| 43 | WOODMASTER | 42,309.10 | § 506 Valuation of collateral and lien perfection |
| 44 | GMAC | 118,710.75 | § 506 Valuation of collateral and lien perfection |
| 45 | GMAC | 128,252.00 | § 506 Valuation of collateral and lien perfection |
| 48 | QUALITY TRUSS | 47,197.73 | § 506 Valuation of collateral and lien perfection |
| 49 | SECURITY FINANCIAL | 173,304.25 | § 506 Valuation of collateral. |
| 52 | GMAC | 173,687.48 | § 506 Valuation of collateral and lien perfection |
| 61 | RUSTY/ANN PARKER | 122,806.01 | § 506 Valuation of collateral and lien perfection/avoidance. |
| 62 | GMAC | 155,920.43 | § 506 Valuation of collateral and lien perfection |
| 63 | GMAC | 283,412.95 | § 506 Valuation of collateral and lien perfection |
| 64 | GMAC | 211,448.11 | § 506 Valuation of collateral and lien perfection |
| 65 | ALT. FUNDING | 238,161.14 | |
| 66 | ROBERT/KATHI MEYERS | 212,446.20 | |
| 67 | ROBERT/KATHI MEYERS | 364,060.00 | |
| 69 | ROBERT/KATHI MEYERS | 348,754.00 | These claims are the subject of Adversary Proceeding 10-08086 JDP; a copy of the complaint is available upon request and discussed briefly herein above. |
| 70 | ROBERT/KATHI MEYERS | 262,834.35 | |
| 71 | ROBERT/KATHI MEYERS | 15,759.00 | |
| 72 | ROBERT/KATHI MEYERS | 15,759.00 | |
| 73 | ROBERT/KATHI | 14,805.00 | |

[47] Debtor expressly reserves all rights to contest the validity of any claim, including those claims that may not be listed herein, as Debtor may deem advisable.

APPENDIX "O"

*(CLAIMS THAT MAY BE CONTESTED)*

| | | | |
|---|---|---|---|
| | MEYERS ROBERT/KATHI | | |
| 74 | MEYERS ROBERT/KATHI | 12,920.00 | |
| 75 | MEYERS ROBERT/KATHI | 6,519.00 | |
| 76 | MEYERS ROBERT/KATHI | 9,918.00 | |
| 77 | MEYERS ROBERT/KATHI | 13,230.00 | |
| 78 | MEYERS ROBERT/KATHI | 13,230.00 | |
| 79 | MEYERS ROBERT/KATHI | 13,230.00 | |
| 80 | MEYERS ROBERT/KATHI | 4,095.00 | |
| 81 | MEYERS ROBERT/KATHI | 8,118.00 | |
| 82 | MEYERS ROBERT/KATHI | 9,918.00 | |
| 83 | MEYERS ROBERT/KATHI | 9,918.00 | |
| 84 | MEYERS ROBERT/KATHI | 236,741.33 | |
| 85 | MEYERS | 4,086.00 | |
| 86 | KENNY CARDONA | 5,619.27 | § 506 Valuation of collateral and lien perfection |
| 87 | DAVID/MARTHA ORR | 391,991.95 | § 506 Valuation of collateral and lien perfection; validity and effect of subordination agreement, late filed, etc. |
| 89 | IDAHO PIPE AND STEEL | 1,123.19 | Late filed. |
| D | 127 MILL GREEN | 44,741.88 | § 506 Valuation of collateral and lien perfection |
| D | BANK OF AM. | 10,000.00 | § 506 Valuation of collateral and lien perfection |
| D | BANK OF AM. | 87,903.53 | § 506 Valuation of collateral and lien perfection |
| D | BANK OF AM. | 196,000.00 | § 506 Valuation of collateral and lien perfection |
| D | BANK OF AM. | 66,309.24 | § 506 Valuation of collateral and lien perfection |
| D | EMC | 46,227.74 | § 506 Valuation of collateral and lien perfection |
| D | MARTENS | 310,000.00 | § 506 Valuation of collateral and lien perfection; may be subject to set off |
| D | VANDERBILT MORT. | 49,368.83 | § 506 Valuation of collateral and lien perfection |
| F | FAST GLASS | 243.60 | May be subject to set off. |
| F | LEE'S AUTOMOTIVE | 1,109.12 | May be subject to set off. |

APPENDIX "O"
*(CLAIMS THAT MAY BE CONTESTED)*

## REAL PROPERTY LIQUIDATION ANALYSIS

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | TITLE | FAIR MARKET VALUE (FMV) | BASIS FOR FMV (APPRAISAL/BPO) | ENCUMBRANCES/LIENS | COSTS OF SALE (25% of FMV) | EQUITY |
|---|---|---|---|---|---|---|---|
| 4233 N. 1350E Buhl (aka 4243)  4bdr house on 3 acres | Rental | LEED | 91,000.00 | Appraisal | 124,992.46 | 22,750 | (56,742.46) |
| 303, 305, 307 E. C St. Shoshone (aka 315 S. Beverly)  4 plex apts | Rental | LEED | 105,000.00 | Appraisal | 183,500.00 | 26,250 | (104,750.00) |
| 319 N. Dorothy St. Shoshone  3bdr house | Rental | LEED | 67,000.00 | Appraisal | 128,252.00 | 16,750 | (78,002.00) |
| 116 E A St. Shoshone  2 bdr house | Rental | LEED | 55,000.00 | Appraisal | 118,710.75 | 13,750 | (77,460.75) |
| 208 West B St. Shoshone 2bdr house | Rental | LEED | 55,000.00 | Appraisal | 123,980.67 | 13,750 | (82,730.67) |
| 254 Mariposa Shoshone 4bdr house on | Owner of 2nd position--unrecorded | Gerald Martens | 180,000.00 | BPO | 230,000 (est) | 45,000 | (95,000.00) |
| 259 Mariposa Shoshone 4bdr house | Owner of 2nd position--unrecorded | Gerald Martens | 180,000.00 | BPO | 230,000 (est) | 45,000 | (95,000.00) |
| 262 Mariposa Shoshone 4bdr house | Owner of 2nd position--unrecorded | Gerald Martens | 180,000.00 | BPO | 230,000 (est) | 45,000 | (95,000.00) |
| 255 Mariposa Shoshone 4bdr house | Owner of 2nd position--unrecorded | Gerald Martens | 180,000.00 | BPO | 230,000 (est) | 45,000 | (95,000.00) |
| 251 Mariposa Shoshone 4bdr house | Owner of 2nd position--unrecorded | Gerald Martens | 186,397.00 | BPO | 230,000 (est) | 46,599 | (90,202.25) |
| 516 N, Fir St. Shoshone 2bdr house | Rental | LEED | 50,000.00 | Appraisal | 522,635.84 | 12,500 | (485,135.84) |
| 516 N. Birch St. Shoshone 2 bdr house | Rental | LEED | 53,000.00 | Appraisal | 93,109.24 | 13,250 | (53,359.24) |
| 418 N Date St.Shoshone 3 bdr house | Rental | LEED | 80,000.00 | Appraisal | 107,503.53 | 20,000 | (47,503.53) |
| 102 Riverview Dr. Shoshone 4bdr house | Owner of 2nd mortgage | Sandra Huntley | Foreclosed prepetition | NA | 0.00 | NA | 0.00 |
| 103 Riverview Dr. Shoshone 4bdr house | Owner of 2nd mortgage | Sandra Huntley | 127,000.00 | Appraisal | 211,193.38 | 31,750 | (115,943.38) |

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

# APPENDIX "P"
*(REAL PROPERTY LIQUIDATION ANALYSIS)*

## REAL PROPERTY LIQUIDATION ANALYSIS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 107 Riverview Dr. Shoshone 4bdr house | Owner of 2nd mortgage | Sandra Huntley | 127,000.00 | Appraisal | 207,220.97 | 31,750 | (111,970.97) |
| 110 Riverview Dr. Shoshone 4bdr house | Owner of 2nd mortgage | Sandra Huntley | 126,000.00 | Appraisal | 211,168.57 | 31,500 | (116,668.57) |
| 111 Riverview Dr. Shoshone 4bdr house | Owner of 2nd mortgage | Sandra Huntley | Foreclosed prepetition | NA | 0.00 | NA | 0.00 |
| 524 N Fir St. Shoshone 3bdr townhouse | Rental | LEED | 110,000.00 | Appraisal | 211,448.11 | 27,500 | (128,948.11) |
| 525 N Fir St. Shoshone 3bdr townhouse | Subject to Litigation | Robert & Kathy Meyers | 115,000.00 | Appraisal | 197,000.00 | 28,750 | (110,750.00) |
| 527 N Fir St. Shoshone 3bdr townhouse | Subject to Litigation | Robert & Kathy Meyers | 115,000.00 | Appraisal | 250,000.00 | 28,750 | (163,750.00) |
| 531 N Fir St. Shoshone 2 bdr house | Subject to Litigation | Robert & Kathy Meyers | 50,000.00 | Appraisal | 250,213.00 | 12,500 | (212,713.00) |
| 205 E 6th St Shoshone 3bdr townhouse | Subject to Litigation | Robert & Kathy Meyers | 116,000.00 | Appraisal | 185,195.00 | 29,000 | (98,195.00) |
| 207 E 6th St Shoshone 3bdr townhouse | Subject to Litigation | Robert & Kathy Meyers | 116,000.00 | Appraisal | 185,195.00 | 29,000 | (98,195.00) |
| 301 E 6th St Shoshone 3bdr townhouse | Subject to Litigation | Robert & Kathy Meyers | 115,000.00 | Appraisal | 185,195.00 | 28,750 | (98,945.00) |
| 303 E 6th St Shoshone 3bdr townhouse | Subject to Litigation | Robert & Kathy Meyers | 115,000.00 | Appraisal | 185,195.00 | 28,750 | (98,945.00) |
| 305 E 6th St.Shoshone 3bdr townhouse | Rental | LEED | 116,000.00 | Appraisal | 159,975.00 | 29,000 | (72,975.00) |
| 307 E 6th St Shoshone 3bdr townhouse | Rental | LEED | 116,000.00 | Appraisal | 159,975.00 | 29,000 | (72,975.00) |
| 4235 N 1360E Buhl 2bdr house on 3 acres | Lease w/option to purchase-tenant contract (pre-petition) | Edward E. Montgomery | 83,000.00 | Appraisal | 46,227.74 | 20,750 | 16,022.26 |
| 112 E Syringa Loop Shoshone 3bdr house | Rental | LEED | 146,000.00 | Appraisal | 262,834.35 | 36,500 | (153,334.35) |
| 141 E Syringa Loop Shoshone 3bdr house | Subject to Litigation | Mitch Campbell | 194,000.00 | Appraisal | 336,400.00 | 48,500 | (190,900.00) |
| 152 E.Syringa Loop Shoshone 4bdr house | Subject to Litigation | Robert & Kathy Meyers | 162,000.00 | Appraisal | 297,175.00 | 40,500 | (175,675.00) |
| 182 E Syringa Loop Shoshone 4bdr house | Subject to Litigation | Robert & Kathy Meyers | 152,000.00 | Appraisal | 293,895.00 | 38,000 | (179,895.00) |

## APPENDIX "P"
*(REAL PROPERTY LIQUIDATION ANALYSIS)*

### REAL PROPERTY LIQUIDATION ANALYSIS

| Property | Status | Owner | Value 1 | Method | Value 2 | Value 3 | Net |
|---|---|---|---|---|---|---|---|
| 191 E Syringa Loop Shoshone 4bdr house | Subject to Litigation | Robert & Kathy Meyers | 148,000.00 | Appraisal | 279,225.00 | 37,000 | (168,225.00) |
| 422 N. Date St. Shoshone 3 bdr manf. home | Rental | LEED | 75,000.00 | Appraisal | 485,135.84 | 18,750 | (428,885.84) |
| 105 E 620 N 3bdr house on 11 acr w/shop | lease w/option to purchase | Old Shoshone Ranch LLC | See footnote 11 | NA | See footnote 11 | NA | 0.00 |
| 104 Sunset Dr. Shoshone 6bdr house | Lease w/option to purchase-tenant contract (pre-petition) | Lon & Becky Montgomery | 143,000.00 | Appraisal | 283,412.95 | 35,750 | (176,162.95) |
| 148 E. 450 N. 3bdr manf. home on 5 acres | Rental | LEED | 82,000.00 | Appraisal | 124,145.24 | 20,500 | (62,645.24) |
| 82 E Parker Gulch Rd.Shoshone 3bdr manf home | Rental | LEED | 77,000.00 | Appraisal | 117,027.56 | 19,250 | (59,277.56) |
| 275 E. 506 N. Shoshone (aka 509 N. 275 E.) 4bdr house on 5 acres | Rental | LEED | 146,000.00 | Appraisal | 204,594.65 | 36,500 | (95,094.65) |
| lot 12 Parker Gulch Shoshone 4bdr  5 acres | New construction | Old Shoshone Ranch LLC | See footnote 11 | NA | See footnote 11 | NA | 0.00 |
| lot 17 Parker Gulch Shoshone 4bdr  5 acres | New construction | Old Shoshone Ranch LLC | See footnote 11 | NA | See footnote 11 | NA | 0.00 |
| lot 19 Parker Gulch Shoshone 4bdr  5 acres | New construction | Old Shoshone Ranch LLC | See footnote 11 | NA | See footnote 11 | NA | 0.00 |
| lot 25 Parker Gulch Shoshone 4bdr  5 acres | New construction | Old Shoshone Ranch LLC | See footnote 11 | NA | See footnote 11 | NA | 0.00 |
| lot 27 Parker Gulch Shoshone 4bdr  5 acres | New construction | Old Shoshone Ranch LLC | See footnote 11 | NA | See footnote 11 | NA | 0.00 |
| 404 N. Birch Shoshone 4 bdr house | Rented pending sale approval (CLM-NH Bankruptcy) | LEED | 95,000.00 | Sale pending | 96,330.20 | 23,750 | (25,080.20) |
| 4197 N. 1212 E Buhl 3bdr house on 5 acres | Rental | LEED | 165,000.00 | Appraisal | 173,687.48 | 41,250 | (49,937.48) |

SECOND AMENDED DISCLOSURE STATEMENT—THE LEED CORPORATION
JUNE 23, 2011

# APPENDIX "P"
### *(REAL PROPERTY LIQUIDATION ANALYSIS)*

REAL PROPERTY LIQUIDATION ANALYSIS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3950 N. 2820 E Filer (aka 2280) 3 bdr 2 bth 1 acr | Rental | LEED | 132,000.00 | Appraisal | 155,920.43 | 33,000 | (56,920.43) |
| 318 N. Date St. Shoshone 3 bdr house | Subject to Litigation | Robert & Kathy Meyers | 62,000.00 | Appraisal | 153,900.00 | 15,500 | (107,400.00) |
| lot 12j 412 N Birch Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 69,744.00 | BPO | 151,949.62 | 17,436 | (99,641.62) |
| lot 13j 410 N Birch Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 73,078.00 | BPO | 175,691.36 | 18,270 | (97,141.12) |
| lot 16j 402 N Birch Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 89,380.00 | BPO | 166,212.44 | 22,345 | (99,177.44) |
| lot 1j 210 W 4th St.Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 87,638.00 | BPO | 176,130.60 | 21,910 | (110,402.10) |
| lot 6j 413 N Apple Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 106,328.00 | BPO | 203,224.71 | 26,582 | (123,478.71) |
| lot 8j 415 N Apple Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 98,320.00 | BPO | 193,381.54 | 24,580 | (119,641.54) |
| lot 2a 501 N Apple Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 96,153.00 | BPO | 185,296.79 | 24,038 | (113,182.04) |
| lot 4a 505 N Apple Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 94,478.00 | BPO | 168,335.96 | 23,620 | (97,477.46) |
| lot 5a 509 N Apple Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 81,783.00 | BPO | 162,813.02 | 20,446 | (101,475.77) |
| lot 7a 515 N Apple Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 74,578.00 | BPO | 154,807.74 | 18,645 | (98,874.24) |
| lot 9a 519 N Apple Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED | 74,178.00 | BPO | 161,924.95 | 18,545 | (106,291.45) |

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

APPENDIX "P"
*(REAL PROPERTY LIQUIDATION
ANALYSIS)*

# REAL PROPERTY LIQUIDATION ANALYSIS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| lot 19 Carmen St Shoshone 4bdr house | New construction-not completed (CLM-NH Bankruptcy) | LEED/Dale Sluder | 69,668.00 | BPO | 94,257.72 | 17,417 | (42,006.72) |
| lot 15 187 E Eric Rd Shoshone 4bdr house 5 acre | New construction-not completed (CLM-NH Bankruptcy) | LEED/Dale Sluder | 68,387.00 | BPO | 94,295.84 | 17,097 | (43,005.59) |
| lot 24 144E 420N Shoshone 4bdr house on 5 acre | New construction-not completed (CLM-NH Bankruptcy) | LEED/Dale Sluder | 68,867.00 | BPO | 87,830.20 | 17,217 | (36,179.95) |
| 1944 E. 1300 S. Gooding 3bdr house on 5 acres | Rental | LEED | 126,000.00 | Appraisal | 196,000.00 | 31,500 | (101,500.00) |
| 605 W 14th Gooding 4bdr house | Under construction-not completed | LEED | 102,000.00 | Appraisal | 216,500.00 | 25,500 | (140,000.00) |
| 208 North Greenwood 2bdr. House | lease w/option to purchase | McBride/Sun Valley Prop. | Lease rejected | NA | NA | NA | 0.00 |
| 204 North Greenwood/Office | lease w/option to purchase | McBride/Sun Valley Prop. | Lease rejected | NA | NA | NA | 0.00 |
| 283 E. 520 N. 3bdr. Manf home on 5 acres | Rental | LEED | 86,000.00 | Appraisal | 111,290.83 | 21,500 | (46,790.83) |
| 416 N Date  St. lot | building lot | LEED | 15,000.00 | Appraisal | 42,700.38 | 3,750 | (31,450.38) |
| 62 E. Huyser Dr. Shoshone 5 acre lot | building lot | LEED | 25,000.00 | Appraisal | 49,368.83 | 6,250 | (30,618.83) |
| Riverview Subd. Phs 3,4 Shoshone  27 platted lots | building lots | LEED | 370,662.00 | BPOs | 428,885.84 | 92,666 | (150,889.34) |
| Riverview Subd. Phs 5 Shoshone  160 pre-platted lots | building lots lease w/option to purchase | Harley Sanders | 1,488,000.00 | BPO | 725,000.00 | 372,000 | 391,000.00 |
| 63 platted/developed lots ph. 2,3,4 Desert Rose Sub.building lots | building lots | LEED | 831,730.00 | BPO | 605,102.87 | 207,933 | 18,694.63 |
| 41 pre- platted/ lots ph. 5 Desert Rose Sub.building lots | building lots lease w/option to purchase | L & S Development, Inc. | See footnote 10 | NA | See footnote 10 | NA | 0.00 |
| 201 and 203 E 6th St. lots | Subject to Litigation | Robert & Kathy Meyers | 16,000.00 | Appraisal | 77,600.00 | 4,000 | (65,600.00) |
| South Park Development Beverly St. Shoshone | Subject to Litigation | Robert & Kathy Meyers | 25,000.00 | BPO | 275,500.00 | 6,250 | (256,750.00) |

APPENDIX "P"
*(REAL PROPERTY LIQUIDATION ANALYSIS)*

REAL PROPERTY LIQUIDATION ANALYSIS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Cowboy Subdivision Richfield 6 platted lots** | **building lots** | **LEED** | **Stipulated Stay Relief** | **NA** | **NA** | **NA** | **NA** |
| **273 Robbins Twin Falls 6 4-plex lots** | **building lots** | **LEED** | **Stay Relief Order Entered** | **NA** | **NA** | **NA** | **NA** |
| **Lot 10 Block 2  Riverview Subd Shoshone** | **Subject to Litigation** | **Robert & Kathy Meyers** | **21,333.00** | **BPO** | **77,200.00** | **5,333** | <span style="color:red">**(61,200.25)**</span> |
| **530 E 5th St. Wendell 3 bdr house (522)** | **Rental-oral lease w/option to purch** | **Val Jensen** | **Lease rejected** | **NA** | **NA** | **NA** | **0.00** |
| **120 Rainbow Jerome 4 bdr house** | **Rental-oral lease w/option to purch** | **Val Jensen** | **Lease rejected** | **NA** | **NA** | **NA** | **0.00** |
| | | | | | | **TOTAL EQUITY:** | **$425,716.89** |

**The projected equity has deducted the hypothetical costs of liquidation (an estimated 25% of the FMV) leaving an estimated $425,716.89  for creditors in a liquidation.**

# APPENDIX "P"
*(REAL PROPERTY LIQUIDATION ANALYSIS)*

# Notes Receivable/Aged A/R Itemization

| DESCRIPTION | CURRENT VALUE |
|---|---|
| David and Sheri Andrews, note and lease due | $13,155.00 |
| Justin Schoolcraft & Shanna Anderson, note due | 7,152.00 |
| Thomas Cooper & Sandra Crenshaw, note and lease due | $7,200.00 |
| Michael Mase, Lani Stafford, Cody Sauerwein, Rani Haner, note and lease due | $23,445.00 |
| Michael & Mandy Lee, note due | $7,152.00 |
| Josh Hettenbach, note and lease due | $19,897.00 |
| Montana and Heidi Lyon, lease due | $1,453.00 |
| Bruce and Julie Frandsen, note and lease due | $5,167.00 |
| Robert Morrison, note due | $3,576.00 |
| Chad and Maggie Stewart,  note and lease due | $14,018.00 |
| Kevin Jennings, note and lease due | $16,490.00 |
| William and Jennie Cantrell | $6,695.00 |
| Skye and Crista Roseboom, note and lease due | $5,678.00 |
| Erin and Jamie Boatman, note and lease due | 15,715.00 |
| Mark Lind, lease deposit due | $1,100.00 |
| Adam Carter, note and lease due | $10,350.00 |
| Rodney and Crystal Sisiam, Claim on Purchase and Sale Agreement | $52,000.00 |
| Chad and Janna Balkowitsch, notes, lease, and alliances due | $50,673.00 |
| Joseph and Kara Holley, note and lease due | $13,674.00 |
| Gilbert and Nancy Gulick, note, lease and Judgment for Att. Fees for eviction | $20,593.00 |

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

APPENDIX "Q"

*(Debtor's Notes Receivable
and A/R Itemization)*

## Notes Receivable/Aged A/R Itemization

| | |
|---|---|
| Solomon and Sally Tipton, note and lease due | $10,208.00 |
| Katrina Griggs and Elizabeth MeneFee, lease and note due | $15,353.00 |
| David and Virgina Lindsay and Jeanette Ward, note and lease due | $16,924.00 |
| Tiffany and Chris Carter, lease and Deposit due | $1,516.00 |
| Michael and Nichele Wilson, note and lease due | $19,473.00 |
| Franklin Brady and Angelina Frazier, note and lease due | $17,448.00 |
| John and Juanita Dixon, note due | $7,152.00 |
| Robert Hettenbach, Getterdone Construction, shortages on contract jobs and truss damage | $12,547.00 |
| Shelly Scott, note due | $9,593.00 |
| Erwin Aldrich, note and lease due | $5,083.00 |
| Codie and Chelsie Twitchell, note and lease due | $19,160.00 |
| Ralph Romero, note due | $9,672.00 |
| William, Pamela Rex, and William Moffitt, note and lease due | $12,467.00 |
| Gary Hussey, rent due | $3,500.00 |
| Matthew and Virgina Meyers, Judgment-rents | $10,000.00 |
| Darrell Lage, Judgment-sprinkler system | $4,918.00 |
| Mike Bright, rents due | $1,000.00 |
| Randy Gifford, note due and lease | $7,824.00 |
| Angela Turnipseed, note and deposit due | $5,600.00 |
| Jason and Gayla Bowles, note due | $800.00 |
| Charlotte Sheppard, rents and damages due, Attorney fees | $2,400.00 |

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011



APPENDIX "Q"
*(Debtor's Notes Receivable
and A/R Itemization)*

## Notes Receivable/Aged A/R Itemization

| | |
|---|---|
| Mitch and Lorie Simer, rents due | $2,083.00 |
| George Wyant, subdivision development costs due | $20,000.00 |
| Larry Betz, sprinkler and Attorney fees due | $3,869.00 |
| Randy Merritt, RM Specialty Contractors and Rm Roofing, Advancement on contract and damages to job sites | $32,000.00 |
| Wendy Spaulding and Adam Boswell, Judgment-livestock | $2,000.00 |
| Timothy and Brenda Cox | $1,200.00 |
| Shaun and Diane Bettencourt, note due | $8,200.00 |
| Antonio Garcia Leon, deposit due | $1,975.00 |
| Sandra J. Huntley, 5-2nd Mortgages | $130,000.00 |
| Sean Dooley and LaDonna Wisenhunt, rents due | $1,195.00 |
| Tammy Scofield, landscaping | $1,698.00 |
| Scott and Crystal Vorroubek, lease and note due | $7,825.00 |
| Kelly Huett, rent due | $2,105.00 |
| Brent Higley, rents due | $1,200.00 |
| William Greener, rents due | $1,000.00 |
| Paramount Funding, Claim for loss of funding, Title, appraisals, and up-front fees | $82,000.00 |
| DML Funding, Up-front fees for funding, contested | $8,500.00 |
| First Central Mortgage Funding Inc., Inspection fees, no show | $8,450.00 |
| MFI Corp., No funding refundable processing fee | $3,000.00 |
| Keith Thomas/Roy Vargus, $25,000.00 up-front lending fees, no show for closing , $50,000.00 Leed borrowed from Rob Feldman with Premier Financial to pay of 3rd mortgage on Old School Lots and Keith hasn't released mortgage. | $75,000.00 |

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011



APPENDIX "Q"
*(Debtor's Notes Receivable
and A/R Itemization)*

# Notes Receivable/Aged A/R Itemization

| | |
|---|---|
| Jennifer Short, rents due | $800.00 |
| Green Cut Service Customers that are delinquent or owing | $7,500.00 |
| Phil Dixon, rents due, offsets to contract services for electric | $7,490.00 |
| William and Kristi Torstenson, rents due and attorney fees | $2,835.00 |
| Kendra Lopez, rents due | $1,873.00 |
| Sunny and Theron Muir, Lot in Pocatello as down payment and they filed a Chapter 13 last year.  They deeded the lot to Leed and the Muirs' didn't have clear entitlement.  James Landis is contesting the transfer and is listed in unsecured along with their attorney. | $35,000.00 |
| Off-sets Gerald Martens, 2nd position 5 homes Desert Rose and Landscaping | TBD |
| Off-sets Robert Meyers, interest adjustments on notes and maintenance services on lots and landscaping | TBD |
| Off-sets Mitch Campbell, AES, LLC, Avaunte Property management, Alternative Funding, sprinkler systems, Adjustments to loan points for escrow, interest adjustments to escrow account and pay-offs | TBD |
| Off-sets John Lothspeich, landscaping | TBD |
| Off-sets Lee's Automotive, sprinkler service | TBD |
| Off-sets Vintage Construction, rents due | TBD |
| Off-sets Ash International, landscaping | TBD |
| Off-sets Green Cut HOA, ongoing operation of irrigation system and weed control | TBD |
| **Total** | $936,619.00 |

SECOND AMENDED DISCLOSURE STATEMENT—THE
LEED CORPORATION
JUNE 23, 2011

APPENDIX "Q"
*(Debtor's Notes Receivable
and A/R Itemization)*

## MACHINERY/EQUIPMENT LIQUIDATION ANALYSIS

| DESCRIPTION | VALUE | SECURED PARTY | EQUITY |
|---|---|---|---|
| 2004 Kubota Tractor 4X4, Model L3010, Serial number 77208, 31 horsepower 2400 hours, Diesel | $10,150.00 | IRS | 0.00 |
| 12' Tandem axle trailer | $600.00 | Farm Bureau | 0.00 |
| 15' Tandem axle box trailer w/canv.top | $600.00 | Farm Bureau | 0.00 |
| 16' Cattle trailer w/tandem axles | $600.00 | Farm Bureau | 0.00 |
| 16' Tandem axle trailer | $600.00 | Farm Bureau | 0.00 |
| 18' Tandem axle trailer | $600.00 | Farm Bureau | 0.00 |
| 1945 Sullivan Air Comp. 105 Pull Behind | $796.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| 1961 Leroi Air Comp. 125 Pull Behind | $2,070.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| 1968 Dodge 6 wheel dump truck | $600.00 | Farm Bureau | 0.00 |
| 1970 Ford Truck 3/4 ton | $600.00 | Farm Bureau | 0.00 |
| 1977 Chevy Truck 3/4 ton | $500.00 | Farm Bureau | 0.00 |
| 1977 GMC Truck 3/4 ton | $500.00 | Farm Bureau | 0.00 |
| 1981 Toyota Truck mid size | $300.00 | Farm Bureau | 0.00 |
| 1987 Burkeen Vib. Plow, Hatz-B30, Serial #371485027485, 2039 Hrs., 25 Hrspwr., Diesel | $6,860.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| 1993 Chevrolet 4X4 Truck | $2,250.00 | Farm Bureau | 0.00 |
| 1993 Kubota attachments & Back-hoe | $3,640.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| 1993 Kubota Tractor 4X4, Model L2650D, Serial #80519, 20 Hrspwr., 3420 hrs., Diesel | $5,000.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| 1994 Case Maxi-Sneaker Vib. Plow, Series C, JAF0118553, 1500 Hrs., 25 Hrspwr., Diesel | $13,500.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| 1994 Case Maxi-Sneaker Vib. Plow, Series C, JAF0156713, 1800 Hrs., 25 Hrspwr., Diesel | $13,500.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| 1994 Hydro-seeder, attach. & trailer, Monarch Serial #2394 Model #ISP1382 Type C 8 Hrspwr. & 5 Hrspwr., mixing pump and 350 Gallon Tank & assembly | $9,000.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| 2000 Jeep Cherokee | $4,000.00 | None | 4,000.00 |
| 2001 Nissan Sentra | $1,400.00 | Farm Bureau | |
| 2004 3' Gooseneck trailer w/ramps | $1,200.00 | Farm Bureau | |

DISCLOSURE STATEMENT—THE LEED CORPORATION
JUNE 23, 2011

# APPENDIX "R"

*(Machinery/Equipment Liquidation Analysis)*

## MACHINERY/EQUIPMENT LIQUIDATION ANALYSIS

| | | | |
|---|---|---|---|
| 2004 Curb Machine, mixer,& equip., Lil' Bubba Curb Machine Model #0X120 4 Hrspwr./Honda, Zest Mixer Model #6X240 8 Hrspwr./Honda | $7,000.00 | Neal Hocklander; IRS; Idaho Tax | 5,366.00 |
| 2004 Kubota attachments & Back-hoe | $4,500.00 | Neal Hocklander; IRS; Idaho Tax | 4,500.00 |
| 2004 Wells Cargo trailer 24' | $4,000.00 | IRS | 0.00 |
| 2005 Ingersol Rand 185 cfm air compressor | $6,000.00 | IRS | 0.00 |
| 2007 16ft. Haulmark enclosed trailer | $2,100.00 | Farm Bureau | |
| 2007 Chevy Silverado 4X4 crew cab blue (surrendered) | - | WFDS, 36,967.66 | 0.00 |
| 2007 Chevy Silverado 4X4 crew cab grey (surrendered) | - | WFDS, 32,755.46 | 0.00 |
| 2007 Chevy Silverado 4X4 crew cab white | $13,000.00 | WFDS, 33,043.51 | 0.00 |
| 2007 John Deere skid steer | $5,000.00 | John Deere | 0.00 |
| 2008 John Deere mowing equipment | $3,000.00 | John Deere | 0.00 |
| 2008 John Deere Tractor & attachments | $17,000.00 | John Deere | 0.00 |
| 2009 John Deere Back-hoe (surrendered) | - | John Deere | 0.00 |
| 4 bottom plow, Hydraulic, 3 pt. | $1,960.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| Cultivator, 3 pt. | $3,500.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| Grain Hopper/Grinder, self contained | $2,000.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| Grain Planter, 3 pt. | $1,400.00 | Neal Hocklander; IRS; Idaho Tax | 0.00 |
| Hydraulic disc, 3 pt. | $2,500.00 | Neal Hocklander; IRS; Idaho Tax | 1,524.31 |
| International 1975 Tractor model 4560 | $4,000.00 | Neal Hocklander; IRS; Idaho Tax | 4,000.00 |
| John Deere 28 Hrspwr., Diesel irrigation pump system, main-line, hand-line sections | $25,000.00 | Neal Hocklander; IRS; Idaho Tax | 25,000.00 |
| Lift/Ditcher, 3 pt. | $600.00 | Neal Hocklander; IRS; Idaho Tax | 600.00 |
| Misc. construction tools | $7,000.00 | Neal Hocklander; IRS; Idaho Tax | 7,000.00 |
| Misc. landscape tools & inst. Equipment | $9,560.00 | Neal Hocklander; IRS; Idaho Tax | 9,560.00 |
| Misc. landscape tools & inst. Equipment | $5,000.00 | Neal Hocklander; IRS; Idaho Tax | 5,000.00 |
| New Holland Baler, self propelled | $2,000.00 | Neal Hocklander; IRS; Idaho Tax | 2,000.00 |
| New Holland Swather, self propelled | $1,500.00 | Neal Hocklander; IRS; Idaho Tax | 1,500.00 |
| Roller Harrow, Hydraulic, 3 pt. | $2,500.00 | Neal Hocklander; IRS; Idaho Tax | 2,500.00 |
| Spray/Tank applicator, 3 pt. | $900.00 | Neal Hocklander; IRS; Idaho Tax | 900.00 |
| Tractor landscape rakes, & boring units | $3,000.00 | Neal Hocklander; IRS; Idaho Tax | 3,000.00 |

# APPENDIX "R"

*(Machinery/Equipment Liquidation Analysis)*

## MACHINERY/EQUIPMENT LIQUIDATION ANALYSIS

| | | | |
|---|---|---|---|
| Tractor landscape rakes, boxes, & boring units | $3,500.00 | Neal Hocklander; IRS; Idaho Tax | 3,500.00 |
| 2008 12' box trailer | $900.00 | Farm Bureau | 0.00 |
| 1977 Ford Pickup | $600.00 | Farm Bureau | 0.00 |
| 16' Tandem axle trailer | $600.00 | Farm Bureau | 0.00 |
| 1986 Chevrolet Pickup | $900.00 | Farm Bureau | 0.00 |
| **Total** | **$219,386.00** | | **79,950.31** |

**RELATED ENCUMBRANCES**

| | |
|---|---|
| IDAHO TAX | 1,180.41 |
| FARM BUREAU | 20,177.93 |
| FARM BUREAU | 14,600.82 |
| DEERE | 28,752.66 |
| Internal Revenue Service | 28,805.28 |
| WFDS | 32,487.39 |
| NEAL HOCKLANDER | 56,000.00 |
| **TOTAL Encumbrances:** | **$182,004.49** |

**Assuming that Debtor's values are accurate and given the currently**

**depressed used equipment/machinery market, this Appendix shows at most:** **$79,950.31**

**would be available for unsecured creditors from liquidation of the equipment.**

APPENDIX "R"

*(Machinery/Equipment
Liquidation Analysis)*