MITCH R. CAMPBELL
PO BOX 1785
TWIN FALLS, IDAHO 83303
Ph. 208 731-2345

U.S. COURTS

OCT 24 2011

Rcvd_____ Filed_____ Time_____
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

In Re:

LEED CORPORATION (THE), DBA,       )
GREEN CUT SPRINKLERS AND           )    Case No. 10-40743-JDP
LANDSCAPING, DBA LEED CORP.        )
QUALITY BUILT HOMES, DBA GREEN     )    Chapter No. 11
CUT CONSTRUCTION, DBA SHOSHONE     )
DEVELOPERS,  DBA DESERT GREEN      )
SPRINKLERS AND LANDSCAPING,        )
DBA GREEN CUT LAWN CARE, DAB       )
DESERT GREEN,                      )
                                   )
                        Debtors.   )
_____)

| AMENDED OBJECTION TO DEBTOR'S SECOND AMENDED |
| CHAPTER 11 PLAN OF REORGANIZATION (Docket No. 332) |

COMES NOW creditor Mitch Campbell and objects to Debtor's Proposed Second Amended Chapter 11 Plan of Reorganization as follows:

I.    DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT AND SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION CONTAINS INACURATE AND MISLEADING INFORMATION

A.   On page 16 (Doc.333) of Debtor's second amended disclosure statement it states the following factors it claims supports the viability of "Debtor's plan".

1.    Citing the "Lincoln County Work Force Trends" (Exhibit A) (Exhibit "J" Doc.333), debtor quotes, "….so subdivisions and residential construction will continue in Shoshone, where sustainable growth is expected over the long term" However, the remainder of the report lists factors that support an opposite conclusion. Under the heading "Labor Force & Employment" the report states, "Since the economic downturn, unemployment has reached unprecedented levels with a major loss of construction jobs pushing it to 13.4 percent in March 2011 – well above the State and national rates" The chart "Unemployment Rates" on the same page shows a steady increase in unemployment since 2007. The "Occupational Wages" chart on the next page lists wages earned by Lincoln County workers.  With the exception of teachers, wages range from $7.25 an hour to $13.00 per hour for firefighters. The average wage for most workers is $9.00 per hour.  Increasing unemployment and an average monthly take home pay of less than $1,200 per month does not support a credible or realistic view that residential construction will, or should, continue in Shoshone, or sustainable growth is expected over the long term.

2.      Debtor presents the Landaker "Economic Market Study of Lincoln County, Idaho and Surrounding Area" (Doc.333, appendix H) in support of its proposition that local economic conditions will improve near term to lend credibility and viability to debtor's plan. The "objective" of the study as stated on page 2 of the report is, "… to draw a conclusion about the mid to long term economic vitality of the area in the foreseeable future and how that vitality will impact the demand for housing and related development and how that demand may impact future housing and real estate values." The introduction on page 2 states that, "The study was conducted by the Landaker Marketing Group, LLC (Landaker Marketing) using secondary research methods accessing reports, forecasts, and news articles, available via the internet, from various state and federal, public and private sources." The company website (landakermarketing.com) lists Paul Landaker as president and owner of Landaker Marketing, LLC. Mr. Landaker lists no academic credentials or professional associations in economics or forecasting. Mr. Landaker claims experience in "marketing" from "working in both large and small advertising and direct marketing companies in Oregon and Tennessee with an emphasis on "Business Development" strategies." (Exhibit B, pg.1). Other experience and services offered by Landaker Marketing are Brand Management, Business Development, Event Promotion, Email Marketing Campaign Services (Exhibit B, Pg.2), Public Relations Planning and Implementation, Direct Marketing, Media Planning and Placement Coordination, and Market Research (Exhibit B, pg.3). Nowhere in the company bio is economic forecasting listed. In other words, it appears that Landaker Marketing is a Marketing and promotion company that has no credentials or experience in economics or forecasting but is well suited to promote the debtor company and market the debtor's plan to creditors and the court.

AMENDED OBJECTION TO DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION   -3-

This type of unqualified testimony creates an "evidentiary problem" that was addressed by Judge Meyers in an Idaho case (In Re: Smitty Investment Group, LLC) (SIG) (08:2 IBCR 67). In both SIG and the present case the witnesses "opinion" testimony related to the Idaho real estate market, currently and at various points in the future. In the SIG case the witnesses (Hon) had been in the local real estate business since 2004 dealing in investment properties since 2002. Another witness, Penny Leavitt had been in the local real estate business since 1979. The third witness Smith, had been in the local real estate business since 1992. By contrast, Mr. Landaker apparently has no real estate experience, does not live or work in Idaho or, more specifically, Lincoln County and has no economic or forecasting education or experience. This type of unqualified speculative "marketing" information and testimony should not be considered reliable or credible by this court in forecasting or attempting to predict future economic trends.

3.    The Wood River Regional Airport has been the primary selling point of Debtor's plan. Debtor has included a 20-page report (Appendix "K" (Doc.333) in support of the proposition that construction on a regional airport will begin some time in the near future and the economy will boom and provide a market for debtor's inventory of unsold homes. The most recent information shows that, the FAA says it can't support the move of the Hailey Airport at this time (Exhibit C) and suspends the approval process indefinitely (Exhibit D). This appears to be the final word from the FAA that no regional airport will be built any time in the foreseeable future, if ever.

II.       DEBTOR'S PLAN DOES NOT MEET THE REQUIREMENTS OF
11 U.S.C. 1129.

A.       11 U.S.C. 1129 (5)(A)(i) requires debtor to disclose the identity and
affiliation of any individual proposed to serve, after confirmation of the plan, as a
director, officer, or voting trustee of the debtor, an affiliate of the debtor
participating in a joint plan with the debtor or a successor to the debtor under the
plan; and (ii), the appointment to, or continuance in, such office of such
individual, is consistent with the interests of creditors and equity security holders
and with public policy.

1.       Page 32 of Debtor's second amended disclosure statement (Exhibit E)
(Doc.333, Pg.32) lists Sandra Huntley as secretary and director of the post
confirmation business. In depositions conducted July 21, 2011 (Exhibit F) Sandra
Huntley was ask,

> Q. In the second amended plan, the bankruptcy plan that they are
> proposing, it has you in there as a director of Leed Corporation.
> A No.  Q Okay, according to what I saw --  A. No.  Q  you were
> listed as being --  A. I am not a director of Leed Corporation. I have
> not been. I am not.  Q  Do you know why it would say that in the plan?
> A.  I have no idea.  Q  But as far as you know you don't have anything
> to do with it?  A. I'm not.  Q.  And you are not proposing to be or
> planning to be or wanting to be; is that correct?  A. No I don't want to be.

Debra Denny was also listed on the same page as being a Director in the post
confirmation company. At a hearing before this court on September 28, 2011 Ms.
Denny disclosed to the court that she was ask to be a director by Mr.
Montgomery but did not know what that entailed.

With Sandra Huntley's refusal to serve as director and Debra Denny not knowing anything about her position or duties, it does not appear that Debtor has met the requirements of 1129 (a)(5)(A)(ii)

III.        DEBTOR'S PLAN DOES NOT MEET THE REQUIREMENTS
OF 11 U.S.C. 1129(B)(2)

A.    1129 (b)(1) requires a showing that a plan dose not unfairly discriminate and that it is fair and equitable with respect to each class of claims.

1.    Debtor's Plan (Doc.332, Pg.39) provides that ownership of properties currently owned by Sandra Huntley would be joint owned 50/50 with debtor. Huntley would receive the benefit of debt forgiveness of the difference between the amount owed and the cram down amount as well as 50% of all rental income and sale proceeds. This is not equitable and unfairly discriminates against other claims in like classes.

2.    Page 37 of debtor's Second Amended Plan (Doc. 332) provides that real property currently owned by Lon and Rebecca Montgomery would be joint owned by the Montgomerys (60%) and the estate (40%). The Montgomery's would receive the benefit of debt forgiveness of the difference between the amount owed and the cram down amount as well as 60% of all rental income and sale proceeds. This is not equitable and unfairly discriminates against other claims in like classes.

3.    Page 37 of debtor's Second Amended Plan (Doc. 332) provides that real property currently owned by Harley Sanders would be joint owned by Mr. Sanders (70%) and the estate (30%). Mr. Sanders would receive payment of $725,000 of the net sale proceeds and retain 70 % of all future profits. This is not equitable and unfairly discriminates against other claims in like classes.

IV.    11 U.S.C. 1129 (a)(11) REQUIRES THE COURT TO MAKE A
   DETERMINATION THAT CONFIRMATION OF THE PLAN IS NOT
   LIKELY TO BE FOLLOWED BY THE LIQUIDATION, OR THE NEED
   FOR FURTHER   FINANCIAL REORGANIZATION OF THE DEBTOR.

1.    In In Re: Smitty Investment Group, LLC (08.2 IBCR 67), judge Meyers discusses the standard of feasibility under 1129 (a)(11). Citing In Re: Wiersma (03.1 I.B.C.R. 42, 51), the court reasoned that the test in evaluating 1129(a)(11) is that the court should,

> "consider factors impacting that required showing, such as the adequacy of the debtor's financial structure; the earning power of the debtor's business; economic conditions; and the ability of debtor's management. The plan proponent bears the burden of proof under a preponderance standard and, thus, bears the onus of showing the plan, more probably than not, meets the confirmation standards."

Citing In re: Investors Florida Aggressive Growth Fund, Ltd., (168 B.R. 760), the court further recognized that:

> "Plans which extensively rely on the sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where the asset has been a marginal performer to date, are inherently speculative and invite close judiciary scrutiny of the assumptions underlying the plan."

V.      THE FOUR REPAYMENT COMPONANTS OF DEBTOR'S SECOND
AMENDED CHAPTER 11 PLAN OF REORGANIZATION AS LISTED IN
THE PLAN SUMMARY ARE NOT CREDIBLE, REALISTIC OR FEASABLE.


1.      THE RENTAL OPERATIONS AND REAL PROPERTY SALES

a.      Debtor proposes cramming down the values and retaining a number of
properties that it intends to rent until the market improves and the properties can
be sold at a profit. The attached "Post Confirmation Real Estate Summary"
(Exhibit G) of appendix "N" (Exhibit H) of debtor's Second Amended Disclosure
Statement (Doc. 333) shows the properties retained by debtor, monthly payment
amount and rental income under the plan. As shown, assuming all properties are
rented at all times for the amount stated, debtor will have net monthly income of
$1,458.94.

In appendix "N" (Exhibit H) debtor has factored taxes, insurance, and
management fees but failed to account for a vacancy factor and for "repairs and
maintenance." As shown in the "Rental Property Repair & Maintenance Expense
Summary" (Exhibit I), the average monthly repair and maintenance expense has
been $2,565.89 per month. These expenses are $1,106.95 per month more than
the net monthly rent (Exhibit G) if there is no vacant properties or uncollected
rent. Simply stated, debtor does not and will not have sufficient monthly income
to pay repairs, maintenance and the mortgage payments as outlined in the plan.


b.      At the beginning of 2009, debtor had an inventory of over 20 newly
constructed homes that it had been unable to sell in the previous years
(Attachment A.1.19-28, 1.30-1.34, 1.40-1.45, Doc. 35, Pg.2).

In mid 2009, with a huge inventory of unsold homes, debtor borrowed additional millions to purchase development land and build another 14 homes. A "Summary of Multiple Listing Data (Residential) Sold 2007 TO 2011" (Exhibit J) illustrates the lack of a consumer real estate market in Shoshone, Idaho for new homes. Other than the homes debtor constructed and sold to investors, only two comparable homes were listed on MLS as sold in 2008, three comparable homes were sold in 2009, two in 2010 and 4 were sold in 2011. Two of the homes sold in 2011 were bank foreclosures that were previously sold by debtor. Comparable homes are defined as built within the last five years, equal number of bedrooms, bathrooms, garage and close to the same square footage as those for sale by debtor.

c.    The attached "Summary of Multiple Listing Data" (Exhibit J) shows an extremely limited consumer real estate market in Shoshone, Idaho over the last 5 years. The "summary" data provided represents the "consumer market" so homes that debtor sold to investors were not included unless they were resold after foreclosure. As the data shows, since 2008, consumer home sales of properties comparable to debtor's, have averaged approximately 3 a year including foreclosed properties. (This figure excludes properties debtor built and sold to investors). If, as expected, there is no improvement in local economic conditions in the near future, data suggests that debtor has a 5 to 7 year inventory of unsold homes. Adding another 14 new homes to the current inventory will likely further depress local real estate values and make it more difficult for debtor to rent or sell retained properties.

d.      Debtor proposes to complete and sell the 14 unfinished homes referred to as the old school project. Debtor claims in its second amended disclosure statement (Doc. 333, Pg. 13) that, "the national and Idaho real estate markets in 2008 were experiencing a significant recession that negatively impacted the Debtor's construction business in 2009." In addition to the "recession" debtor also states it was a victim of fraud by CL&M when CL&M did not provide construction funding to complete the 14 new homes debtor was building. It is these factors the debtor claims, that caused its bankruptcy. As evidence shows, the recession and CL&M fraud did not cause debtor's bankruptcy it simply accelerated it. The primary factor assuring Debtor's bankruptcy was its reckless disregard for sound business principals and practices and a lack of understanding of the basic economic principal of supply and demand. As indicated above, based on a five year history debtor currently has a five to seven year inventory of unsold homes without the construction of an additional 14. There has been no credible evidence offered that unemployment will decline, business will expand, wages will increase or the Lincoln County economy will improve any time soon or that there is any factor or combination of factors indicating an increase in new home buyers in the near future.


2.      WINDING DOWN OF CONSTRUCTION OPERATIONS.

a.      Debtor's plan appears to conflict with this stated objective. Under the plan, debtor will retain the River View subdivision development property for 12 months interest free with additional 12 month extensions in an attempt to borrow 6.5 million dollars to refinance and develop the property (Doc.332, pg.92). It also proposes retaining the Desert Rose Subdivision wherein a Gerald Martens has a secured claim in the amount of $310,000 (Appendix "D", Doc. 333, pg. 52).

The plan proposes that "the unpaid balance thereon ($310,000)(Doc. 333, Pg.37) shall accrue interest at 4.75% and shall be paid as lots are sold on a pro rata basis by lot, with the unpaid balance being divided by the remaining lots."  4.75% interest on $310,000 adds $14,725 per year debt to the estate with no benefit. Only about a dozen of the lots in the development are improved. Even the improved lots can not be sold due to debtor's failure to comply with county planning and zoning requirements (Exhibit K). Debtor's plan does not address how or when it will obtain the financing to complete the development to the point where lots could be sold.

3.        THE LANDSCAPING OPERATIONS

a.    On page 20 of debtor's First Amended Disclosure Statement it states, "However it is debtor's considered opinion that these Appendices support the Debtor's assertion that landscaping operations can continue to be operated at a profit for the benefit and support of the plan implementation...."

The attached "Net Landscaping Income Summary" of all Profit & Loss statements included in debtor's Monthly Operating Reports does not support this claim. In fact, it shows that without the benefit of gross rental income (and no mortgage payments) debtor's Landscaping business would suffer losses of approximately $3,200 per month. (Exhibit L).

4.                    PENDING   LITIGATION

a.      Current litigation (adversarial case) is currently limited to the Meyers/ Campbell claim.   However, debtor intends to file an adversarial claim against Spruce Mountain Associates, LLC (Doc.332, Pg.31) and has listed an additional 32 claims that may be contested (Exhibit M) (Appendix "O", Second Amended Disclosure Statement, Doc.333, Pg.132).

One of debtor's attorneys (Nathan Olsen), with respect to the Meyers/Campbell adversarial case, has agreed to a contingency fee as payment for his services. Debtor has employed an additional attorney for this case and an attorney to represent the Unsecured Creditor Committee. Neither of those attorneys, it appears, has agreed to a contingency fee arrangement. According to supplemental information contained in debtor's August Operating Report (Doc.466, Pg. 54), it owes attorney Robert Maynes $120,578.63. Amounts owed to the other two attorneys have not been disclosed. The record and monthly operating reports show that debtor does not have sufficient income to pay these ongoing expenses.

VI.      DEBTOR HAS DEFAULTED IN THE PAYMENT OF STIPULATED
SETTLEMENTS MADE PRE CONFIRMATION.

a.      On October 19, 2010, the court approved a stipulation for Adequate Protection and Removal of Automatic Stay between debtor and Security Financial Fund, LLC (Doc. 178). On June 1, 2011, Security Financial Fund, LLC filed a Notice of Default for debtor's failure to make monthly payments as agreed (Doc.312). This is further evidence suggesting debtor lacks sufficient monthly income, adequate management skill or a commitment to fulfill the obligations of its proposed reorganization plan.

VII.    ABILITY OF DEBTOR'S MANAGEMENT IS PROPER INQUIRY FOR THE
COURT IN DETERMINING COMPLIANCE WITH 1129(11).

a.      As the court noted In Re: Smitty Investment Group, LLC. (08.2 IBCR 71),
citing In Re Wiersma, the ability of debtor's management, as well as financial
structure, earning power, and economic conditions are factors to consider and
review in determining feasibility under 1129(11). It is evident that good
businessmen rarely find themselves in bankruptcy but the question for the court
is did the debtor learn from its mistakes and experience and can it now apply
sound business principals to successfully manage its reorganized business.

b.      According to the general history of debtor (Doc.333, Pg. 7-8) and
Attachment A.1.71 – A.1.74 (Doc. 35, Pg. 3) debtor borrowed $2,453,000 to
develop 291 building lots in Lincoln County, Idaho. The acquisition cost was
$8,430 per undeveloped lot.  From 2005 through 2009, the Lincoln county labor
force (people who could be in the market to purchase a lot and build a home)
averaged around 2,500 people (Exhibit A). A Summary of Multiple Listing Data
on Residential Country Lots Sold 2007 through 9/29/11 (Exhibit N) shows four
lots sold (excluding those built on by debtor) in 2007. The data further shows,
one lot in 2008,  2 lots in 2009,  2 lots in 2010 and none in 2011. Using sales
from the best year, data shows that debtor currently has a 72-year inventory of
undeveloped lots. This would appear to be too large of an inventory for a
business that is "(3) the winding down of construction operations" (Doc.333, Pg.
6). The annual debt on those lots, without interest, would be, post confirmation,
$81,767 per year for 30 years.

c.      Debtor's proposed plan is to retain all of the lots and in the case of the
Riverview subdivision the debtor proposes to borrow an additional $6,500,000 to
refinance and develop the property (Doc.332, Pg.92).

d.      Notwithstanding the fact that debtor has a current inventory of over 20 newly constructed homes it has been unable to sell, it proposes borrowing $340,000 to complete 14 new homes currently under construction. Debtor will owe $24,285.71 per home and 12% interest plus $22,000 for fees/points on the $242,000 note (Doc. 332, Pg.48) and 33% of the net proceeds of each home sold (Doc. 332, Pg. 50). In its Motion For Authority To Sell Property (Doc. 470, Pg. 3), debtor will receive $24,998.21 net proceeds. That amount does not appear to cover the fees/points and 33% of the net sale proceeds. If the housing market does not improve next year, which is not expected, and more foreclosed properties are sold, which is expected, it will be extremely difficult for debtor to sell more than one or two, if any, homes in a year.

The enquiry is thus on whether [the] plan proponent has sufficiently established its post conformation viability, and its ability to meet its future obligations. Particularly important in this regard is that the plan proponent demonstrate that any necessary financing or funding has been obtained or is likely to be obtained. With or without this financing however, "Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan" (In Re Smitty Investment Group, LLC, citing In Re Pizza of Hawaii, Inc.)

VIII.    DEBTOR CAN NOT GENERATE SUFFICIENT INCOME OR CASH FLOW TO SUPPORT THE PROPOSED CHAPTER 11 REORGANIZATION PLAN

a.      As shown above, rental operations generate a net monthly loss of $1,106.95 per month without considering a vacancy factor (V.(1)(a)).

b.     There have been no new home sales listed on MLS in the last 5 years (Exhibit J). The debtor currently has 20 newly constructed homes it has been unable to sell in over 4 years. The number of homes comparable to those of debtor that have sold through MLS (excluding those sold by debtor to investors) were 2 in 2008, 3 in 2009, 2 in 2010 and 4 in 2011. (Exhibit J)

c.     Debtor's proposal to retain over 104 undeveloped lots (Attachment A.1.73-74) that cannot be built on due to debtor's failure to comply with County development requirements (Exhibit K) incurs additional debt for the estate without any potential benefit or profit to the estate.

d.     Debtor's proposal to incur 6.5 million in additional debt (Doc. 332, Pg. 92) to develop 187 lots in Riverview Subdivision is unfeasible. Other than the lots debtor has built on, MLS data lists no lots sold in 2011 and only 9 lots sold in the preceding 4 years (Exhibit N). There may have been additional private (non-MLS) home and lot sales in Shoshone during that period but, it is unlikely there were as many as sold by MLS local Realtors.

e.     Absent gross rental income (without mortgage payments) Debtor's landscaping business will sustain losses of over $3,000 per month. (Exhibit L)

## SUMMARY

As the court pointed out in SIG,

> "Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises. The test is whether the things which are to be to be done after confirmation can be done as a practical matter under the facts."

One fact that the evidence shows is that there is no near term consumer real estate market in Shoshone, Idaho sufficient to purchase debtor's current inventory of 20 + homes that it has been attempting to sell for the last 2 to 3 years or the 14 additional new homes debtor proposes to complete and sell.  Another fact shown by the evidence is that a regional airport will not be constructed any time in the foreseeable future, if ever

No credible evidence has been presented that unemployment will decrease, that new businesses will move to Shoshone, that current businesses will expand, that additional jobs will become available or that the local economy will improve any time in the near future. Even if the court were inclined to accept debtor's "visionary promises", it should consider that if the 14 new homes were completed and sold as outlined in debtor's proposed plan and income is generated as stated in debtor's "Motion For Authority To Sell Property Free and Clear of all liens (Doc.470, Pg.3)", income would not be sufficient to pay even the current and continuing administrative and legal expenses. Nor would the plan generate sufficient income to pay ongoing legal expenses for the additional adversarial actions contemplated by the debtor.

Debtor is asking the court to confirm a plan that would result in millions of dollars in cram down losses for secured creditors with a "visionary promise", and a virtually non-existent chance, that the plan will be successful or that the unsecured creditors will recover any money. Evidence presented herein and in the record strongly suggests that confirmation of debtor's proposed plan would simply incur more debt for the estate and prolong the inevitable chapter 7 conversion.


ON THE RECORD AND FOR THE REASONS STATED HEREIN, confirmation of Debtor's Second Amended Chapter 11 Plan of Reorganization should be denied.


DATED this 21st day of October 2011.


Mitch Campbell, creditor


AMENDED OBJECTION TO DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION  -16-

## <u>AFFIDAVIT OF SERVICE</u>

 I HEREBY CERTIFY that on the 21st day of October 2011, I mailed the foregoing AMENDED OBJECTION TO DEBTOR'S SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION to the U.S. Bankruptcy Court at 801 E. Sherman St., Pocatello, Idaho 83201. All parties registered with CM/ECF were served a true and correct copy of the foregoing at the time of filing. The following attorneys were also served via email on October 21, 2011.

| | |
|---|---|
| Robert J. Maynes | maynoslaw@hotmail.com |
| Matthew Christensen | mtc@angstman.com |
| Nathan Olsen | nolsen@pmholaw.com |
| John Richie | cctlaw@mis.a.com |
| Mary P. Kimmel | mary.p.kimmel@usdoj.gov |
| U S Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Aaron Tolson | ajt@aarontolsonlaw.com |
| Craig Jorgensen | biggunlaw@cableone.net |
| Craig Christensen | cwcc@ida.net |

 I FURTHER CERTIFY that on the 21st day of October 2011, I caused a true and correct copy of the foregoing document to be sent U S Mail, first class, postage prepaid to the following individuals:

| | | |
|---|---|---|
| Almer Huntley, Jr. | Kent McBride | Dale H. Sluder |
| ASH International, Ltd. | Sun Valley Properties | Central Idaho Const. |
| 2721 S. 900 E. | 204 N. Greenwood | 318 E. D St. |
| Hagerman, ID. 83332 | Shoshone, ID. 83352 | Shoshone, ID. 83352 |

Lon E. Montgomery
Leed Corporation
The Leed Corporation
PO Box 2292

DATED this 21st day of October 2011.

Mitch R. Campbell

EXHIBIT A Pg. 1 of 2



# Lincoln County

*April 2011*

## Work Force Trends

## Population

Lincoln County's population has risen 16 percent in the last 10 years, keeping pace with other growing counties in the region. The city of Shoshone, considered the gateway to Sun Valley, is the county seat with a population of 1,461. Lincoln County continues to rely on agriculture with several large scale dairies contributing to the industry's regional growth. Manufacturing was nearly non-existent prior to Glanbia Food's whey processing plant in Richfield, 14 miles east of Shoshone, and Rocky Mountain Hardware, which machines brass fixtures in Shoshone. As a bedroom community to both the Wood River Valley and Twin Falls, workers have an easy commute. Affordable housing continues to be an issue in the Wood River Valley so subdivisions and residential construction will continue in Shoshone, where sustainable growth is expected over the long term. Currently there is an inventory of building lots.



## Labor Force & Employment

Unemployment has been a roller coaster in Lincoln County. The seasonally adjusted rate originally peaked at 5.6 percent in 2008 from a record low of 3.2 percent in 2007. During six of the last 10 years, the unemployment rate has exceeded 5 percent. Since the economic downturn, unemployment has reached unprecedented levels with a major loss of construction jobs pushing it to 13.4 percent in March 2011 — well above the state and national rates. Economic diversification has created new jobs but mostly in the service sector. Dairies have brought stability to traditional seasonal jobs in tourism, landscaping and agriculture. More retail is popping up to serve the highway traffic between Twin Falls and the Wood River Valley. Whey processing jobs in Richfield are stable, and manufacturing is gaining ground and raising area wages. Hay, grains, corn and other crops that can be green



chopped for dairy silage are the primary commodities. The U.S. Bureau of Land Management's regional headquarters and the National Interagency Fire Center dispatch operation are seasonal employers. The surrounding small communities all saw interest in new housing prior to the downturn. The county is expected to continue steady growth when the economy rebounds and those higher-paying jobs return to Blaine County.

| Labor Force | Mar 10 | Mar 11 |
|---|---|---|
| Civilian Labor Force | 2,649 | 2,610 |
| Total Employment | 2,329 | 2,260 |
| Unemployed | 320 | 350 |
| % of Labor Force Unemployed | 12.1 | 13.4 |
| State of Idaho % Unemployed | 9.0 | 9.7 |
| U.S. % Unemployed | 9.7 | 8.8 |

| Labor Force | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Civilian Labor Force | 2,198 | 2,231 | 2,288 | 2,266 | 2,322 | 2,400 | 2,551 | 2,517 | 2,577 | 2,536 | 2,639 |
| Unemployment | 94 | 88 | 116 | 124 | 123 | 103 | 104 | 79 | 143 | 280 | 345 |
| % of Labor Force Unemployed | 4.3 | 3.9 | 5.1 | 5.5 | 5.3 | 4.3 | 4.1 | 3.2 | 5.5 | 11.0 | 13.1 |
| Employment | 2,104 | 2,143 | 2,172 | 2,142 | 2,198 | 2,297 | 2,447 | 2,438 | 2,434 | 2,256 | 2,294 |

*Prepared by Jon Roeser, Regional Economist, Idaho Department of Labor • 420 Falls Ave, Twin Falls, Idaho 83301*
**Phone: (208) 735-2500, ext. 3639 • email: jon.roeser@labor.idaho.gov • Labor Market Information website: lmi.idaho.gov**

**EXHIBIT** A Pg. 2 of 2

## Nonfarm Payroll Jobs for 2010



| Major Employers |
|---|
| 4 Brothers Dairy |
| AHS of Idaho |
| Bootjack Dairy |
| BRP Health Management |
| Donley Farms |
| Glanbia, Inc |
| Idaho Dept of Transportation |
| Rocky Mountain Hardware |
| Sweet's Septic & Backhoe Service |
| U.S. Bureau of Land Management |

## Wages & Income

Per capita income in Lincoln County has grown steadily, rising 38 percent from 2000 to 2009. But it still remains 10.7 percent below the state per capita income and 28 percent below the national figure. The county ranks 29th among the 44 counties. Many of the jobs are in services and agriculture, which tend to pay lower wages. Both, however, have experienced a jump with the minimum wage increases in 2007, 2008 and 2009. The whey manufacturing plant offers higher-paying jobs and the possibility of expansion. Meanwhile, retail and office developers will continue to make concerted efforts at capturing the commuter traffic market so they can lease their existing space.

| Occupational Wages* | Starting Wage |
|---|---|
| Teachers | $30,000.00 |
| Bookkeepers | $9.00 |
| Cashiers | $7.25 |
| School Custodians | $10.50 |
| Cheese Processors | $9.00 |
| Receptionists | $9.00 |
| Fire Fighters | $13.00 |
| Milkers | $11.00 |
| General Farm Labor | $9.90 |
| Construction Labor | $10.00 |

\* Additional occupational wage data can be found on the Idaho Department of Labor website at *lmi.idaho.gov*.

| Covered Employment & Average Annual Wages Per Job for 2000, 2009 & 2010 | 2000 | | 2009 | | 2010 | |
|---|---|---|---|---|---|---|
| | Average Employment | Average Wages | Average Employment | Average Wages | Average Employment | Average Wages |
| Total Covered Wages | 1,130 | $20,280 | 1,410 | $29,228 | 1,345 | $28,840 |
| Agriculture | 147 | $19,118 | 240 | $26,949 | 263 | $26,900 |
| Mining | 0 | $0 | 0 | $0 | 0 | $0 |
| Construction | 91 | $21,079 | 130 | $28,984 | 80 | $27,752 |
| Manufacturing | * | | 127 | $50,306 | 130 | $45,215 |
| Trade, Utilities & Transportation | 166 | $13,182 | 143 | $18,921 | 131 | $20,153 |
| Information | * | | * | $0 | * | |
| Financial Activities | 15 | $13,888 | 20 | $15,487 | 13 | $15,078 |
| Professional and Business Services | 19 | $19,374 | 48 | $29,175 | 52 | $28,650 |
| Educational and Health Services | 112 | $21,181 | 123 | $26,216 | 140 | $23,836 |
| Leisure and Hospitality | 60 | $9,210 | 47 | $9,249 | 40 | $9,694 |
| Other Services | 0 | $0 | 7 | $24,279 | 6 | $25,930 |
| Government | 462 | $22,513 | 524 | $31,198 | 501 | $31,365 |

| Per Capita Income | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|
| Lincoln County | $20,663 | $22,213 | $22,003 | $21,382 | $24,069 | $24,124 | $25,736 | $30,493 | $31,950 | $28,455 |
| State of Idaho | $24,683 | $25,642 | $26,007 | $26,438 | $28,414 | $29,594 | $31,585 | $32,734 | $33,062 | $31,857 |
| United States | $30,318 | $31,145 | $31,461 | $32,271 | $33,881 | $35,424 | $37,698 | $39,461 | $40,674 | $39,635 |



DEPARTMENT OF LABOR

This county is served by the office listed below:
Idaho Department of Labor
420 Falls Avenue
Twin Falls, ID 83301  Ph: (208) 735-2500

labor.idaho.gov

This publication is produced by the Idaho Department of Labor and is funded at least in part by federal grants from the U.S. Department of Labor. Costs associated with this specific publication are available by contacting the Idaho Department of Labor. The Idaho Department of Labor is an equal opportunity employer and service provider. Auxiliary aids and services are available upon request to individuals with disabilities. Dial 711 for TTY Idaho Relay Service.

**EXHIBIT** *"B" pg. 1 of 3*

Business Development, Brand Management, Event Promotion



### Paul Landaker, President and Owner

Paul's gained valuable experience and perspective while working in both large and small advertising and direct marketing companies in Oregon and Tennessee. He has also served as the managing partner and part owner of two creative "boutique" advertising agencies in Portland, Paul formed the Landaker Marketing Group, LLC. in 2004.

With an emphasis on "Business Development" strategies, his vision continues to combine experience and expertise with a passion and commitment to providing exceptional marketing solutions for his clients. Depending on the need, Landaker Marketing will partner with qualified marketing and creative services professionals to create and complete projects and or full campaigns.

## Experienced Marketing Guru

With over 25 years of advertising, marketing, direct response and magazine publishing experience, Paul has a depth of knowledge and understanding of the brand marketing process. During his career, he has enhanced this knowledge by attending several marketing and management seminars. Paul has served as leader of a nationally attended direct marketing workshop in New York City. He also continues to stay abreast of the latest trends and evolution of the branding process as it relates to advertising, marketing, public relations and promotions.

## Strategic Thinker... Big Picture Guy

Paul has directed agency teams in formulating and implementing strategically based, results oriented brand messaging campaigns for all types of clients from a variety of product, service and manufacturing industry segments.

## Broad Based Account Manager

He has managed and supervised agency account teams made up of creatives, media planners and buyers, research and account support staff. He has lead teams in effectively implementing marketing campaigns for a variety of clients ranging from national consumer, business to business, e-commerce, to high tech, regional healthcare, automotive and many other types of businesses.

Created with 1&1 WebsiteBuilder

# EXHIBIT _"B" pg. 1 of 3_

## Brand Management

**The key to branding** is distinguishing your company, product or service from your competition by **creating a positive and lasting impression in your prospect's mind.** Creating a clear brand identity and then managing the ongoing consistent messaging of that identity is crucial for the successful ongoing operation of your business.  We work with our clients to assist
in developing and implementing an effective, integrated brand management program.

## Business Development

We also work with clients to assist in **developing sales and marketing materials to aid in ongoing business development efforts.**  Effectively communicating the value of your products and services is crucial component of any sales program.  If you are looking for a business development company to help you grow your business, then you have found the right place.

Our business model is simple. We are committed to providing honest, straightforward brand management and business development services for our clients with the objective of developing long term successful results for their businesses.

## Event Promotion

Developing an effective marketing plan to promote your event is crucial for its' success. **We can assist in developing pre-event marketing materials, advertising and e-marketing for attendance and sponsorship.**

## Email Marketing Campaign Services

Develop ongoing email marketing communication strategies with your key customers and prospects to grow your business. We utilize the latest email marketing techniques to develop an ongoing email marketing communications programs for our clients. We will take your existing email list and develop compelling communications with graphics and links to your website and Facebook page to increase your business.



Created with 1&1 WebsiteBuilder

http://landakermarketing.com/

8/27/2011

EXHIBIT *B pg. 3 of 3*

HOME    SERVICES    CLIENTS    ABOUT US    CONTACT US

Business Development, Brand Management, Event Promotion

# Services

Depending on a clients needs, our services can range from evaluating your sales and marketing program to developing and implementing a comprehensive and integrated brand marketing and sales development program. We have expertise to provide any or all of the following services:

## Email Marketing Programs

We are very pleased to be offering email marketing campaign services for our clients.  We are working with a leading email marketing services provider, benchmark email, Just click on the link to learn more about their easy to use tools that include managing your email lists, to creating emails, sending them out and then evaluating response reports.  Our role can be to manage the entire process for our clients from the email list to developing effective email messaging to scheduling and sending out your email campaigns.

## Business Development
• Brand Strategy Development
• Business Development Planning and Implementation
• Product / Service Sales Strategies based on "Value"
• Sales Team Training and Management
• Event Attendance Marketing
• Sponsorship and Advertising Sales

## Creative Concept Development and Production
• Advertising concept development
• Logo design
• Sales and marketing collateral materials
• Print, billboards, TV and radio production
• Brochures, flyers, newsletters, etc.

**Public Relations Planning and Implementation**

**Direct Marketing**

**Website Content and Project Coordination**

**Media Planning and Placement Coordination**

**Market Research**

Created with 1&1 WebsiteBuilder

http://landakermarketing.com/2.html                                                    8/27/2011

We connect
buyers and sellers FREEDOM
208-734-3000

MOBILE   ABOUT US   CONTACT US   TV GUIDE                    TWITTER   FACEBOOK

# EXHIBIT ___C___

Search

**NEWS**   WEATHER   SPORTS   FEATURES   VIDEO

Closings   Live Stream   Community Events   Gas Buddy

Local   State   Regional   Rise and Shine   Sign Up for Breaking News   Weather Closings   DVD of News Story



## FAA says they can't support the move of the Hailey Airport at this time

By Paul Johnson
Story Created: Aug 23, 2011 MDT
(Story Updated: Aug 23, 2011 at 1:56 PM MDT )

HAILEY, IDAHO (KMVT-TV) The Federal Aviation Administration has said they can't support the move of the Airport near Hailey. According to the Mountain Express newspaper in Ketchum A draft environmental impact statement for a replacement airport has been suspended indefinitely, the Federal Aviation Administration announced Monday night.

The environmental impact statement was meant to consider whether an airport to replace Friedman Memorial Airport in Hailey would be possible at one of two locations, one near the Lincoln-Blaine county line and one near Fairfield. The administration announced in a letter to airport manager Rick Baird late Monday night that it would no longer consider either site.

"We are concerned that this project may not be affordable for either FAA or the local community," wrote Donna P. Taylor, spokeswoman for the FAA.

The administration's announcement follows a media release in late July that announced the EIS had been delayed due to wildlife and financial issues. Baird said he believed the letter meant that the community and the Friedman Memorial Airport Authority would need to consider other alternatives.

**Previous article**
Burley plane crash investigation finds nothing wrong with the engine

**Next article**
Saylor Creek wild horses up for adoption

Login
This blog post
All blog posts
Subscribe to this blog post's comments through...



[ ] Add to My
[ ] Add to Google
[ ] RSS Icon   RSS Feed

Subscribe via email
Email Address          Subscribe
Follow the discussion

**Comments**
Logging you in...
Close
Login to IntenseDebate
Or create an account
Username or Email:
Password:

**MOST VIEWED**

Police searching for missing 16 year old boy 🔊

How to make wasps not think you're delicious 🔊

Four People arrested as Twin Falls Police kept busy with three early morning calls 🔊

Twin Falls Police search for man wanted for fraud 🔊


St Luke's Clinic
Find Your Doctor


Meridian: Work At Home Jobs (EXPOSED)
We Investigated work at home jobs and what we found may shock...

How to Relieve your Joints?
Shocking discovery by Boston Researchers for amazing joint...

## Poll Question

Are you in need of a 'digital detox'; could you go a day without using your cell phone?

[ ] Yes
[ ] No

[ Submit ]

## Most Viewed

1. Family of U of I Murdered Student releases statement about Mondays shooting

2. Police searching for missing 16 year old boy 🔊

3. Moscow Idaho police release more information following shooting/suicide 🔊

4. How to make wasps not think you're delicious 🔊